## TRADEMARK LICENSE AND TRANSFER AGREEMENT

THIS TRADEMARK LICENSE AND TRANSFER AGREEMENT ("Agreement") is entered into as of the __1st__ day of September, 2001, (the "Effective Date") by and between Pet Life Foods, Inc., a corporation organized under the laws of the State of Illinois ("Pet Life"), and Sergeant's Pet Care Products, Inc., a corporation organized under the laws of the State of Nevada ("Sergeant's").

### Background

Pet Life is the owner, in the United States, of certain trademarks, associated and related logos, related trade dress, and trademark registrations as identified on Exhibit A attached hereto (the "Trademarks");

Pet Life desires to sell the Trademarks to Sergeant's and Sergeant's desires to buy the Trademarks and grant Pet Life a license to use certain of the Trademarks.

## AGREEMENT:

THEREFORE, in consideration of the mutual covenants exchanged herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    **Sale of Trademarks.**

a.    Sergeant's shall purchase from Pet Life all of Pet Life's right, title and interest in and to the Trademarks identified on Exhibit A.  The sale of the Trademarks shall be effective as of September 1, 2001.

b.    In addition to the payment of $600,000, Sergeant's hereby agrees to assume and pay any and all additional payments due to Gaines Pet Foods Corp., pursuant to the Supplier and Royalty Agreement dated November 23, 1999, in an amount of up to $270,000 and any and all amounts due to Whitecap, Inc., Gerald Shulman and David Kofsky, pursuant to a Sales and Marketing Agreement dated November 16, 1999, in an amount up to $50,000.

2.    **License.**

a.    Sergeant's hereby grants Pet Life a non-exclusive license to sell products, approved by Sergeant's, under the Trademarks for a period of one year (the "License Period"). During the term of the License Period, Pet Life must notify Sergeant's of the product being sold under the Trademark and Sergeant's shall have the right to monitor the quality of the product being sold and may revoke the license if Pet Life fails to maintain a quality and/or customer service standard acceptable to Sergeant's. Pet Life shall pay to Sergeant's a license fee equal to 5% of net sales as determined by

Trademark License and Transfer Agreement
Page 1



EXHIBIT

3

S 000160

Sergeant's. Pet Life shall pay to Sergeant's a license fee equal to 5% of net sales as determined by Sergeant's (the "License Fee"). The License Fee shall be paid on the 15th day of the month following each calendar quarter. Sergeant's acknowledges that the License Fee cannot be paid until Pet Life obtains the consent of LaSalle Business Credit, Inc. ("LaSalle"). If a payment is delayed, it shall accrue interest at 10% per annum.

      b.     Sergeant's shall have the right to terminate the license, as to sales of trademarked products to any particular customer, at such time as Sergeant's elects to sell products directly to such customer. Pet Life shall transfer to Sergeant's the plates for each customer's work at the time that Sergeant's notifies Pet Life that Sergeant's intends to produce the trademarked product for that customer. Pet Life shall be the preferred provider for all trademarked products and Sergeant's shall offer Pet Life the right to produce and package the trademarked products if Pet Life is competitive as to price and can provide reasonable assurances of delivery in accordance with the terms of the orders in question.

      c.     Pet Life hereby grants Sergeant's a non-exclusive license to the Trademark, "Pet Life," for a period of one year. During this period, Sergeant's must notify Pet Life of the products being sold, and Pet Life may revoke the license if Sergeant's fails to maintain a quality and/or customer service standard acceptable to Pet Life. The consideration for the license shall be the amounts described in Paragraph 1.

3.    **Ownership.**

      a.     Pet Life acknowledges and agrees that Sergeant's is the sole owner of all right, title and interest in and to the Trademarks and that all intellectual property rights that may be acquired by the use of the Trademarks by Pet Life shall inure to the sole benefit of Sergeant's.

      b.     Pet Life agrees that it will not directly or indirectly challenge or contest Sergeant's sole ownership of the Trademarks, attempt to register the Trademarks (or any trademarks confusingly similar thereto) in any jurisdiction. Pet Life may use the Trademarks in connection with the sale of pet treats and pet food products (the "Licensed Goods") in any manner it deems appropriate during the term of the license. Pet Life agrees to execute such further documents as may be reasonably required to effectuate the assignment to Sergeant's of any intellectual property rights that Pet Life may acquire in the Trademarks, including any goodwill associated with the Trademarks.

4.    **Pet Life Warranties and Representations.**

      a.     Pet Life warrants and represents that on the date hereof, Pet Life owned all right, title and interest in and to the Trademarks and the transfer described herein shall be free and clear of all liens and encumbrances, except the lien in favor of LaSalle in the amount of $200,000. In the event that Sergeant's is required to make a payment in respect of the $200,000 lien in favor of LaSalle, Pet Life shall pay all such amounts to Sergeant's, plus interest at 15% per annum. Pet Life further

Trademark License and Transfer Agreement
Page 2

S 000161

represents and warrants that its use of the Trademarks shall be conducted in accordance with all applicable foreign, domestic, federal, state and local laws, regulations, restrictions, rules, ordinances and orders.

b.    Pet Life warrants and represents that it will take no action which is likely to damage or impair the quality image and goodwill associated with the Trademarks.

c.    This license is terminable by Sergeant's on three (3) days notice if Sergeant's believes that the representations set forth in Paragraph 3 have been breached.

