# EXHIBIT "A"

# ASSET PURCHASE AGREEMENT

among

## PET LIFE FOODS, INC.

## DAD'S PRODUCTS COMPANY, INC.

## GAINES PET FOODS CORP.

## GAINES PET FOODS

## MAPLE LEAF MARKETING, INC.

and

## SHATO HOLDINGS LTD.

dated as of

November 23, 1999

S 000404


Δ π EXHIBIT 14
Deponent Brown
Date 8/17/05 Rptr 777
WWW.DEPOBOOK.COM

# TABLE OF CONTENTS

Page

## ARTICLE 1

### DEFINED TERMS

1.1  Defined Terms ........................................................... 1
1.2  References and Titles. .................................................. 11

## ARTICLE 2

### SALE AND PURCHASE OF ASSETS

2.1  Agreement to Sell and Buy ............................................. 11
2.2  Purchase Price ........................................................ 12
2.3  Assumption of Obligations. ............................................ 13
2.4  Allocation. ........................................................... 13

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES

3.1  Representations and Warranties Regarding Seller. ...................... 14
3.2  Representations and Warranties of Buyer. .............................. 29

## ARTICLE 4

### COVENANTS DURING INTERIM PERIOD RELATING TO CONDUCT OF BUSINESS

4.1  Covenants of Seller. .................................................. 30

## ARTICLE 5

### ADDITIONAL AGREEMENTS OF SELLER AND THE SHAREHOLDER

5.1  No Solicitation of Transactions; Break-up Fee. ........................ 31
5.2  Access and Information. ............................................... 32
5.3  Compliance With Laws. ................................................. 32
5.4  Notification of Certain Matters. ...................................... 33
5.5  Third Party Consents. ................................................. 33
5.6  Conditions Precedent. ................................................. 33

## ARTICLE 6

S 000405

<u>Page</u>

## ARTICLE 7

### MUTUAL COVENANTS

| | | |
|---|---|---|
| 7.1 | Governmental Consents. | 34 |
| 7.2 | Bulk Sales Law. | 34 |
| 7.3 | Risk of Loss. | 34 |
| 7.4 | Employment Matters. | 35 |
| 7.5 | Additional Agreements. | 35 |
| 7.6 | Option to Purchase Certain Equipment. | 35 |

## ARTICLE 8

### CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 8.1 | Conditions to Obligation of Buyer. | 36 |
| 8.2 | Unsatisfied Conditions For the Benefit of Buyer. | 38 |
| 8.3 | Conditions to Obligations of Seller. | 39 |
| 8.4 | Unsatisfied Conditions for the Benefit of Seller. | 39 |

## ARTICLE 9

### CLOSING

| | | |
|---|---|---|
| 9.1 | First Closing | 40 |
| 9.2 | Second Closing | 43 |
| 9.3 | Post-Closing. | 46 |

## ARTICLE 10

### TERMINATION, AMENDMENT AND WAIVER

| | | |
|---|---|---|
| 10.1 | Termination. | 49 |
| 10.2 | Effect of Termination. | 49 |

## ARTICLE 11

### INDEMNIFICATION

| | | |
|---|---|---|
| 11.1 | Indemnification of Buyer Indemnified Parties. | 50 |
| 11.2 | Indemnification of Seller Indemnified Parties | 50 |
| 11.3 | Defense of Third-Party Claims | 50 |
| 11.4 | Direct Claims | 51 |
| 11.5 | [intentionally deleted] | 51 |
| 11.6 | Limitation on Liability | 51 |
| 11.7 | Tax Related Adjustments | 52 |

S 000406

<u>Page</u>

# ARTICLE 12

## GENERAL PROVISIONS

| | | |
|---|---|---|
| 12.1 | Survival of Representations, Warranties, and Covenants | 52 |
| 12.2 | Further Assurances. | 53 |
| 12.3 | Amendment and Modification | 53. |
| 12.4 | Waiver of Compliance | 53 |
| 12.5 | Specific Performance | 53 |
| 12.6 | Severability | 53 |
| 12.7 | Expenses and Obligations | 53 |
| 12.8 | Parties in Interest | 53 |
| 12.9 | Notices | 54 |
| 12.10 | Counterparts | 55 |
| 12.11 | Entire Agreement | 55 |
| 12.12 | Binding Arbitration | 55 |
| 12.13 | Governing Law; Choice of Forum | 56 |
| 12.14 | Public Announcements | 56 |
| 12.15 | Assignment | 56 |
| 12.16 | Director and Officer Liability | 56 |
| 12.17 | No Waiver Relating to Claims for Fraud | 56 |
| 12.18 | Currency. | 57 |
| 12.19 | Right of Set-Off | 57 |
| 12.20 | Guarantee by the Shareholder | 57 |
| 12.21 | Obligations Joint and Several | 57 |

[Rest of page intentionally left blank]

S 000407

**Exhibits:**

| | | |
|---|---|---|
| **Exhibit A** | — | Form of Bill of Sale and Assignment |
| **Exhibit B** | — | [intentionally deleted] |
| **Exhibit C** | — | Form of Building Lease Agreement |
| **Exhibit D** | — | Form of Opinions of Buyer's Counsel |
| **Exhibit E** | — | Form of Opinions of Seller's Counsel |

**Schedules:**

| | | |
|---|---|---|
| **Schedule 1.1** | — | Excluded Assets |
| **Schedule 2.3** | — | Assumed Contracts |
| **Schedule 2.4** | — | Allocation of Purchase Price |
| **Schedule 3.1(a)** | — | Qualification to do Business and Good Standing |
| **Schedule 3.1(e)** | — | Unrecorded Liabilities and Conduct of Business |
| **Schedule 3.1(f)** | — | Licenses and Permits |
| **Schedule 3.1(g)** | — | Litigation |
| **Schedule 3.1(h)** | — | Insurance |
| **Schedule 3.1(j)** | — | Personal Property |
| **Schedule 3.1(k)** | — | Ownership of Assets; Liens and Encumbrances |
| **Schedule 3.1(l)** | — | Environmental Matters |
| **Schedule 3.1(n)** | — | Certain Agreements |
| **Schedule 3.1(o)** | — | Employee Benefit Matters/Collective Bargaining Agreement |
| **Schedule 3.1(p)** | — | Intellectual Property |
| **Schedule 3.1(q)** | — | Affiliate Relationships |
| **Schedule 3.1(s)** | — | Year 2000 Compliance Plan |
| **Schedule 3.1(t)** | — | Warranty Matters |
| **Schedule 3.1(cc)** | — | Liabilities |
| **Schedule 3.1(ee)** | — | Customer and Supplier Relations |
| **Schedule 7.6** | — | Purchased Equipment |

S 000408

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 23, 1999, among Pet Life Foods, Inc., an Illinois corporation ("Pet Life"), Dad's Product Company, Inc., a Pennsylvania corporation ("Dad's") (Pet Life and Dad's are collectively referred to as "Buyer"), Gaines Pet Foods Corp., a corporation existing under the laws of the Province of Ontario ("Gaines"), Gaines Pet Foods, a partnership existing under the laws of the Province of Ontario (the "Partnership"), Maple Leaf Marketing, Inc., a Delaware corporation (the "Subsidiary") (Gaines, the Partnership and the Subsidiary are collectively referred to as "Seller") and Shato Holdings Ltd., a corporation existing under the laws of British Columbia ("Shareholder").

### RECITALS

A.      Gaines and Ron Toigo Holdings Ltd. ("Toigo"), a corporation existing under the laws of British Columbia, together own 100% of the interest in the Partnership. Gaines is the registered holder of all of the issued and outstanding shares in the capital of the Subsidiary. Shareholder is the registered holder of all of the issued and outstanding shares in the capital of Gaines.

B.      Seller intends to close down its business and terminate all of its employees and Seller desires to sell and Buyer desires to buy certain of the assets that were used or held for use by Seller in the manufacture and sale of pet treats and pet food, both tangible and intangible, excluding the Excluded Assets (as hereinafter defined) (the "Business"), upon the terms and conditions hereinafter set forth.

### AGREEMENTS

NOW, THEREFORE, in consideration of the respective representations, warranties, agreements, and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE 1

### DEFINED TERMS

1.1      **Defined Terms**.  The following terms shall have the following meanings in this Agreement:

"AAA" shall mean the American Arbitration Association.

"Accounts Receivable" means all of Seller's accounts receivables (as would be classified as accounts receivable on the asset side of a balance sheet of Seller prepared in accordance with GAAP and Buyer's normal accounting practices), including trade receivables.

"Affiliate" means, with respect to any person, any other person controlling, controlled by or under common control with such person. For purposes of this definition and this Agreement, the term "control" (and correlative terms) means the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a person.

"Applicable Laws" means all laws, statutes, rules, regulations, ordinances, judgments, orders, decrees, injunctions, and writs of any Governmental Entity applicable to or having jurisdiction over the Assets or the Business, as may be in effect on or prior to the Closing.

"Assets" means all the tangible and intangible assets owned, leased, licensed or used by Seller, whether or not reflected on the Financial Statements or Balance Sheet, but specifically excluding therefrom the Excluded Assets.

"Associate", when used to indicate a relationship with any person means:

(a)     a body corporate of which that person beneficially owns or controls, directly or indirectly, shares or securities currently convertible into shares carrying more than ten per cent of the voting rights under all circumstances or by reason of the occurrence of an event that has occurred and is continuing, or a currently exercisable option or right to purchase such shares or such convertible securities;

(b)     a partner of that person acting on behalf of the partnership of which they are partners;

(c)     a trust or estate in which that person has a substantial beneficial interest or in respect of which he serves as a trustee or in a similar capacity;

(d)     a spouse or child of that person; and

(e)     a relative of that person or of his spouse if that relative has the same residence as that person.

"Assumed Contracts" means those Contracts set forth on Schedule 2.3 identified as being assumed by Buyer;

"Audited Financial Statements" has the meaning set forth in Section 3.1(e).

"Balance Sheet" has the meaning set forth in Section 3.1(e).

"Balance Sheet Date" has the meaning set forth in Section 3.1(e).

"Benefit Program or Agreement" has the meaning set forth in Section 3.1(o)(i)(B).

S 000410

"Bill of Sale and Assignment" means a Bill of Sale and Assignment between Buyer and Seller in the form of Exhibit A.

"Building Lease Agreement" means the agreement between Buyer, Seller and Shareholder as to the certain uses of the Owned Real Property by Buyer subsequent to the Second Closing Date, in the form of Exhibit C.

"Business" has the meaning set forth in Recital B.

"Business Day" means any day other than (i) a Saturday or Sunday or (ii) a day on which chartered banks in Toronto, Canada are required to be closed.

"Buyer" has the meaning set forth in the first paragraph of this Agreement and includes permitted successors and assigns.

"Buyer Indemnified Costs" means, subject to Section 12.1, (a) any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs, and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) that any of the Buyer Indemnified Parties incurs and that arise out of any breach or default by Seller or Shareholder of any of their respective representations, warranties or covenants under this Agreement or any agreement or document executed in connection herewith or which would not have to be paid by the Buyer in the absence of such breach or default; (b) any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs, and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) incurred by any of the Buyer Indemnified Parties resulting from Seller's ownership of the Assets or operation or control of the Business on or prior to the applicable Closing Date, including any and all liabilities arising under the Licenses, Permits and the Assumed Contracts which relate to events occurring on or prior to applicable Closing Date; (c) any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs, and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) that any of the Buyer Indemnified Parties incurs and that arise out of any breach or default by Seller or Shareholder of any covenant or agreement made by Seller or Shareholder under this Agreement or any agreement or document executed in connection herewith or which would not have to be paid by the Buyer in the absence of such breach or default; (d) the actual amount of any and all obligations or liabilities of Seller under any contract or agreement not expressly assumed by Buyer pursuant to the terms hereof; (e) the items indemnified against pursuant to Section 7.2 or Section 7.4; (f) the actual amount of any payments required to be made by Buyer as a result of having purchased any of the Assets, whether pursuant to a Third Party Action or otherwise, to the extent such payments do not relate to liabilities assumed hereunder and which relate to matters arising prior to the Second Closing; and (g) any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs, and expenses, including reasonable legal fees and expenses, incident to any of the foregoing.

S 000411

3

"Buyer Indemnified Parties" means Buyer and their respective officers, directors, attorneys, employees, consultants, shareholders and Affiliates.

"CBCA" means the *Canada Business Corporations Act.*

"Choses in Action" means a right to receive or recover property, debt or damages on a cause of action, whether pending or not and whether arising in contract, tort or otherwise. The term shall include rights to indemnification, damages for breach of warranty or any other event or circumstance, judgments, settlements and proceeds from judgments or settlements.

"Closing" means, as applicable, the First Closing or the Second Closing.

"Closing Balance Sheet" has the meaning set forth in Section 2.3(c)(i).

"Code" means the United States Internal Revenue Code.

