(viii)    Clearance Certificates.

(A)    clearance certificate pursuant to the *Retail Sales Tax Act* (Ontario); and

(B)    clearance certificate pursuant to the *Workplace Safety Insurance Act* (Ontario);

(ix)    Bulk Sales Affidavits.  Affidavits, in the form of Form 1 prescribed in the regulations to the *Bulk Sales Act* (Ontario), executed:

(A)    on behalf of Gaines, by a senior officer of Gaines; and

(B)    on behalf of the Partnership, by each of Gaines and Toigo as the partners of the Partnership;

(x)    Pension Plan and Labour Obligations    Evidence that all Pension Plan obligations have been paid (or secured as contemplated in subsection 8.1(c)(ii)) and that all employment and severance obligations have been paid;

(xi)    Residence. Evidence in the form satisfactory to Buyer and its solicitors that Seller (other than the Subsidiary) is not then a "non-resident" of Canada within the meaning of the Tax Act;

(xii)    Letter of Credit.  The Letter of Credit provided by Buyer to Seller at First Closing as contemplated in subsection 9.1(b)(v) and such other documents as may be requested by Buyer for the bank which issued such letter of credit to discharge Buyer's obligations to pay thereunder; and

(xiii)    Liens.  Evidence that all liens applicable to the Second Assets have been released

**9.3    Post-Closing.**

**(a)**    Each of Seller and Shareholder jointly and severally covenants that, subsequent to **each** Closing Date (provided, however, that if a specific Closing Date is specified herein this **Section** 9.3, then subsequent to such Closing Date) each of Seller and Shareholder shall:

(i)    at the request of the Buyer, execute and deliver such additional conveyances, transfers and other assurances as may, in the opinion of the Buyer solicitors, be required to carry out the intent of this Agreement and to transfer the applicable Assets to the Buyer;

46

S 000454

(ii)    take all commercially reasonable steps required by Buyer to assist Buyer in retaining the goodwill of the Business, including, if requested by Buyer, introducing Buyer to the customers and suppliers of the Buyer and writing letters to such customers and suppliers and not to otherwise intentionally do any act or thing which will have the effect of diminishing such goodwill; and

(iii)    remit to the appropriate Governmental Entity all GST and PST collected from Buyer pursuant to the transactions contemplated herein.

(b)    [intentionally deleted]

(c)    To the extent Buyer receives cheques belonging to Seller or Seller receives cheques belonging to Buyer, the party receiving the cheques shall promptly deliver the cheques in question to the other party. If a customer includes payment for an invoice due to Buyer in a payment made to Seller or a payment for an invoice due to Seller in a payment made to Buyer the party receiving the payment shall promptly forward the payment in question to the other party.

(d)    Except as contemplated by this Agreement or to the extent that Buyer shall otherwise consent in writing, Seller covenants and agrees to take the following actions with respect to the Pension Plans forthwith following the Second Closing Date and shall continue to promptly respond and follow up with respect to the said matters in order to cause the wind up of the Pension Plans to be completed in as short a time period as is reasonably possible:

(i)    Seller shall deal with any questions and issues raised in connection with the written notice of proposal to wind up each of the Pension Plans, which notice of proposal to wind up shall, pursuant to Section 8.1(c), have been given prior to the Second Closing to all members and former members of the relevant Pension Plan, to any other person entitled to a payment from the Pension Plan, to the Superintendent of Financial Services of Ontario (the "Superintendent"), and to each trade union that represents members of the Pension Plan.

(ii)    Seller shall cause a wind up report to be prepared with respect to each Pension Plan, in accordance with subsection 70(1) of the *Pension Benefits Act* (Ontario) and the regulations thereunder (collectively, the "PBA"). Seller shall also cause all appropriate amendments/resolutions effecting the wind up to be prepared. The said wind up report and amendments/resolutions shall be submitted to the Superintendent for approval within as short a time period as possible, notwithstanding that the PBA may generally permit a later date for the filing of a wind up report.

(iii)    Seller shall promptly provide to the Superintendent all additional information and documents, including any supplementary wind up report and annual information returns, as may be required by the Superintendent. Seller shall also provide to

S 000455

Revenue Canada, and to any other regulatory agency that has authority with respect to any of the Pension Plans, all information and documents as may be required in connection with the winding up of the Pension Plans, as soon as possible.

(iv)    Seller shall as soon as possible make all contributions required to be made to each of the Pension Plans in accordance with the PBA.

(v)    Forthwith after receipt of the approval of the Superintendent of the wind up report for a Pension Plan, Seller shall cause all steps to be taken for the assets of the Pension Plan to be used to satisfy the liabilities of the Pension Plan, in accordance with the wind up report. Seller shall provide to the Superintendent and to Buyer evidence of the completion of the wind up of each Pension Plan as soon as such wind up has been completed.

**(e)**    <u>Environmental Costs and Liabilities.</u>

(i)    Seller hereby agrees that it shall remain liable for, and shall indemnify the Buyer from, any Environmental Costs or Liabilities relating to the Real Property. Seller hereby further agrees that it shall remain liable for, and shall indemnify the Buyer from, any Environmental Costs or Liabilities relating to the Second Assets which may have arisen prior to the date hereof and up until such date as the Second Assets are removed by the Buyer from the Real Property as contemplated in the Building Lease Agreement.

For greater certainty, Sections 11.6 and 12.1 shall apply to this subsection 9.3(e)(i).

(ii)    Seller hereby agrees to be liable to Buyer for any loss, up to a maximum amount equal to the Purchase Price payable by Buyer at the Second Closing, arising from the inability of the Buyer to remove the Second Assets from the Real Property as a result of the issuance of any order, judgment or decree from any Governmental Entity in connection with the violation of Seller of any Environmental Laws or in connection with any matter which would constitute a breach of the representations and warranties provided by Seller in Section 3.1(l).

**(f)**    <u>Access to Books and Records.</u> Upon prior written notice to the Buyer, Seller shall, at its own expense during normal business hours, have the right to inspect the books and records provided to Buyer at First Closing for the sole purpose of complying with applicable laws relating to continuing corporate and tax purposes.

S 000456

(g)    <u>Assistance in Selling Finished Goods.</u>   Subsequent to the Second Closing Date, Buyer may, acting reasonably, determine to assist Seller in selling any of Seller's finished goods inventory existing at the time of the Second Closing.

## ARTICLE 10

## TERMINATION, AMENDMENT AND WAIVER

10.1    <u>Termination</u>.  This Agreement may be terminated prior to the Second Closing:

(a)    by mutual consent of Buyer and Seller;

(b)    by Buyer or Seller pursuant to the provisions of Sections 8.2 or 8.4, as the case may be; or

(c)    by either Seller or Buyer; if a court of competent jurisdiction or other Governmental Entity shall have issued an order, decree, or ruling or taken any other action (which order, decree or ruling the parties hereto shall use their best efforts to lift), in each case permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and the other Transaction Documents, and such order, decree, ruling or other action shall have become final and nonappealable.

The right of any party hereto to terminate this Agreement pursuant to this Section 10.1 shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any party hereto, any person controlling any such party or any of their respective officers, directors, employees, accountants, consultants, legal counsel, agents or other representatives whether prior to or after the execution of this Agreement.  Notwithstanding anything in the foregoing to the contrary, no party that is in material breach of this Agreement shall be entitled to terminate this Agreement except with the consent of the other party.

10.2    <u>Effect of Termination</u>.

In the event of a termination of this Agreement by either Seller or Buyer as provided above, there shall be no liability on the part of either Buyer, Seller or Shareholder, except for liability arising out of a breach of this Agreement.  Articles 1, 11, and 12, Section 7.3, and this Article 10 shall survive the termination of this Agreement.

S 000457

49

## ARTICLE 11

## INDEMNIFICATION

**11.1** **Indemnification of Buyer Indemnified Parties.** From and after the Closing and subject to the provisions of this Article 11, Section 12.1 and Section 12.17, Seller and Shareholder, jointly and severally, agree to indemnify and hold harmless the Buyer Indemnified Parties from and against any and all Buyer Indemnified Costs.

**11.2** **Indemnification of Seller Indemnified Parties.** From and after the Closing and subject to the provisions of this Article 11, Section 12.1 and Section 12.17, Buyer agrees to indemnify and hold harmless Seller Indemnified Parties from and against any and all Seller Indemnified Costs.

**11.3** **Defense of Third-Party Claims.** An Indemnified Party shall give prompt written notice to any entity or person who is obligated to provide indemnification hereunder (an "Indemnifying Party") of the commencement or assertion of any action, proceeding, demand, or claim by a third party (collectively, a "third-party action") in respect of which such Indemnified Party shall seek indemnification hereunder. Any failure so to notify an Indemnifying Party shall not relieve such Indemnifying Party from any liability that it, he, or she may have to such Indemnified Party under this Article 11 unless, and then only to the extent that, the failure to give such notice materially and adversely prejudices such Indemnifying Party. The Indemnifying Party shall have the right to assume control of the defense of, settle, or otherwise dispose of such third-party action on such terms as it deems appropriate; provided, however, that:

(a)    the Indemnified Party shall be entitled, at its own expense, to participate in the defense of such third-party action (provided, however, that the Indemnifying Party shall pay the attorneys' fees of the Indemnified Party if the employment of separate counsel shall have been authorized in writing by such Indemnifying Party in connection with the defense of such third-party action, the Indemnifying Party shall not have employed counsel reasonably satisfactory to the Indemnified Party to have charge of such third-party action, or the Indemnified Party's counsel shall have advised the Indemnified Party in writing, with a copy delivered to the Indemnifying Party, that there is a conflict of interest that could make it inappropriate under applicable standards of professional conduct to have common counsel);

(b)    the Indemnifying Party shall obtain the prior written approval of the Indemnified Party before entering into or making any settlement, compromise, admission, or acknowledgment of the validity of such third-party action or any liability in respect thereof if, pursuant to or as a result of such settlement, compromise, admission, or acknowledgment, injunctive or other equitable relief would be imposed against the Indemnified Party or if, in the opinion of the Indemnified Party, such settlement, compromise, admission, or acknowledgment could have an adverse effect on its business;

S 000458

50

(c)    no Indemnifying Party shall consent to the entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by each claimant or plaintiff to each Indemnified Party of a release from all liability in respect of such third-party action; and

(d)    the Indemnifying Party shall not be entitled to control (but shall be entitled to participate at its own expense in the defense of), and the Indemnified Party shall be entitled to have sole control over, the defense or settlement, compromise, admission, or acknowledgment of any third-party action as to which the Indemnifying Party fails to assume the defense within a reasonable length of time or to the extent the third-party action seeks an order, injunction, or other equitable relief against the Indemnified Party which, if successful, would materially adversely affect the business, operations, assets, or financial condition of the Indemnified Party; provided, however, that the Indemnified Party shall make no settlement, compromise, admission, or acknowledgment that would give rise to liability on the part of any Indemnifying Party without the prior written consent of such Indemnifying Party.

The parties hereto shall extend reasonable cooperation in connection with the defense of any third-party action pursuant to this Article 11 and, in connection therewith, shall furnish such records, information, and testimony and attend such conferences, discovery proceedings, hearings, trials, and appeals as may be reasonably requested.

11.4    <u>Direct Claims</u>.  In any case in which an Indemnified Party seeks indemnification hereunder which is not subject to Section 11.3 because no third-party action is involved, the Indemnified Party shall notify the Indemnifying Party in writing of any Indemnified Costs which such Indemnified Party claims are subject to indemnification under the terms hereof. The failure of the Indemnified Party to exercise promptness in such notification shall not amount to a waiver of such claim unless the resulting delay materially prejudices the position of the Indemnifying Party with respect to such claim. Any Indemnifying Parties shall promptly (but in no event later than 15 days after the date on which the Indemnifying Party receives notice from the Indemnified Party of a claim for Indemnification under the terms hereof) pay, reimburse, repay or otherwise discharge any Indemnified Costs of the Indemnified Party.

11.5    [intentionally deleted]

11.6    <u>Limitation on Liability</u>.

(a)    No Indemnifying Party shall have any liability to an Indemnified Party in respect of claims (excluding any claims related to the reduction of the Purchase Price contemplated in subsection 7.3(b)(i)) arising under this Agreement except if and to the extent that the aggregate of all such claims shall exceed the sum of $25,000 provided, however, that such de minimus provision shall not apply to any Indemnified Costs incurred as result of a breach of any representations and warranty made by Seller or Shareholder herein relating to the

S 000459

ownership or title of the Assets or the conveyance thereof from Seller to Buyer or to any representation and warranty which has a "materiality" standard imposed thereon.

(b)     Under no circumstance will the aggregate Indemnified Costs payable by an Indemnifying Party hereunder exceed the aggregate of the following amounts:

     (i)     the Purchase Price;

     (ii)     the aggregate of all amounts payable by Buyer to Seller pursuant to the terms of the Supplier and Royalty Agreement; and

     (iii)     the costs incurred by the Indemnified Party in pursuing to recover such Indemnified Costs payable to it by the Indemnifying Party.