5.    **Term and Termination.**

a.    This Agreement shall commence as of the Effective Date and shall continue for a period of one (1) year unless earlier terminated as set forth herein.

b.    The terms and conditions of this Agreement relating to ownership, warranty, disclaimer of warranties, limitation of liability, indemnification and confidentiality shall survive termination of this Agreement.

6.    **Limitation of Liability.**

a.    Pet Life expressly acknowledges and agrees that Pet Life shall bear sole responsibility for all damages or losses of any kind whatsoever, including without limitation, any economic loss, property damage, physical injury, lost profits or lost savings arising out of Pet Life's use of the Trademarks or the inability to use the Trademarks

b.    Without limiting the generality of the foregoing, Pet Life expressly acknowledges and agrees that Sergeant's shall not, under any circumstances, be liable to Pet Life or any third party for any indirect, special, consequential, punitive or exemplary damages or losses of any kind whatsoever, including without limitation, any economic loss, property damage, physical injury, lost profits or lost savings arising out of Pet Life's use of the Trademarks, or the inability to use the Trademarks.

7.    **Indemnification.**    Pet Life agrees to defend, indemnify and hold harmless Sergeant's, its parents, subsidiaries, affiliates, officers, directors, employees and agents from and against all claims (including attorney's fees) arising out of Pet Life's use of the Trademarks, including but not limited to any claims based upon product liability, but excluding any claims arising out of a breach of Sergeant's warranties and representations.

S 000162

8.    **Insurance.**

a.    Pet Life agrees to maintain liability and other insurance including, but not limited to, comprehensive general liability and broad form contractual, employee liability and product liability insurance, with limits of liability not less than Two Million Dollars ($2,000,000.00) per occurrence, combined single limit for bodily injury and property damage, and statutory workers compensation in all states wherein Pet Life's employees can be found.

b.    All such insurance is to be purchased from reputable, duly qualified insurance companies, and such insurance is to be maintained during the term of this Agreement and for a minimum of one year thereafter. Pet Life agrees to furnish Sergeant's upon request certificates of insurance properly executed by Pet Life's insurance company evidencing such insurance, and to give Sergeant's thirty (30) days notice of any cancellation or material alteration of such insurance coverage.

9.    **Protection of Trademarks.**

a.    The parties agree to promptly notify each other of any actual or threatened infringement of any of the Trademarks by any third party. The parties further agree to promptly notify each other of any actual or threatened claim that any of the Trademarks infringe upon third party rights.

b.    In the event that Pet Life, in its sole discretion, should determine to prosecute or defend any action involving the Trademarks, Sergeant's shall, at Pet Life's expense, provide reasonable information and assistance to Pet Life in connection with such prosecution or defense. Any such proceedings shall be at the expense of Pet Life and any monetary recoveries shall be shared by Licensee and Licensor as Licensor may deem appropriate.

c.    The parties acknowledge and agree that nothing contained herein shall be construed as obligating either party to take any action against any alleged infringement of the Trademarks or to defend any action brought by any third party except Pet Life shall be required to defend the title to the Trademarks.

d.    Sergeant's agrees to file new applications to register the Trademarks and to maintain existing registrations for the Trademarks, to the extent that such applications and registrations may be filed or maintained under applicable law, and to the extent that Sergeant's deems such applications or registrations appropriate and such expenses shall be paid by Sergeant's. Sergeant's shall take such actions to register and maintain Trademarks as Pet Life may request, but such actions shall be at Pet Life's expense. Pet Life agrees to execute such documents and to provide such information and materials as may be required to facilitate the filing of such new applications and the maintenance of such existing registrations.

Trademark License and Transfer Agreement
Page 4

S 000163

10.    **Confidentiality.**

a.    In connection with the parties' performances hereunder, each party to this Agreement may be required to disclose to the other party certain confidential or otherwise proprietary information. The parties agree that the receiving party will use reasonable efforts to maintain the secrecy of any confidential or otherwise proprietary information received from the disclosing party and designated in writing as confidential ("Confidential Information").

b.    The term "Confidential Information" shall not include any information that is: (i) already known to or otherwise in the possession of the receiving party at the time of receipt from the disclosing party, (ii) publicly available or otherwise in the public domain, (iii) rightfully obtained by the receiving party from any third party without restriction and without breach of this Agreement by the receiving party, or (iv) independently developed hereafter by the receiving party without reference to the information received from the disclosing party.

11.    **Assignment and Sublicensing of License Grant.**    Pet Life acknowledges and agrees that the rights and obligations contained herein are personal to Pet Life and that Pet Life may not assign or sublicense any of its rights or obligations hereunder to any third party without the express written consent of Sergeant's, except Pet Life may assign any and all of the rights described hereunder to LaSalle.