"Commonly Controlled Entity" has the meaning set forth in Section 3.1(o)(iii).

"Company Reports" has the meaning set forth in Section 3.1(e).

"Consents" means all consents and approvals and all consents and approvals of third parties (including Government Entities), in each case that are necessary in order to transfer the Assets to Buyer and otherwise to consummate the transactions contemplated hereby.

"Contracts" means all agreements, contracts, undertakings, letters of intent, understandings, licenses, instruments, arrangements or other binding commitments or arrangements, written or oral (including any amendments and other modifications thereto), to which Seller is a party or is otherwise bound and which affect or relate to the Assets or the Business.

"Demand to Arbitrate" has the meaning set forth in Section 12.12(a).

"Employees" means the current or former employees of Seller employed in the Business or persons who will become employees of Seller employed in the Business on or prior to the Second Closing Date, whether employed by written or verbal employment contract or pursuant to any collective agreement.

"Employee Benefit Plans" means all Pension Plans and all Benefit Programs or Agreements providing benefits to any Employee maintained, sponsored or contributed to by any such entity within six years prior to the First Closing Date or as to which any Seller has any liability or obligation.

"Environmental Costs or Liabilities" means any losses, liabilities, obligations, damages, fines, penalties, judgments, settlements, actions, claims, costs and expenses (including, without limitation, reasonable fees, disbursements and expenses of legal counsel, experts, engineers

4

and consultants, and the costs of investigation or feasibility studies and performance of remedial or removal actions and cleanup activities) arising from, under or in connection with (1) any Environmental Laws, (2) any order of, or contract of Seller with, any Governmental Entity or any private or public persons or (3) any exposure of any person or property to Hazardous Substances.

"Environmental Laws" means all Applicable Laws and rules of common law pertaining to the environment, natural resources, public or employee health and safety, product safety and product liability as each of the foregoing may be amended and in effect on or prior to the Closing.

"Excluded Assets" shall consist of the following:

(a)     all Real Property;

(b)     Seller's cash on hand and all other cash in any of Seller's bank or savings accounts and any other similar cash equivalents of Seller;

(c)     all Accounts Receivable including, for greater certainty, all insurance proceeds payable pursuant to insurance policies of Seller (other than proceeds from insurance policies relating to the Second Assets which are payable to Buyer in accordance with Section 7.3(b));

(d)     all notes receivable or other indebtedness, deferred indebtedness, obligations to pay rent or reimbursement obligations owed to Seller by Shareholder or any other Affiliates or employees of Seller;

(e)     all Inventory;

(f)     all prepaid expenses, taxes and all deposits with any Governmental Entity; and

(g)     all office equipment, office furniture and office fixtures not required for the operation of the Business as described in Schedule 1.1 attached hereto.

"Excluded Liabilities" has the meaning set forth in Section 2.3.

"Financial Statements" has the meaning set forth in Section 3.1(e).

"First Assets" has the meaning set forth in Section 2.1(a) and, for greater certainty, shall specifically exclude therefrom any Excluded Assets.

"First Closing" means the consummation of the transactions contemplated by this Agreement to occur on the First Closing Date.

S 000413

"First Closing Date" means the date of this Agreement.

"Gaines" has the meaning set forth in the first paragraph of this Agreement.

"GAAP" means generally accepted accounting principles in Canada.

"Governmental Entity" means any governmental department, commission, board, bureau, agency, court or other instrumentality exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, any government of Canada, the United States or any foreign country, or any state, province, county, parish or municipality, jurisdiction or other political subdivision thereof.

"GST" means goods and services tax pursuant to the GST Legislation;

"GST Legislation" means the *Excise Tax Act* (Canada), as amended.

"Hazardous Substances" means (A) any hazardous materials, hazardous wastes, hazardous substances, toxic wastes and toxic substances as those or similar terms are defined under any Environmental Laws; (B) any asbestos or any material which contains any hydrated mineral silicate, including chrysolite, amosite, crocidolite, tremolite, anthophylite and/or actinolite, whether friable or non-friable; (C) PCBs, or PCB-containing materials, or fluids; (D) radon; (E) any other hazardous, radioactive, toxic or noxious substance, material, pollutant, contaminant, constituent, or solid, liquid or gaseous waste; (F) any petroleum, petroleum hydrocarbons, petroleum products, crude oil and any fractions or derivatives thereof, any oil or gas exploration or production waste, and any natural gas, synthetic gas and any mixtures thereof; (G) any substance that, whether by its nature or its use, is subject to regulation under any Environmental Laws or with respect to which any Environmental Laws or Governmental Entity requires environmental investigation, monitoring or remediation; and (H) any underground storage tanks, dikes or impoundments as defined under any Environmental Laws.

"Indemnified Costs" means the Buyer Indemnified Costs or the Seller Indemnified Costs, as the case may be.

"Indemnified Parties" means the Buyer Indemnified Parties or the Seller Indemnified Parties, as the case may be.

"Indemnifying Party" means any person who is obligated to provide indemnification hereunder.

"Information Systems" has the meaning set forth in Section 3.1(s).

"Intellectual Property" means all Trademarks, trade secrets, industrial designs, Know-how, copyrights, copyright registrations and applications for registration, recipes, formulae, formulations, process guidelines and quality control specifications for all pet products, and all other

S 000414

intellectual property rights (including internet domain names), whether registered or not, licensed to or owned by Seller, including the goodwill related to the foregoing.

"Interim Period" means the period between the First Closing and the Second Closing.

"Inventory" means all inventory owned, used or held for use by Seller, including, without limitation, all inventory of raw materials or supplies, components, work in progress and finished products.

"IP Assignment Agreements" means assignment agreements dated the First Closing Date between Seller and Buyer whereby Seller assigns its rights in and to the Intellectual Property.

"Know-how" means all plans, ideas, concepts and data, research records, all promotional literature, customer and supplier lists and similar data and information and all other confidential or proprietary technical and business information.

"Knowledge" means, with respect to a specified party hereto, the actual knowledge of such party (including, but not limited to, the actual knowledge of such party's officers, directors, employees, consultants and counsel), together with such additional knowledge as would be acquired by a reasonable person upon conducting reasonable and diligent inquiry concerning the subject matter in question.

"Leased Real Property" means all of Seller's leasehold interests, easements, licenses, rights to access and rights-of-way, including those interests which are identified and described in Schedule 3.1(i).

"Letter of Credit" has the meaning set forth in subsection 9.1(b)(v).

"Letter of Intent" means the letter of intent dated September 21, 1999 between Sowell & Co. and Gaines.

"Liabilities" means all costs, expenses, charges, debts, liabilities, claims, demands, Taxes and obligations, whether primary or secondary, direct or indirect, fixed, contingent, absolute or otherwise, including, without limitation, those arising under any law, rule or regulation of any Governmental Entity, any award of any arbitrator, court or other tribunal and any contract, agreement, arrangement, lease, commitment or undertaking.

"Licenses" means all licenses, permits or authorizations (including any amendments thereto) issued to Seller by any Governmental Entity, including those listed on Schedule 3.1(f), with any additions thereto during the Interim Period.

"Liens" has the meaning set forth in Section 3.1(k).

"Loss" shall have the meaning set forth in Section 7.4(a).

7

S 000415

"Material Adverse Effect" means a material adverse effect on the business, operations, properties (taken as a whole), condition (financial or otherwise), results of operations, assets (taken as a whole), liabilities or prospects of the Business.

"Non-Competition Agreements" means the collective reference to the non-competition agreements dated the First Closing Date between Buyer and each of Gaines, the Partnership, Shareholder and Subsidiary.

"Notice of Termination" means such notice as is required by the *Employment Standards Act* (Ontario) and the regulations thereto to effect the termination of the employment of the Employees.

"Owned Real Property" means those parcels of real property owned in fee by Seller, and all buildings, structures, improvements and fixtures thereon, together with all rights of way, easements, privileges and appurtenances pertaining or belonging thereto, including any right, title and interest of Seller in and to any street or other property adjoining any portion of such property.

"Pension Plan" has the meaning set forth in subsection 3.1(o)(i)(A).

"Permits" means all permits, registrations, licenses, authorizations, orders, approvals, consents, and the like required to be obtained or filed by Seller under any Environmental Laws in connection with the Business, including those activities relating to the generation, use, storage, treatment, disposal, release or remediation of Hazardous Substances

"person" means an individual, corporation, partnership, limited liability company, association, trust, unincorporated organization, or other entity.

"Personal Property" means all of the machinery, equipment, computer programs, computer software, tools, motor vehicles, furniture, furnishings, leasehold improvements, office equipment, supplies, plant, spare parts and other tangible or intangible personal property which are owned, leased or used by Seller, including the personal property which is listed on Schedule 3.1(j) hereto, together with any additions thereto during the Interim Period, but specifically excluding therefrom the Excluded Assets.

"PST" means provincial sales tax;

"Purchase Price" has the meaning set forth in Section 2.2(a).

"Purchased Accounts Receivable" has the meaning set forth in Section 2.2(c).

"Purchased Packaging and Inventory" has the meaning set forth in Section 2.2(b).

"Real Property" means the Leased Real Property and the Owned Real Property.

8

S 000416

"Schedules" means the Schedules attached hereto.

"Second Assets" has the meaning set forth in Section 2.1(b) and, for greater certainty, shall specifically exclude therefrom any Excluded Assets.

"Second Closing" means the consummation of the transactions contemplated by this Agreement to occur on the Second Closing Date.

"Second Closing Date" means January 21, 2000 provided, however, that such Second Closing Date may, upon prior written notice to the other parties hereto, be extended to February 21, 2000: (a) by Seller in order for Seller to comply with the conditions precedent provided for in Section 8.1; or (b) by Buyer if Seller has not, by January 21, 2000, fulfilled all of its obligations to supply products to Buyer pursuant to Article 2 of the Supplier and Royalty Agreement.

"Seller" has the meaning set forth in the first paragraph of this Agreement.

"Seller Indemnified Costs" means (a) any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs, and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) that any of the Seller Indemnified Parties incurs and that arise out of any breach or default by Buyer of any of its representations or warranties under this Agreement or any agreement or document executed in connection herewith or which would not have to be paid by the Seller in the absence of such breach or default; (b) any and all damages losses, claims, liabilities, demands, charges, suits, penalties, costs, and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) incurred by any of the Seller Indemnified Parties resulting from Buyer's operation or control of the Business after the applicable Closing Date, including any and all liabilities arising under the Licenses, Permits or the Assumed Contracts which relate to events occurring after the applicable Closing Date; (c) any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs, and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) that any of the Seller Indemnified Parties incurs and that arise out of any breach or default by Buyer of any covenant or agreement made by Buyer under this Agreement or any agreement or document executed in connection herewith or which would not have to be paid by the Buyer in the absence of such breach or default; and (d) any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs, and expenses, including reasonable legal fees and expenses, incident to any of the foregoing.

"Seller Indemnified Parties" means Seller and the Shareholder and their respective officers, directors, attorneys, employees, consultants and Affiliates.

"Seller Transaction Costs" means the aggregate amount of all fees, costs and expenses of Seller (whether incurred on behalf of Seller or on behalf of any of Seller's shareholders) incurred in connection with this Agreement or the transactions contemplated hereby (whether incurred before or after the First `Closing Date), including, without limitation, any investment banking, accounting,

S 000417

advisory, brokers, finders, escrow agent or legal fees paid to any Governmental Entity or third party (whether such fees, costs and expenses have been paid by Seller before the First Closing Date or are payable on or after the First Closing Date).

"Shareholder" has the meaning set forth in the first paragraph of this Agreement.

"Subsidiary" has the meaning set forth in the first paragraph of this Agreement.

"Supplier and Royalty Agreement" means the supplier and royalty agreement dated the First Closing Date between Buyer and Seller.

"Tax Act" means the *Income Tax Act* (Canada), as amended from time to time.

"Taxes" means taxes, charges, fees, imposts, levies, interest, penalties, additions to tax or other assessments or fees of any kind, including, but not limited to, income, corporate, capital, excise, property, sales, use, turnover, value added and franchise taxes, deductions, withholdings and customs duties, imposed by any Governmental Entity and any payments with respect thereto required under any tax-sharing agreement.

"Tax Returns" means any return, report, statement, information return or other document (including any related or supporting information) filed or required to be filed with any Governmental Entity in connection with the determination, assessment, collection or administration of any Taxes or the administration of any laws, regulations or administrative requirements relating to any Taxes.

"Third Party Action" has the meaning set forth in Section 11.3.

"Toigo" has the meaning set forth in the first paragraph of this Agreement.

"Trademarks" means (a) trademarks, service marks, distinguishing guises, trade names, trade dress, labels, logos and all other names and slogans associated with any products or embodying the goodwill of Seller or the Business, whether or not registered, and any applications or registrations therefor and (b) any goodwill or common law rights associated therewith owned by Seller.