    **11.7     Tax Related Adjustments**. Seller and Buyer agree that any payment of Indemnified Costs made hereunder will be treated by the parties on their Tax Returns as an adjustment to the Purchase Price. If, notwithstanding such treatment by the parties, any payment of Indemnified Costs is determined to be taxable income rather than adjustment to Purchase Price by any taxing authority, then the Indemnifying Party shall indemnify the Indemnified Party for any Taxes payable by the Indemnified Party or any subsidiary by reason of the receipt of such payment (including any payments under this Section 11.6), determined at an assumed marginal tax rate equal to the highest marginal tax rate then in effect for corporate taxpayers in the relevant jurisdiction. If either Buyer or Seller is in receipt of actual cash tax benefits as a result of the payment of an Indemnified Cost (after considering the receipt of the Indemnified Costs), then Seller or Buyer, as the case may be, shall pay to the other the amount of such actual cash tax benefit received in that year. The amount of such payment shall be determined by Dad's or Pet Life's accountants and such determination shall not be reviewable or subject to arbitration.

# ARTICLE 12

# GENERAL PROVISIONS

    **12.1     Survival of Representations, Warranties, and Covenants**. Regardless of any investigation at any time made by or on behalf of any party hereto or of any information any party may have in respect thereof, each of the representations, warranties and covenants made hereunder or pursuant hereto or in connection with the transactions contemplated hereby shall survive for a period of two years from the Second Closing Date, other than the representations and warranties contained herein relating to ownership or title of the Assets which representations and warranties shall survive for a period of ten years from the Second Closing Date. Unless expressly provided otherwise in the Transaction Documents, to the extent that such are performable after either Closing, each of the covenants and agreements contained in each of the Transaction Documents shall survive such Closing indefinitely (other than the covenants and agreements provided by Seller in Section 9.3(e) which shall survive the Second Closing Date for a period of seven years).

S 000460

**12.2    Further Assurances**. The parties hereto covenant and agree to sign such other papers, cause such meetings to be held, resolutions passed and by-laws enacted, exercise their vote and influence, do and perform and cause to be done and performed such further and other acts and things as may be necessary or desirable in order to give full effect to this agreement and every part hereof.

**12.3    Amendment and Modification**. This Agreement may not be amended except by an instrument in writing signed by Buyer and Seller.

**12.4    Waiver of Compliance**. Any failure of Buyer on the one hand, or Seller and Shareholder, on the other hand, to comply with any obligation, covenant, agreement, or condition contained herein may be waived only if set forth in an instrument in writing signed by the party or parties to be bound thereby, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any other failure.

**12.5    Specific Performance**. The parties recognize that in the event Seller or Shareholder should refuse to perform under the provisions of this Agreement, monetary damages alone will not be adequate. Buyer shall therefore be entitled, in addition to any other remedies which may be available, including money damages, to obtain specific performance of the terms of this Agreement. In the event of any action to enforce this Agreement specifically, Seller and Shareholder hereby waive the defense that there is an adequate remedy at law. In no event shall Seller or Shareholder be entitled to seek specific performance with respect to any of Buyer's obligations arising under this Agreement.

**12.6    Severability**. If any term or other provision of this Agreement is determined by a court of competent jurisdiction to be invalid, illegal, or incapable of being enforced by any rule of applicable law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated herein are not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated herein are consummated as originally contemplated to the fullest extent possible.

**12.7    Expenses and Obligations**. Except as otherwise expressly provided in this Agreement or as provided by law, all costs and expenses incurred by the parties hereto in connection with the consummation of the transactions contemplated hereby shall be borne solely and entirely by the party which has incurred such expenses. Buyer shall pay all the transfer taxes. In the event of a dispute between the parties in connection with this Agreement and the transactions contemplated hereby, each of the parties hereto hereby agrees that the prevailing party shall be entitled to reimbursement by the other party of reasonable legal fees and expenses incurred in connection with any action or proceeding.

**12.8    Parties in Interest**. This Agreement shall be binding upon and, except as provided below, inure solely to the benefit of each party hereto and their respective successors, assigns and transferees, and nothing in this Agreement, except as set forth below, express or implied, is intended to confer upon any other person (other than the Indemnified Parties as provided in Article 11) any rights or remedies of any nature whatsoever under or by reason of this Agreement.

S 000461

**12.9    Notices**. All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally, telecopied or mailed by registered or certified mail (return receipt requested) or sent by Federal Express or other recognized overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

      (a)      If to Buyer:

                  Pet Life Foods, Inc.
                  c/o Sowell & Co.
                  3131 McKinney Avenue
                  Suite 200
                  Dallas, Texas 75204

                  Attn: Alan Brown

                  Facsimile:  (214) 871-3320

                  - and -

                  Dad's Products Company, Inc
                  P.O. Box 451
                  Meadville, PA
                  16335

                  Attn:  President

                  Facsimile: (814) 337-2743

                  with copies to:

                  - and -

                  Aird & Berlis
                  BCE Place
                   181 Bay Street
                  Suite 1800, Box 754
                  Toronto, Ontario
                  M5J 2T9

                  Attn:   Jay A. Lefton

                  Facsimile:  (416) 863-1515

                  - and -

                  Knox McLaughlin Gornall & Sennett, P.C.
                  120 West 10th Street
                  Erie, Pennsylvania
                  16501

S 000462

(b)    Arbitrator.  S.. ..d the arbitrator so appointed die, resign, ..fuse or become unable to act before a decision is given, the vacancy shall be filled by the AAA. The place of arbitration shall be Dallas, Texas. It is the agreement of the parties hereto that the arbitrator render a decision within six months of the date of the Demand to Arbitrate and that the parties use their reasonable commercial efforts to assist the arbitrator to render such decision within such time frame.

(c)    Binding Effect.  The award and all decisions of the arbitrator shall be final and binding upon the parties and there shall be no appeal therefrom to any court except as expressly permitted by the law of the place of arbitration. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In the event of any conflict between the rules of the arbitral authority and this Section 12.12, the provisions of this Section 12.12 shall govern.

12.13    Governing Law; Choice of Forum.  This Agreement is governed by the laws of the Province of Ontario (without reference to its rules as to conflicts of law) and the laws of Canada applicable therein. Each of the parties hereto hereby irrevocably attorn to the non-exclusive jurisdiction of the courts of the Province of Ontario with respect to any matters arising out of this Agreement.

12.14    Public Announcements.  Except for statements made or press releases required to be issued pursuant to applicable law or necessary to comply with the rules of regulatory bodies having jurisdiction over the parties hereto, Seller and Buyer shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby. Prior to either Closing, Seller will not issue any other press release or otherwise make any public statements regarding its business, except as may be required by applicable law.

12.15    Assignment.  Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by any of the parties hereto, whether by operation of law or otherwise; provided, however, that (a) upon notice to Seller and without releasing Buyer from any of its obligations or liabilities hereunder, Buyer may assign or delegate any or all of its rights or obligations under this Agreement to any Affiliate of Buyer or any Person with or into which Buyer or any parent company of Buyer merges or consolidates, and (b) nothing in this Agreement shall limit Buyer's ability to make a collateral assignment of its rights under this Agreement to any lender that provides funds to Buyer or Buyer's designee without the consent of Seller or Shareholder. Seller and each Shareholder shall execute an acknowledgement of such assignment(s) and collateral assignments in such forms as Buyer or its lenders may from time to time reasonably request; provided, however, that unless written notice is given to Seller and Shareholder that any such collateral assignment has been foreclosed upon, Seller shall be entitled to deal exclusively with Buyer as to any matters arising under this Agreement or any of the other agreements delivered pursuant hereto. In the event of such an assignment, the provisions of this Agreement shall inure to the benefit of and be binding on Buyer's assigns.

12.16    Director and Officer Liability.  None of the directors, officers or shareholders of Buyer or its Affiliates shall have any personal liability or obligation arising under this Agreement (including any claims that Seller may assert) other than as an assignee of this Agreement.

12.17    No Waiver Relating to Claims for Fraud.  The liability of any party under Article 11 shall be in addition to, and not exclusive of any other liability that such party may have at law or equity based on such party's fraudulent acts or omissions. None of the provisions set forth in this Agreement shall be deemed a waiver by any party to this Agreement of any right or remedy which such party may have at law or equity based on any other party's fraudulent acts or omissions, nor shall any such provisions limit, or be deemed to limit, (i) the amounts of recovery sought or awarded in any such claim for fraud, (ii) the time period during which a claim for fraud may be brought, or (iii) the recourse which any such party may seek against another party with respect to a claim for fraud; provided, that with respect to such rights and remedies at law or equity, the parties further acknowledge and agree that none of the provisions of this Section 12.17, nor any reference to this

Section 12.17 throughout this Agreement, shall be deemed a waiver of any defenses which may be available in respect of actions or claims for fraud, including but not limited to, defenses of statutes of limitations or limitations of damages.

    **12.18**  **Currency.** All dollar amounts referred to in this Agreement shall be in United States funds.

    **12.19**  **Right of Set-Off.** Each of the parties hereto shall have the right to satisfy any amount owing from time to time to such party by the other party by reducing any amount from time to time owing to the other party by such party, howsoever arising (and whether arising under this Agreement, the Supplier and Royalty Agreement or otherwise).

    **12.20**  **Guarantee by the Shareholder.** The Shareholder hereby guarantees, as principal obligator and not as surety, in favour of Buyer the due and punctual performance by Seller of Seller's obligations hereunder and agrees to indemnify Buyer in respect of any failure by Seller to duly and punctually perform its obligations hereunder. The guarantees and indemnities are given herein on the basis that same are unconditional and irrevocable and that such guarantees and indemnities shall not be abrogated, prejudiced or affected by any act or omission which would or might abrogate or prejudice or affect the liability of the Shareholder generally.

    **12.21**  **Obligations Joint and Several.** Unless otherwise noted herein, the obligations hereunder of the Buyer, on the one hand, and of the Seller and the Shareholder, on the other hand, are joint and several.

    IN WITNESS WHEREOF, Buyer, Seller and Shareholder have caused this Agreement to be signed as of the date first written above.

                 **SELLER:**

                 GAINES PET FOODS CORP.

By: _____

Name: _____

Title: _____

Authorized Signing Officer

57

S 000464

GAINES PET FOODS CORP. in its capacity as
partner of Gaines Pet Foods

By:

Name: _Kim Berlante_

Title: _Secretary Treasurer_

Authorized Signing Officer


MAPLE LEAF MARKETING, INC.

By:

Name: _Sultan Thiara_

Title: _Chief Financial Officer_

Authorized Signing Officer


**SHAREHOLDER:**

SHATO HOLDINGS LTD.

By:

Name: _Sultan Thiara_

Title: _Senr - Exec  V P & CFO_

Authorized Signing Officer


**BUYER:**

DAD'S PRODUCTS COMPANY, INC.

By:

G. Thomas Lang
President
Authorized Signing Officer


PET LIFE FOODS, INC.

By:

Alan Brown
Chairman
Authorized Signing Officer


58

S 000465

::ODMA\PCDOCS\DOCS\762157\12

S 000466

# EXHIBIT "B"

## SUPPLIER AND ROYALTY AGREEMENT

THIS AGREEMENT made as of the 23rd day of November, 1999

BETWEEN:

**DAD'S PRODUCTS COMPANY, INC.,** a corporation existing under the laws of the State of Pennsylvania

(hereinafter called "Dad's")

- and -

**PET LIFE FOODS, INC.,** a corporation existing under the laws of the State of Illinois

(hereinafter called "Pet Life")

- and -

(Dad's and Pet Life being hereinafter each referred to as a "Buyer" or collectively referred to as the "Buyers")

- and -

**GAINES PET FOODS CORP.,** a corporation existing under the laws of the Province of Ontario

- and -

**GAINES PET FOODS,** a partnership existing under the Province of Ontario

(hereinafter collectively referred to as the "Seller")

- and -

**SHATO HOLDINGS LTD.** a corporation existing under the laws of the Province of British Columbia

(hereinafter called the "Shareholder").