12.    **Notices.**    All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, telecopied or mailed by registered or certified mail (return receipt requested) or sent by Federal Express or other recognized overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)    If to Pet Life, to:

Mr. Bruce Atherley, President
Pet Life Foods, Inc.
4355 Ferguson Dr., Suite. 150
Cincinnati, OH 45245
Facsimile:513/947-1915

(b)    If to Sergeant's, to:

Robert Scharf, President
Sergeant's Pet Products, Inc.
14748 W. Center Road, Suite 303
Omaha, NE  678144
Facsimile: 402/938-7092

Trademark License and Transfer Agreement
Page 5

S 000164

(c)    With copies of all notices to:
Steven E. Smathers, Esq.
Attorney at Law
1601 Elm Street, Suite 300
Dallas, TX  75201
Facsimile: 214/871-1620

All notices, requests or instructions given in accordance herewith shall be deemed given (i) on the date of delivery, if hand delivered, (ii) on the date of receipt, if telecopied, (iii) three business days after the date of mailing, if mailed by registered or certified mail, return receipt requested, and (iv) one business day after the date of sending, if sent by Federal Express or other recognized overnight courier.

13.    **Governing Law.**    This Agreement, including its interpretation, performance and enforcement shall be governed by and construed in accordance with the laws of the state of Texas.

14.    **Binding Effect.**    This Agreement shall inure to the benefit of and be binding upon the parties hereto and to their respective successors, assigns and legal representatives.

15.    **Nonwaiver.**    No provisions of this Agreement will be waived by any party except in writing. The parties hereto agree that the waiver by any party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of that provision by the same party, or any other provision or condition of this Agreement.

16.    **Severability.**    If any provision or application of this Agreement shall be held invalid or unenforceable, the remaining provisions and applications of this Agreement shall not be affected, but rather shall remain valid and enforceable.

17.    **Entire Agreement.**    This Agreement constitutes the entire agreement and supersedes any and all other understandings and agreements between the parties with respect to the subject matter hereof and no representation, statement or promise not contained herein shall be binding on either party. This Agreement may be modified only by a written amendment duly signed by persons authorized to sign agreements on behalf of the parties and shall not be supplemented or modified by any course of dealing or trade usage.

S 000165

IN WITNESS WHEREOF, the parties have hereunder executed this Agreement effective as of September 1, 2001.

Sergeant's Pet Care Products, Inc.

By: _____

Name: _Robert Schrift_____

Title: _President_____

Pet Life Foods, Inc.

By: _____

Name: _Bruce Atherley_____

Title: _CEO_____

S 000166

Exhibit A
Trademarks

| Mark | Application No. | Filing Date | Registration No. | Registration Date |
|---|---|---|---|---|
| PEOPLE CRACKERS | | | 1,593,298 | 04/24/90 |
| LOLLI-PUPS | | | 843,886 | Mexico |
| DOGGIE DONUTS | | | 569,205 | 01/13/53 |
| SAY CHEESE | | | 1,273,795 | 04/10/84 |
| SIRLOINS | 76/015,808 | 04/03/2000 | 848,256 | Mexico |
| MUNCHEEZ BEEF AND CHEESE TREAT | | | 2,084,349 | 07/29/97 |
| SCHNITZEL SNACKS | | | | |
| STEAKHOUSE STRIPS | 76/193,156 | 01/16/01 | 1,691,000 | 06/02/92 |
| NUTRI-DOG BARS | 76/057,760 | 05/26/2000 | | |
| SEASON'S TREATINGS | 76/073,539 | 06/19/2000 | | |
| DOG NOG | 76/071,358 | 06/16/2000 | | |
| BEER BONES | 76/073,519 | 06/19/2000 | | |
| NUTRI-CAT | 76/146,796 | 10/16/2000 | | |
| TREAT-TABS | 76/146,794 | 10/16/2000 | | |
| DENTA FRESH | 76/084,356 | 07/07/2000 | | |
| DENTAPLUS | 76/234,574 | 04/02/01 | | |
| ON POINT | 76/100,352 | 05/08/2000 | | |
| CATNIPTIONS | 76/146,795 | 10/16/2000 | | |
| TROPICAL TREATS | 76/193,155 | 01/16/01 | | |
| IT'S A DOG'S LIFE | 76/001,573 | 03/16/2000 | | |
| LICKS & KISSES | 76/015,809 | 04/03/2000 | | |
| PURRSCRIPTIONS | 76/146,793 | 10/16/2000 | | |
| PURRSUASIONS | 76/146,792 | 10/16/2000 | | |
| PURRS | 76/146,791 | 10/16/2000 | | |
| PURRSONALS | 76/146,790 | 10/16/2000 | | |
| CHEESEWICHES | 76/175,987 | 12/05/2000 | | |
| TREATWICHES | 76/175,986 | 12/05/2000 | | |
| CAT LIFE | | | 1,594,475 | 05/01/90 |
| BURGLAR CONFIGURATION | | | 1,657,561 | 09/17/91 |
| DOG CATCHER CONFIGURATION | | | 1,651,611 | 07/23/91 |
| MAILMAN CONFIGURATION | | | 1,667,782 | 10/10/91 |
| MILK MAN CONFIGURATION | | | 1,651,612 | 07/23/91 |
| POLICEMAN CONFIGURATION | | | 1,649,626 | 07/02/91 |
| TREATERS | | | 1,461,227 | 10/13/87 |
| DOG LIFE AND DESIGN | | | 577,878 | 07/28/53 |
| DOG LIFE TASTY VITTLES AND DESIGN | | | 748,854 | 04/30/63 |