"Transaction Documents" means this Agreement, the Bill of Sale and Assignment, the Building Lease Agreement and each other agreement, document, and instrument required to be executed in accordance herewith or entered into by Seller with Buyer on either of the First Closing Date or the Second Closing Date.

"Unaudited Financial Statements" has the meaning set forth in Section 3.1(e).

"Year 2000 Data" has the meaning set forth in Section 3.1(s).

S 000418

1.2    <u>References and Titles</u>. All references in this Agreement to Exhibits, Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Schedules, Articles, Sections, subsections and other subdivisions of this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement are for convenience only, do not constitute any part of such Articles, Sections, subsections or other subdivisions, and shall be disregarded in construing the language contained therein. The words *"this Agreement," "herein," "hereby," "hereunder," "* and *"hereof,"* and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words *"this Section," "this subsection,"* and words of similar import, refer only to the Sections or subsections hereof in which such words occur. The word *"or"* is not exclusive, and the word *"including"* (in its various forms) means *"including without limitation."* Pronouns in masculine, feminine, or neuter genders shall be construed to state and include any other gender and words, terms and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise expressly requires. Unless the context otherwise requires, all defined terms contained herein shall include the singular and plural and the conjunctive and disjunctive forms of such defined terms.

## ARTICLE 2

## SALE AND PURCHASE OF ASSETS

2.1    <u>Agreement to Sell and Buy</u>

(a)    <u>First Closing Date</u>

Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell, assign, transfer, convey and deliver to Buyer on the First Closing Date, and Buyer hereby agrees to purchase on the First Closing Date, all of the following Assets (being hereinafter referred to as the "First Assets"), free and clear of any Liens or liabilities:

(i)    all Intellectual Property;

(ii)    all customer and supplier lists (and related information) related to the Business;

(iii)    all Licenses and Permits, if any;

(iv)    all Choses in Action of Seller other than in respect of the Excluded Assets;

(v)    all goodwill relating to the foregoing;

(vi)    all books and records of Seller relating to the Assets or relating to or entered into with any customers of the Business including executed copies of the

11

Assumed Contracts, or if no executed agreement exists, summaries of such Assumed Contracts provided however that Seller may retain the originals of all books and records required to be kept by Seller to comply with continuing corporate and tax purposes.

(b)     Second Closing Date

Subject to the terms and conditions set forth in this Agreement, Seller hereby agrees to sell, assign, transfer, convey and deliver to Buyer on the Second Closing Date, and Buyer hereby agrees to purchase on the Second Closing Date, all of the following Assets (being hereinafter referred to as the "Second Assets"), free and clear of any Liens or liabilities:

(i)     all Personal Property (and, if applicable, the insurance proceeds related thereto as contemplated in Section 7.3(b));

(ii)     all computer programs and software pertaining to the production process of the Business, and all rights and interests of Seller in and to any computer programs and software pertaining to the production process of the Business (provided, however, that Buyer acknowledges that it will be responsible for any transfer fees and/or ongoing royalty payments in connection with the software licensed to Seller from Laguna Software & Consulting, Inc.;

(iii)     all tangible and intangible assets of Seller not specifically described in subsection 2.1(a) or this subsection 2.1(b), including goodwill, business processes and all other assets owned, leased or licensed by Seller;

(iv)     all technical information and data, machinery and equipment warranties, plans, diagrams, blueprints and schematics of Seller, and goodwill relating to the foregoing;

(v)     the Purchased Packaging and Inventory, if any; and

(vi)     the Purchased Accounts Receivable, if any.

**2.2     Purchase Price**

(a)     General. Subject to adjustment in accordance with subsection 7.3(b), the Purchase Price for the Assets is $2,550,000 (the "Purchase Price") to be paid by the Buyer to Seller as follows:

(i)     $500,000 by certified cheque, bank draft or wire transfer at the First Closing, representing the purchase price for the First Assets; and

S 000420

(ii)  $2,050,000 by certified cheque, bank draft or wire transfer at the Second Closing, representing the purchase price for the Second Assets;

(b)  <u>Packaging Purchase</u>.  At least ten Business Days prior to the Second Closing, Seller shall provide to Buyer detailed written information as to the quantity of packaging (and a detailed breakdown as to the cost to Seller of the components of such packaging, determined in accordance with GAAP, consistently applied) owned by Seller and used in connection with the Business that Seller expects to own as at the Second Closing Date.  At least five Business Days prior to the Second Closing, Buyer shall advise Seller as to the quantity, if any, of such packaging that Buyer wishes to purchase (the "Purchased Packaging").  At the Second Closing, Buyer shall pay Seller an amount equal to Seller's cost (as determined above) for the Purchased Packaging that Buyer agrees to purchase.  Buyer agrees, at its own expense, to remove the Purchased Packaging from the Real Property within seven Business Days from the Second Closing Date.

(c)  <u>Accounts Receivable Purchase</u>.  At least ten Business Days prior to the Second Closing, Seller shall provide to Buyer a detailed written breakdown of the Accounts Receivable which Seller expects to remain outstanding as at the Second Closing Date.  At the Second Closing, Buyer shall have the option, in its sole discretion, to purchase some or all of Seller's Accounts Receivable outstanding as of the Second Closing Date (the "Purchased Accounts Receivable") at a purchase price equal to the actual amount of the Purchased Accounts Receivable.

2.3  <u>Assumption of Obligations</u>.  As of the First Closing, Buyer shall assume and undertake to pay, discharge and perform all obligations arising under the Assumed Contracts that relate to the time period after the First Closing.  All other obligations and liabilities of Seller, including, without limitation, any liabilities arising during the Interim Period, shall remain and be the obligation and liability solely of Seller, and Buyer shall have no liability or responsibility for any of the obligations arising therefrom.  Other than as specified in the first sentence of this Section 2.3, Buyer, directly or indirectly, shall assume no liabilities or obligations of Seller and shall not be liable therefor.  This Section 2.3 is not intended to and shall not benefit any person other than Seller and Buyer.  Nothing in this Section 2.3 shall create or be construed as creating any third party beneficiary right in any person.

2.4  <u>Allocation</u>.  Seller and Buyer, acting in good faith, hereby agree that attached hereto as Schedule 2.4 is a reasonable allocation of the Purchase Price among the Assets (as well as any liabilities assumed by Buyer) and that such allocation complies with the Tax Act and Section 1060 of the Code with respect to the allocation of the Purchase Price.  Seller and Buyer shall file their respective tax returns prepared in accordance with such allocation.

S 000421

13

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES

**3.1** <u>Representations and Warranties Regarding Seller.</u> Seller and Shareholder, jointly and severally, represent and warrant to Buyer as follows (with the understanding that the Buyer is relying on such representations and warranties in entering into and performing this Agreement):

(a)    (i)    <u>Organization, Good Standing, Etc. - Gaines.</u>  Gaines is a corporation duly organized, validly existing and in good standing under the laws of the Province of Ontario, has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted and is duly qualified and in good standing to do business in each jurisdiction listed on <u>Schedule 3.1(a)</u>, which jurisdictions represent every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary. Seller has delivered to Buyer true and complete copies of the constating documents and by-laws of Gaines, as in effect at the date of this Agreement. Gaines is not in violation of any provisions of its constating documents or by-laws.

(ii)    <u>Organization, Good Standing, Etc. - Subsidiary.</u>  The Subsidiary is a corporation duly organized, validly existing and in good standing under the laws of Delaware, has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted and is duly qualified and in good standing to do business in each jurisdiction listed on <u>Schedule 3.1(a)</u>, which jurisdictions represent every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary. Seller has delivered to Buyer true and complete copies of the constating documents and by-laws of the Subsidiary as in effect at the date of this Agreement. The Subsidiary is not in violation of any provisions of its constating documents or by-laws.

(iii)    <u>Organization, Good Standing, Etc. - Partnership.</u>  The Partnership is a partnership duly formed, validly existing and in good standing under the laws of the Province of Ontario, has all requisite power and authority to own, lease and operate its properties and to carry on its business as now being conducted and is duly qualified and in good standing to do business in each jurisdiction listed on <u>Schedule 3.1(a)</u>, which jurisdictions represent every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary. Seller has delivered to Buyer true and complete copies of the constating documents and by-laws of the Subsidiary as in effect at the date of this Agreement. The Partnership is not in violation of any provisions of its constating documents or by-laws.

S 000422

14

(iv)   <u>Organization, Good Standing, Etc. - Shareholder.</u>   Shareholder is a corporation duly organized, validly existing and in good standing under the laws of British Columbia, has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted and is duly qualified and in good standing to do business in each jurisdiction listed on <u>Schedule 3.1(a)</u>, which jurisdictions represent every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary. Seller has delivered to Buyer true and complete copies of the constating documents and articles of Shareholder, as in effect at the date of this Agreement. Shareholder is not in violation of any provisions of its constating documents or articles.

(v)   <u>Organization, Good Standing, Etc. - Toigo.</u>   Toigo is a corporation duly organized, validly existing and in good standing under the laws of the Province of British Columbia, has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted and is duly qualified and in good standing to do business in each jurisdiction listed on <u>Schedule 3.1(a)</u>, which jurisdictions represent every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary. Seller has delivered to Buyer true and complete copies of the constating documents and articles of Toigo as in effect at the date of this Agreement. Toigo is not in violation of any provisions of its constating documents or articles.

(b)   <u>Subsidiaries of Seller.</u>   Other than the Subsidiary, of which Gaines is the registered and beneficial owner of all of its issued and outstanding shares, Seller does not own, directly or indirectly, any equity interest in any other corporation, partnership or other person or have the right, pursuant to a contract or otherwise, to acquire any capital stock, equity interest or other similar investment in any corporation, partnership or other person. Shareholder is the registered holder of all of the issued and outstanding shares in the capital of Seller.

(c)   <u>Authority.</u>   Each of Seller and Shareholder has all requisite corporate power and authority to enter into each of the Transaction Documents to which Seller and/or Shareholder is a party and to consummate the transactions contemplated hereby or thereby. The execution and delivery of the Transaction Documents by Seller and Shareholder and the consummation by Seller and Shareholder of the transactions contemplated hereby or thereby have been duly authorized by all necessary action on the part of Seller and Shareholder, as the case may be, including, without limitation, the requisite approval of Shareholder as the sole holder of the outstanding capital stock of Gaines, the requisite approval of Gaines as the sole holder of the outstanding capital stock of Subsidiary and the requisite approval of each Gaines and Toigo as the partners comprising the Partnership. The Transaction Documents have been, or upon execution and delivery will be, duly executed and delivered and constitute, or upon execution and delivery will constitute, the valid and binding obligations of Seller and Shareholder enforceable against each of them and each of Gaines and Toigo as the partners comprising the Partnership in accordance with their terms, subject as to

S 000423

enforceability to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(d)    <u>No Conflict; Required Filings and Consents</u>.  The execution and delivery of this Agreement and the other Transaction Documents by Seller and Shareholder do not, and the performance by Seller and Shareholder of the transactions contemplated hereby or thereby will not, subject to obtaining the consents, approvals, authorizations, and permits and making the filings described in this <u>Section 3.1(d)</u> or on <u>Schedule 3.1(n)</u>, (all of which have been obtained) (i) violate, conflict with, or result in any breach of any provision of Seller's or Shareholder's constating documents or by-laws, (ii) violate, conflict with, or result in a violation or breach of, or constitute a default (with or without due notice or lapse of time or both) under, or permit the termination of, or result in the acceleration of, or entitle any party to accelerate (whether as a result of a change of control of Seller or Shareholder or otherwise) any obligation, or result in the loss of any benefit, or give any person the right to require any security to be repurchased, or give rise to the creation of any Lien upon any of the Assets under any of the terms, conditions, or provisions of any loan or credit agreement, note, bond, mortgage, indenture or deed of trust, or any license, lease, agreement or other instrument or obligation to which Seller or Shareholder is a party or by which or to which it or any of the Assets may be bound or subject, or (iii) violate any order, writ, judgment, injunction, decree, statute, law, rule or regulation, of any Governmental Entity applicable to Seller or Shareholder or by which or to which any of the Assets is bound or subject.  No Consent of, or registration, declaration or filing with any Governmental Entity is required by or with respect to Seller or Shareholder in connection with the execution and delivery of this Agreement or any of the other Transaction Documents by Seller or Shareholder or the consummation of the transactions contemplated hereby or thereby.

(e)    <u>Reports; Financial Statements; Absence of Certain Changes or Events</u>.

(i)    Seller has filed timely all forms, reports, statements, and other documents required to be filed with Governmental Entities (collectively, the "<u>Company Reports</u>").  The Company Reports were prepared in all material respects in accordance with the requirements of all Applicable Laws.