Δ π EXHIBIT _13_
Deponent _Scharf_
Date _3/10/05_ Rptr. _MM_
WWW.DEPOBOOK.COM

S 000099

- 2 -

WHEREAS the Seller has carried on the business of manufacturing, selling and distributing pet food and pet treats at the manufacturing facility located in Cobourg, Ontario;

AND WHEREAS the Buyers, the Seller, the Shareholder and Maple Leaf Marketing, Inc. entered into an asset purchase agreement (the "Purchase Agreement") dated the date hereof pursuant to which the Buyers agreed to purchase from the Seller certain assets;

NOW THEREFORE THIS AGREEMENT WITNESSES that, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and subject to the terms and conditions hereinafter set out, the parties hereto agree as follows:

## ARTICLE 1 - DEFINED TERMS

1.1       In this Agreement and in any amendment to this Agreement, the following terms shall have the following meanings:

(a)    "**Affiliate**" means, with respect to any person, any other person controlling, controlled by or under common control with such person;

(b)    "**Business Day**" means any day other than (i) a Saturday or Sunday or (ii) a day on which chartered banks in Toronto, Canada are required to be closed;

(c)    "**Control**" (and its correlative terms) means the power, whether by contract, equity ownership or otherwise, to direct the policies or management of a corporation;

(d)    "**Existing Pet Food Customers**" means the buyers or buyer groups of the customers on Schedule "A" of the Seller as at the date of this Agreement (excluding future acquisitions and/or mergers of such buyer or buyer groups);

(e)    "**Existing Pet Food Products**" means any pet food product being produced by the Seller as at the date of this Agreement as listed on Schedule "A" attached hereto;

(f)    "**Existing Pet Treat Customers**" means the buyer or buyer groups of the customers on Schedule "A" of the Seller as at the date of this Agreement (excluding future acquisitions and/or mergers of such buyer or buyer groups);

S 000100

- 3 -

(g)   **"Existing Pet Treat Products"** means any pet treat product being produced by the Seller as at the date hereof as listed on Schedule "A" attached hereto;

(h)   **"GAAP"** means generally accepted accounting principles in Canada;

(i)   **"Net Sales"** means the gross amount actually received by the Buyers for sales made in a Royalty Year, less the amount of:

     (i)   trade, quantity and cash discounts allowed;

     (ii)   discounts, credits, refunds, rebates, chargebacks and retroactive price adjustments;

     (iii)   returns and allowances;

     (iv)   any tax imposed that is appropriately deducted from sales under GAAP;

     (v)   allowance for postage, handling, insurance and duties paid for and separately identified on the invoice or other documentation maintained in the ordinary course of business;

     (vi)   excise taxes, other consumption taxes, import/export taxes, customs duties and compulsory payments to governmental authorities; and

     (vii)   any other reasonable and customary deductions which according to GAAP are *bona fide* deductions from gross sales to determine Net Sales or are otherwise considered to be in respect of "cost of goods sold" according to GAAP;

such amounts being determined from the books and records of the Buyers maintained in accordance with GAAP, consistently applied;

(j)   **"Products"** means, collectively, the pet food and the pet treats to be produced by the Seller as described in Schedule "B";

(k)   **"Purchase Order"** has the meaning attributed to it in Subsection 2.1(c);

(l)   **"Supply Period"** means the period commencing on the date hereof and terminating on January 21, 2000;

S 000101

- 4 -

(m)    "**Royalty Term**" means the period commencing on January 1, 2000 and terminating on December 31, 2004; and

(n)    "**Royalty Year**" means the period from and including January 1 in any calendar year to and including December 31 in the same calendar year and the first Royalty Year shall be the period from and including January 1, 2000 to and including December 31, 2000.

## ARTICLE 2 - SUPPLY OF PRODUCT

**2.1    Agreement to Buy and Supply**

(a) During the Supply Period, Pet Life and Dad's agree to purchase and the Seller agrees to manufacture, supply and deliver the volumes of Products identified on Schedule B. In addition, Seller shall produce and deliver, as directed by Dad's and Pet Life, on January 21, 2000, to a location or locations designated by Pet Life and/or Dad's, a volume of Product equal to (i) two weeks of average weekly sales volume for single extruded treats, (ii) eight weeks of average weekly sales volume for dual extruded treats, (iii) one week of average weekly sales volume for Variety and U.S. Burger, (iv) three weeks of average weekly sales volume for Dry Cat and (v) four weeks of average weekly for Top Choice. All Variety production shall be complete by December 20, 1999. In addition, Pet Life shall purchase excess Product from Seller in the following amounts:

(A) up to one week average sales volume of single extruded treats, Variety, U.S. Burger, Dry Cat and Soft-Moist Products;

(B) up to four weeks average sales volume of dual extruded treats Products; and

(C) up to two weeks average sales volume of Top Choice Products.

To the extent Seller has inventory of Products on hand on January 21, 2000, in excess of the volume set forth above (the "Excess Inventory"), Pet Life and Dad's shall attempt to sell such inventory in the ordinary course of their business. To the extent such Excess Inventory exists and such Excess Inventory remains palatable and marketable, Pet Life and Dad's shall not produce or purchase such Products until such Excess Inventory is sold or is no longer marketable. Seller shall pay all costs related to the transportation, and/or storage of Excess Inventory. Seller shall be paid for Excess Inventory within seven days of the date that Pet Life or Dad's have received payment from a third party in respect of such Excess Inventory.

S 000102

- 5 -

(b) Pet Life and Dad's shall pay the price identified on Schedule B for each Product, plus shipping cost pursuant to subsection (e) hereof. For all Product other than Excess Inventory, including shipping, Seller shall invoice Pet Life and Dad's on each Monday for all Product shipped in the prior week. Such invoice shall be payable in 21 days, but in no event shall the amounts due from Pet Life and Dad's exceed $2,200,000(Cdn). Pet Life and Dad's shall have no obligation to purchase any Actrium inventory and Seller shall have no obligation to produce any Actrium product. Buyer and Seller agree to use their best efforts to work together to coordinate production schedules and any increase or decrease in Product requirements. Notwithstanding the foregoing, Seller is committed to producing and Buyer is committed to purchasing the Products identified in Schedule B and in Paragraph 2.1(i), (ii), (iii), (iv), and (v) of this Agreement.

(c) Each of the Buyers shall, during the Supply Period, provide a written purchase order (a "Purchase Order") to the Seller directing the Seller as to the destination of the delivery of Products.

(d) The Seller agrees to use all reasonable commercial efforts to meet the delivery dates specified in all Purchase Orders. The Seller shall promptly notify the Buyer of any delay or anticipated delay in meeting such delivery date and shall notify it of the date on which it believes delivery will be made. If Pet Life or Dad's, acting reasonably, determines that the Seller will not be able to produce and supply the Product required under this Agreement, Pet Life and/or Dad's shall take reasonable steps or expend funds to ensure production of the required Products. All such amounts expended shall be reimbursed by the Seller within 21 days of receipt by the Seller of an invoice setting forth the expenditures.

(e) The Seller shall be responsible for all freight, postage, handling, insurance, shipping and all other costs relating to the delivery of the Products. Seller shall utilize the carriers suggested by Buyer to carry out the delivery of the Products. Buyer shall reimburse Seller for such costs within 21 days of receipt of an invoice setting out such cost together with such other back up information as may be requested by Buyer in order to substantiate such cost.

(f) To ensure that labour will be available to produce the Products, Seller shall implement an employee retention program, which shall be funded by Seller.

## 2.2    Adjustment to Purchase Price

If, at any time during the Supply Period, the cost to the Seller of the raw materials comprising any item of Product as at the date hereof increases or decreases by more than 10%, then the Purchase Price of such Product produced after the date of such increase in raw material costs shall be

S 000103

- 6 -

increased or decreased by an amount equal to such increase in raw material costs used to produce such Product. The Seller shall provide the Buyers with such evidence and other documents as the Buyer may reasonably request as to such raw material costs.

## 2.3    Exclusivity

Except as otherwise contemplated herein, during the Supply Period and thereafter, the Seller and Shareholder shall not manufacture, distribute, sell or offer to sell the Products or any other pet product other than at the direction of the Buyers. Notwithstanding the foregoing, the Buyers shall be entitled to manufacture and/or purchase product which is the same or similar to an item of the Products from suppliers other than the Seller.

## 2.4    Quality Control

(a)    The Seller shall be solely responsible for the quality of the Products which it manufactures and shall comply with all the then current Good Manufacturing Practices regulations for pet food products as set forth and amended from time to time by the United States Food and Drug Administration (or any successor thereof), or comparable regulations issued by Health Protection Branch of Health Canada (or any successor thereof). The Products, when delivered in accordance with a Purchase Order, shall have a remaining shelf life of not less than nine months. The Products shall be produced in accordance with existing formulas and shall have the same appearance and quality as such products have had, or have been marketed as having, over the past 90 days.

(b)    If the Products delivered by the Seller fail to meet the quality standards set out in Section 2.4(a), then the Buyers have the right to return or cause the return of such Products to the Seller at which time the Buyers shall be relieved of their obligations to pay for such Products and such Products shall be deemed to have never been delivered for the purposes of this Agreement. Upon the return of such Products, the Buyers may, at their discretion, acting reasonably, require the Seller to replace such Products to the destination outlined in the original Purchase Order relating to such Products. Within seven days of the delivery of such replacement Products by the Seller, the Buyers shall pay to the Sellers the Purchase Price attributed to such Products.

(c)    Each of the Buyers shall have the right at any time during normal business hours to inspect the Seller's production operations, quality control facilities, procedures and records with respect to the manufacturing and the standards and specifications of the Products in order to ensure the Seller's compliance with its obligations hereunder.

S 000104

855 P08   NOV 24 '99   11:50

- 7 -

### 2.5    Return of Product by Customers

(a)    If a third party returns any Products delivered to them to the Seller or to the Buyer because of a failure by the Seller to meet the requirements set out in Schedule "B", a failure to meet the quality standards set out in Section 2.4 above or for any other reason whatsoever resulting from the actions of the Seller, then the Buyers shall be relieved of their obligations to pay for such Products, such Products shall be deemed to have never been delivered for the purposes of this Agreement and the Seller shall refund any amounts previously paid by the Buyers to the Seller pursuant to this Agreement in connection with the purchase of such Products.

### 2.6    Failure to Supply

(a)    The Parties hereby acknowledge that the Buyers' obligations to pay to the Seller the Purchase Price for any Products arises only upon the shipment by the Seller of the Product described in Seller's invoice which is to be issued on the Monday following each week of shipments. If Products listed in the invoice are not delivered, they are to be charged back against future payments due to Seller.

(b)    Notwithstanding any reasonable commercial efforts by the Seller, the Seller hereby acknowledges that a failure to supply any of the quantity of the Product described in Schedule "B" on the proposed delivery dates may have a material adverse effect on the relationship of the Buyers with its customers and, as a result, in addition to the remedies provided to the Buyer in Section 2.4(b), the Seller shall be obligated to pay to the Buyers direct and consequential damages suffered by the Buyers as a result of the failure to supply such Product. For the purposes hereof, consequential damages shall include, without limitation, the lost income to the Buyers resulting from the loss of future sales to any customers of the Buyers who have ceased to be customers of the Buyers or who have reduced the quantity of purchases from the Buyers as a result of such failure to supply.

### 2.7    Ownership of Products and Inventory

Title to Products passes to the Buyers upon delivery by the Seller of such Product to the destination specified in a Purchase Order.

### 2.8    Obligation to Operate Computer Systems

The Seller agrees to continuously, throughout the Supply Period, operate its computer systems (including, without limitation, all order/entry systems) consistently with the past practices of the Seller. The Seller agrees to make such changes in such computer systems as suggested by Buyer, provided that such changes are compatible with the existing computer systems of the Seller without the Seller incurring any extraordinary costs or expenses.

S 000105

- 8 -

## 2.9    License to Use Trademarks

(a)    Subject to the conditions and restrictions set out below, the Buyers hereby grant to the Seller a non-transferable right to use, on a non-exclusive basis, the trademarks (the "Trademarks") purchased by the Buyers as set out in Schedule 3.1(p) of the Purchase Agreement for the purposes of enabling the Seller to comply with its obligations to manufacture and supply the Products hereunder and for no other purpose.

(b)    The grant of the license hereunder this Section 2.9 shall terminate at the end of the Supply Period or such earlier date as the Buyers, in their sole discretion, may notify the Seller; provided however, that, notwithstanding the foregoing, the Seller shall, for a period of six months from the end of the Supply Period, have the limited use of the Trademarks which relate to any finished goods inventory which the Seller owns at the end of the Supply Period and which Buyer has declined to purchase for the sole purpose of selling such inventory.

(c)    The Seller undertakes to use the Trademarks in strict accordance with the quality standards set out in Section 2.4 above and with the instructions, standards of quality and trademark specifications supplied by the Buyers from time to time, and to use each of the Trademarks only in association with the manufacture and supply of the Products by the Seller hereunder.

(d)    The Seller undertakes not to authorize any third party to use the Trademarks.

(e)    The Seller acknowledges and agrees that it has no right, title or interest in or to the Trademarks, nor any part thereof, except the use of the same as herein set out and that nothing in this Agreement shall be construed as an assignment or grant to the Seller of any right, title or interest to the Trademarks.

(f)    The Seller agrees not to challenge, directly or indirectly, the Buyers' right, title or interest in the Trademarks or any one or more of them.

## ARTICLE 3- ROYALTY PAYMENTS

## 3.1    Royalty Payments

In consideration of the agreement set forth in Section 2.3:

(a)    Dad's and Pet Life jointly and severally agree to pay to the Seller a royalty equal to 2% of the Net Sales of Existing Pet Food Products made by Dad's to Existing Pet Food Customers for each Royalty Year during the Royalty Term.

S 000106

- 9 -

(b)   Dad's and Pet Life jointly and severally agree to pay to the Seller a royalty equal to 2% of the Net Sales of Existing Pet Treat Products made by Pet Life to Existing Pet Treat Customers for each Royalty Year during the Royalty Term.

(c)   If the total royalty payments in any Royalty Year are less than $300,000, Dad's and Pet Life shall jointly and severally make additional payments which, in the aggregate, equal to the amount which results when the amount of royalty payments made in such Royalty Year is subtracted from $300,000. Notwithstanding the foregoing, in no event shall Dad's and Pet Life pay to the Seller less than an aggregate of $75,000 per quarter as computed on a cumulative quarterly basis for the applicable Royalty Year.

(d)   The maximum royalty payments payable by the Buyers to the Seller hereunder in any Royalty Year shall be $440,000. If any payments are made in error in excess of $440,000, the Seller shall forthwith return any excess to Pet Life, as agent for the Buyer.

**3.2    Payment Date**

The royalty payments contemplated herein shall be made by the Buyer to the Seller within 30 days from the end of each quarter of each Royalty Year.