| Mark | Application No. | Filing Date | Registration No. | Registration Date |
|---|---|---|---|---|
| DOGGIE FRANKS | | | 1,438,258 | 04/28/87 |
| HI-LIFE AND DESIGN | | | 389,548 | 08/12/41 |
| LOLLI-PUPS CANADA | | | 209,689 | 09/26/75 |
| LOLLI-PUPS AND DESIGN | | | 569,205 | 01/13/57 |
| MY DOGGIES BAG | | | 1,460,847 | 10/13/87 |
| PEOPLE CRACKERS (MEXICO) | | | 552,254 | Not Available |
| TRAIL CALL | | | 889,124 | 04/07/70 |
| DOG HEAD LOGO | | | 1,882,414 | 03/07/95 |
| CAT HEAD LOGO | | | 1,859,904 | |
| HI-LIFE | | | 1,878,815 | 02/14/95 |
| FANTASY | | | 1,508,487 | 10/25/94 |
| LOVE MY CAT | | | 1,422,199 | 12/23/86 |
| ME & MY CAT | | | 1,461,218 | 10/13/87 |
| ME & MY DOG | | | 1,393,471 | 05/13/86 |
| PICK-OF-THE-LITTER | | | 1,476,130 | 02/09/88 |
| TRAINING WHEELS | | | 1,839,060 | 06/07/94 |

S 000168

EXHIBIT B

Licenses

The licenses described in this Agreement.

S 000169

## CONSENT AND AMENDMENT NO. 7
## TO LOAN AND SECURITY AGREEMENT

This CONSENT AND AMENDMENT NO. 7 TO LOAN AND SECURITY AGREEMENT is entered into as of this 1st day of September, 2001 (this "Amendment") by and among PET LIFE FOODS, INC., an Illinois corporation ("Borrower") and LASALLE BUSINESS CREDIT, INC., a Delaware corporation ("LaSalle"). Unless otherwise specified herein, all capitalized terms used in this Amendment shall have the respective meanings ascribed to them in the Loan and Security Agreement (as hereinafter defined).

### RECITALS

WHEREAS, Borrower and LaSalle are parties to a Loan and Security Agreement dated as of June 21, 1999 (as amended, supplemented, restated or otherwise modified from time to time, the "Loan and Security Agreement"); and

WHEREAS, Borrower requests LaSalle's consent under the Loan and Security Agreement and certain amendments and waivers to the Loan and Security Agreement as herein set forth.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual agreements contained herein, and for good and valuable consideration, the parties hereto agree as follows:

Section 1. Consent . Subject to the conditions herein set forth and notwithstanding Paragraphs 14(e), (i) or (j) of the Loan and Security Agreement, or any other provisions of the Loan and Security Agreement to the contrary, LaSalle consents to the following:

(a)      Borrower's sale of the trademarks identified on Schedule 1 hereto (the "Branded Products Trademarks") pursuant to that certain Trademark License and Transfer Agreement entered into as of September 1, 2001, by and among Sergeant's Pet Care Products, Inc. ("Sergeant") and Borrower (the "Sale Agreement") for a purchase price of not less than Six Hundred Thousand Dollars ($600,000) (the "Purchase Price"), plus the assumption by Sergeant of any and all additional payments due to Gaines Pet Foods Corp., pursuant to the Supplier and Royalty Agreement dated November 23, 1999 and any and all amounts due to Whitecap, Inc., Gerald Shulman and David Kofsky pursuant to a Sales and Marketing Agreement dated November 16, 1999, in an aggregate amount not less than $320,000, plus the payment by Sergeant to Borrower of $30,000 (the "Reimbursement Amount") as reimbursement for certain test marketing costs incurred by Borrower. Such consent is conditioned upon, in addition to the other conditions herein set forth, the continuation of LaSalle's first priority security interest in the Branded Products Trademarks to secure Liabilities in an amount of up to $350,000. Borrower hereby agrees that (i) all proceeds of the Purchase Price and the Reimbursement Amount will be applied against the outstanding principal balance of the Revolving Loan and (ii) all proceeds received by LaSalle to reduce the amount of Liabilities secured by the Branded Products Trademarks pursuant to the Trademark Security Agreement (as hereinafter defined) shall be

applied, at LaSalle's option, either as mandatory prepayment of one or more of the Term Loans (as determined by LaSalle in its sole discretion), or to such other Liabilities of Borrower as LaSalle may elect.

(b)    Borrower's sale of that certain Triangle B3PFCTZ Bag Machine identified on Schedule 2 hereto (the "Triangle Bagger") pursuant to that certain Bill of Sale by and between Borrower and CIT Group/ Equipment Financing, Inc. ("CIT") (the "Triangle Bagger Sale Agreement") and the lease of the Triangle Bagger from CIT to Borrower pursuant to that certain Master Lease Agreement dated as of September 25, 2001 (the "Triangle Bagger Lease"), provided that (i) the proceeds of such sale shall be not less than $528,000 net of transaction expenses; (ii) the annual lease payments under the Triangle Bagger Lease shall not exceed $110,000 per year; and (iii) proceeds from such sale in an amount not less than $280,000 shall be applied by Borrower against the outstanding principal balance of the Revolving Loans.