(ii)    Seller has delivered to Buyer copies of (A) the audited balance sheet of Seller as at March 31, 1999, together with the audited statements of income and cash flows of Seller for the year then ended, and the notes thereto, accompanied by the reports thereon of KPMG LLP, independent chartered accountants (collectively, the "<u>Audited Financial Statements</u>"), and (B) the unaudited balance sheet (the "Balance Sheet") of Seller as at September 30, 1999 (the "Balance Sheet Date"), together with the related unaudited statements of income and cash flows of Seller for the period then ended (collectively, the "<u>Unaudited Financial Statements</u>") (the Audited Financial Statements and the Unaudited Financial Statements are collectively referred to in this Agreement as the "<u>Financial</u>

S 000424

Statements"). The Financial Statements, including the notes thereto, were (a) prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (except to the extent disclosed therein or required by changes in GAAP); (b) fairly, fully and correctly present the results of operations of Seller for the respective periods indicated; (c) are in accordance with the books and records of Seller; and (d) contain and reflect all necessary adjustments for a fair presentation of the results of operations of the Business for the periods covered thereby.

(iii)    Except as disclosed in Schedule 3.1(e), since the Balance Sheet Date, Seller has conducted its business only in the ordinary course consistent with past practices. Except as disclosed in Schedule 3.1(e), since the Balance Sheet Date, (A) there has not been any event, circumstance or fact (whether or not covered by insurance) that, individually or in the aggregate, has resulted in or could reasonably be expected to result in a Material Adverse Effect for the Business; (B) there has not been any event, circumstance or fact (whether or not covered by insurance) that, individually or in the aggregate, materially impairs the operation of the Assets; and (C) nothing has occurred that would have been prohibited by Section 4.1 if the terms of such section had been in effect as of and after the Balance Sheet Date.

(f)    Compliance with Applicable Laws.

(i)    The Business has been conducted in compliance in all material respects with Applicable Laws. No investigation or review by any Governmental Entity with respect to Seller is pending or, to the Knowledge of Seller and Shareholder, threatened.

(ii)    Schedule 3.1(f) is a true and complete list of all Licenses issued to Seller or to any person engaged in the operation of the Business for or on behalf of Seller by any Governmental Entities and held by Seller or such persons as of the date of this Agreement. Such Licenses constitute all of the licenses, permits and authorizations required for the operation of the Business, and each of such Licenses is in full force and effect. The Business has been operated in all material respects in accordance with the terms of such Licenses and Seller is otherwise in compliance with, and has conducted its business so as to comply with, the terms of such Licenses. There are no proceedings pending or, to the Knowledge of Seller and Shareholder, threatened, which reasonably may be expected to result in the revocation, material adverse modification, non-renewal, or suspension of any of such Licenses, the denial of any pending applications for any such Licenses, the issuance against Seller of any cease and desist order, or the imposition of any administrative actions (which shall include the proposed assessment of any fines or penalties) by any Governmental Entity with respect to such Licenses, or which reasonably may be expected to adversely affect Buyer's ability to operate the Business as currently operated after the First Closing or the Second Closing.

(g)    Absence of Litigation. Except as set forth on Schedule 3.1(g), there is no claim, action, suit, inquiry, judicial or administrative proceeding, grievance or arbitration pending or, to the Knowledge of Seller and Shareholder, threatened by or against Seller, the Business

S 000425

or any of the Assets by or before any arbitrator or Governmental Entity, nor are there any investigations relating to Seller, the Business or any of the Assets pending or, to the Knowledge of Seller and Shareholder, threatened by or before any arbitrator or Governmental Entity. Except as set forth in Schedule 3.1(g), there is no judgment, decree, injunction, order, determination, award, finding, notice or letter of deficiency of any Governmental Entity or arbitrator outstanding against Seller, the Business or any of the Assets. There is no action, suit, inquiry or judicial or administrative proceeding pending or, to the Knowledge of Seller and Shareholder, threatened by or against Seller relating to the Assets, the transactions contemplated by this Agreement and other Transaction Documents.

(h)     Insurance. All of the Assets are insured for the full replacement value thereof. All such policies insure the Assets against loss or damage by all insurable risks and hazards The proceeds of such policies are and shall continue until the Second Closing to be fully payable to Seller. All premiums in connection with such policies are fully paid. Since 1997, Seller has been insured against such risks as companies engaged in a similar business would, in accordance with good business practice, customarily be insured. Schedule 3.1(h) sets forth a complete and accurate list of all fire, general liability, malpractice liability, theft, and other forms of insurance and all fidelity bonds which are held by or applicable to Seller, the Business or the Assets as of the date hereof and which have been held by or applicable to Seller or the Business during each of the past five (5) calendar years. No event has occurred, including the failure by Seller to give any notice or information or the delivery of any inaccurate or erroneous notice or information, which limits or impairs the rights of Seller under any such insurance policies in such a manner has had or as could reasonably be expected to have a Material Adverse Effect. Excluding insurance policies that or have expired and been replaced in the ordinary course of business, no insurance policy held by or applicable to Seller, the Business or the Assets has been cancelled within the last two years prior to the date hereof.

(i)     [intentionally deleted]

(j)     Personal Property. Schedule 3.1(j) contains a description of the items of Personal Property, broken down by leased or owned property, used or held for use in connection with the Business or which permit the conduct of the Business as now conducted. All such Personal Property is located at the location listed on Schedule 3.1(j). Except as set forth on Schedule 3.1(j) or Schedule 3.1(k), Seller owns the Assets with good and marketable title or with a valid leasehold or license interest therein. As at the date hereof and at the Second Closing, Seller is not, and to the Knowledge of Seller and Shareholder, no other party is in default under any of the leases, licenses and other Contracts relating to the Assets. Except as otherwise disclosed in Schedule 3.1(j), the Assets have been maintained in accordance with Seller's past practices, consistently applied, and, to the actual knowledge of the Seller, without further investigation, in accordance with manufacturer's recommendations.

(k)     Ownership of Assets; Liens and Encumbrances. Schedule 3.1(k) indicates the owner of each of the Assets. All of the Assets, including leases, are owned by Seller free and clear

18

S 000426

of all liens, pledges, claims, security interests, restrictions, mortgages, deeds of trust, tenancies and other possessory interests, conditional sale or other title retention agreements, assessments, easements, rights of way, covenants, restrictions, rights of first refusal, defects in title, encroachments and other burdens, options or encumbrances of any kind (collectively, "Liens") except Liens set forth on Schedule 3.1(k). At each Closing, all of the Assets being sold at such Closing shall be conveyed to the Buyer free and clear of all Liens.

(l)    Environmental Matters. Except as disclosed on Schedule 3.1(l):

(i)    the Second Assets comply in all material respects with, and have at all times complied in all material respects with all Environmental Laws; and

(ii)    none of the Assets is, nor has ever been, a "Source of Contaminant" as such term or similar terms is or are defined under Environmental Laws, including, without limitation, the *Environmental Protection Act* (Ontario).

(m)    Goods and Services Tax Exemption. Seller is registered for purposes of Part IX of the GST Legislation.

(n)    Certain Agreements.

(i)    Schedule 3.1(n) lists each oral or written (1) employment or consulting Contract which is not terminable by Seller or its assignees without liability or penalty on 30 days or less notice, (2) Contract under which any party thereto remains obligated to provide goods or services having a value, or to make payments aggregating, in excess of $10,000 per year in the aggregate, (3) Contract that is otherwise material to Seller or the Assets or the conduct of the Business, (4) Contract relating to leasehold interests, and (5) Contract set forth on Schedule 3.1(q) (relating to agreements with Affiliates of Seller), in any such case to which Seller is a party or by which or to which Seller or the Assets is bound or subject. Each such Contract described in Schedule 3.1(n) or required to be so described is a valid and binding obligation of Seller and is in full force and effect without amendment. Seller and, to the Knowledge of Shareholder, each other party to such Contracts has performed in all material respects the obligations required to be performed by it under such Contracts and is not (with or without lapse of time or the giving of notice, or both) in breach or default thereunder. Except as disclosed in Schedule 3.1(n), Seller has not received (i) any notice, written or otherwise, of defaults by Seller under any Contract required to be listed in Schedule 3.1(n), or (ii) any notice written or otherwise, that any other party to any such contract has terminated or cancelled, or intends to terminate or cancel, such Contract. Schedule 3.1(n) identifies, as to each such Contract required to be listed thereon, (1) whether the consent of the other party thereto is required, (2) whether notice must be provided to any party thereto (and the length of such notice), (3) whether any payments are required (and the amount of such payments), in each case in order for such Contract to continue in full force and

S 000427

effect upon the consummation of the transactions contemplated in the Transaction Documents, (4) whether such Contract will be assumed by Buyer and (5) whether such Contract can be cancelled by the other party without liability to such other party due to the consummation of the transactions contemplated in the Transaction Documents. A complete copy of each written Contract and a description of each oral Contract required to be set forth in Schedule 3.1(n) has been provided to Buyer prior to the date of this Agreement.

(ii)    Other than as disclosed in writing to Alan Brown, on behalf of Buyer, Seller is not a party to any oral or written agreement, plan or arrangement with any employee (whether an employee, consultant or an independent contractor) of Seller (A) the benefits of which are contingent, or the terms of which are materially altered, upon, or result from, the occurrence of a transaction involving Seller of the nature of any of the transactions contemplated by this Agreement or the other Transaction Documents, (B) providing severance benefits or other benefits after the termination of employment or other contractual relationship regardless of the reason for such termination and regardless of whether such termination is before or after a change of control, or (C) any of the benefits of which will be increased, or the vesting of benefits of which will be accelerated, by the occurrence of any of the transactions contemplated by this Agreement or the other Transaction Documents or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement.

(o)    Employee Benefit Matters; Labor.

(i)    Schedule 3.1(o) provides a complete and accurate description of each of the Employee Benefit Plans which is sponsored, maintained or contributed to by Seller for the benefit of the Employees, or has been so sponsored, maintained or contributed to within six years prior to the First Closing Date for the benefit of such individuals or as to which Seller has any liability or obligation. The Employee Benefit Plans include:

(A)    pension plans which have been registered under the Tax Act and under Ontario pension law ("Pension Plans"); and

(B)    each other personnel policy, plan, program, arrangement or understanding (whether funded or not) which provides benefits to any present or former employee of Seller, including any stock option plan, stock purchase plan, stock appreciation rights plan, phantom stock plan, collective bargaining agreement, bonus plan or arrangement, profit sharing plan, incentive award plan or arrangement, vacation policy, severance pay plan, policy or agreement, deferred compensation agreement or arrangement, executive compensation or supplemental income arrangement, consulting agreement, employment agreement, disability, medical, dental,

20

S 000428

hospitalization and death benefit insurance plan (individually, a "<u>Benefit Program or Agreement</u>" or, if there is more than one, the "<u>Benefit Programs or Agreements</u>").

(ii)    True, correct and complete copies of each of the Pension Plans, related trusts, insurance or group annuity contracts and each other funding or financing arrangement relating to any Pension Plan, including all amendments thereto, have been furnished to Buyer. A true, correct and complete copy of the most recent actuarial valuation report for each Pension Plan has been furnished to Buyer. True, correct and complete copies or descriptions of all Benefit Programs and Agreements have also been furnished to Buyer.

(iii)   Except as otherwise set forth on <u>Schedule 3.1(o)</u>,

(A)    As to any Pension Plan, there has been no event or condition which presents the risk of termination, no notice of intent to terminate the Pension Plan has been given, no proceeding has been instituted to terminate the Pension Plan.

(B)    With respect to any Employee Benefit Plan, which is not listed in <u>Schedule 3.1(o)</u> but which is sponsored, maintained or contributed to, or has been sponsored, maintained or contributed to within six years prior to the First Closing Date, by any corporation, trade, business or entity under common control with Seller, ("<u>Commonly Controlled Entity</u>"), (1) no withdrawal liability, has been incurred, which withdrawal liability has not been satisfied, (2) no liability has been incurred by any Commonly Controlled Entity, which liability has not been satisfied, (3) no accumulated funding deficiency has been incurred, and (4) all contributions (including installments) to such plan required by law or contract have been timely made.

(C)    No amendments have been made to any of the Employee Benefit Plans, no improvements promised, and no such amendments or improvements will be made or promised prior to the Second Closing except as specified in Schedule 3.1(o)(ii).

(D)    All employee data provided is true and correct.

(E)    All contributions or premiums required to be paid under each Employee Benefit Plan have been paid in a timely fashion in accordance with the relevant Employee Benefit Plan and Applicable Laws.

(F)    There have been no improper withdrawals, applications or transfers of assets from any Employee Benefit Plan or related fund.

S 000429

(G)    All material obligations with respect to the Employee Benefit Plans have been satisfied and there are no outstanding defaults or violations by any party thereto.

(H)    There are no outstanding actions or claims with respect to the Employee Benefit Plans or the assets thereof, except for the payment of benefits in the ordinary course.

(I)    Each of the Employee Benefit Plans is in compliance with all Applicable Laws and have been administered in accordance with their terms.

(J)    No changes have occurred which would materially affect the Pension Plan actuarial valuation reports required to be provided to the Buyer.