**3.3    Reports**

(a)   If the Seller has received royalty payments less than $440,000 in any Royalty Year, then, within 90 days after the end of such Royalty Year, the applicable Buyer shall provide the Seller with a report of the Net Sales of Existing Pet Food Products or Existing Pet Treat Products to Existing Pet Food Customers or Existing Pet Treat Customers, as the case may be, made by such Buyer. All such reports of the Buyers are to be attested to and signed by a senior officer of such Buyer as being true, complete and accurate, and shall include all of the necessary information to permit the Seller to determine that the amount of the royalty payment paid by the Buyer for each Royalty Year is the full amount which is due and payable provided, however, that a Buyer shall not be required to identify sales to any specific customer.

(b)   The Seller agrees that all information contained in such reports provided by the Buyers is confidential and shall not be used by the Seller for any purposes other than calculating the Net Sales made during any Royalty Year.

S 000107

- 10 -

### 3.4    Books and Records

Each of the Buyers shall keep true and accurate records and books of account containing all data reasonably required for the computing of and verification of the Net Sales. Such records shall be retained for at least seven years following the payment therefor and shall be available during normal business hours for inspection by the Seller or its professional representatives for the purpose of verifying the Net Sales. In the event that any such inspection shows an underpayment by a Buyer for any Royalty Year, then such Buyer shall pay to the Seller the amount of such underpayment within 15 days of the completion of such inspection by the Seller in addition to interest which would have accrued on the amount of such underpayment at the U.S. prime rate from time to time charged plus 5% (calculated from time to time from the end of the preceding Royalty Year until the date on which underpayment is made to the Seller. In the event that any such inspection shows an underpayment by a Buyer in excess of five percent for the preceding Royalty Year, then such Buyer shall pay to the Seller the reasonable costs of the inspection incurred by the Seller.

## ARTICLE 4 - GENERAL PROVISIONS

### 4.1    Indemnification

(a)    The Seller hereby agrees to assume liability for, and does hereby agree to indemnify, protect, save and keep harmless each of the Buyers and their respective successors, assigns, legal representatives, agents and servants, from and against, any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses or disbursements (including legal fees and expenses) of any kind and nature whatsoever which may be imposed on, incurred by or asserted against either of the Buyers or any of their respective successors, assigns, legal representatives, agents and servants (whether or not also indemnified against by the manufacturer(s) or any other person), in any way relating to or arising out of this Agreement or any documents contemplated hereby, or the performance or enforcement of any of the terms hereof, or in any way relating to or arising out of all third party claims arising out of, or in connection with, the production by the Seller of the Products or the sale or consumption of the Products provided, however, that the Seller shall not be required to assume any liabilities for or indemnify the Buyers hereunder this Section 4.1 as a result of the negligence of the Buyers.

(b)    Under no circumstance will the aggregate costs payable by the Seller to the Buyers pursuant to Section 4.1(a) hereunder exceed the aggregate of the following amounts:

(i)    the Purchase Price (as such term is defined in the Purchase Agreement); and

(ii)    the aggregate of all amounts payable by Dad's and Pet Life pursuant to Section 3.1 hereunder.

S 000108

- 11 -

(c)     No claim may be made hereunder by the Buyers against the Seller as a result of a breach of the representations, warranties and covenants of the Seller provided herein after the date which is two years from the end of the Supply Period.

### 4.2     Right of Set-Off

Each of the Buyers shall have the right to satisfy any amount owing from time to time by such Buyer to the Seller by reducing such amount by any amount from time to time owing by the Seller to such Buyer, howsoever arising (and whether arising under this agreement or otherwise) including any amount owing to such Buyer pursuant to the Seller's indemnification pursuant to section 4.1 hereof or pursuant to the Purchase Agreement.

### 4.3     Binding Arbitration

(a)     In the event of a dispute under this Agreement, the parties shall, by notice to the other party (a "Demand to Arbitrate"), elect that the matter be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") by one arbitrator, chosen by the AAA, who shall administer the arbitration. The costs and expenses of any such arbitration shall be borne by the parties as determined by the arbitrator. Any such election to arbitrate shall be binding on all parties to this Agreement.

(b)     Should the arbitrator so appointed die, resign, refuse or become unable to act before a decision is given, the vacancy shall be filled by the AAA. The place of arbitration shall be Dallas, Texas. It is the agreement of the parties hereto that the arbitrator render a decision within six months of the date of the Demand to Arbitrate and that the parties use their reasonable commercial efforts to assist the arbitrator to render such decision within such time frame.

(c)     The award and all decisions of the arbitrator shall be final and binding upon the parties and there shall be no appeal therefrom to any court except as expressly permitted by the law of the place of arbitration. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In the event of any conflict between the rules of the arbitral authority and this Section, the provisions of this Section shall govern.

### 4.4     Assignment

Neither this Agreement nor any of the rights, interests, or obligations hereunder shall be assigned by any of the parties hereto, whether by operation of law or otherwise; provided, however, that upon notice to the Seller and without releasing either of the Buyers from any of their obligations or liabilities hereunder, a Buyer may assign or delegate any or all of its rights or obligations under this Agreement to any Affiliate of such Buyer or any person with or into which such Buyer or any parent company of such Buyer merges or consolidates.

- 12 -

The Seller agrees that upon receipt of written notice from a Buyer of such assignment, the Seller shall perform all of its obligations hereunder for the benefit of such Buyer's assignee and agrees to execute and deliver to such Buyer such documentation as such assignee may reasonably require.

Following the performance by Seller of its obligations pursuant to Article 2 hereof, Seller may assign its rights hereunder to any Affiliate of Seller; and upon receipt of written notice from Seller of such assignment, Buyer shall perform its remaining obligations hereunder for the benefit of such Seller's assignee, but nothing contained herein shall affect Seller's obligations hereunder.

## 4.5    Entire Agreement

This Agreement and all schedules attached hereto constitute the entire agreement between the parties hereto relating to the subject matter of this Agreement and supersede all prior agreements, letters of intent, understandings, agreements, representations, warranties or other provisions, express or implied with respect thereto, and no amendments of any provision hereof shall be binding on any party hereto unless consented to in writing by all parties.

## 4.6    Waiver of Breach

The parties hereto mutually covenant and agree that a waiver by any party of a breach of any of the terms of this Agreement by another party shall not be deemed a waiver of any subsequent breach of the terms of this Agreement.

## 4.7    Invalid Provisions

If any provision of this Agreement should be determined by a tribunal of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such determination shall not impair or affect the validity, legality or enforce ability of the remaining provisions hereof, and each provision of this Agreement is to be considered separate, severable and distinct, except those which are an integral part of or are otherwise clearly inseparable from such invalid or unenforceable part or provision.

## 4.8    Currency

Unless otherwise indicated, all dollar amounts referred to in this Agreement are expressed in United States currency.

S 000110

- 13 -

## 4.9    Relationships of Parties

Nothing in this Agreement shall be deemed or construed to constitute between the parties hereto the relationship of principal and agent, nor to create any partnership, joint venture or other form of legal association of any nature whatsoever. None of the parties is hereby constituted a legal representative of another party for any purpose whatsoever; and neither is granted any right or authority hereunder to assume or create, whether in writing or otherwise, any obligation or responsibility, express or implied, or to make any representation, warranty or guarantee, or otherwise to act in any manner in the name of the other party.

## 4.10    Notice

(a)    All notices shall be in writing in English and shall be sent by registered mail or facsimile to the following addresses unless otherwise instructed by notice to the other party:

If to the Buyers to:    Pet Life Foods, Inc.
c/o Sowell & Co.
3131 McKinney Avenue
Suite 200
Dallas, Texas 75204

Attn: Alan Brown

Facsimile:  (214) 871-3320


Dad's Products Company, Inc.
P.O. Box 451
Meadville, PA 16335

Attn:  President

Facsimile: (814) 453-4530

with a copy to: Aird & Berlis
BCE Place
181 Bay Street
Suite 1800, Box 754
Toronto, Ontario M5J 2T9

Attn:   Jay A. Lefton

Facsimile:  (416) 863-1515

S 000111

- 14 -

- and -

Knox McLaughlin Gornall & Sennett, P.C.
120 West 10th Street
Erie, Pennsylvania 16501-1461

Attn:  Robert G. Dwyer, Esquire

Facsimile:  (814) 453-4530

If to the Seller, to:  Gaines Pet Foods Corp.
c/o Shato Holdings, Ltd.
4088 Cambie Street, Suite 300
Vancouver, B.C.
V52 2X8

Facsimile:  (604) 874-4567

Attn:  Sultan Thiara, Chief Financial Officer

with a copy to: Lang Michener
BCE Place
181 Bay Street
Suite 2500, Box 747
Toronto, Ontario  M5J 2T7

Attn: Howard M. Drabinsky

Facsimile:  (416) 365-1719

(b)    All notices shall be deemed to have been duly given and received (i) on the fifth Business Day following the sending thereof by registered mail, or (ii) on the day such facsimile is sent, provided such day is a Business Day, failing which it shall be deemed to be received on the next Business Day.

- 15 -

**4.11    Further Assurances.**

The parties hereto covenant and agree to sign such other papers, cause such meetings to be held, resolutions passed and by-laws enacted, exercise their vote and influence, do and perform and cause to be done and performed such further and other acts and things as may be necessary or desirable in order to give full effect to this agreement and every part hereof. Each of the Buyers is hereby authorized by the Seller to cause this Agreement or other instruments to be filed or recorded for the purposes of showing such Buyer's interest in the Assets and the Seller agrees to execute and deliver all such instruments at the request of such Buyer and that such Buyer may execute and deliver such instruments for and on behalf of the Seller.

**4.12    Counterparts.**

This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties, it being understood that all parties need not sign the same counterpart.

**4.13    Governing Law; Choice of Forum.**

This Agreement is governed by the laws of the Province of Ontario (without reference to its rules of conflicts of law) and the laws of Canada applicable therein. Each of the parties hereto hereby irrevocably attorn to the non-exclusive jurisdiction of the courts of the Province of Ontario with respect to any matters arising out of this Agreement.

**4.14    Successors and Assigns**

This Agreement shall be binding upon and enure to the benefit of each of the Buyers and the Seller and their respective successors and assigns.

**4.15    Time is of the Essence**

Time shall be of the essence of this Agreement and of every part hereof and no extension or variation of this Agreement shall operate as a waiver of this provision.

**4.16    Obligations Joint and Several**

Unless otherwise noted herein, the obligations hereunder of the Buyers, on the one hand, and of the Seller and the Shareholder, on the other hand, are joint and several.

S 000113

- 16 -

### 4.17    Extended Meanings

In this Agreement, words importing the singular number include the plural and vice versa.

### 4.18    Guarantee by the Shareholder

The Shareholder hereby guarantees, as principal obligator and not as surety, in favour of each of the Buyers the due and punctual performance by the Seller of its obligations hereunder and agrees to indemnify each of the Buyers in respect of any failure by the Seller to duly and punctually perform its obligations hereunder. The guarantees and indemnities are given herein on the basis that same are unconditional and irrevocable and that such guarantees and indemnities shall not be abrogated, prejudiced or affected by any act or omission which would or might abrogate or prejudice or affect the liability of the Shareholder generally.

### 4.19    Change of Control of Buyers.    The Buyers shall give prior written notice (the "Change of Control Notice") to the Seller at least 15 days prior to an anticipated date of either the sale, directly or indirectly, of greater than 50% of the voting securities of a Buyer or the sale, directly or indirectly, of all or substantially all of a Buyer's assets (either event being a "Change of Control"). If the Seller provides the Buyers, in writing within 15 days after the date of the Change of Control Notice, that the Seller, acting reasonably, is not satisfied that the creditworthiness of the party purchasing the securities or of the Buyer after giving effect to the Change of Control, in the case of a sale of the securities of a Buyer, or the party purchasing the assets of the applicable Buyer, in the case of a sale of the assets of a Buyer, is equal to or greater than the creditworthiness of such Buyer as at the date of the Change of Control Notice (failing which the Seller shall be deemed to have consented to the Change of Control for the purposes hereof), then the Change of Control may not be completed without the Buyers, contemporaneously with the closing of the Change of Control, paying to the Seller the amount which is equal to the present value (based upon a discount rate of 7.5%) of the future royalty payments (the "Remaining Royalty Payments") required to be made by the Buyers to the Seller during the remainder of the Royalty Term.

For the purposes hereof, each Remaining Royalty Payment shall be deemed to be made on the 30th day after the end of each quarter of the applicable calendar year and shall be equal to the amount which results when:

S 000114

- 16 -

(a)    the sum of all royalty payments previously made by the Buyers to the Seller prior to the date of the Change of Control Notice

is divided by

(b)    the number of calendar quarters of the Royalty Term attributable to the royalty payments referred to in (a) above.

In the case of a sale of the assets of a Buyer, if the Seller is satisfied with the creditworthiness of the party purchasing such assets as contemplated above, then such party shall be required to execute this Agreement and guarantee the obligations of such Buyer hereunder.

IN WITNESS WHEREOF this Agreement has been executed under seal by the parties hereto as of the date written above.