(c)    Borrower's sale of the Doboy Model HD Pinch Top Bag Sealer identified on Schedule 3 hereto (the "Bag Sealer") pursuant to that certain Bill of Sale (the "Doboy Model HD Pinch Top Bag Sealer Sale Agreement"), provided that (i) the proceeds of such sale shall be not less than $8,000 net of transaction expenses; (ii) all proceeds from such sale shall be applied by Borrower against the outstanding principal balance of the Revolving Loans; (iii) such sale shall be completed within 45 days of the date hereof; and (iv) LaSalle shall have received a fully executed copy of the Doboy Model HD Pinch Top Bag Sealer Sale Agreement, and all documents related thereto, each in form and substance satisfactory to LaSalle.

Section 2. Amendments.

(a)    The following definition is hereby added to Paragraph 1 of the Loan and Security Agreement:

> "**Amendment 7 Effective Date**" shall mean the date on which that certain Consent and Amendment No. 7 to Loan and Security Agreement became effective in accordance with Section 4 thereof.

(b)    Clause (viii) of the definition of "Eligible Account" in Paragraph 1 of the Loan and Security Agreement is hereby amended to read as follows:

> "(viii) the Account Debtor thereunder is not a director, officer, employee or agent of Borrower, or a Subsidiary, Parent or Affiliate of Borrower; provided, however, that the foregoing limitation shall not apply to Accounts in an amount not to exceed $150,000 owing from Sergeant's Pet Care Products, Inc. ("Sergeant's"), provided, (a) any such Accounts owing from Sergeant are evidenced by an invoice that is due and payable within thirty (30) days after the stated invoice date thereof and does not remain unpaid more than thirty (30) days past the stated invoice date;"

(c)     The last sentence of Paragraph 3(a)(i) of the Loan and Security Agreement is hereby amended to read as follows:

"Following the Amendment 7 Effective Date, (A) payment on each of the scheduled monthly installments of principal payable on account of Term Loan A during the period from September 1, 2001 through August 1, 2002 shall be in the amount of $24,851.55 and (B) payment on each of the scheduled monthly installments of principal payable on account of Term Loan A on and after September 1, 2002 shall be in the amount of $61,904.76 (with the final installment being in the remaining amount of Term Loan A then outstanding);"

(d)     The last sentence of Paragraph 3(a)(ii) of the Loan and Security Agreement is hereby amended to read as follows:

"Following the Amendment 7 Effective Date, (A) payment on each of the scheduled monthly installments of principal payable on account of Term Loan B during the period from September 1, 2001 through August 1, 2002 shall be in the amount of $3,914.12 and (B) payment on each of the scheduled monthly installments of principal payable on account of Term Loan B on and after September 1, 2002 shall be in the amount of $9,750.00 (with the final installment being in the remaining amount of Term Loan B then outstanding);"

(e)     The last sentence of Paragraph 3(a)(iii) of the Loan and Security Agreement is hereby amended to read as follows:

"Notwithstanding the foregoing, following the Amendment No. 7 Effective Date, (1) payment on each of the scheduled monthly installments of principal payable on account of the Capital Expenditure Term Loan (except with respect to Clauses (A), (B) and (C) below) during the period from September 1, 2001 through August 1, 2002 shall be in the amount of $2,076.71 and (2) payment on each of the scheduled monthly installments of principal payable on account of the Capital Expenditure Term Loan (except with respect to Clauses (A), (B) and (C) below) on and after September 1, 2002 shall be in the amount of $5,173.05 (with the final installment being in the remaining amount of the Capital Expenditure Term Loan then outstanding). Further notwithstanding the foregoing, (A) the proceeds of the Capital Expenditure Term Loan advance in the amount of $200,000 to be made by LaSalle on the Amendment 7 Effective Date shall be applied by Borrower against the outstanding principal balance of

the Revolving Loans, (B) the proceeds of the Capital Expenditure Term Loan advance in the amount of $200,000 to be made on or after October 1, 2001 shall be paid by LaSalle directly to Roofing and Supply, Inc. or any other Person owed payment in respect of the Roof Work (as defined below), provided, if the aggregate amount due and owing with respect to the Roof Work is less than $200,000, the balance shall be applied by Borrower against the outstanding principal balance of the Revolving Loan and, in addition to the other conditions set forth in this Agreement, such Capital Expenditure Term Loan advance shall be subject to (x) LaSalle's receipt from Borrower of written evidence satisfactory to LaSalle that the repair of the roof on its facility at 3393 Route M40 South Hamilton, Michigan 49419, which repair shall make the facility water tight (the "Roof Work"), is fully complete and LaSalle's receipt of written evidence satisfactory to LaSalle in its sole discretion indicating that all costs due and owing with respect to the Roof Work have been fully paid or reserved for, including, but not limited to the receipt of any and all mechanics' lien waivers or releases for the work completed, provided, further, that a reserve shall be established by LaSalle against the Revolving Loan in an amount equal to all amounts unpaid with respect to the Roof Work, regardless of whether such amounts are due and owing at such time; (y) LaSalle's receipt from Borrower of a written plan setting forth the manner in which Borrower will correct its existing product packaging anomalies, which plan shall be in form and substance satisfactory to LaSalle, and (z) Borrower's compliance with paragraph 14(n)(iv) hereof for the period ending September 31, 2001, (C) the proceeds of the Capital Expenditure Term Loan advance in the amount of $200,000 to be made on or about February 1, 2002 shall be applied by Borrower against the outstanding principal balance of the Revolving Loans and, in addition to the other conditions set forth in this Agreement, shall be subject to (x) the concurrent receipt by Borrower of cash proceeds of $200,000 from the issuance of additional equity of Borrower on terms satisfactory to LaSalle, which proceeds shall be applied by Borrower against the outstanding principal balance of the Revolving Loans and (y) no Default or Event of Default shall have occurred and be continuing (D) principal payable on account of any Capital Expenditure Term Loan advance set forth in clauses (A), (B) or (C) above shall be payable in successive monthly installments (i) payable on the first day of each month, the first of which installments shall be due and payable on August 1, 2002 and (ii) based on an amortization schedule consisting of thirty-six (36) equal and level payments and (E) following the Amendment 7 Effective Date, LaSalle shall not be obligated to make any Capital