(K)    Neither the Seller nor its agents has been in breach of any fiduciary obligation with respect to the administration of any Pension Plan.

(L)    There are no outstanding liabilities under the Tax Act with respect to any Pension Plan.

(M)    No insurance policy or other contract affecting any Employee Benefit Plan requires or permits a retroactive increase in premiums or payments due thereunder.  All Benefit Plans (other than Pension Plans) have been insured by the Seller through Aetna Canada as disclosed in <u>Schedule 3.1(o)</u>.

(iv)    Seller is a party to the collective bargaining agreement attached as <u>Schedule 3.1(o)</u>. Seller is in compliance with all terms of the collective bargaining agreement. There is no labor strike or labor dispute, slowdown, work stoppage or lockout pending or, to the Knowledge of Seller and Shareholder, threatened against or affecting Seller.  Other than as disclosed in Schedule 3.1(o), Seller (A) is, and has always been since January 1, 1995, in substantial compliance with all applicable laws and regulations regarding labor and employment practices, including, without limitation, terms and conditions of employment, equal employment opportunity, employee compensation, employee benefits, affirmative action, wages and hours, plant closing and mass layoff, occupational safety and health, immigration, workers' compensation, disability, unemployment compensation, whistleblower laws or other employment or labor relations laws, (B) is not engaged, nor has it since January 1, 1995, engaged, in any unfair labor practices, and has no, and has not had since January 1, 1995, any, unfair labor practice charges or complaints pending or, to the Knowledge of Seller and Shareholder threatened against it, (C) has no, and has not had since January 1, 1995, any, grievances, arbitrations, or other proceedings arising or asserted to arise under any collective bargaining agreement, pending or, to the Knowledge of Seller and Shareholder threatened, against it and (D) has no, and has not had since January 1, 1995, any, charges, complaints, or proceedings before the

S 000430

Department of Labor or any other Governmental Entity responsible for regulating labor or employment practices, pending, or, to the Knowledge of Seller and Shareholder, threatened against it.

(v)    Schedule 3.1(o) contains a true and complete list of all persons employed by Seller, including the respective dates of hire of each, a description of material compensation arrangements (other than employee benefit plans set forth in Schedule 3.1(o)) and a list of other terms of any and all material agreements affecting such persons. Unless otherwise disclosed in Schedule 3.1(o), all of such persons are resident in the Province of Ontario.

(p)    Intellectual Property. Schedule 3.1(p) is a true and complete list of all of the Intellectual Property including, with respect to any Intellectual Property that has been registered or that is subject to an application for registration, the country or jurisdiction subject to such registration or application. True and complete copies of all documents representing such Intellectual Property, and all license agreements or Contracts pertaining to any such Intellectual Property, have previously been provided to Buyer. Except as disclosed in Schedule 3.1(p):

(i)    Seller's interest in each item of Intellectual Property is free and clear of all Liens;

(ii)    Seller does not use any United States or foreign patents, patented processes, design patents, utility models or industrial designs in carrying on the Business;

(iii)    For each United States and foreign registered trademark, registered service mark, distinguishing guise and registered trade name listed in Schedule 3.1(p) as owned by Seller, all appropriate affidavits and associated fees necessary to show continued use, and all renewals and associated fees, have been timely filed with the appropriate administrative or governmental office;

(iv)    Each United States and foreign application for registration of a trademark, service mark, distinguishing guise, trade name or copyright listed in Schedule 3.1(p) as owned by Seller, remains pending and has not been abandoned;

(v)    Each license agreement or Contract under which Seller has any license, right or interest in the Intellectual Property is a valid, binding and enforceable agreement which remains in full force and effect, and for each such license agreement or Contract, Seller has a paid-up, royalty-free, perpetual license, and no restrictions exist which would prohibit or impair the ability of Seller to assign each such license agreement or Contract to Buyer;

(vi)    No product used, sold or manufactured by Seller, nor the conduct of the Business by Seller as it is currently conducted, infringes on or otherwise violates the

23

S 000431

patent, design patent, industrial design, trademark, service mark, trade name, copyright, industrial model, utility model, confidential information, trade secret or other intellectual property rights of any third party;

(vii)    To the Knowledge of Seller and Shareholder, no third party is challenging or infringing or otherwise violating any of the Intellectual Property owned by Seller;

(viii)    To the Knowledge of Seller and Shareholder, no third party is challenging or infringing or otherwise violating the Intellectual Property under which Seller has any right, license or interest;

(ix)    To the Knowledge of Seller and Shareholder, there are no restrictions that would materially impair the use of any United States or foreign trademark, service mark, distinguishing guise or trade name listed in Schedule 3.1(p) by Buyer or the transfer of any United States or foreign trademark, service mark or trade name listed in Schedule 3.1(p) to Buyer; and

(x)    Seller has taken commercially reasonable precautions to maintain the confidentiality of the Know-how relating to the Business.

(q)    Affiliate Relationships.  Other than as disclosed in Schedule 3.1(q), no officer, director, employee, shareholder or Affiliate of Seller or Shareholder is or has ever been a party to an agreement, contract or other arrangement relating to the sales or marketing of the Business or the purchase by or the sale of goods to the Business.

(r)    Assets.  The Assets (including for the purposes of this Section 3.1(r), the Excluded Assets) constitute all of the assets (real, personal, or mixed, tangible or intangible), properties, licenses, permits, Contracts and other agreements which are used or held for use in the operation of the Business as presently conducted by Seller.

(s)    Information Systems Plan.  Attached hereto as Schedule 3.1(s) is a true and correct copy of the Seller's plan to address the ability of Seller's information systems to accurately process date and time data (including, but not limited to, calculation, comparing and sequencing) from, into and between the twentieth and twenty-first centuries and the years 1999 and 2000 and leap year calculations, and beyond the year 2000 ("Year 2000 Data"), and the ability of such systems to interact with third parties' systems and with and through electrical power, telecommunications and other utilities and services.

(t)    Warranty Matters.    Except as set forth on the Financial Statements or on Schedule 3.1(t), there are no claims pending or, to Knowledge of Seller or Shareholder, threatened against Seller for products furnished by Seller which are defective or fail to meet any product warranties. Except as set forth on Schedule 3.1(t), no claim of any breach of product or service warranty to any customer is pending against Seller with respect to

24

S 000432

products produced in the conduct of the Business nor, to the Knowledge of Seller, is any such claim threatened.

(u)    No Other Agreements to Purchase. No person, other than Buyer, has any written or oral agreement or option or any right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option for the purchase from Seller of any of the Assets, other than pursuant to purchase orders accepted by Seller in the ordinary course of the Business.

(v)    Books and Records.    The books of account and financial records of Seller have been kept in accordance with generally accepted accounting principles and procedures on a basis consistent with those of preceding accounting periods and fairly and correctly set out and disclose in all material respects the current financial position of Seller and all transactions of Seller have been accurately recorded in such books and records.  All vacation pay, bonuses, commissions and other emoluments relating to each of the employees of the Business have been accrued to date in such books.

(w)    Unfilled Orders. All unfilled orders (whether or not there are any contracts in writing with respect thereto) which are in existence as at the date of this Agreement have been accepted by Seller in the ordinary course of the Business and upon terms and conditions consistent with normal industry terms and Seller's usual past practices.

(x)    Forward Commitments. All forward commitments by or to Seller for Inventory, supplies, equipment or services, whether or not there are any contracts in writing with respect thereto, which are in existence have been entered into by Seller in the ordinary course of business and upon terms and conditions consistent with their usual past practices.  There are no material forward commitments for Inventory, supplies, equipment or services.

(y)    No Material Adverse Changes. Other than as disclosed in writing to Alan Brown, on behalf of Buyer, since September 30, 1999, there have been no material adverse changes in the affairs, business, prospects, liabilities, assets, operations or condition of the Business, financial or otherwise, including without limitation, changes arising as a result of any legislative or regulatory change, revocation of agreement, licences or rights to do business, fire, explosion, accident, casualty, labor trouble, act of god or other public force or otherwise.

(z)    Business Carried on in Ordinary Course. Other than as disclosed in writing to Alan Brown, on behalf of Buyer, since September 30, 1999, Seller has carried on the Business in the ordinary course and has not done any act or suffered anything to be done which would in any way materially diminish the value of the Assets or the Business. Without limiting the generality of the foregoing, since September 30, 1999, Seller has:

(i)    continued to pay, satisfy and discharge its obligations and liabilities in the ordinary course of business;

S 000433

25

(ii)    not disposed of any of the Inventory, other than in the ordinary course of business;

(iii)    not sold or transferred any tangible assets or cancelled or released any debts or claims, except in each case, in the ordinary course of business or not exceeding $5,000 in any single transaction or $25,000 in the aggregate;

(iv)    not sold, leased, mortgaged, pledged or otherwise encumbered or disposed of any of the assets or properties of or relating to the Business, except in the ordinary course of business;

(v)    not purchased or agreed to purchase, nor leased or agreed to lease, nor acquired or agreed to acquire any additional assets or property, except for purchases of materials and supplies for use in the ordinary and usual conduct of the course of business;

(vi)    not suffered any material damage, destruction or loss, whether or not covered by insurance;

(vii)    not sold, assigned, transferred, encumbered or granted any rights with respect to copyright, trademarks, trade names, licences, franchises or other intangible assets;

(viii)    not incurred any debt, liability or obligation whatsoever, absolute or contingent, secured or unsecured, other than current liabilities in the ordinary course of business, and not entered into any transaction or into any contract or agreement whatsoever, other than in the ordinary course of business;

(ix)    not assured, guaranteed or otherwise become liable for the obligations of any other person, firm or corporation; or

(x)    not authorized, declared or paid any unusual management fees or bonuses, dividends or other distributions on any of the shares of Seller.

(aa)    No Expropriation. No part of the Assets has been taken or expropriated by any federal, provincial, state, municipal or other authority nor has any notice or proceeding in respect thereof been given or commenced nor is Seller or Shareholder aware of any intent or proposal to give any such notice or continence any such proceeding.

(bb)    Solvency. Neither Seller nor Shareholder is insolvent, has committed any act of bankruptcy, proposed a compromise or arrangement to its creditors generally, had any petition for a receiving order in bankruptcy filed against it, taken any proceeding with respect to a compromise or arrangements, taken any proceeding to have itself declared bankrupt or wound-up, taken any proceeding to have a receiver appointed of any part of its assets, had

S 000434

any encumbrancer take possession of any of its property, or had any execution or distress become enforceable or become levied upon any of its property.

(cc)   <u>Liabilities.</u>   Except as disclosed in Schedule 3.1(cc) hereto or in the Financial Statements, Seller has not been and is not now subject to any Liabilities or obligations, direct, indirect or contingent, other than those disclosed in this Agreement and those arising in the ordinary course of business (none of which are materially adverse) since September 30, 1999. Without limiting the generality of any representation or warranty contained in this Agreement, to the Knowledge of Seller nor Shareholder, there are no facts or circumstances which might reasonably serve as the basis for, or give rise to, any material Liabilities or obligations on the part of Seller or Shareholder which are not disclosed in this Agreement, other than those arising in the ordinary course of business (none of which are materially adverse).

(dd)   <u>No Broker.</u>   There is no broker, finder or other person who has any valid claim against Buyer for a commission, finder's fee or brokerage fee in connection with this Agreement or the consummation of the transactions contemplated hereby, by virtue of any action taken by Seller or Shareholder. For greater certainty, each of Seller and Shareholder shall be jointly and severally responsible for the satisfaction of any such unpaid obligations incurred by or on behalf of them in connection with the transactions contemplated herein. There are no Seller Transaction Costs other than those that are only for the account with Seller.

(ee)   <u>Customer and Supplier Relations.</u>   Other than as disclosed in writing to Alan Brown, on behalf of Buyer, there has not been any material adverse change in relations with customers or suppliers of the Business since March 31, 1999 or as a result of the transactions contemplated by this Agreement and, to the Knowledge of Seller and Shareholder no such change is anticipated. Schedule 3.1(ee) hereto sets forth a complete and accurate list of all of the customers of the Business as at the date hereof including a list of the addresses and telephone numbers of such customers and a detailed breakdown of the sales made to such customers over the past two years broken down by sales volume and product type. Except as disclosed in <u>Schedule 3.1(ee)</u>, each of the customers of the Business pays its account in a timely fashion and has been active in terms of revenue generation during the immediately preceding 12 months. Schedule 3.1(ee) hereto sets forth a complete list of all suppliers of the Business as at the date hereof and contains an accurate list of the addresses and telephone numbers of such suppliers.