**DAD'S PRODUCTS COMPANY, INC.**

Per:    _G. Thomas Lang_
       G. Thomas Lang
       President
       Authorized Signing Officer

**PET LIFE FOODS, INC.**

Per:    _Alan O. Brown_
       Alan Brown
       Chairman
       Authorized Signing Officer

**GAINES PET FOODS CORP.**

Per:    _____
       Name:  Kim Bortnak
       Title:  Sec Tres.
       Authorized Signing Officer

S 000115

- 17 -

**GAINES PET FOODS CORP.**, in its capacity as a
partner of Gaines Pet Foods

Per: _____

Name: Kim Bortnak
Title: Sec. Tres.
Authorized Signing Officer

**SHATO HOLDINGS LTD.**

Per: _____

Name: Kim Bortnak
Title: V.P. Assi. Sec. & Treasurer
Authorized Signing Officer

::ODMA\PCDOCS\DOCS\764403\BLA

S 000116

## SCHEDULE "A"

| Stop & Shop | | |
|---|---|---|
| Stop & Shop Beef & Cheese 12/6 oz. | *Pet Treat* | Stop & Shop |
| Stop & Shop Chewy Bones 12/6 oz. | | Stop & Shop |
| Stop & Shop Bite Size 12/6 oz. | | Stop & Shop |
| Stop & Shop Variety 10/4 lb. | *Pet Food* | Stop & Shop |
| Stop & Shop Lean Variety 10/4 lb. | | Stop & Shop |
| Stop & Shop Deli Cat 6/3.5 lb. | | Stop & Shop |

| Kash N. Karry | | |
|---|---|---|
| Kash N Karry Chewy Bones 12/6 oz. | *Pet Treat* | Kash N Karry |
| Kash N Karry Beef & Cheese 12/6 oz. | | Kash N Karry |
| Kash N Karry Bite Size 12/6 oz. | | Kash N Karry |

| Kroger | | |
|---|---|---|
| Kroger Beef & Cheese 12/6 oz. | *Pet Treat* | Kroger |
| Kroger Bite Size 12/6 oz. | | Kroger |
| Kroger Chewy Bones 12/6 oz. | | Kroger |
| Kroger Variety 10/4 lb. | *Pet Food* | Kroger |
| Kroger Lean Variety 10/4 lb. | | Kroger |
| Kroger Lean Variety 1/20 lb. | | Kroger |
| Kroger Variety 1/20 lb. | | Kroger |
| Kroger Beef Burger 6/72 oz. | *Pet Treat* | Kroger |
| Kroger Cheese Burger 6/72 oz. | | Kroger |

| Smith's | | |
|---|---|---|
| Smith's Beef & Cheese 12/6 oz. | *Pet Treat* | Fred Meyer |
| Smith's Variety 10/4 lb. | *Pet Food* | Fred Meyer |
| Smith's Variety 1/20 lb. | | Fred Meyer |
| Smith's Beef Burger 6/72 oz. | *Pet Treat* | Fred Meyer |
| Smith's Deli Cat 6/3.5 lb. | *Pet Food* | Fred Meyer |

| Laura Lynn | | |
|---|---|---|
| Laura Lynn Variety 10/4 lb. | *Pet Food* | Ingles |
| Laura Lynn Variety 1/20 lb. | | Ingles |
| Laura Lynn Premium Blend 6/3.5 lb. | | Ingles |

| Pathmark | | |
|---|---|---|
| Pathmark Variety 10/4 lb. | *Pet Food* | C&S |
| Pathmark Variety 1/20 lb. | | C&S |
| Pathmark Gourmet Dry Cat 6/3.5 lb. | | C&S |

S 000117

Gaines Pet Foods
Volume / Pricing Models for Pet Life

| US Burger | Avg/Week YTD | Opening Inventory | Scheduled Production | Total Available | Sales Nov 22-28 | Sales Nov 29-3 | Sales Dec 6-10 | Sales Dec 13-17 | Sales Dec 20-24 | Sales Dec 27-31 | Sales Jan 3-7 | Sales Jan 10-14 | Total 8 weeks | Inventory @ Jan 14 | # weeks Inventory | Current Price | Current Net Price | Price to Pet Life | Total Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beef Burger 13.9 lb | 630 | 4,498 | 1,802 | 6,300 | 630 | 630 | 630 | 630 | 630 | 630 | 630 | 630 | 5,040 | 1,260 | 2.0 | $ 6.85 | $ 6.71 | $ 4.56 | 28,6xx |
| Cheese Burger 13.5 lb | 1,267 | 4,730 | 7,940 | 12,670 | 1,267 | 1,267 | 1,267 | 1,267 | 1,267 | 1,267 | 1,267 | 1,267 | 10,134 | 2,536 | 2.0 | $ 6.85 | $ 6.71 | $ 4.56 | 57,0xx |
| Me & My Dog Beef Burger 6/72 oz | 149 | 1,084 | 406 | 1,490 | 149 | 149 | 149 | 149 | 149 | 149 | 149 | 149 | 1,192 | 298 | 2.0 | $ 9.95 | $ 9.75 | $ 6.63 | 9,8xx |
| Me & My Dog Cheese Burger 6/72 oz | 196 | 2,602 | - | 2,602 | 196 | 196 | 196 | 196 | 196 | 196 | 196 | 196 | 1,572 | 1,030 | 5.2 | $ 9.95 | $ 9.75 | $ 6.63 | 17,xx |
| Food Lion Cheese Burger 36/6 oz | 1,852 | 5,779 | 11,259 | 17,038 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 1,666 | 13,332 | 3,706 | 2.0 | $ 6.35 | $ 6.22 | $ 4.23 | 72,8xx |
| Food Lion Beef Burger 6/72 oz | 768 | 1,444 | 3,855 | 5,299 | 518 | 518 | 518 | 518 | 518 | 518 | 518 | 518 | 4,146 | 1,153 | 2.0 | $ 9.35 | $ 9.16 | $ 6.23 | 72,099 |
| Food Lion Cheese Burger 6/72 oz | 768 | 1,931 | 5,135 | 7,066 | 691 | 691 | 691 | 691 | 691 | 691 | 691 | 691 | 5,528 | 1,538 | 2.0 | $ 9.35 | $ 9.16 | $ 6.23 | 33,017 |
| Hannaford Cheese Burger 36/6 oz | 255 | 1,204 | 1,346 | 2,550 | 255 | 255 | 255 | 255 | 255 | 255 | 255 | 255 | 2,041 | 509 | 2.0 | $ 5.00 | $ 4.90 | $ 3.33 | 44,0xx |
| Hannaford Cheese Burger 6/72 oz | 167 | 1,550 | 100 | 1,650 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 167 | 1,337 | 313 | 1.9 | $ 10.06 | $ 9.86 | $ 6.70 | 8,5xx |
| Southern Home Cheese Burger 6/72 oz | 73 | 11 | 719 | 730 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 587 | 143 | 1.9 | $ 10.20 | $ 10.00 | $ 6.80 | 11,0xx |
| Southern Home Beef Burger 6/72 oz | 84 | 490 | 350 | 840 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 668 | 172 | 2.1 | $ 11.57 | $ 11.34 | $ 7.71 | 4,6xx |
| Southern Home Beef Burger 36/6oz | 86 | 409 | 451 | 860 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 686 | 174 | 2.0 | $ 5.71 | $ 5.60 | $ 3.81 | 6,0xx |
| Southern Home Cheese Burger 36/6oz | 108 | 114 | 966 | 1,080 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 108 | 867 | 213 | 2.0 | $ 6.26 | $ 6.13 | $ 4.17 | 3,2xx |
| Von's Beef Burger 6/72 oz | 110 | 248 | 852 | 1,100 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 880 | 220 | 2.0 | $ 11.70 | $ 11.47 | $ 7.80 | 4,9xx |
| Von's Cheese Burger 6/72 oz | 84 | 744 | 176 | 920 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 84 | 672 | 248 | 3.0 | $ 11.70 | $ 11.47 | $ 7.80 | 8,7xx |
| Safeway Beef Burger 6/72 oz | 424 | 609 | 3,631 | 4,240 | 424 | 424 | 424 | 424 | 424 | 424 | 424 | 424 | 3,392 | 848 | 2.0 | $ 11.70 | $ 11.47 | $ 7.80 | 7,1xx |
| Safeway Cheese Burger 6/72 oz | 672 | 547 | 6,173 | 6,720 | 672 | 672 | 672 | 672 | 672 | 672 | 672 | 672 | 5,376 | 1,344 | 2.0 | $ 11.70 | $ 11.47 | $ 7.80 | 8,8xx |
| Pet Club Beef Burger 6/72 oz | 332 | 643 | 2,677 | 3,320 | 332 | 332 | 332 | 332 | 332 | 332 | 332 | 332 | 2,655 | 665 | 2.0 | $ 11.70 | $ 11.47 | $ 7.80 | 33,0xx |
| Pet Club Cheese Burger 6/72 oz | 384 | 1,873 | 1,967 | 3,840 | 384 | 384 | 384 | 384 | 384 | 384 | 384 | 384 | 3,071 | 769 | 2.0 | $ 11.00 | $ 10.78 | $ 7.33 | 52,395 |
| Kroger Cheese Burger 6/72 oz | 415 | 1,059 | 3,091 | 4,150 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 415 | 3,324 | 826 | 2.0 | $ 11.00 | $ 10.78 | $ 7.33 | 24,337 |
| Smith's Beef Burger 6/72 oz | 632 | 1,305 | 5,015 | 6,320 | 632 | 632 | 632 | 632 | 632 | 632 | 632 | 632 | 5,058 | 1,262 | 2.0 | $ 9.95 | $ 9.75 | $ 6.63 | 28,1xx |
| Soft-Moist | 79 | 56 | 734 | 790 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 632 | 158 | 2.0 | $ 10.50 | $ 10.29 | $ 7.00 | 41,9xx |
| Me & My Dog Cheese 10/4 lb | 388 | 3,339 | - | 3,339 | 388 | 388 | 388 | 388 | 388 | 388 | 388 | 388 | 3,107 | 232 | 0.6 | $ 15.00 | $ 14.70 | $ 10.00 | 33,3xx |
| Me & My Dog Cheese 10/4 lb | 435 | 1,228 | 2,252 | 3,480 | 435 | 435 | 435 | 435 | 435 | 435 | 435 | 435 | 3,477 | 3 | 0.0 | $ 17.50 | $ 17.15 | $ 11.66 | 40,5xx |
| Top Choice | 248 | 257 | 1,727 | 1,984 | 248 | 248 | 248 | 248 | 248 | 248 | 248 | 248 | 1,987 | (3) | (0.0) | $ 15.00 | $ 14.70 | $ 10.00 | 19,8xx |
| Beef 10/1.6kg (Canada) | 985 | 1,248 | 12,542 | 13,790 | 985 | 985 | 985 | 985 | 985 | 985 | 985 | 985 | 7,883 | 5,907 | 6.0 | $ 24.25 | $ 23.77 | $ 16.16 | 222,8xx |
| Beef 6/1.6kg (Canada) | 31 | 1,482 | - | 1,482 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 31 | 249 | 1,233 | 39.6 | $ 14.55 | $ 14.26 | $ 9.70 | 14,3xx |
| Beef 1/4kg (Canada) | 245 | 1,421 | 2,009 | 3,430 | 245 | 245 | 245 | 245 | 245 | 245 | 245 | 245 | 1,964 | 1,466 | 6.0 | $ 6.12 | $ 6.00 | $ 4.08 | 13,9xx |
| Chicken 10/1.6kg (Canada) | 357 | 869 | 4,129 | 4,998 | 357 | 357 | 357 | 357 | 357 | 357 | 357 | 357 | 2,852 | 2,146 | 6.9 | $ 24.25 | $ 23.77 | $ 16.16 | 80,7xx |
| Chicken 10/1.6kg (Canada) | 23 | 881 | - | 881 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 186 | 695 | 29.9 | $ 14.55 | $ 14.26 | $ 9.70 | 8,5xx |
| Beef & Cheese 10/1.6kg (Canada) | 53 | 192 | 550 | 742 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 423 | 319 | 6.0 | $ 24.25 | $ 23.77 | $ 16.16 | 11,9xx |