CH_DOCS\346799.7 [W97]

S 000173

Expenditure Term Loan advance (except as provided in clauses (A), (B) and (C) above)."

(f)    Paragraph 3(a)(iv) of the Loan and Security Agreement is hereby amended to insert the following sentence at the end thereof:

"Following the Amendment 7 Effective Date, (A) payment on each of the scheduled monthly installments of principal payable on account of Term Loan C during the period from September 1, 2001 through August 1, 2002 shall be in the amount of $2,692.57 and (B) payment on each of the scheduled monthly installments of principal payable on account of Term Loan C on and after October 1, 2002 shall be in the amount of $6,707.14 (with the final installment being in the remaining amount of Term Loan C then outstanding);"

(g)    Paragraph 3(a)(v) of the Loan and Security Agreement is hereby deleted in its entirety.

(h)    The second and third sentences of <u>paragraph 5(a)</u> of the Loan and Security Agreement are hereby amended to read as follows:

At Borrower's election, except as otherwise provided in <u>paragraph 6 (c)</u> hereof, interest shall accrue on: (A) the unpaid principal balance of the Term Loan A and Term Loan C made to Borrower outstanding at the end of each day at (x) a fluctuating rate per annum equal to one and three-quarters of one percent (1.75%) above the Prime Rate; (B) the unpaid principal balance of the Term Loan B made to Borrower outstanding at the end of each day at (x) a fluctuating rate per annum equal to two percent (2.0%) above the Prime Rate; (C) the unpaid principal balance of the Capital Expenditure Term Loan made to Borrower outstanding at the end of each day at (x) a fluctuating rate per annum equal to one and three-quarters of one percent (1.75%) above the Prime Rate; and (D) the principal amount of the Revolving Loans made to Borrower outstanding at the end of each day at a fluctuating rate per annum equal to one and one-half of one percent (1.50%) above the Prime Rate.

Following receipt of Borrower's financial statements for any period ending on or after December 31, 2002 and provided Borrower is in compliance with paragraph 14(n)(ii) of the Loan and Security Agreement for the period ending March 31, 2003, at Borrower's election, except as otherwise provided in <u>paragraph 6 (c)</u> hereof, interest shall accrue on: (A) the unpaid principal balance of the Term Loan A and Term Loan C made to Borrower

CH_DOCS\346799.7 [W97]

S 000174

outstanding at the end of each day at (x) a fluctuating rate per annum equal to three-quarters of one percent (.75%) above the Prime Rate; (B) the unpaid principal balance of the Term Loan B made to Borrower outstanding at the end of each day at (x) a fluctuating rate per annum equal to one percent (1.0%) above the Prime Rate; (C) the unpaid principal balance of the Capital Expenditure Term Loan made to Borrower outstanding at the end of each day at (x) a fluctuating rate per annum equal to three-quarters of one percent (.75%) above the Prime Rate; and (D) the principal amount of the Revolving Loans made to Borrower outstanding at the end of each day at a fluctuating rate per annum equal to one-half of one percent (.50%) above the Prime Rate.

(i)     Paragraph 14(n)(ii) of the Loan and Security Agreement is amended and restated to read in its entirety as follows:

Beginning March 31, 2003, Borrower and its Subsidiaries on a consolidated basis, shall maintain a Debt Service Coverage Ratio, as of the end of each fiscal quarter on a then current Fiscal Year to date basis, of not less than 1.25 to 1.00.

(j)     Paragraph 14(n)(iv) of the Loan and Security Agreement is amended and restated to read in its entirety as follows:

(iv)    Minimum EBITDA. Borrower and its Subsidiaries on a consolidated basis shall have, at the end of each month set forth below, EBITDA for the period beginning July 1, 2001 through such date, of not less than the following:

| Period | EBITDA |
|---|---|
| September 31, 2001 | <$129,400> |
| October 31, 2001 | $30,400 |
| November 30, 2001 | $194,000 |
| December 31, 2001 | $358,000 |
| January 31, 2002 | $591,000 |
| February 28, 2002 | $698,700 |
| March 31, 2002 | $829,500 |
| April 31, 2002 | $981,700 |
| May 31, 2002 | $1,186,000 |
| June 30, 2002 | $1,430,700 |
| July 31, 2002 | $1,634,700 |
| August 31, 2002 | $1,868,100 |
| September 31, 2002 | $2,091,800 |
| October 31, 2002 | $2,407,400 |

| November 30, 2002 | $2,720,400 |
| December 31, 2002 | $3,016,300 |
| January 31, 2003 | $3,248,700 |
| February 28, 2003 | $3,356,300 |
| March 31, 2003 | $3,487,100 |

For purposes of calculating EBITDA for any period in this Paragraph 14(n)(iv) only, severance costs in an amount not more than $104,000 and moving, transition or consulting costs in an amount not more $174,000 associated with the closing of Borrower's office in Cincinnati shall added back to net income after taxes for such period.