(ff)   <u>Computer Systems.</u>   To the Knowledge of Seller and Shareholder, Seller's computer system related to the production process of the Business or the Assets, including but not limited to, mainframes, mini-computers, personal computers and special purpose systems are fully operational and have adequate documentation describing, among other things, the operation of the hardware, required maintenance, daily/weekly/monthly/quarterly/ annual "run books" or other operational procedures, all operating systems, applications and utilities. The documentation matches the implementation of the hardware and software in use as of

S 000435

the date thereof. To the Knowledge of each of Seller and Shareholder, Seller is in material compliance with all legal obligations with respect to all software used by it and has license to use all software currently used by it which it does not own. Further, Seller has a copy of source codes, fully annotated, for all custom software and all other software not generally available to the public, used by Seller in connection with the production process of the Business or the Assets.

(gg)    Equipment

   (i)    Schedule 3.1(j) hereto contains a materially complete and materially accurate list as at the date hereof of all machinery, equipment, tools, furniture, furnishings (whether or not fixtures), and accessories of all kinds used in connection with the Business.

   (ii)    Schedule 3.1(j) hereto contains a materially complete and materially accurate list as at the date hereof of all motor vehicles, including trucks and trailers, owned by Seller setting out the year of make, vehicle description and the employee for whom the vehicle is provided.

   (iii)    Schedule 3.1(j) hereto contains a materially complete and materially accurate list as at the date hereof all leases of all leased assets including, without limitation, motor vehicles, trucks and trailers.

(hh)    Seller's Residency. Seller (other than the Subsidiary) is not a non-resident of Canada within the meaning of the Tax Act.

(ii)    Disclosure. No representation or warranty by Seller contained in this Agreement or in any exhibit, schedule, written statement, certificate or other document delivered or to be delivered by Seller pursuant to this Agreement or in connection with the consummation of the transactions contemplated hereby contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading or which might be reasonably expected to diminish Buyer's appreciation of the worth or profitability of the Business or the Assets or which, if known by the Buyer, might be reasonably expected to deter it from completing the transactions contemplated herein.

(jj)    Bring-Down of Representations and Warranties. Each of the representations and warranties of Seller and Shareholder contained herein shall be deemed to be true and correct in all material respects (except for those representations and warranties which are by their terms qualified by a standard of materiality, which representations and warranties are true in all respects) as at the Second Closing.

S 000436

28

3.2    <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller as follows (with the understanding that Seller is relying on such representations and warranties in entering into and performing this Agreement):

(a)    <u>Organization Standing and Power</u>.   Pet Life and Dad's are corporations duly organized, validly existing, and in good standing under the laws of the States of Illinois and Pennsylvania, respectively, and each such corporation has all requisite corporate power and authority to own, lease, and operate its respective properties and to carry on its respective businesses as now being conducted.

(b)    <u>Authority</u>.  Buyer has all requisite corporate power and authority to enter into this Agreement and the other Transaction Documents to which it will be a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery of such Transaction Documents by Buyer and the consummation by Buyer of the transactions contemplated hereby or thereby have been duly authorized by all necessary corporate action on the part of Buyer. The Transaction Documents to which Buyer will be a party have been, or upon execution and delivery will be, duly executed and delivered and constitute, or upon execution and delivery will constitute, the valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms, subject as to enforceability to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws affecting creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)    <u>No Conflict; Required Filings and Consents</u>.  The execution and delivery of this Agreement and the other Transaction Documents to which Buyer will be a party do not, and the performance by Buyer of the transactions contemplated hereby or thereby will not, subject to obtaining the consents, approvals, authorizations, and permits and making the filings described in this Section 3.3(c), (i) violate, conflict with or result in any breach of any provisions of Buyer's constating documents or by-laws, (ii) violate, conflict with, or result in a violation or breach of, or constitute a default (with or without due notice or lapse of time or both) under, or permit the termination of, or result in the acceleration of, or entitle any party to accelerate (whether as a result of a change of control of Buyer or otherwise) any obligation under any of the terms, conditions, or provisions of any loan or credit agreement, note, bond, mortgage, indenture, deed of trust, or any license, lease, agreement or other instrument or obligation to which Buyer is a party, or (iii) violate any order, writ, judgment, injunction, decree, statute, law, rule or regulation, of any Governmental Entity applicable to Buyer. No Consent of any Governmental Entity is required by or with respect to Buyer in connection with the execution and delivery of this Agreement or any of the other Transaction Documents by Buyer or the consummation by Buyer of the transactions contemplated hereby or thereby.

(d)    <u>Litigation</u>.   There is no claim, action, suit, inquiry, judicial or administrative proceeding, grievance or arbitration pending or, to the Knowledge of Buyer, threatened

S 000437

against Buyer relating to the transactions contemplated by this Agreement or that could reasonably be expected to materially and adversely affect Buyer's ability to consummate the transactions contemplated in this Agreement and in the other Transaction Documents.

(e)     Reports; Financial Statements; Absence of Certain Changes or Events. Buyer has delivered to Seller copies of (A) the audited balance sheet of Buyer as at December 31, 1998, together with the audited statements of income and cash flows of Buyer for the year then ended, and the notes thereto, accompanied by the reports thereon of Thomas Havey, certified public accountants, with respect to the financial statements of Pet Life and DDK&D, certified public accountants, with respect to the financial statements of Dad's (collectively, the "Buyer Audited Financial Statements"), and (B) the unaudited balance sheet (the "Buyer Balance Sheet") of Buyer as at September 30, 1999 (the "Buyer Balance Sheet Date"), together with the related unaudited statements of income and cash flows of Buyer for the period then ended (collectively, the "Buyer Unaudited Financial Statements") (the Buyer Audited Financial Statements and the Buyer Unaudited Financial Statements are collectively referred to in this Agreement as the "Buyer Financial Statements"). The Buyer Financial Statements, including the notes thereto, were (a) prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby (except to the extent disclosed therein or required by changes in GAAP); (b) fairly, fully and correctly present the results of operations of Buyer for the respective periods indicated; (c) are in accordance with the books and records of Buyer; and (d) contain and reflect all necessary adjustments for a fair presentation of the results of operations of the business of Buyer for the periods covered thereby.

(f)     [intentionally deleted]

(g)     Disclosure. No representation or warranty by Buyer contained in this Agreement or in any exhibit, schedule, written statement, certificate or other document delivered or to be delivered by Buyer pursuant to this Agreement or in connection with the consummation of the transactions contemplated hereby contains or will contain any untrue statement of a material fact, or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

**ARTICLE 4**

**COVENANTS DURING INTERIM PERIOD RELATING TO CONDUCT OF BUSINESS**

**4.1     Covenants of Seller.** Except as contemplated by this Agreement or to the extent that Buyer shall otherwise consent in writing, Seller covenants and agrees that, during the Interim Period, Seller shall not:

(a)     fail to use commercially reasonable efforts to maintain the Second Assets in their

30

S 000438

current condition, except for ordinary wear and tear and damage by casualty governed by Section 7.3; or

(b)    amalgamate or consolidate with or into any other legal entity other than Affiliates of Seller, dissolve, or liquidate; or

(c)    increase in any manner the compensation or fringe benefits of, or pay any benefit not by any existing agreement to, any employee associated with the sales and marketing of the Business, except in the ordinary course of business and consistent with the past practices or except as required by law; or

(d)    acquire (including, without limitation, by merger, consolidation, or the acquisition of any equity interest or assets) or sell (whether by merger, consolidation, or the sale of an equity interest or assets), lease, or dispose of any Second Assets except in the ordinary course of business and consistent with past practices or, even if in the ordinary course of business and consistent with past practices (other than sales of surplus or obsolete equipment), whether in one or more transactions, in no event involving a Second Asset or Second Assets having an aggregate fair market value in excess of $20,000; or

(e)    mortgage, pledge, or subject to any Lien any of the Second Assets; or

(f)    without the prior written consent of Buyer, acting reasonably, commence or pursue any action against any customers of the Business to recover, or engage the services of any collection agency in connection with, any Accounts Receivable.

## ARTICLE 5

## ADDITIONAL AGREEMENTS OF SELLER AND THE SHAREHOLDER

### 5.1    No Solicitation of Transactions; Break-up Fee.

(a)    The Shareholder and Seller hereby jointly and severally covenant and agree with Buyer that neither Seller nor Shareholder shall, directly or indirectly, through any officer, director, shareholder, employee, agent, financial advisor, banker or other representative, or otherwise, solicit, initiate or encourage the submission of any proposal or offer from any person relating to any acquisition or purchase of all or any material portion of the Business or the Assets or any equity interest in Seller or any amalgamation, consolidation, share exchange, business combination or other similar transaction with Seller or participate in any negotiations regarding, or furnish to any other person any information with respect to, or otherwise cooperate in any way with, or assist or participate in, facilitate, or encourage, any effort or attempt by any other person to do or seek any of the foregoing. The Shareholder and Seller hereby jointly and severally covenant and agree with Buyer that Seller and Shareholder shall immediately communicate to Buyer the material terms of any such proposal (and the identity of the party making such proposal) which it may receive and, if

S 000439

such proposal is in writing, Seller and Shareholder shall promptly deliver a copy of such proposal to Buyer. The Shareholder and Seller hereby jointly and severally covenant and agree with Buyer that neither Seller nor Shareholder shall release any third party from, or waive any provision of, any confidentiality or standstill agreement to which Shareholder and Seller is a party. The Shareholder and Seller hereby jointly and severally covenant and agree with Buyer that Seller and Shareholder immediately shall cease and cause to be terminated all existing discussions or negotiations with any parties conducted heretofore with respect to any of the foregoing.

(b)    If Seller or Shareholder breaches their respective representations, warranties, covenants or other agreements set forth in subsection 5.1(a), Seller and Shareholder shall immediately pay all of Buyer's expenses incurred in connection with the transactions contemplated herein up to a maximum of Thirty-five Thousand dollars ($35,000). The receipt of this amount will not serve as the exclusive remedy to Buyer under this Agreement in the event of a breach by Seller or Shareholder of this Section 5.1, and Buyer will be entitled to all other rights and remedies provided by law or in equity.

5.2    Access and Information. During the Interim Period, Seller shall afford to Buyer and its representatives (including accountants and counsel) full access, during normal business hours, upon reasonable notice and in such manner as will not unreasonably interfere with the conduct of the business of Seller, to all properties, books, records and Tax Returns of Seller and all other information with respect to the Business or the Assets (including, without limitation, all technical information and data, machinery and equipment warranties, plans, diagrams, blueprints and schematics relating to the Business and the Assets), together with the opportunity to make copies of such books, records and other documents and to discuss the Business with such officers, directors, managerial personnel, accountants, consultants and counsel for Seller as Buyer deems reasonably necessary or appropriate for the purposes of familiarizing itself with Seller and the Business, including the right to visit the Business. In furtherance of the foregoing, Seller shall authorize and instruct its accountants and auditors to meet with Buyer and its representatives, including Buyer's independent public accountants and auditors, to discuss the business and accounts of Seller and to make available (with the opportunity to make copies) to Buyer and its representatives, including its independent public accountants, all the work papers of its accountants related to their audit of the consolidated financial statements and Tax Returns of Seller.

5.3    Compliance With Laws. Seller hereby covenants and agrees with Buyer that Seller will operate the Business in compliance with all Applicable Laws. If Seller (or its counsel) receives an administrative or other order or notification relating to any violation or claimed violation of any Applicable Law that could affect Seller's ability to consummate the transactions contemplated hereby and by the other Transaction Documents, Seller shall promptly notify Buyer in writing and use its commercially reasonable efforts to take such steps as may be necessary to remove any such impediment to the transactions contemplated by this Agreement and by the other Transaction Documents.

S 000440

**5.4**   <u>Notification of Certain Matters</u>.  Seller and Shareholder shall give prompt written notice to Buyer of (a) the occurrence, or failure to occur, of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Seller contained in this Agreement to be untrue or inaccurate in any material respect at any time during the Interim Period, (b) the failure of Seller, or any officer, director, employee or agent of Seller, to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder, (c) the occurrence of any threat made to Seller by any personnel to resign or otherwise terminate their employment or independent contractor relationship with Seller.  No such notification shall affect the representations or warranties of the parties or the conditions to their respective obligations hereunder.

**5.5**   <u>Third Party Consents</u>.  During the Interim Period, Seller shall use its best efforts, including making any required payments, to obtain the written consent from any party to an agreement or instrument identified in <u>Schedule 3.1(n)</u> or any other Assumed Contract which is required to permit the consummation of the transactions contemplated hereby.

**5.6**   <u>Conditions Precedent.</u>  During the Interim Period, Seller shall use its reasonable commercial efforts to satisfy all conditions precedent set forth in Section 8.1.  Seller agrees to immediately notify Buyer if, in the opinion of Seller, acting reasonably, any of such conditions will be unable to be satisfied prior to the Second Closing.

## ARTICLE 6

## COVENANTS OF BUYER

**6.1**   Buyer shall give to Seller prompt written notice of:

(a)   the occurrence, or failure to occur, of any event of which it becomes aware that has caused or that would be likely to cause any representation or warranty of Buyer or Seller contained in this Agreement to be untrue or inaccurate at any time during the Interim Period; or

(b)   the failure of Buyer, or any officer, director, employee or agent thereof, to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it hereunder.