S 000118

S 000119

**Gaines Pet Foods**
**Volume / Pricing Models for Pet Life**

| Dry Cat | Avg Week YTD | Opening Inventory | Scheduled Production | Total Available | Sales Nov 22-26 | Sales Nov 29-3 | Sales Dec 6-10 | Sales Dec 13-17 | Sales Dec 20-24 | Sales Dec 27-31 | Sales Jan 3-7 | Sales Jan 10-14 | Total Sales | Inventory @ Jan 14 | # weeks Inventory | Current Price | Current Net Price | Price to Pet Life | Total Revenue to Pet Life |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Love My Cat 6/3.5 lb | 111 | 375 | 957 | 1,332 | 111 | 111 | 111 | 111 | 111 | 111 | 111 | 111 | 885 | 447 | 4.0 | $14.50 | $14.21 | $9.66 | 12,07? |
| BiLo Premium Blend 6/3.5 lb | 195 | 312 | 2,040 | 2,352 | 196 | 196 | 196 | 196 | 196 | 196 | 196 | 196 | 1,572 | 780 | 4.1 | $13.50 | $13.23 | $9.00 | 21,0?? |
| Richfood Premium Blend 6/3.5 lb | 41 | 363 | 129 | 492 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 325 | 167 | 4.1 | $13.50 | $13.23 | $9.33 | 4,6?? |
| Southern Home Premium Blend 6/3.5 lb | 25 | 102 | 198 | 300 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 199 | 101 | 4.0 | $16.00 | $13.72 | $9.33 | 3,1?? |
| Finast Premium Blend 6/3.5 lb | 61 | 166 | 566 | 732 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 488 | 244 | 4.0 | $16.55 | $15.55 | $10.58 | 6,5?? |
| Pet Club Dell Cat 6/3.5 lb | 68 | 310 | 506 | 816 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 542 | 274 | 4.0 | $13.50 | $13.72 | $9.00 | 6,585 |
| Stop & Shop Dell Cat 6/3.5 lb | 102 | 74 | 1,150 | 1,224 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 813 | 411 | 4.0 | $14.00 | $13.72 | $9.33 | 7,613 |
| Smith's Dell Cut 6/3.5 lb | 45 | 48 | 492 | 540 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 361 | 179 | 4.0 | $13.50 | $13.23 | $9.00 | 11,0?? |
| Laura Lynn Premium Blend 6/3.5 lb | 77 | 319 | 605 | 924 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 614 | 310 | 4.0 | $14.00 | $13.72 | $9.33 | 4,6?? |
| Pathmark Gourmet Dry Cat 6/3.5 lb | 63 | 600 | 156 | 756 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 506 | 250 | 4.0 | $14.65 | $14.36 | $9.76 | 8,6?? |
| Harris Teeter Total Pet Dry Cat 6/3.5 lb | 41 | 972 | | 972 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 41 | 325 | 647 | 15.9 | $15.87 | $13.72 | $9.33 | 7,8?? |
| Harris Teeter Premium Blend 6/3.5 lb | 70 | 469 | 371 | 840 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 560 | 280 | 4.0 | $14.00 | $13.72 | $9.33 | 9,0?? |
| Titan Dry Cat 1/20kg (Canada) | | | | | | | | | | | | | | | #DIV/0! | | | | 7,6?? |
| **Non-Produced Treats** | | | | | | | | | | | | | | | | | | | |
| Patsmart Veg. Bones 12/4.5 oz | | 3 | | 3 | | | | | | | | | | 3 | | | | | |
| Patsmart Veg. Bones 12/7.1 oz | | 1 | | | | | | | | | | | | 1 | | | | | |
| Puppy 12/105g (Canada) | 56 | 1,778 | | 1,778 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 450 | 1,328 | | | | | |
| Calcium 12/129g (Canada) | 93 | 1,737 | | 1,737 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 748 | 989 | | | | | |
| Chlorophyll 12/129g (Canada) | 163 | 2,776 | | 2,776 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 163 | 1,302 | 1,474 | | | | | |
| Cheese 12/129g (Canada) | 156 | 2,228 | | 2,228 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 156 | 1,252 | 976 | | | | | |
| Bulk Variety 9064g (Canada) | 11 | 494 | | 494 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 11 | 90 | 404 | | | | | |
| ACTRIUM Biscuits - Skin & Coat 6/330g (Canada) | | 377 | 423 | 800 | | | | | | | | | | 800 | | | | | |
| ACTRIUM Biscuits - Energy Boost 6/330g (Canada) | | 251 | 549 | 800 | | | | | | | | | | 800 | | | | | |
| ACTRIUM Biscuits - Exercise 6/330g (Canada) | | 972 | | 972 | | | | | | | | | | 972 | | | | | |
| ACTRIUM Biscuits - Shart Cart 6/330g (Canada) | | 670 | 130 | 800 | | | | | | | | | | 800 | | | | | |
| ACTRIUM Biscuits - Digestive 6/330g (Canada) | | 251 | 549 | 800 | | | | | | | | | | 800 | | | | | |
| ACTRIUM Bones 12/128g (Canada) | | 2,396 | | 2,396 | | | | | | | | | | 2,396 | | | | | |
| ACTRIUM Bones 24/64g (Canada) | | 2,396 | | 2,396 | | | | | | | | | | 2,396 | | | | | |
| **Dry Dog** | | | | | | | | | | | | | | | | | | | |
| ACTRIUM Dry - Highly Active 53.6kg (Canada) | | 585 | | 585 | | | | | | | | | | 585 | #DIV/0! | $3.66 | $3.59 | $2.44 | 1,427 |
| ACTRIUM Dry - Highly Active 19.1kg (Canada) | | 359 | | 359 | | | | | | | | | | 359 | #DIV/0! | $7.79 | $7.63 | $5.19 | 1,864 |
| ACTRIUM Dry - Highly Active 1/18kg (Canada) | | 35 | | 35 | | | | | | | | | | 35 | #DIV/0! | $15.71 | $15.40 | $10.47 | 366 |
| ACTRIUM Dry - Normally Active 53.6kg (Canada) | | 148 | | 148 | | | | | | | | | | 148 | #DIV/0! | $3.36 | $3.29 | $2.24 | 331 |
| ACTRIUM Dry - Normally Active 19.1kg (Canada) | | 238 | | 238 | | | | | | | | | | 238 | #DIV/0! | $7.49 | $7.34 | $4.99 | 1,189 |
| ACTRIUM Dry - Normally Active 1/18kg (Canada) | | 328 | | 328 | | | | | | | | | | 328 | #DIV/0! | $13.06 | $12.80 | $8.70 | 2,854 |
| ACTRIUM Dry - Moderately Active 53.6kg (Canada) | | 179 | | 179 | | | | | | | | | | 179 | #DIV/0! | $3.31 | $3.24 | $2.21 | 395 |
| ACTRIUM Dry - Moderately Active 19.1kg (Canada) | | 121 | | 121 | | | | | | | | | | 121 | #DIV/0! | $7.27 | $7.12 | $4.84 | 585 |
| ACTRIUM Dry - Puppy 53.6kg (Canada) | | 146 | | 146 | | | | | | | | | | 146 | #DIV/0! | $3.66 | $3.59 | $2.44 | 355 |
| ACTRIUM Dry - Puppy 19.1kg (Canada) | | 359 | | 359 | | | | | | | | | | 359 | #DIV/0! | $7.79 | $7.63 | $5.19 | 1,86? |
| ACTRIUM Dry - Puppy 1/8.1kg (Canada) | | | | | | | | | | | | | | | #DIV/0! | | | | |
| Titan Dry Dog 1/20kg (Canada) | 1,548 | 1,548 | 1,548 | 1,548 | 387 | 387 | 387 | 387 | 387 | 387 | 387 | 387 | 1,548 | 280 | 4.0 | | | | |
| **Totals** | 34,081 | 174,350 | 235,709 | 411,069 | 34,292 | 34,292 | 34,217 | 34,050 | 33,189 | 33,053 | 32,892 | 32,847 | 268,824 | 142,245 | | | | | 2,723,684 |

S 000120

**Gaines Pet Foods**

**Volume / Pricing Models for Pet Life**

| Variety | Avg Week YTD | Opening Inventory | Scheduled Production | Total Available | Sales Nov 22-28 | Sales Nov 29-3 | Sales Dec 6-10 | Sales Dec 13-17 | Sales Dec 20-24 | Sales Dec 27-31 | Sales Jan 3-7 | Sales Jan 10-14 | Total 8 weeks | Inventory @ Jan 14 | # weeks Inventory | Current Price | Current Net Price | Price to Pet Life | Total Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nuggets & Nibbles 10/4 lb | 305 | 1,412 | 1,638 | 3,050 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 305 | 2,442 | 608 | 2.0 | $20.00 | $19.60 | $13.33 | 40,656 |
| Nuggets & Nibbles 5/8 lb | 263 | 1,435 | 1,195 | 2,630 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 2,105 | 525 | 2.0 | $19.50 | $19.11 | $12.99 | 34,101 |
| Nuggets & Nibbles 5/8 lb @$3.39 | 104 | 224 | 816 | 1,040 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 835 | 205 | 2.0 | $19.70 | $19.11 | $13.13 | 13,682 |
| Nuggets & Nibbles 1/20 lb | 380 | 4,803 | | 4,803 | 380 | 380 | 380 | 380 | 380 | 380 | 380 | 380 | 3,040 | 1,763 | 4.6 | $9.75 | $9.75 | $4.50 | 13,682 |
| Nuggets & Nibbles 1/20 lb @$37.99 | 113 | 2,664 | | 2,654 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 903 | 877 | 7.8 | $6.75 | $6.52 | $4.60 | 21,664 |
| Nuggets & Nibbles 1/20 lb @$36.99 | 113 | 1,780 | | 1,780 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 113 | 903 | 90 | 0.8 | $6.30 | $6.17 | $4.28 | 11,184 |
| Kash & Karry 5/8 lb | 45 | 360 | 90 | 450 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 360 | 90 | 2.0 | $7.00 | $6.86 | $4.66 | 8,303 |
| Kash & Karry 5/8 lb | 45 | 360 | 90 | 450 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 360 | 90 | 2.0 | $7.00 | $6.86 | $4.66 | 5,460 |
| Food Lion Variety 10/4 lb | 504 | 1,361 | 3,679 | 5,040 | 453 | 453 | 453 | 453 | 453 | 453 | 453 | 453 | 3,626 | 1,414 | 2.8 | $17.15 | $16.81 | $11.43 | 55,490 |
| Food Lion Variety 5/8 lb | 508 | 674 | 3,898 | 4,572 | 457 | 457 | 457 | 457 | 457 | 457 | 457 | 457 | 3,658 | 914 | 1.8 | $16.50 | $16.17 | $11.00 | 52,296 |
| Food Lion Variety 1/20 lb | 1,857 | 4,125 | 12,588 | 16,713 | 1,672 | 1,672 | 1,672 | 1,672 | 1,672 | 1,672 | 1,672 | 1,672 | 13,372 | 3,341 | 1.8 | $17.15 | $16.81 | $11.43 | 66,495 |
| BiLo Variety 10/4 lb | 196 | 1,235 | 725 | 1,960 | 196 | 196 | 196 | 196 | 196 | 196 | 196 | 196 | 1,568 | 392 | 2.0 | $5.97 | $5.85 | $3.98 | 22,666 |
| BiLo Variety 1/20 lb | 491 | 2,486 | 2,424 | 4,910 | 491 | 491 | 491 | 491 | 491 | 491 | 491 | 491 | 3,927 | 983 | 2.0 | $5.97 | $5.85 | $3.98 | 19,533 |
| Richfood Variety 10/4 lb | 45 | 20 | | 20 | | | | | | | | | | 914 | 2.0 | $17.35 | $17.00 | $11.56 | |
| Richfood Variety 1/17.6 lb @$37.99 | 54 | 20 | | 20 | | | | | | | | | | 392 | 2.0 | $5.97 | $5.85 | $3.98 | |
| Hannaford Variety 1/20 lb | 271 | 2,948 | | 2,948 | 271 | 271 | 271 | 271 | 271 | 271 | 271 | 271 | 2,168 | 780 | 2.9 | $16.32 | $15.99 | $10.88 | 8,158 |
| Southern Home Variety 10/4 lb | 49 | 1,032 | | 1,032 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 388 | 644 | 13.3 | $6.25 | $6.13 | $4.17 | 11,004 |
| Southern Home Variety 1/20 lb | 158 | 859 | 721 | 1,580 | 158 | 158 | 158 | 158 | 158 | 158 | 158 | 158 | 1,266 | 315 | 2.0 | $5.60 | $5.49 | $3.73 | 12,970 |
| Southern Lean Variety 10/4 lb | 28 | 165 | 115 | 280 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 28 | 226 | 54 | 1.9 | $6.45 | $6.49 | $4.30 | 6,791 |
| Southern Lean Variety 1/20 lb | 79 | 120 | 670 | 790 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 632 | 158 | 2.0 | $12.58 | $12.33 | $8.38 | 2,347 |
| Southern Home Lean Variety 10/4 lb | 102 | 523 | 497 | 1,020 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 102 | 813 | 207 | 2.0 | $6.19 | $6.07 | $4.05 | 8,258 |
| Finast Variety 10/4 lb | 158 | 5,532 | | 5,532 | 158 | 158 | 158 | 158 | 158 | 158 | 158 | 158 | 1,266 | 4,287 | 27.0 | $13.88 | $13.60 | $9.25 | 9,435 |
| Finast Variety 1/20 lb | 36 | 423 | | 423 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 289 | 134 | 3.7 | $5.97 | $5.85 | $3.98 | 22,000 |
| Finast Lean Variety 10/4 lb | 124 | 214 | 1,026 | 1,240 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 992 | 246 | 2.0 | $13.88 | $13.60 | $9.25 | 3,913 |
| Finast Lean Variety 1/20 lb | 339 | 811 | 2,579 | 3,390 | 339 | 339 | 339 | 339 | 339 | 339 | 339 | 339 | 2,710 | 680 | 2.0 | $5.97 | $5.85 | $3.98 | 4,931 |
| Pet Club Variety 10/4 lb | 964 | 2,366 | 7,574 | 9,540 | 964 | 964 | 964 | 964 | 964 | 964 | 964 | 964 | 7,708 | 1,932 | 2.0 | $19.80 | $19.40 | $13.19 | 44,730 |
| Pet Club Variety 1/20 lb | 79 | 371 | 419 | 790 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 632 | 158 | 2.0 | $17.35 | $17.00 | $11.56 | 37,062 |
| Stop & Shop Variety 10/4 lb | 25 | 239 | 11 | 250 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 200 | 50 | 2.0 | $17.35 | $17.00 | $11.50 | 9,134 |
| Stop & Shop Variety 1/20 lb | 308 | 934 | 2,146 | 3,080 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 2,466 | 614 | 2.0 | $17.25 | $16.91 | $11.50 | 2,889 |
| Kroger Variety 10/4 lb | 203 | 450 | 1,580 | 2,030 | 203 | 203 | 203 | 203 | 203 | 203 | 203 | 203 | 1,626 | 404 | 2.0 | $5.75 | $5.64 | $3.83 | 35,406 |
| Kroger Lean Variety 10/4 lb | 910 | 926 | 8,174 | 9,100 | 910 | 910 | 910 | 910 | 910 | 910 | 910 | 910 | 7,280 | 1,820 | 2.0 | $17.25 | $16.91 | $11.50 | 23,336 |
| Kroger Variety 1/20 lb | 1,520 | 6,371 | 8,829 | 15,200 | 1,520 | 1,520 | 1,520 | 1,520 | 1,520 | 1,520 | 1,520 | 1,520 | 12,157 | 3,043 | 2.0 | $5.75 | $5.64 | $3.83 | 34,869 |
| Kroger Lean Variety 1/20 lb | 56 | 172 | 388 | 560 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 452 | 108 | 1.9 | $6.07 | $5.95 | $4.05 | 58,243 |
| Smith's Variety 10/4 lb | 133 | 1,980 | | 918 | 133 | 133 | 133 | 133 | 133 | 133 | 133 | 133 | 1,066 | 914 | 6.9 | $19.80 | $19.40 | $13.19 | 6,919 |
| Smith's Variety 1/20 lb | 80 | 918 | | 790 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 80 | 641 | 277 | 3.5 | $6.05 | $5.93 | $4.03 | 8,009 |
| Laura Lynn Variety 10/4 lb | 470 | 1,421 | 3,279 | 4,633 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 470 | 3,757 | 943 | 2.0 | $18.49 | $18.64 | $12.32 | 12,118 |
| Laura Lynn Variety 1/20 lb | 79 | 79 | 72 | 790 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 632 | 158 | 2.0 | $5.90 | $5.78 | $3.93 | 18,949 |
| Pathmark Variety 10/4 lb | 399 | 2,718 | 1,252 | 3,990 | 399 | 399 | 399 | 399 | 399 | 399 | 399 | 399 | 3,194 | 798 | 2.0 | $6.23 | $6.11 | $4.15 | 9,476 |
| Pathmark Variety 1/20 lb | 45 | 487 | | 487 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 45 | 361 | 126 | 2.8 | $16.85 | $16.51 | $11.23 | 15,668 |
| Weis Variety 10/4 lb | 230 | 1,621 | 679 | 2,300 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 230 | 1,843 | 457 | 2.0 | $6.11 | $5.99 | $4.07 | 5,468 |
| Weis Variety 1/20 lb @$37.99 | 354 | 5,533 | | 5,533 | 354 | 354 | 354 | 354 | 354 | 354 | 354 | 354 | 2,833 | 2,700 | 7.5 | $18.54 | $18.17 | $12.36 | 9,549 |
| N&N Regular 8/1.8kg (Canada) | 423 | 4,633 | | 4,633 | 423 | 423 | 423 | 423 | 423 | 423 | 423 | 423 | 3,385 | 1,248 | 2.9 | $6.07 | $5.95 | $4.05 | 76,140 |
| N&N Regular 1/6kg (Canada) | 162 | 192 | 1,428 | 1,620 | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 162 | 1,299 | 321 | 2.0 | $20.65 | $20.24 | $13.76 | 18,370 |
| W.F. Variety 8/1.8kg (Canada) | 61 | 440 | 170 | 610 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 490 | 206 | 2.0 | $5.95 | $5.83 | $3.97 | 22,293 |
| W.F. Variety 1/20 lb (Canada) | 105 | 612 | 438 | 1,050 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 105 | 844 | 321 | 2.0 | $16.92 | $16.58 | $11.28 | 6,878 |
| W.F. Variety Mix 10/4 lb (Canada) | 200 | 65 | 1,935 | 2,000 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 1,600 | 400 | 2.0 | $4.56 | $4.47 | $3.04 | 3,191 |
| W.F. Variety Mix 10/1.8kg (Canada) | | | | | | | | | | | | | | | | | | | |
| Super Saver Variety Mix 10/1.8kg (Canada) | | | | | | | | | | | | | | | | | | | |