(k)    Paragraph 14(q) of the Loan and Security Agreement is amended by deleting the semi-colon and the word "and" at the end thereof and inserting the following in place thereof:

"except, Borrower shall be permitted to (i) enter into the Sale Agreement and (ii) following receipt of Borrower's audited financial statements for any period ending on or after December 31, 2002 and provided such financial statements demonstrate that Borrower and its Subsidiaries, on a consolidated basis, maintain a Debt Service Coverage Ratio for the three month period then ended of not less than 1.25 to 1.00, make a royalty payment to Sergeant in an amount equal to five percent (5%) of all proceeds received from the sale of products subject to the Branded Products Trademarks (the "Sergeant Royalty") plus any accrued Sergeant Royalty, provided, Excess Availability is equal to or greater than $500,000 after payment of (or deemed payment of) all accounts payable outstanding in excess of 30 days past due."

Section 3.  Representations and Warranties of Loan Parties.  Borrower represents and warrants that:

(a)    each of the representations and warranties contained in the Loan and Security Agreement is true and correct in all material respects on and as of the date hereof as if made on the date hereof, except to the extent that such representations and warranties expressly relate to an earlier date;

(b)    the execution, delivery and performance by Borrower of this Amendment have been duly authorized by all necessary corporate action required on its part and this Amendment is a legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms except as the enforcement thereof may be subject to (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); and

(c)    neither the execution, delivery and performance of this Amendment nor the consummation of the transactions contemplated hereby does or shall contravene, result in a breach of, or violate (i) any provision of Borrower's Articles of Incorporation or Bylaws, (ii) any law or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which Borrower is a party or by which Borrower or any of its property is bound, except in any such case to the extent such conflict or breach has been waived by a written waiver document, a copy of which has been delivered to Agent on or before the date hereof.

Section 4. Conditions to Effectiveness.    This Amendment shall be effective upon satisfaction of the following conditions precedent:

(a)    Execution and delivery of this Amendment by Borrower and LaSalle.

(b)    The representations and warranties contained herein shall be true and correct in all respects.

(c)    . LaSalle shall have received a fully executed copy of the Sale Agreement and all documents related thereto, each in form and substance satisfactory to LaSalle.

(d)    LaSalle shall have received a fully executed copy of a security agreement executed by Sergeant granting LaSalle a lien on the Branded Products Trademarks (the "Trademark Security Agreement") and all financing statements or other documents (including an inventory disposition agreement) which LaSalle determines are reasonably necessary, each in form and substance satisfactory to LaSalle.

(e)    LaSalle shall have received a fully executed copy of each of the Triangle Bagger Sale Agreement and the Triangle Bagger Lease Agreement, and all documents related thereto, each in form and substance satisfactory to LaSalle.

(f)    LaSalle shall have received evidence satisfactory to it in its sole discretion that Borrower has received the Reimbursement Amount.

(g)    Borrower and LaSalle shall have executed and delivered an Amendment to the Loan and Security Agreement to incorporate into the Other Agreements provisions with respect to revised Article 9 of the Illinois Uniform Commercial Code and Borrower shall have executed any additional financing statements or amendments to previously filed financing statements to the extent necessary or appropriate to perfect LaSalle's liens on the Collateral.

(h)    LaSalle shall have received a fully executed copy of a no offset agreement executed by Sergeant.

Section 5. Reference to and Effect Upon the Loan and Security Agreement.

(a)    The Loan and Security Agreement and the Other Agreements shall remain in full force and effect and are hereby ratified and confirmed, except as specifically amended hereby.

8

S 000177

(b)    The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of LaSalle under the Loan and Security Agreement or any Other Agreement, nor constitute a waiver of any provision or defaults or unmatured defaults of the Loan and Security Agreement or any Other Agreement, except as specifically set forth herein.

(c)    Upon the effectiveness of this Amendment, each reference in the Loan and Security Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of similar import shall mean and be a reference to the Loan and Security Agreement as amended hereby.

Section 6. Costs and Expenses.  Borrower agrees to reimburse Agent for all fees, costs and expenses, including the fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with this Amendment.

Section 7. GOVERNING LAW.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO CONFLICTS OF LAWS PROVISIONS) OF THE STATE OF ILLINOIS.

Section 8. Headings.  Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purposes.

Section 9. Counterparts.  This Amendment may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Facsimile signatures shall be deemed to be equivalent to original signatures for all purposes with respect to this Amendment.

(signature page follows)

S 000178

CH_DOCS\346799.7 [W97]

IN WITNESS WHEREOF, this Amendment has been duly executed as of the date first written above.

PET LIFE FOODS, INC.

By: _____

Title: _____  CCC

LASALLE BUSINESS CREDIT, INC.

By: _____

Title: F, V, P.