No such notification shall affect the representations or warranties of the parties, the conditions to their respective obligations hereunder or liability for breach of representation or warranty hereunder.

S 000441

33

## ARTICLE 7

## MUTUAL COVENANTS

**7.1    Governmental Consents.** Promptly following the execution of this Agreement, the parties shall proceed to prepare and file with the appropriate Governmental Entities such requests, reports, or notifications as may be required in connection with this Agreement and shall diligently and expeditiously prosecute, and shall cooperate fully with each other in the prosecution of, such matters.

**7.2    Bulk Sales Law.** Buyer agrees to waive compliance by Seller with the requirements of the *Bulk Sales Act* (Ontario) and any other bulk sales or fraudulent conveyance statute applicable to Seller or the Assets, and Seller, in consideration of such waiver, agrees to indemnify and hold Buyer harmless against any and all damages, losses, claims, liabilities, demands, charges, suits, penalties, costs and expenses (including court costs and reasonable attorneys' fees and expenses incurred in investigating and preparing for any litigation or proceeding) resulting from or arising out of any failure to comply with any such statute.

**7.3    Risk of Loss.**

(a)    The risk of any loss, damage, impairment, confiscation, or condemnation of any of the Second Assets from any cause whatsoever shall be borne by Seller at all times during the Interim Period.  In the event of any such loss, damage, impairment, confiscation, or condemnation, whether or not covered by insurance (a "Loss"), Seller shall promptly notify Buyer of such loss, damage, impairment, confiscation, or condemnation, which notice shall provide an estimate of the costs to repair, restore or replace such Assets and shall state whether Seller intends to repair, restore or replace such assets.

(b)    If Seller does not or cannot restore or replace lost, damaged, impaired, confiscated or condemned Second Assets (the "Damaged Second Assets") or informs Buyer that it does not intend to restore or replace such Second Assets in connection with a Loss, Buyer may at its option:

> (i)    proceed to the Second Closing without Seller completing the restoration and replacement of the Damaged Second Assets, provided however that Buyer may decide not to purchase some or any of the Damaged Second Assets and, consequently, may reduce the cash portion of the Purchase Price due at the Second Closing by the amount of the Purchase Price which has been allocated to such Damaged Second Assets not purchased by Buyer as set out in Schedule 2.4; or

> (ii)    proceed to the Second Closing without Seller completing the restoration and replacement of the Damaged Second Assets, provided that Seller shall assign all rights under applicable insurance policies and condemnation awards, if any, to Buyer, (provided, however, that Buyer shall not be entitled to retain any amount which,

34

when added to the fair market value of the Second Assets purchased by Buyer, exceeds $1,750,000) and that the cash portion of the Purchase Price due at the Second Closing shall be reduced by the repair or replacement cost of such Damaged Second Assets to the extent not covered by such insurance proceeds or condemnation awards.

(c)     Buyer will notify Seller of a decision under the options described in Section 7.3(b)(i) or 7.3(b)(ii) above within ten Business Days after Seller's notice to Buyer of the Loss; provided, however, that if Seller states that it intends to restore the Damaged Second Assets and if Seller has not restored or replaced such Damaged Second Assets prior to the Second Closing Date, notwithstanding Buyer's prior delivery of a notice pursuant to proceed pursuant to this subsection 7.3(c), Buyer shall continue to have the right to exercise its option pursuant to subsection 7.3(b) at any time prior to the Second Closing.

7.4     **Employment Matters**.  Seller agrees that, with respect to all claims by employees of Seller arising from claims incurred under all Employee Benefit Plans whether insured or otherwise (including, but not limited to, pension, bonus, retirement, vacation, life insurance, medical, severance and disability programs), Seller at its own expense shall honor or cause to be honored such claims, whether made before or after the date hereof, in accordance with the terms and conditions of such Employee Benefit Plans.  Buyer shall not be obligated to pay, assume, perform or discharge any claim, demand, liability or obligation of any kind whatsoever under Employee Benefit Plan, and Seller shall indemnify and hold harmless Buyer for any loss, cost, claims, damage, liability or expense which Buyer may suffer or incur as result thereof.

7.5     **Additional Agreements**.  Subject to the terms and conditions of this Agreement, each of the parties hereto will use its commercially reasonable efforts to do, or cause to be taken all action and to do, or cause to be done, all things necessary, proper, or advisable under Applicable Laws and regulations to consummate and make effective the transactions contemplated by this Agreement. If at any time after the either Closing, any further action is necessary or desirable to carry out the purposes of this Agreement, the parties to this Agreement and their duly authorized representatives shall take all such action.  Without limiting the generality of the foregoing, if, after the either Closing, Buyer seeks indemnification or recovery from one or more other parties to an Assumed Contract or otherwise seeks to enforce such Assumed Contract and, in order to obtain such indemnification, recovery or enforcement, it is necessary for Seller to initiate a suit, participate in any enforcement proceeding or otherwise provide assistance to Buyer, then, at the request and the sole expense of Buyer, Seller shall take such action as Buyer may reasonably request in connection with Buyer's efforts to obtain such indemnification, recovery or enforcement.

7.6     Option to Purchase Certain Equipment.

(a)     At any time after December 20, 1999 and prior to the Second Closing Date, Buyer shall have the option (the "Equipment Option"), in its sole discretion, to purchase from Seller the equipment set out in Schedule 7.6 (the "Purchased Equipment") for a purchase price of $820,000 (plus applicable PST and GST) (the "Equipment Purchase Price"). The Equipment

35

Option may be exercised by Buyer by delivery of an executed revocable notice (the "Equipment Notice") to Seller in accordance with the notice provisions contained herein which Equipment Notice shall contain the date (the "Equipment Purchase Date") that Buyer wishes to purchase such equipment (such date being at least five Business Days after the date of delivery of the Equipment Notice and being no later than the Second Closing Date). If Buyer has delivered the Equipment Notice to Seller, Seller shall sell, assign, transfer, convey and deliver to Buyer and Buyer shall purchase, on the Equipment Purchase Date, the Purchased Equipment free and clear of any Liens or liabilities whatsoever in consideration of the payment of the Equipment Purchase Price. At the Equipment Purchase Date, Seller and Buyer shall also enter into a Bill of Sale and Assignment (in the form of the Bill of Sale and Assignment attached hereto as Schedule A) and such other conveyance documents as may be reasonably requested by Buyer.

(b)    Notwithstanding anything contained herein, Buyer shall have the right, in its sole discretion, to revoke the Equipment Notice after delivery to Seller at any time prior to the Equipment Purchase Date without any recourse to Buyer or further obligation on Buyer to purchase the Purchased Equipment on the Equipment Purchase Date.

(c)    If Buyer has exercised the Equipment Option and has purchased the Purchased Equipment as contemplated in Section 7.6(a), then the amount of the Letter of Credit (as described in subsection 9.1(b)(v)) and the Purchase Price payable by Buyer to Seller at the Second Closing shall both be reduced by an amount equal to the Equipment Purchase Price (plus applicable PST and GST).

## ARTICLE 8

## CONDITIONS PRECEDENT

8.1    <u>Conditions to Obligation of Buyer</u>. The obligation of Buyer to purchase the Second Assets contemplated in subsection 2.1(b) on the Second Closing Date is hereby subject to the satisfaction of the following conditions unless waived, in whole or in part, by Buyer:

(a)    <u>Title to Assets.</u> At the Second Closing, Seller shall deliver evidence satisfactory to Buyer, acting reasonably, that the Second Assets to be transferred at the Second Closing will be transferred to Buyer free and clear of all Liens.

(b)    <u>Termination of Employees.</u> At the Second Closing, Seller shall have delivered evidence satisfactory to Buyer, in its sole discretion, that:

(i)    (A)    Seller has provided to the Employees the Notice of Termination;

(B)    the notice requirements of the *Employment Standards Act* (Ontario) and the regulations thereto with respect to the termination of

S 000444

employment of the Employees have been or will be complied with prior to the Second Closing; and

      (C)      that all Employees have been and will remain terminated by Seller prior to the Second Closing Date provided, however, that Seller may, subsequent to the Second Closing Date, continue to retain in its employ up to a maximum of ten Employees who are not employed by Seller in any sales or marketing function; and

     (ii)     Seller has paid in full (other than in respect of the Employees retained by Seller as contemplated in subsection 8.1(b)(i)(C)) the payment of:

      (A)     all wages, salaries or other amounts owing pursuant to any employment contract (whether written or verbal) or collective agreement;

      (B)     all premium amounts required to be paid by the Seller with respect to any benefits which the Seller is contractually obliged to provide to the Employees;

      (C)     all amounts owing or arising as a result of the termination of the employment of any of such Employees, whether such obligations arise under contract or statute; and

      (D)     all amounts required to be remitted to any governmental agency with respect to the employment of any of the Employees or with respect to any amount paid to or on behalf of any of the Employees.

**(c)**     <u>Employee Benefit Plans.</u>  Prior to the Second Closing, Seller shall have delivered **evidence** satisfactory to Buyer, acting in its sole discretion, that:

     (i)     it has provided, in respect of each of the Pension Plans, a written notice of proposal to wind up the Pension Plan, which notice of proposal shall provide for an effective date of the winding up of the relevant Pension Plan as of a date which is prior to the Second Closing Date and not earlier that the date the notice was given to members, and which written notice of proposal shall have been given to the Superintendent of Financial Services of Ontario, each member and former member of the Pension Plan and any other person entitled to a payment from the Pension Plan fund, and to each trade union that represents members of the Pension Plan; and

     (ii)     Seller has paid in full, or has posted adequate security (in the form and amount satisfactory to the Buyer, acting reasonably) for the payment of, all contributions required to be paid prior to the Second Closing to each of the

S 000445

Pension Plans and, in addition, the Seller has paid in full, or has posted adequate security (in the form and amount satisfactory to the Buyer, acting reasonably) for the payment of, the amount of any unfunded solvency liability disclosed in the most recent actuarial valuation report for each Pension Plan.

(d)    Consents and Approvals. All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity necessary for the consummation of the transactions contemplated by subsection 2.1(b) shall have been filed, occurred, or been obtained.

(e)    No Injunctions or Restraints. No temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall be in effect.

(f)    No Action. No action shall have been taken nor any statute, rule or regulation shall have been enacted by any Governmental Entity that makes the consummation of the transactions contemplated hereby illegal.

(g)    Proceedings or Investigations. No litigation or administrative proceeding or investigation (whether formal or informal) shall be pending or, to Seller's or Shareholder's or Buyer's Knowledge, threatened which challenges the transactions contemplated hereby by a third party.

(h)    Consents Under Agreements. Buyer shall have been furnished with evidence reasonably satisfactory to it of the consent or approval of each person that is a party to a Contract identified in Schedule 3.1(n) (including evidence of the payment of any required payments) whose consent or approval shall be required in order to permit the consummation of the transactions contemplated to take place at the Second Closing, such consent or approval being in form and substance satisfactory to Buyer.

(i)    Closing Deliveries. All documents, instruments, certificates or other items required to be delivered by Seller and Shareholder pursuant to Section 9.2(c) shall have been delivered.

8.2    Unsatisfied Conditions For the Benefit of Buyer. In case of any of the foregoing conditions declared to be for the benefit of Buyer shall not be satisfied at the Second Closing, Buyer may:

(a)    Ability to refuse to close. Refuse to complete the transactions contemplated herein by delivering notice to Seller, and in such event Buyer shall be released from all obligations hereunder, it being expressly understood and agreed that Buyer may rely, notwithstanding

S 000446

such refusal, upon the warranties, representations, covenants and conditions contained in this Agreement; or

(b)    Ability to close.  Complete the transactions contemplated herein, it being expressly understood and agreed that Buyer may rely, notwithstanding such completion, upon the warranties, representations, covenants and conditions contained in this Agreement and may commence an action against Seller for direct or consequential damages suffered by Buyer as a result of the failure of such conditions being satisfied at the Second Closing.  In addition to the foregoing, if the Seller fails to satisfy the conditions contained in subsection 8.1(b) and 8.1(c), then the Buyer may, at its option, complete the transactions contemplated herein and reduce the amount of the Purchase Price payable to Seller at the Second Closing by an amount equal to the aggregate of the amounts contemplated in subsections 8.1(b)(ii) and 8.1(c)(ii) and pay, on behalf of Seller, such amounts to the appropriate parties contemplated in such subsections.

Provided that any of the said conditions may be waived in whole or in part by Buyer without prejudice to its rights of rescission in the event of the non-fulfilment, non-performance or breach of any other condition, representation or warranty, any such waiver prior to the Second Closing to be binding on Buyer only if the same is in writing.

8.3    Conditions to Obligations of Seller.   The obligation of Seller to effect the transactions contemplated to take place at the Second Closing is subject to the satisfaction of the following conditions, which are for the exclusive benefit of Seller unless waived, in whole or in part, by Seller:

(a)    Closing, Deliveries.  All documents and instruments required to be delivered by Buyer pursuant to Section 9.2(b) shall have been delivered.