| Weis | | |
|---|---|---|
| Weis Variety 10/4 lb.<br>Weis Variety 1/20 lb. @$7.99<br>Weis Total Pet Dry Cat 6/3.5 lb. | *Pet Food* | Weis<br>Weis<br>Weis |
| Harris Teeter | | |
| Harris Teeter Premium Blend 6/3.5 lb. | *Pet Food* | Harris Teeter |

S 000121

## SCHEDULE ·

### U.S.A. ·

| BRANDED | CUSTOMER |
|---|---|
| Jerky Jerky 12/3 oz. | C&S Wholesale<br>Olean<br>Piggly Wiggly<br>Super Valu |
| Existing Pet Treat Product | |
| Sirloin Tips 12/6 oz. | Albertson's<br>Brookshire<br>C&S Wholesale<br>Cohen<br>Demoulas<br>Fleming<br>Furrs<br>Giant<br>Golub<br>Hannaford<br>Merchants<br>O.K. Grocery<br>Olean<br>Piggly Wiggly<br>Richfood<br>Scot Lad<br>Seaway<br>Shaws<br>Super Valu<br>Winn Dixie |
| Existing Pet Treat Product | |
| Schnitzel 12/6 oz. | Albertson's<br>Dollar General<br>Fleming Golub<br>Olean<br>Super Valu<br>Winn Dixie |
| Existing Pet Treat Product | |
| Chewy Bones 12/6 oz. | Demoulas<br>Marsh |
| Existing Pet Treat Products | |

Exhibit A

S 000122

NOV-23-99 05:41PM FROM-Lang Michener 4163608600 T-631 P.06/10 F-280

| | | |
|---|---|---|
| Muncheez 12/6 oz. | | A.W.I. Demoulas Giant Golub Merchants O.K.Grocery Scot Lad |
| *Existing Pet Treat* | | |
| Nuggets & Nibbles 10/4 lb. | | Brookshire Fleming Harris Teeter Merchants Piggly Wiggly Super Valu |
| *Existing Pet Food* | | |
| Nuggets & Nibbles 5/8 lb. | | Albertson's Fleming Ignles Merchants Minyard Piggly Wiggly |
| *Existing Pet Food* | | |
| Nuggets & Nibbles 5/8 lb.@$3.99 *Pet Food* | | Winn Dixie |
| Nuggets & Nibbles 1/20 lb. | | A.W.I. Akel Cohen Demoulas Fleming Merchants Olean Seaway |
| *Existing Pet Food* | | |
| Nuggets & Nibbles 1/20 lb.@$7.99 | | Cohen Harris Teeter Scot Lad Super Valu |
| *Existing Pet Food* | | |
| Nuggets & Nibbles 1/20 lb.@$6.99 *Existing Pet Food* | | Winn Dixie |

S 000123

| | |
|---|---|
| Beef Burger 13.5 lb.<br><br><br>*Pet Treat* | Brookshire<br>Furrs<br>Ingles<br>Merchants<br>Minyard<br>Seaway<br>Weis<br>Winn Dixie |
| Cheese Burger 13.5 lb.<br><br><br><br><br><br><br>*Pet Treat* | A.W.I.<br>Albertson's<br>Brookshire<br>Furrs<br>Merchants<br>Minyard<br>Richfood<br>Scot Lad<br>Scott Grocery<br>Super Valu<br>Winn Dixie |
| Me & My Dog Beef Burger 6/72 oz.<br>*Pet Treat* | H.E. Butt |
| Me & My Dog Cheese Burger 6/72 oz.<br>*Pet Treat* | H.E. Butt |
| Me & My Dog Beef 10/4 lb.<br><br><br><br><br><br><br><br><br><br><br>*Pet Food* | A.W.I.<br>Akel<br>C & S<br>Fleming<br>Giant<br>Hannaford<br>Jefferson<br>Merchants<br>Minyard<br>O.K. Grocery<br>Olean<br>Richfood<br>Scott Grocery<br>Super Valu |
| Me & My Dog Cheese 10/4 lb.<br><br><br><br>*Pet Food* | Harris Teeter<br>Marsh<br>Merchants<br>Scot Lad<br>Seaway<br>Winn Dixie |

S 000124

| | | |
|---|---|---|
| Me & My Dog 10/4 lb.@$1.99 | | Demoulas<br>Fleming<br>Super Valu |
| *Pet Food* | | |
| Love My Cat 6/3.5 lb. | | Demoulas<br>Fleming<br>Marsh<br>Richfood<br>Scot Lad<br>Seaway |
| *Pet Food* | | |
| Petsmart | | |
| Healthy Treats Veg. Bones 12/4.5 oz.<br>Healthy Treats Veg. Bones 12/7.1 oz.<br>*Pet Treat* | | Petsmart<br>Petsmart |
| Food Lion | | |
| Food Lion Chewy Bones 12/6 oz.<br>Food Lion Beef n Cheese 12/6 oz.<br>Food Lion Bite Size 12/6 oz.<br>Food Lion Variety 10/4 lb.<br>Food Lion Variety 5/8 lb.<br>Food Lion Variety 1/20 lb.<br>Food Lion Cheese Burger 36/6 oz.<br>Food Lion Beef Burger 6/72 oz.<br>Food Lion Cheese Burger 6/72 oz. | *Pet Treat*<br><br>*Pet Food*<br><br>*Pet Treat* | Food Lion<br>Food Lion<br>Food Lion<br>Food Lion<br>Food Lion<br>Food Lion<br>Food Lion<br>Food Lion<br>Food Lion |
| BiLo | | |
| BiLo Beef n Cheese 12/6 oz.<br>BiLo Sausage 12/6 oz.<br>BiLo Variety 10/4 oz.<br>ViLo Variety 1/20 lb.<br>BiLo Premium Blend 6/3.5 lb. | *Pet Treat*<br><br>*Pet Food* | BiLo<br>BiLo<br>BiLo<br>BiLo<br>BiLo |
| Richfood | | |
| Richfood Bite Size 12/6 oz.<br>Richfood Sausage 12/6 oz.<br>Richfood Variety 10/4 lb.<br>Richfood Variety 1/17.6 lb.@$7.99<br>Richfood Premium Blend 6/3.5 lb. | *Pet Treat*<br><br>*Pet Food* | Richfood<br>Richfood<br>Richfood<br>Richfood<br>Richfood |

S 000125

| | | |
|---|---|---|
| **Hannaford** | | |
| Hannaford Chewy Bones 12/6 oz. | ⎱ Pet Treat | Hannaford |
| Hannaford Beef & Cheese 12/6 oz. | Pet Food | Hannaford |
| Hannaford Variety 1/20 lb. | Pet Food | Hannaford |
| Hannaford Cheese Burger 36/6 oz. | ⎱ Pet Treat | Hannaford |
| Hannaford Cheese Burger 6/72 oz. | | Hannaford |
| **Southern Home** | | |
| Southern Home Bite Size 12/6 oz. | ⎱ Pet Treat | Brunos |
| Southern Home Beef & Cheese 12/6 oz. | | Brunos |
| Southern Home Variety 10/4 lb. | Pet Food | Brunos |
| Southern Home Variety 1/20 lb. | | Brunos |
| Southern Home Lean Variety 8/4 lb. | | Brunos |
| Southern Home Beef Burger 6/72 oz. | ⎱ Pet Treat | Brunos |
| Southern Home Cheese Burger 6/72 oz. | | Brunos |
| Southern Home Beef Burger 36/6 oz. | | Brunos |
| Southern Home Cheese Burger 36/6 oz. | | Brunos |
| Southern Home Premium Blend 6/3.5 lb. | Pet Food | Brunos |
| **Finast** | | |
| Finast Bite Size 12/6 oz. | ⎱ Pet Treat | Tops |
| Finast Sausage 12/6 oz. | | Tops |
| Finast Variety 10/4 lb. | | Tops |
| Finast Variety 1/20 lb. | Pet Food | Tops |
| Finast Lean Variety 10/4 lb. | | Richfood |
| Finast Lean Variety 1/20 lb. | | Richfood |
| Finast Premium Blend 6/3.5 lb. | | Richfood |
| **Pet Club** | | |
| Pet Club Beef & Cheese 12/6 oz. | ⎱ Pet Treat | Pet Club |
| Pet Club Sausage 12/6 oz. | | Pet Club |
| Pet Club Variety 10/4 lb. | Pet Food | Pet Club |
| Pet Club Variety 1/20 lb. | | Pet Club |
| Pet Club Beef Burger 6/72 oz. | | Pet Club |
| Pet Club Cheese Burger 6/72 oz. | Pet Treat | Pet Club |
| Pet Club Deli Cat 6/3.5 lb. | Pet Food | Pet Club |