CH_DOCS\346799.7 [W97]

S 000179

### Schedule 1
### Trademarks

| Mark | Application No. | Filing Date | Registration No. | Registration Date |
|---|---|---|---|---|
| PEOPLE CRACKERS | | | 1,593,298 | 04/24/90 |
| LOLLI-PUPS | | | 843,886 | Mexico |
| | | | 569,205 | 01/13/53 |
| DOGGIE DONUTS | | | 1,273,795 | 04/10/84 |
| SAY CHEESE | | | 848,256 | Mexico |
| SIRLOINS | 76/015,808 | 04/03/2000 | | |
| MUNCHEEZ BEEF AND CHEESE TREAT | | | 2,084,349 | 07/29/97 |
| SCHNITZEL SNACKS | | | 1,691,000 | 06/02/92 |
| STEAKHOUSE STRIPS | 76/193,156 | 01/16/01 | | |
| NUTRI-DOG BARS | 76/057,760 | 05/26/2000 | | |
| SEASON'S TREATINGS | 76/073,539 | 06/19/2000 | | |
| DOG NOG | 76/071,358 | 06/16/2000 | | |
| BEER BONES | 76/073,519 | 06/19/2000 | | |
| NUTRI-CAT | 76/146,796 | 10/16/2000 | | |
| TREAT-TABS | 76/146,794 | 10/16/2000 | | |
| DENTA FRESH | 76/084,356 | 07/07/2000 | | |
| DENTAPLUS | 76/234,574 | 04/02/01 | | |
| ON POINT | 76/100,352 | 05/08/2000 | | |
| CATNIPTIONS | 76/146,795 | 10/16/2000 | | |
| TROPICAL TREATS | 76/193,155 | 01/16/01 | | |
| IT'S A DOG'S LIFE | 76/001,573 | 03/16/2000 | | |
| LICKS & KISSES | 76/015,809 | 04/03/2000 | | |
| PURRSCRIPTIONS | 76/146,793 | 10/16/2000 | | |
| PURRSUASIONS | 76/146,792 | 10/16/2000 | | |
| PURRS | 76/146,791 | 10/16/2000 | | |
| PURRSONALS | 76/146,790 | 10/16/2000 | | |
| CHEESEWICHES | 76/175,987 | 12/05/2000 | | |
| TREATWICHES | 76/175,986 | 12/05/2000 | | |
| CAT LIFE | | | 1,594,475 | 05/01/90 |
| BURGLAR CONFIGURATION | | | 1,657,561 | 09/17/91 |
| DOG CATCHER CONFIGURATION | | | 1,651,611 | 07/23/91 |
| MAILMAN CONFIGURATION | | | 1,667,782 | 10/10/91 |
| MILK MAN CONFIGURATION | | | 1,651,612 | 07/23/91 |
| POLICEMAN CONFIGURATION | | | 1,649,626 | 07/02/91 |
| TREATERS | | | 1,461,227 | 10/13/87 |
| DOG LIFE AND DESIGN | | | 577,878 | 07/28/53 |
| DOG LIFE TASTY VITTLES AND DESIGN | | | 748,854 | 04/30/63 |

S 000180

| Mark | Application No. | Filing Date | Registration No. | Registration Date |
|------|-----------------|-------------|------------------|-------------------|
| DOGGIE DOGS | | | 1,438,257 | 04/28/87 |
| DOGGIE FRANKS | | | 1,438,258 | 04/28/87 |
| HI-LIFE AND DESIGN | | | 389,548 | 08/12/41 |
| LOLLI-PUPS CANADA | | | 209,689 | 09/26/75 |
| LOLLI-PUPS AND DESIGN | | | 569,205 | 01/13/57 |
| MY DOGGIES BAG | | | 1,460,847 | 10/13/87 |
| PEOPLE CRACKERS (MEXICO) | | | 552,254 | Not Available |
| TRAIL CALL | | | 889,124 | 04/07/70 |
| DOG HEAD LOGO | | | 1,882,414 | 03/07/95 |
| CAT HEAD LOGO | | | 1,859,904 | |
| HI-LIFE | | | 1,878,815 | 02/14/95 |
| FANTASY | | | 1,508,487 | 10/25/94 |
| LOVE MY CAT | | | 1,422,199 | 12/23/86 |
| ME & MY CAT | | | 1,461,218 | 10/13/87 |
| ME & MY DOG | | | 1,393,471 | 05/13/86 |
| PICK-OF-THE-LITTER | | | 1,476,130 | 02/09/88 |
| TRAINING WHEELS | | | 1,839,060 | 06/07/94 |

S 000181

## Schedule 2

### Description of the Triangle B3PFCTZ Bag Machine ("Triangle Bagger")

Triangle B3PFCTZ Bag Machine s/n 119462 with A14C6 Scale, two formtubes, platform, bins and conveying system, checkweigher, infeed conveyor extention, retractable infeed systems, casing station, and filmroll stand, together with all replacements, additions, accessions and accessories incorporated therein and/or affixed thereto and all proceeds thereof, including, but not limited to, amounts payableunder any insurance policy.

## Schedule 3

### Description of Doboy Model HD Pinch Top Bag Sealer

Doboy HD Pinch Top Bag Sealer Serial #99 21 405 Including Control Panel and Flat Belt Conveyer.