(b)    No Injunctions or Restraints.  No temporary restraining order, preliminary or permanent injunction, or other order issued by any court of competent jurisdiction or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall be in effect unless such order or injunction was caused, directly or indirectly, by Seller or Shareholder.

(c)    No Action.  No action shall have been taken nor any statute, rule or regulation shall have been enacted by any Governmental Entity that makes the consummation of the transactions contemplated hereby illegal unless caused, directly or indirectly, by Seller or Shareholder.

8.4    Unsatisfied Conditions for the Benefit of Seller.  In case any of the foregoing conditions hereinbefore declared to be for the benefit of Seller shall not be satisfied at the Second Closing, Seller may:

S 000447

(a)    <u>Ability to refuse to close</u>. Refuse to complete the transactions contemplated herein by delivering notice to Buyer, and in such event Seller or Shareholder shall be released from all obligations hereunder, it being expressly understood and agreed that Seller and Shareholder rely, notwithstanding such refusal, upon the warranties, representations, covenants and conditions contained in this Agreement; or

(b)    <u>Ability to close</u>. Complete the transactions contemplated herein, it being expressly understood and agreed that following such completion, Seller <u>may not</u> thereafter rely on any representations, warranties or covenants relating to any unsatisfied condition of which Seller was aware at the Second Closing.

Provided that any of the said conditions may be waived in whole or in part by Seller without prejudice to its rights of rescission in the event of the non-fulfilment and/or non-performance of any other condition or conditions, any such waiver prior to the Second Closing to be binding on Seller only if the same is in writing.

## ARTICLE 9

## CLOSING

### 9.1    <u>First Closing</u>

(a)    <u>Closing.</u> The First Closing will take place at the offices of Aird & Berlis, BCE Place, 181 Bay Street, Suite 1800, Toronto, Ontario, M5J 2T9 at 10:00 a.m., (Toronto time) on the First Closing Date. For purposes of this Agreement, each and every event referred to in this Article 9.1 that is to occur on the First Closing Date shall be deemed to have occurred contemporaneously.

(b)    <u>Buyer's Deliveries at First Closing.</u> At the First Closing, Buyer shall deliver to the appropriate parties the following:

(i)    <u>Purchase Price</u>. $500,000 plus applicable GST, by certified cheque, bank draft or wire transfer of immediately available funds made payable to Seller (or to such persons as Seller so directs Buyer, in writing);

(ii)    <u>Bill of Sale and Assignment.</u> A counterpart of the Bill of Sale and Assignment relating to the First Assets executed by Buyer;

(iii)    <u>IP Assignment Agreements.</u> A counterpart of each of the IP Assignment Agreements executed by Buyer;

(iv)    <u>Non-Competition Agreements</u>. A counterpart of each of the Non-Competition Agreements executed by Buyer;

40

S 000448

(v)    <u>Letter of Credit.</u>  An irrevocable letter of credit confirmed by a Canadian chartered bank (the "Letter of Credit"), naming the Seller as payee, in the amount of $2,050,000 securing the purchase price for the Second Assets payable at the Second Closing;

(vi)    <u>Legal Opinions.</u>  Executed opinions from Aird & Berlis, Ontario counsel to the Buyer, and from United States corporate counsel to the Buyer, each dated the First Closing Date; and

(vii)    <u>Certificates.</u>  An executed certificate of the president or such other senior officer of each of Dad's and Pet Life attaching:

    (A)    incumbency list with specimen signatures of officers and directors;

    (B)    constating documents;

    (C)    by-laws; and

    (D)    resolutions authorizing the execution and delivery of this Agreement and the transactions contemplated hereby.

(c)    <u>Seller's and Shareholder's Deliveries at First Closing.</u>  At the First Closing, Seller and Shareholder shall deliver to Buyer the following:

(i)    <u>Legal Opinions.</u>  Executed opinions from Lang Michener, corporate counsel to Seller, and from local counsel to Shareholder, each dated the First Closing Date;

(ii)    <u>Certificates.</u>  An executed certificate of the president or such other senior officer of each of Gaines, the Partnership, the Subsidiary and Shareholder attaching:

    (A)    incumbency list with specimen signatures of officers and directors;

    (B)    constating documents;

    (C)    by-laws or articles, as the case may be; and

    (D)    resolutions authorizing the execution and delivery of this Agreement and the transactions contemplated hereby;

(iii)    <u>Books and Records.</u> All books and records kept by the Seller relating to the First Assets provided, however, that Seller may provide copies of such books and records and may retain the originals thereof if originals are required under applicable laws to comply with continuing corporate and tax purposes;

S 000449

(iv) <u>Customer and Supplier Lists</u>. All customer and supplier lists of Seller as described in Schedule 3.1(ee);

(v) <u>First Assets</u>. Possession of the First Assets to Buyer;

(vi) <u>Conveyance Documents</u>. Deliver to the Buyer in registrable form, satisfactory to the Buyer's solicitors, acting reasonably, all necessary deeds, conveyances, bills of sale, assurances, transfers, assignments and Consents and any other documents, necessary or reasonably required in the opinion of the Buyer's solicitors, to transfer effectively to the Buyer good and marketable title to the First Assets free and clear of all mortgages, pledges, liens, charges, claims, demands, security interests or other encumbrances of any nature or kind whatsoever including, without limiting the generality of the foregoing with respect to any other Contracts, leases or rights affecting the First Assets to which the Seller is a party at the First Closing and which the Buyer is required to assume at the First Closing in accordance with this Agreement, such unconditional written consents to the assignment thereof as are necessary in the opinion of the Buyer's solicitors to assign such Contracts, leases or rights together with written acknowledgements from the other party to such Contracts, leases or rights in a form satisfactory to the Buyer's solicitors acknowledging that the said Contracts, leases or rights are in good standing, that all amounts due and payable by the Seller thereunder have been paid in full to the First Closing Date;

(vii) <u>Consents</u>. The original of each Consent required to be provided in connection with the transactions occurring at the First Closing;

(viii) <u>Licenses, Permits, Contracts, Business Records, Etc</u>. To the extent they are in the possession of Seller, copies of all Licenses, Permits, Assumed Contracts, blueprints, schematics, working drawings, plans, projections, statistics and all files and records used by Seller in connection with the Business, which copies shall be available at the First Closing or at a Seller's principal business offices;

(ix) <u>IP Assignment Agreements</u>. A counterpart of each of the IP Assignment Agreements executed by Seller;

(x) <u>Non-Competition Agreements</u>. A counterpart of the Non-Competition Agreements executed by the Gaines, the Partnership, the Subsidiary and Shareholder, as applicable;

(xi) <u>Trade Name</u>. All necessary documents, consents and undertakings requested by Buyer in order to enable the Buyer to file constating documents (with respect to Gaines and the Subsidiary) or an amendment to the Declaration of Partnership (with respect to the Partnership) in which the word "Gaines" or "Maple Leaf Marketing" appears as part of the proposed name of the corporation in question and other

S 000450

appropriate transfer documents of all trade names which includes the words or phrase "Gaines" or "Maple Leaf Marketing" including:

    (A)    executed Articles of Amendment for Gaines and Subsidiary;

    (B)    executed amendment to Declaration of Partnership for the Partnership re name change of Gaines;

    (C)    irrevocable directions to Buyer to file preceding items after the First Closing; and

    (D)    an undertaking of Seller and Shareholder not to use, or incorporate a corporation with, the name "Gaines" or "Maple Leaf Marketing" (or any combination thereof) in the future;

(xii)    <u>Clearance Certificates</u>.

    (A)    clearance certificate pursuant to the *Retail Sales Tax Act* (Ontario); and

    (B)    clearance certificate pursuant to the *Workplace Safety Insurance Act* (Ontario);

(xiii)    <u>Bulk Sales Affidavits.</u>  Affidavits, in the form of Form 1 prescribed in the regulations to the *Bulk Sales Act* (Ontario), executed:

    (A)    on behalf of Gaines, by a senior officer of Gaines; and

    (B)    on behalf of the Partnership, by each of Gaines and Toigo as the partners of the Partnership; and

(xiv)    <u>Residence</u>. Evidence in the form satisfactory to Buyer and its solicitors that Seller (other than the Subsidiary) is not then a "non-resident" of Canada within the meaning of the Tax Act; and

(xv)    <u>Liens.</u>  Evidence that all liens applicable to the First Assets have been released.

## 9.2    <u>Second Closing</u>

(a)    <u>Closing.</u>  The Second Closing will take place at the offices of Aird & Berlis, BCE Place, 181 Bay Street, Suite 1800, Toronto, Ontario, M5J 2T9 at 10:00 a.m., (Toronto time) on the Second Closing Date. For purposes of this Agreement, each and every event referred

S 000451

to in this Article 9.2 that is to occur on the Second Closing Date shall be deemed to have occurred contemporaneously.

(b)    Actions to Occur at Second Closing.  At the Second Closing, Buyer shall deliver to the appropriate parties the following:

(i)    Purchase Price.  $2,050,000 (plus, if applicable, the purchase price of the Purchased Packaging and the Purchased Accounts Receivable, as contemplated in Sections 2.2(b) and 2.2(c) and less, if applicable, the Equipment Purchase Price as contemplated in Section 7.6) plus applicable PST and GST, by certified cheque, bank draft or wire transfer of immediately available funds made payable to Seller (or to such persons as Seller so directs Buyer, in writing);

(ii)    Bill of Sale and Assignment.  A counterpart of the Bill of Sale and Assignment executed by Buyer;

(iii)    [intentionally deleted]

(iv)    Building Lease Agreement.  A counterpart of the Building Lease Agreement executed by Buyer; and

(v)    Legal Opinions.  Executed opinions from Aird & Berlis, Ontario counsel to the Buyer, and from United States corporate counsel to the Buyer, each dated the Second Closing Date, in the form attached as Exhibit D hereto; and

(vi)    Bring-Down Certificates.  An executed certificate of the president or such other senior officer of each of Dad's and Pet Life certifying that:

(A)    that the certificates described in Section 9.1(b)(vii) delivered at First Closing are true and correct as of the Second Closing; and

(B)    the representations and warranties made as of the First Closing are true and correct as of the Second Closing;

provided, however, that the representations and warranties made by Buyer in this Agreement shall continue notwithstanding any discrepancies thereto with the representations and warranties made in such certificates.

(c)    At the Second Closing, Seller and Shareholder shall deliver to Buyer the following:

(i)    Legal Opinions.  Executed opinions from Lang Michener, corporate counsel to Seller, and from local counsel to Shareholder, each dated the Second Closing Date, in the form attached as Exhibit E hereto;

S 000452

44

(ii)    Bring-Down Certificates.  An executed certificate of the president or such other senior officer of each of Gaines, the Partnership, the Subsidiary and Shareholder certifying that:

> (A)    that the certificates described in Section 9.1(c)(ii) delivered at First Closing are true and correct as of the Second Closing; and

> (B)    the representations and warranties made as of the First Closing are true and correct as of the Second Closing;

provided, however, that the representations and warranties made by Seller and Shareholder in this Agreement shall continue notwithstanding any discrepancies thereto with the representations and warranties made in such certificates;

(iii)    Assets.  Possession of the Second Assets to Buyer;

(iv)    Conveyance Documents.  The duly executed Bill of Sale and Assignment, together with, in registrable form and satisfactory to the Buyer's solicitors, acting reasonably, all necessary deeds, conveyances, bills of sale, assurances, transfers, assignments and Consents and any other documents, necessary or reasonably required in the opinion of the Buyer's solicitors, to transfer effectively to the Buyer good and marketable title to the Second Assets free and clear of all mortgages, pledges, liens, charges, claims, demands, security interests or other encumbrances of any nature or kind whatsoever including, without limiting the generality of the foregoing with respect to any other Contracts, leases or rights affecting the Second Assets to which the Seller is a party at the Second Closing and which the Buyer is required to assume at the Second Closing in accordance with this Agreement, such unconditional written consents to the assignment thereof as are necessary in the opinion of the Buyer's solicitors to assign such Contracts, leases or rights together with written acknowledgements from the other party to such Contracts, leases or rights in a form satisfactory to the Buyer's solicitors acknowledging that the said Contracts, leases or rights are in good standing, that all amounts due and payable by the Seller thereunder have been paid in full to the Second Closing Date;

(v)    Consents.  The original of each Consent not yet delivered by Seller;

(vi)    Licenses, Permits, Contracts, Business Records, Etc.  To the extent they are in the possession of Seller, copies of all Licenses, Permits, Assumed Contracts, blueprints, schematics, working drawings, plans, projections, statistics and all files and records used by Seller in connection with the Business, which copies shall be available at the Second Closing or at a Seller's principal business offices;

(vii)    Building Lease Agreement.  A counterpart of the Building Lease Agreement executed by Seller;

45

S 000453