S 000126

| Walmart | |
|---|---|
| ACTR1UM Biscuits - Skin & Coat 6/330g | Walmart |
| ACTR1UM Biscuits - Energy Boost 6/330g | Walmart |
| ACTR1UM Biscuits - Echinacea 6/330 | Walmart |
| ACTR1UM Biscuits - Shark Cart. 6/330g | Walmart |
| ACTR1UM Biscuits - Digestive 6/330g | Walmart |
| ACTR1UM Bones 12/128g | Walmart |
| ACTR1UM Bones 24/64g | Walmart |
| ACTR1UM Dry - Highly Active 6/3.6kg | Walmart |
| ACTR1UM Dry - Highly Active 1/9.1kg | Walmart |
| ACTR1UM Dry - Highly Active1/18kg | Walmart |
| ACTR1UM Dry - Normally Active 6/3.6kg | Walmart |
| ACTR1UM Dry - Normally Active 1/9.1kg | Walmart |
| ACTR1UM Dry - Normally Active 1/18kg | Walmart |
| ACTR1UM Dry - Moderately Active 6/3.6kg | Walmart |
| ACTR1UM Dry - Moderately Active 1/9.1kg | Walmart |
| ACTR1UM Dry - Puppy 6/3.6kg | Walmart |
| ACTR1UM Dry - Puppy 1/9.1kg | Walmart |
| Harrison | |
| Titan Dry Dog 1/20kg | Harrison |
| Titan Dry Cat 1/20kg | Harrison |
| Holistic Gold | |
| All Natural Adult Dry Dog (Bulk) | Holistic Gold |
| All Natural Puppy Dry Dog (Bulk) | Holistic Gold |
| All Natural Dry Cat (Bulk) | Holistic Gold |
| Multi-Mar | |
| Variety Mix 10/1.8 kg | Multi-Mar |

S 000127

| Safeway / Von's | |
|---|---|
| Von's Beef Burger 6/72oz<br>Von's Cheese Burger 6/72oz<br>Safeway Beef Burger 6/72oz<br>Safeway Cheese Burger 6/72oz | Von's<br>Von's<br>Safeway<br>Safeway |

S 000128

SCHEDULE "B"

Final

S 000129

Gaines Pet Foods

Volume / Pricing Models for Pet Life and Dad's

November 23, 1999

## Assumptions:

1. All sales volumes are based on YTD weekly trends. Actual weekly sales will vary depending on the timing of orders.
2. Sales projections are based on current trends and do not reflect any changes in the marketplace.
3. The weekly volumes and projections are strictly a planning tool. Weekly deviations may be significant, however in total the volumes are expected to be reasonable.
4. All volumes are in cases.
5. All dollars are in US$.
6. Pricing to Pet Life and Da I's is 68% of Gaines current net selling price (selling price less cash discounts).
7. Pricing for the newer SKUs (Titan, Supersaver) is still in progress and will be forwarded when complete.
8. Production has been scheduled to achieve the following inventory levels at January 14:
   □ Single extruded treats – 2-3 weeks .
   □ Dual extruded treats – 8-12 weeks .
   □ Variety – 1-2 weeks .
   □ US burger – 1-2 weeks .
   □ Soft-moist – none
   □ Top Choice – 4-6 week: .
   □ Dry Cat – 3-4 weeks .
9. Variety production will be complete by December 20. The EDL bundler and cat line can be removed after that date.
10. No production has been planned for Actrium (Walmart). Any requirements can be scheduled in place of Variety but only until December 20. Variety inventories would then be reduced accordingly (possibly to zero).

S 000130

Gaines Pet Foods
Volume / Pricing Models for Pet Life

| Produced Treats | Avg Week YTD | Opening Inventory | Scheduled Production | Total Available | Sales Nov 22-26 | Sales Nov 29-3 | Sales Dec 6-10 | Sales Dec 13-17 | Sales Dec 20-24 | Sales Dec 27-31 | Sales Jan 3-7 | Sales Jan 10-14 | Total 6 weeks | Inventory @ Jan 14 | # weeks Inventory | Current Price | Current Net Price | Price to Pet Life | Total Revenue |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jerky Jerky 12/12oz | 142 | 491 | 929 | 1,420 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 142 | 1,133 | 287 | 2.0 | $ 7.95 | $ 7.79 | $ 5.30 | 7,509 |
| Sirloin Tips 12/6oz | 1,416 | 2,252 | 26,068 | 28,320 | 1,416 | 1,416 | 1,416 | 1,416 | 1,416 | 1,416 | 1,416 | 1,416 | 11,332 | 16,988 | 12.0 | $ 8.25 | $ 8.09 | $ 5.50 | 155,688 |
| Schnitzel 12/6oz | 1,114 | 8,215 | 2,925 | 11,140 | 1,114 | 1,114 | 1,114 | 1,114 | 1,114 | 1,114 | 1,114 | 1,114 | 8,909 | 2,231 | 2.0 | $ 7.95 | $ 7.79 | $ 5.50 | 59,015 |
| Chewy Bones 12/6oz | 65 | 451 | 199 | 650 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 524 | 126 | 1.9 | $ 6.95 | $ 6.81 | $ 4.63 | 3,010 |
| Muncheez 12/6oz | 270 | 1,353 | 4,047 | 5,400 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 270 | 2,157 | 3,243 | 12.0 | $ 7.95 | $ 7.79 | $ 4.63 | 4,633 |
| Food Lion Chewy Bones 12/6oz | 267 | 1,200 | 1,203 | 2,403 | 241 | 241 | 241 | 241 | 241 | 241 | 241 | 241 | 1,925 | 478 | 1.8 | $ 7.45 | $ 7.30 | $ 4.96 | 11,930 |
| Food Lion Beef n Cheese 12/6oz | 278 | 2,036 | 2,986 | 5,022 | 241 | 241 | 241 | 241 | 241 | 241 | 241 | 241 | 2,008 | 3,014 | 10.8 | $ 7.95 | $ 7.79 | $ 5.30 | 28,609 |
| Food Lion Bite Size 12/6oz | 251 | 1,074 | 3,930 | 5,004 | 251 | 251 | 251 | 251 | 251 | 251 | 251 | 251 | 2,008 | 3,004 | 10.8 | $ 7.45 | $ 7.30 | $ 4.96 | 11,520 |
| BiLo Beef in Cheese 12/6oz | 250 | 1,154 | 926 | 2,080 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 2,000 | 1,249 | 12.0 | $ 7.45 | $ 7.30 | $ 4.96 | 24,930 |
| BiLo Sausage 12/6oz | 104 | 1,163 | — | 1,163 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 104 | 831 | 251 | 10.8 | $ 7.45 | $ 7.30 | $ 4.96 | 24,840 |
| Richfood Bite Size 12/6oz | 114 | 1,083 | 477 | 1,560 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 114 | 912 | 333 | 2.2 | $ 7.50 | $ 7.35 | $ 5.00 | 10,394 |
| Richfood Sausage 12/6oz | 78 | 425 | 425 | 850 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 627 | 171 | 11.9 | $ 7.50 | $ 7.35 | $ 5.00 | 5,815 |
| Hannaford Chewy Bones 12/6oz | 85 | 770 | 200 | 970 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 85 | 679 | 193 | 2.0 | $ 7.60 | $ 7.45 | $ 5.06 | 7,900 |
| Hannaford Beef & Cheese 12/6oz | 97 | 601 | 2,059 | 2,660 | 97 | 97 | 97 | 97 | 97 | 97 | 97 | 97 | 777 | 1,594 | 12.0 | $ 7.60 | $ 7.45 | $ 5.06 | 4,305 |
| Southern Home Bite Size 12/6oz | 133 | 460 | 681 | 540 | 133 | 133 | 133 | 133 | 133 | 133 | 133 | 133 | 1,066 | 431 | 11.9 | $ 7.66 | $ 6.53 | $ 4.44 | 4,305 |
| Southern Home Beef & Cheese 12/6oz | 36 | 39 | 60 | 1,780 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 36 | 289 | 323 | 12.0 | $ 6.66 | $ 6.53 | $ 4.44 | 11,806 |
| Finast Bite Size 12/6oz | 27 | 460 | 1,590 | 998 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 27 | 712 | 1,068 | 11.9 | $ 8.25 | $ 8.09 | $ 5.50 | 3,558 |
| Finast Sausage 12/6oz | 89 | 998 | — | 2,480 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 89 | 277 | 277 | 12.0 | $ 8.25 | $ 8.09 | $ 5.50 | 2,969 |
| Pet Club Beef & Cheese 12/6oz | 90 | 1,015 | 1,465 | 2,480 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 712 | 277 | 3.1 | $ 7.50 | $ 7.35 | $ 5.00 | 8,896 |
| Pet Club Sausage 12/6oz | 124 | 1,650 | 1,256 | 2,900 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 994 | 1,486 | 12.0 | $ 7.50 | $ 7.35 | $ 5.00 | 4,988 |
| Stop & Shop Beef & Cheese 12/6oz | 290 | 262 | 818 | 1,080 | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 290 | 2,321 | 579 | 2.0 | $ 7.95 | $ 7.79 | $ 5.30 | 13,195 |
| Stop & Shop Chewy Bones 12/6oz | 54 | 651 | — | 651 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 434 | 646 | 11.9 | $ 7.50 | $ 7.35 | $ 5.00 | 15,364 |
| Kash & Karry Bite Size 12/6oz | 50 | 651 | 435 | 680 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 397 | 254 | 12.1 | $ 7.50 | $ 7.35 | $ 5.00 | 5,398 |
| Kash & Karry Chewy Bones 12/6oz | 34 | 244 | — | 460 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 181 | 409 | 5.1 | $ 7.50 | $ 7.35 | $ 5.00 | 3,254 |
| Kash & Karry Beef & Cheese 12/6oz | 23 | 300 | 88 | 460 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 181 | 279 | 5.3 | $ 7.50 | $ 7.35 | $ 5.00 | 3,399 |
| Kroger Beef & Cheese 12/6oz | 23 | 372 | 435 | 300 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 181 | 279 | 12.4 | $ 7.50 | $ 7.35 | $ 5.00 | 1,499 |
| Kroger Bite Size 12/6oz | 205 | 25 | — | 1,268 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 205 | 1,268 | 279 | 0.0 | $ 7.50 | $ 7.35 | $ 5.00 | 2,299 |
| Kroger Chewy Bones 12/6oz | 242 | 1,268 | — | 1,030 | 242 | 242 | 242 | 242 | 205 | 205 | 205 | 35 | 1,030 | (0) | (0.0) | $ 6.60 | $ 6.47 | $ 4.40 | 2,299 |
| Smith's Beef & Cheese 12/6oz | 47 | 1,030 | — | 650 | 224 | 224 | 224 | 224 | 135 | 136 | — | — | 650 | (0) | (0.0) | $ 6.60 | $ 6.47 | $ 4.40 | 5,577 |
| Sirloin Tips 12/170g (Canada) | 47 | 650 | 640 | 940 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 47 | 379 | 561 | 11.8 | $ 6.95 | $ 6.81 | $ 4.63 | 4,530 |
| Schnitzel 12/170g (Canada) | 651 | 1,597 | 11,423 | 13,020 | 651 | 651 | 651 | 651 | 651 | 651 | 651 | 651 | 5,208 | 7,812 | 12.0 | $ 6.60 | $ 6.47 | $ 4.40 | 2,859 |
| Muncheez 12/170g (Canada) | 493 | 3,460 | 1,470 | 4,930 | 493 | 493 | 493 | 493 | 493 | 493 | 493 | 493 | 3,945 | 985 | 2.0 | $ 6.95 | $ 6.81 | $ 4.63 | 65,074 |
| Chewy Bones 12/170g (Canada) | 195 | 1,046 | 2,854 | 3,900 | 195 | 195 | 195 | 195 | 195 | 195 | 195 | 195 | 1,563 | 2,337 | 12.0 | $ 7.50 | $ 7.35 | $ 5.00 | 24,640 |
| Chewy Bones 300/35g (Canada) | 201 | 515 | 1,495 | 2,010 | 201 | 201 | 201 | 201 | 201 | 201 | 201 | 201 | 1,604 | 406 | 2.0 | $ 7.50 | $ 7.35 | $ 5.00 | 19,492 |
| W.F. Dog Treats - Sirloin 12/170g (Canada) | 6 | 53 | 7 | 60 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 45 | 15 | 2.6 | $ 7.50 | $ 33.57 | $ 5.00 | 10,046 |
| W.F. Dog Treats - Schnitzel 12/170g (Canada) | 30 | 101 | 499 | 600 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 242 | 358 | 1.8 | $ 34.25 | $ 6.37 | $ 22.82 | 1,369 |
| W.F. Dog Treats - Mt.& Ch. 12/170g (Canada) | 23 | 116 | 230 | 230 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 23 | 181 | 49 | 2.2 | $ 6.50 | $ 6.37 | $ 4.33 | 2,599 |
| W.F. Dog Treats - Jerky 12/170g (Canada) | 20 | 596 | — | 596 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 163 | 433 | 21.3 | $ 6.50 | $ 6.37 | $ 4.33 | 2,582 |
| W.F. Dog Treats - Soft Bones 12/170/kg (Canada) | 22 | 131 | 109 | 240 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 24 | 193 | 47 | 1.9 | $ 6.50 | $ 6.37 | $ 4.33 | 1,040 |
| | 22 | 77 | 143 | 220 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 22 | 175 | 45 | 2.0 | $ 6.50 | $ 6.37 | $ 4.33 | 953 |

S 000131

# SOWELL&CO.

1601 Elm Street, Suite 300
Dallas, Texas 75201
(214) 871-3320
Fax: (214) 871-1620
Website: *www.sowellco.com*

## FAX   TRANSMITTAL

Date:           January 10, 2002

To:             Bill Stapel          Fax:          312-904-0291

From:           Steven Smathers

Subject:        Pet Life Foods, Inc.  - Sergeant's

No. of Pages (Including Cover): ___12___ Entity Code:   3012

Attached please find the Settlement Agreement between Dad's Products Company, Inc. and Pet Life Foods, Inc. to terminate Maple Leaf Pet Care, LLC.

**The information contained herein is private and confidential.  If you should receive this fax in error, please call the above number.**

S 000132