# EXHIBIT "C"

1

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

       DAD'S PRODUCTS COMPANY,      )
3      INC.,                        )
                Plaintiff,          )
4                                   ) CIVIL ACTION
       VS.                          )
5                                   ) NO.: 03-350-ERIE
       SERGEANT'S PET PRODUCTS,     )
6      INC.,                        )
                                    )
7           Defendant.              )

8          ------------------------------------

9                    ORAL DEPOSITION OF

10                      ALAN BROWN

11                   August 16, 2005

12                      Volume 1
           ------------------------------------

13

14          ORAL DEPOSITION OF ALAN BROWN, produced as

15   a witness at the instance of the Plaintiff, and duly

16   sworn, was taken in the above-styled and numbered cause

17   on the 16th of August, 2005, from 10:12 a.m. to 11:31

18   a.m., before Michelle L. Varner, CSR in and for the

19   State of Texas, reported by machine shorthand, at the

20   offices of Sergeant's Pet Products, 1601 Elm Street,

21   Suite 300, in the City of Dallas, County of Dallas, and

22   State of Texas, pursuant to the Federal Rules of Civil

23   Procedure and the provisions stated on the record or

24   attached hereto.

25

2

```
 1                    A P P E A R A N C E S

 2

 3      Neal R. Devlin
        KNOX McLAUGHLIN GORNALL & SENNETT
 4      120 West Tenth Street
        Erie, Pennsylvania 16501
 5      (814) 459-2800

 6               FOR THE PLAINTIFF

 7
        David E. White
 8      THORP REED & ARMSTRONG, LLP
        301 Grant Street
 9      Suite 1400
        Pittsburgh, Pennsylvania 15219
10      (412) 394-2343

11
        Steven E. Smathers
12      Attorney at Law
        1601 Elm Street
13      Suite 300
        Dallas, Texas 75201
14      (214) 871-7227

15               FOR THE DEFENDANT

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2

 3    WITNESS:  Alan Brown

 4                                          PAGE

 5    Examination by Mr. Devlin              4

 6

 7

 8

 9                  E X H I B I T S

10    NO.        DESCRIPTION            PAGE

11    14         Asset Purchase Agreement     7

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                    P R O C E E D I N G S
 2                         ALAN BROWN,
 3      having been first duly sworn, testified as follows:
 4                         EXAMINATION
 5      BY MR. DEVLIN:
 6           Q.    Hi, Mr. Brown, my name is Neal Devlin.   We
 7      met a few minutes ago.   I know you sat through
 8      Mr. Scharf's deposition.   Can I just get you, for the
 9      record, to tell me where you are presently employed?
10           A.    I am the chairman of Sergeant's Pet Care
11      Products.
12           Q.    Okay.   How long have you held that position?
13           A.    Five years.
14           Q.    What was your position prior to that?
15           A.    I have been involved in various investments.
16      I have been chairman of several other companies over
17      the last 20 years, all of which were related to
18      private equity investments.
19           Q.    Okay.   Were you involved in Pet Life Foods?
20           A.    I was.
21           Q.    Okay.   What was your involvement in Pet
22      Life?
23           A.    I was on the board of Pet Life and the
24      chairman of Pet Life after we purchased the company in
25      1999.
```

5

1      Q.    When you say "we," who purchased the company

2   in 1999?

3      A.    A group of investors that have made other

4   acquisitions.

5      Q.    Okay.  Was Mr. Sowell included in that

6   group?

7      A.    Yes.

8      Q.    Okay.  In 1999, when the group of investors

9   purchased Pet Life, was there a majority owner of Pet

10   Life?

11      A.    James Sowell was the majority owner.

12      Q.    Okay.  Were you also involved -- I believe

13   Mr. Scharf testified that Mr. Sowell became the

14   majority shareholder in Sergeant's sometime in 2000?

15      A.    Yes, sir, around September of 2000.

16      Q.    Okay.  Were you involved in that, in the

17   acquisition of Sergeant's with Mr. Sowell?

18      A.    Yes.

19      Q.    Okay.  Once that acquisition in September

20   of 2000 occurred, did you -- is that when you became

21   chairman of Sergeant's?

22      A.    Yes.

23      Q.    Okay.  At that time, did you maintain a

24   position on Pet Life's board?

25      A.    I did.

6

1      Q.     Okay.  And what was your position at that

2   time on Pet Life's board?

3      A.     I was still chairman of the board.

4      Q.     And did you remain chairman of Pet Life's

5   board until -- well, through May of 2002?

6      A.     It was about that time that I resigned as a

7   director and as chairman.

8      Q.     So in -- was it in May of 2002 that you

9   resigned?

10      A.     I'd have to go back and see my files.  It

11   was around midyear of 2002.

12      Q.     Okay.  Why did you resign as chairman of Pet

13   Life in midyear 2002?

14      A.     Basically, the company was sold, the assets

15   were sold, the patents and trademarks were sold.  And

16   really Pet Life became just a very scaled down

17   operating entity for a short period of time.

18      Q.     Okay.  Between -- let me go back.

19                    MR. DEVLIN:  Will you mark this as

20   Exhibit 1?

21                    MR. WHITE:  May I suggest that

22   perhaps it would be better to --

23                    MR. DEVLIN:  Just number it

24   sequentially?

25                    MR. WHITE:  Yeah.  That way there's

7

1    no Brown versus Scharf.

2                        MR. DEVLIN:  Can we do that, then?

3                        THE REPORTER:  Sure.  Do you want

4    the exhibits all bound together in one book then?

5                        MR. DEVLIN:  That's fine.

6                        MR. WHITE:  That's fine.

7                        (Exhibit No. 14 marked.)

8        Q.    (By Mr. Devlin)  The court reporter has just

9    marked as Exhibit 14 an agreement entitled Asset

10   Purchase Agreement among Pet Life Foods, Dad's

11   Products Company, Gains Pet Foods Corp., Gains Pet

12   Foods, Mapleleaf Marketing and Chateau Holdings.  Are

13   you familiar with this -- this document, this

14   agreement?

15       A.    Yes.

16       Q.    Okay.  And, I mean, just for the record, you

17   signed this agreement as Pet Life Foods chairman; is

18   that correct?

19       A.    Yes.

20       Q.    Okay.  Do you recall what the -- I realize

21   it's a very long agreement, but what the business

22   purpose of this agreement was?

23       A.    The business purpose was to allow Pet Life

24   Foods and Dad's to purchase the assets -- and I'm

25   talking about trademarks and so forth.  We did not buy

8

1    much of the machinery or iron.  And it would benefit

2    Dad's because they were buying the -- as referred to

3    in here as the dog food business.  And Pet Life was

4    buying as referred in here, the pet treat business,

5    which Pet Life was trying to increase its market share

6    in treats and Dad's was trying to increase its market

7    share in the dog food business.

8        Q.    Did you understand that as part of the

9    consideration going to Gains, as the seller of the

10   assets you just discussed, that Dad's and Pet Life

11   were -- had royalty obligations to Gains?

12       A.    Yes.

13       Q.    Okay.  I'm going to show you what's

14   previously been marked as Exhibit 13, which is

15   entitled, Supplier and Royalty Agreement.  Are you

16   familiar with that document?

17       A.    Yes.

18       Q.    Okay.  If you look at page eight of that

19   document, article three, entitled Royalty Payments.

20   And if you'll go ahead and review article three,

21   subparagraphs A through D, if you don't mind.

22       A.    All right.

23       Q.    Okay.  Did you understand that article to

24   describe the royalty obligations Dad's and Pet Life

25   had to Gains as a result of their purchase of assets

9

1    from Gains?

2       A.    Yes.

3       Q.    Okay.  Did you understand those obligations

4    to be joint and several as between Dad's and Pet Life?

5       A.    Yes.

6       Q.    Okay.  In addition to the royalty

7    obligations, what other considerations did Pet Life

8    pay to receive the assets at issue in Exhibit 14, the

9    Asset Purchase Agreement?

10      A.    We had to agree to take product from the

11    selling company for a period of time, but no longer

12    than, I think, January of 2000.

13      Q.    Okay.

14      A.    There was some cash and consideration up

15    front.  Cash or letter of credit, I've forgotten.  But

16    there was some consideration during this period of

17    time.

18      Q.    Okay.  Subsequent to November 23, 1999, did

19    Pet Life use the trademarks it purchased from Gains?

20      A.    Subsequent to the Purchase Agreement of '99?

21      Q.    Yeah, after you purchased it.

22      A.    Yes.

23      Q.    Okay.  During that period of time did Pet

24    Life make royalty payments pursuant to the Royalty and

25    Purchase -- the Royalty and Supply Agreement?

1      A.    Yes.

2      Q.    Okay.  What was the process for making those

3  payments?  In other words, did Pet Life make them

4  directly to Gains?  Did Pet Life make them to Dad's?

5  Or how was that worked out?

6      A.    It seems like, for a period of time they

7  were made directly.  And then we tried to create the

8  bookkeeping and accounting more efficiently and we

9  started making them to Dad's.

10     Q.    Okay.  So you believe that for a period of

11 time Pet Life would make a payment directly to Gains

12 and Dad's would make a payment directly to Gains; is

13 that right?

14     A.    Yes.

15     Q.    And then at some point in time that changed

16 to where Pet --

17     A.    Trying to streamline the operations, yes.

18     Q.    Okay.  And then would Pet Life make a

19 payment to Dad's and Dad's would make one royalty

20 payment to Gains?

21     A.    Uh-huh.

22     Q.    Okay.  What was your understanding as to the

23 apportionment of the royalty payments between Dad's

24 and Pet Life?

25     A.    There was a percentage that we were each to

11

1    make.

2        Q.    Okay.

3        A.    And if I remember right, the percentage was

4    based on the volume of business that we were buying.

5    And it was 60/40, I believe, but I'm not sure.

6        Q.    Okay.  I think that's right.  Let me show

7    you what's previously been marked as Exhibit 6, which

8    is a Settlement Agreement.  That agreement is dated

9    August 1st, 2001.  As you can see on page four -- is

10   that your signature that you signed that agreement?

11       A.    Yes.

12       Q.    Okay.  We're going to get back to this

13   agreement with respect to it's effect on Mapleleaf.

14   But paragraph four, on page two of this agreement,

15   discusses a royalty obligation.  And if you'll review

16   that.

17                     Am I correct that that indicates

18   that there is an apportionment of that royalty

19   obligation between Dad's and Pet Life, being

20   60 percent Pet Life and 40 percent Dad's?

21       A.    Yes.

22       Q.    Okay.  Was it your understanding that was

23   the apportionment as between Dad's and Pet Life before

24   this agreement, as well?

25       A.    Yes.

1      Q.    Okay.  At or around the time that Dad's and

2    Pet Life purchased the trademarks and possibly other

3    assets from Gains, did you understand that an entity

4    named Mapleleaf was created?

5      A.    Yes.

6      Q.    Okay.  What was the purpose of Mapleleaf?

7      A.    That was the company that was set up for the

8    express purpose of selling product through both the

9    Dad's and Pet Life entity in order to track the

10   royalty -- to track how much volume was going through

11   to utilize a company called White Cap that was a

12   distributor, that had been involved in selling the

13   product in the United States.  So that was the model

14   that I said we tried to create of efficiencies and to

15   pool all of the operations of selling and distributing

16   in the U.S. together.

17     Q.    Okay.  Did -- Pet Life sold product under

18   the trademarks that it purchased from Gains, correct?

19     A.    Yes.

20     Q.    Okay.  Of that product that it sold, what

21   percentage of that product was sold through Mapleleaf?

22     A.    It would just be pure speculation on memory.

23     Q.    Okay.  And that's fair enough.  It would not

24   be a 100 percent, would it?

25     A.    It would be a high majority.  But I do not

13

1   think it would be a hundred percent.

2        Q.    Okay.  Did you understand that Mapleleaf

3   would sell some percentage of the product that would

4   be sold under the trademarks that were purchased from

5   Gains, but that some product sold under those

6   trademarks would also be sold directly from Pet Life

7   or from Dad's?

8        A.    Yes.

9        Q.    Okay.  What was your understanding as to the

10  reason for that?

11       A.    Relationship of customers.

12       Q.    Okay.

13       A.    Who knew the customers, customer continuity.

14       Q.    Okay.  Who ran Mapleleaf?

15       A.    Well, from an accounting point of view,

16  Dad's did.

17       Q.    Okay.  And why do you say "from an

18  accounting point of view"?

19       A.    All of the books and records were kept in

20  and around the Dad's corporate headquarters.  They may

21  have been in a separate building but they were all up

22  in Pennsylvania versus Michigan, where Pet Life had

23  its operation.

24       Q.    Okay.  Did Pet Life have contact with

25  Mapleleaf with respect to the sale of its product?

14

1       A.    Yes.

2       Q.    Okay.  Did you understand that Pet Life had

3   equal access to Mapleleaf as did Dad's?  And by equal

4   access, I'm saying, equal access to the books, equal

5   access with communications to Mapleleaf, that type of

6   thing.

7       A.    Yes.

8       Q.    Okay.  Was Pet Life's use of the trademarks

9   it purchased from Gains profitable for Pet Life?

10      A.    Initially, for a short period of time, yes.

11      Q.    Okay.  How about not initially?  I take by

12  that that at some point in time it ceased being

13  profitable?

14      A.    Yeah.

15      Q.    Okay.

16      A.    Do you want to just go into some of the

17  history here?

18                  MR. DEVLIN:  I'm fine with you doing

19  that.

20                  MR. WHITE:  Yeah, if you can do it.

21  Personal knowledge.

22      A.    Pet Life made a very serious mistake in

23  relying on its existing management to make this

24  acquisition.  Existing management, president and the

25  plant manager and so forth, told the board that we

15

1    could manufacture these treats at our plant in

2    Michigan, efficiently, economically and so forth.  But

3    they need a period of time to come up to scale.  So

4    that's why we had the supply agreement and we made

5    good money.  Pet Life made good money while Gains was

6    producing the product and we were selling it.  And

7    when that supply agreement ceased in January of 2000,

8    we immediately saw our profitability go down.  And it

9    really never lived up to its potential.

10                    And so the business started to fail

11   when the plant never could produce the product that it

12   cost, that had been basically projected by the senior

13   management.

14       Q.    Okay.  With respect to the trademarks that

15   you purchased from Gains, I believe you indicated that

16   Pet Life was interested in those trademarks related to

17   the pet treats, and that Dad's was related --

18   interested in the trademarks related to the pet food;

19   is that correct?

20       A.    Yes.

21       Q.    Can you give me -- are those generally terms

22   of art in the pet food industry?

23       A.    Yeah.  They're called pet food, dog and cat

24   really, versus treats, which has many, many different

25   products.  There's natural treats, formulated treats,

1   toy treats, vitamin treats.

2       Q.    Okay.  Did Pet Life produce any pet foods?

3       A.    Very, very little, maybe five or six

4   percent.  Our equipment was old.  At the time we

5   bought the business we were producing cat food for a

6   particular customer.  I think all of the dog food

7   operation had ceased.  Pet Life was primarily a

8   biscuit manufacturer.

9       Q.    Okay.

10      A.    Very, very small amount.  I'm going to guess

11  less than five percent, was an extruded product the

12  way you would make cat food or dog food.

13      Q.    Okay.  I believe we, in talking about the

14  relationship between Mapleleaf and the sale of product

15  under -- what I'm going to refer to as the Gains

16  trademarks, if that's okay, just to make it easier.  I

17  think you indicated that Mapleleaf was the entity that

18  sold a portion of the product that was sold under

19  those trademarks and that Pet Life and Dad's also sold

20  a portion under their own name, is that --  or absent

21  Mapleleaf; is that correct?

22      A.    Their own sales force, yes.

23      Q.    Okay.  With respect to the division between

24  foods and treats, was there any arrangement between

25  Pet Life and Dad's, whether that arrangement be

1    directly or through Mapleleaf, that Dad's would

2    produce food orders under those trademarks, whether

3    they came through Pet Life, Mapleleaf, and that Pet

4    Life would produce the treats under those trademarks

5    whether the sales came through either Dad's or

6    Mapleleaf?

7        A.    Yeah.   And I think it was more in line with

8    existing customers of Gains, not the trademarks.

9    Because you might have had a customer buying treats

10   and dog food.   And so Dad's would produce all of the

11   dog food for that Gains customer.   And I think in one

12   of the agreements there's a listing of the customers

13   that we were to follow.

14       Q.    Okay.

15       A.    It did not prohibit Pet Life from continuing

16   in this small cat food category.

17       Q.    Okay.

18       A.    We could not do it under any trademark we

19   bought from Gains.   But Pet Life would sell a Pet Life

20   cat food, if we had already been selling it.   So it

21   was a customer restriction as to what company produced

22   what product for that previous Gains customer, i.e.,

23   the customer list that was purchased along with the

24   trademark.

25       Q.    Okay.   With respect to those customers, does

18

1    what you just said hold true regardless of whether the

2    customer was sold the product through the Mapleleaf

3    sales force, the Pet Life sales force, or the Dad's

4    sales force?

5        A.    That would be the spirit of the agreement.

6    Most of the business would have gone through

7    Mapleleaf.  But I know we instructed our people not to

8    venture into and lead people to think that we were

9    selling dog food that should have been Dad's business.

10       Q.    Okay.  And this may get into some of the

11   intent behind why Mapleleaf was created.  But would

12   you agree that one of the underlying intents behind

13   creating Mapleleaf and then dividing the previous

14   Gains customers in that way was based upon established

15   relationships between those customers and either

16   Dad's, Pet Life or the absence of those types of

17   relationships?

18       A.    That was the spirit of the agreement.

19       Q.    Okay.  So in other words, pursuant to the

20   spirit of the agreement, if Pet Life had an

21   established relationship with a customer that was

22   previously a Gains customer, for the trademarks at

23   issue, subsequent to that, Pet Life may be the --

24   maintain that relationship and sell products under

25   those trademarks to that customer; is that right?

19

```
1        A.      In general, that's right, yes.

2        Q.      Okay.

3        A.      There might have been an exception or two

4    like there always is.  But, you know, there wasn't a

5    lot of issues.  Pet Life did not do enough dog food to

6    be a force in the business.

7        Q.      Okay.

8        A.      And so there really wasn't an issue as to

9    how you divide up the product sales.

10        Q.      Okay.  Did you understand, though, that if

11    in that situation where Pet Life would be the primary

12    sales contact with the customer, if the customer

13    placed orders for pet food under the trademarks that

14    had been purchased, that Pet Life would produce --

15    sell that food to the customer but that Dad's would

16    have been the producer of that food?

17        A.      I'm not sure that Pet Life would have sold

18    it.  I think it would have gone through a Mapleleaf

19    invoice.

20        Q.      Okay.  And now, looking at it from the other

21    perspective.  Any customer that Dad's had an

22    established relationship with at the time of the 1999

23    purchase from Gains, some of those customers would

24    have remained Dad's customers as opposed to becoming

25    Mapleleaf customers; is that fair?
```

20

1     A.    If that customer wasn't on the customer list

2    that was purchased.

3         Q.    Okay.

4         A.    You had some customers that Dad's might have

5    been doing business with for years, and they were also

6    a customer of Gains, and they ended up on the customer

7    list that we purchased.   And then we had to talk about

8    those exceptions.

9         Q.    Okay.   In talking about those exceptions,

10   was there -- obviously, discussions -- but was there

11   -- would Pet Life and Dad's have come to an agreement

12   as to whether Mapleleaf or Dad's would service that

13   customer?

14        A.    Yes.

15        Q.    Okay.   If the agreement was struck such that

16   Dad's was servicing that customer, did you understand

17   that the orders Dad's would take, it would produce the

18   food products, but that Pet Life would produce the

19   treat products?

20        A.    Yes.   With the qualification, I really

21   wasn't involved day-to-day in working on those

22   details.

23        Q.    Okay.

24        A.    The president of Pet Life or the president

25   of Dad's was involved in making sure the sales forces

21

1   didn't get too aggressive, that the company wasn't

2   selling the other company's product and, you know,

3   trying to keep everything above board.

4               And I kept getting the reports back

5   that things were progressing on a friendly, cordial

6   basis.

7     Q.    Okay.  Who was the president of Pet Life at

8   that time?

9     A.    Initially, it was a man named Bud Sloup,

10  S-l-o-u-p.

11     Q.    Okay.  How about after Mr. Sloup?

12     A.    After a period of time, there was a

13  gentleman hired, Mr. Atherly.

14     Q.    Okay.  Are you aware if Pet Life -- you had

15  previously discussed, with respect to the customer

16  list, if there had been a customer that had been both

17  a Gains customer and a Dad's customer such that the

18  customer showed up on the customer list that was

19  purchased, there would be discussions as to whether

20  Dad's would service that customer or Mapleleaf would

21  service that customer; is that right?

22     A.    Yes, and vice versa for Pet Life.

23     Q.    Okay.  That was my next question.  There

24  were customers that Pet Life had previously had a

25  relationship with that showed up on the customer list

22

1    that you referred to?

2        A.    Yes.

3        Q.    Okay.  And the same discussion would have

4    occurred whether Pet Life would had maintained a

5    relationship with that customer or whether the

6    customer would be shifted to Mapleleaf?

7        A.    Yes.

8        Q.    Okay.  And were some of those customers

9    maintained -- was the relationship maintained between

10   Pet Life and those customers?

11       A.    My memories serve me that there were some

12   exceptions that had to be worked out and talked

13   through.  That the president of the companies would

14   agree, but then the sales force would each be real

15   protective of giving up their contacts and so forth.

16       Q.    Okay.

17       A.    And so there had to be a little tit for tat,

18   so to speak.

19       Q.    All right.  With respect to those types of

20   customers -- and by "those types of customers," I

21   mean, any customer that would have had a previous

22   relationship with either Pet Life or Dad's, and then

23   had maintained that relationship with Pet Life or

24   Dad's.  In other words, not have come under the

25   Mapleleaf service.  Did Pet Life supply Dad's with

1    treats to service those customers?  In other words,

2    would Pet Life produce treats, send them to Dad's, so

3    that Dad's would have them in their stock to be able

4    to provide them to customers who ordered those treats?

5         A.    It probably was, in that example, would have

6    been produced quote/unquote for Mapleleaf.

7         Q.    Okay.

8         A.    Not for Dad's.

9         Q.    Okay.

10         A.    Because Mapleleaf would have been the

11    account, if you will, of the grocery store or the

12    distributor, not Dad's or Pet Life.  We would be

13    producing the treats, sending it to the warehouse,

14    which happened to be in Pennsylvania, not Michigan.

15    Dad's would be producing the pet food, sending it to

16    the warehouse.  And that account, Mapleleaf, would

17    have been reselling it on pallets to the customer.

18    The customer didn't want a pallet from Pet Life, a

19    pallet from Dad's and a pallet from Mapleleaf.  They

20    wanted one customer number and one pallet to show up

21    to fulfill their order.

22         Q.    Okay.  And under that -- because of that,

23    because customers wanted to deal with one entity, as

24    you said, one pallet.  As we previously discussed,

25    Mapleleaf occasionally was that one entity for a

24

1   percentage --

2        A.    I'd say the majority of the time they were

3   the entity.

4        Q.    Okay.  With respect to the exceptions for

5   that, when either Dad's or Pet Life was the entity,

6   through whom these sales were going, how is it -- that

7   looking through Pet Life's perspective -- how is it

8   Pet Life would obtain the product from Dad's to sell

9   to that customer?

10       A.    Well, theoretically they would send the

11  product to either the Pet Life warehouse or we would

12  work and send it to their warehouse and work out the

13  billing.  That was in theory.  It didn't happen very

14  often that way.

15       Q.    Okay.

16       A.    I mean the vast majority of business that

17  was done between Pet Life and Dad's was through

18  Mapleleaf.

19       Q.    Okay.  Did Pet Life produce product --

20  strike that.

21              When you say, it didn't happen that

22  way.  Are you saying from Pet Life's perspective it

23  was rare that you would sell product to one of these

24  exception customers, instead you would go through

25  Mapleleaf?

25

1          A.    No.

2          Q.    Do you have any knowledge as to whether it

3    was rare for Dad's?  In other words, did Dad's

4    maintain any appreciable number of customers that

5    would have been previous Gains customers but the

6    decision was made that Dad's would maintain the

7    primary sales?

8          A.    It wasn't appreciable because that was one

9    of the reasons that it was such a good fit.  That

10   Dad's and Pet Life worked together.  There was not a

11   large overlap of customers and there was not a large

12   overlap of products.  I mean, it was really the old

13   80/20 rule that made it a good fit.

14         Q.    Okay.  You had indicated that this was a

15   profitable arrangement for Pet Life during the period

16   when Gains was supplying pet treat products; correct?

17         A.    Yes.

18         Q.    Okay.  And after that it was no longer

19   profitable for Pet Life; is that right?

20         A.    It became less and less profitable.

21         Q.    Okay.  And this may be an

22   oversimplification -- but was that due to Pet Life's

23   ability to produce the product on its own?

24         A.    It's an oversimplification.  Part of it was

25   the inability to produce that.  But at the same time,

26

1    natural gas prices had doubled.

2        Q.    Okay.

3        A.    Wheat prices had -- I wouldn't say doubled,

4    but were up 50, 60, 70 percent.  And so those raw

5    material costs were going up dramatically and we could

6    not get a price increase from the customer because of

7    the competition.

8        Q.    Okay.  Did those problems that you just

9    identified, did those create any supply problems for

10   Pet Life?  In other words, did Pet Life at any time

11   have a problem supplying sufficient product to service

12   customers?

13       A.    I'm sure there was always some customer

14   wanting it yesterday, instead of tomorrow.  But, by

15   and large, Pet Life went out of its way to make the

16   product, even though we knew we were selling it at a

17   loss, or at margin.  We tried not to short ship any

18   customer.  That would have damaged the relationship

19   with Mapleleaf and, then, it would have had an overrun

20   effect on Dad's.  So Pet Life many, many times

21   produced a product and sold it to Mapleleaf knowing we

22   lost money on that product.

23       Q.    Okay.  Were you aware of any consistent

24   complaints from Dad's or Mapleleaf of a shortage of

25   pet treat products that were to be produced by Pet

1   Life?

2       A.    I would not say a consistent or a

3   persistent.  I can remember there was conversations,

4   you know, why can't you blankity-blank get this

5   product up here, and for whatever reason, we couldn't.

6   We replaced our president during this period of time.

7   We tried to find someone that would have greater

8   ability, greater span of control over the plant, that

9   was a very professional, well-trained person, highly

10  educated person brought in as the operations manager.

11  A lot of programs were put in place.  A lot of

12  maintenance -- preventative maintenance programs were

13  put in place in order to keep these supply issues to a

14  minimum.

15      Q.    Okay.  Looking at Exhibit 6, the Settlement

16  Agreement.  We had previously discussed paragraph four

17  of that agreement dealing with royalty obligations.

18  What was your understanding of the business purpose of

19  Settlement Agreement?

20      A.    Well, during this period, I guess, until

21  December '02, Pet Life committed not to directly or

22  indirectly be in the business of quote/unquote variety

23  mix, which is a kibble-type product.  Really the dog

24  food that we talked about was the majority of that

25  product.  And Dad's agreed not directly or indirectly

28

1    to be in the private label, soft treats business.

2    There was quite a bit of conversation on whether jerky

3    would fall into the treat category.  And Dad's was

4    very insistent that jerky not be included in the

5    injected molded treats.

6        Q.    Okay.  Those items that you just referred

7    to, is that generally described in paragraph six,

8    which is entitled, Restrictive Covenant, dealing with

9    those market areas that Dad's was not to compete in

10   and those that Pet Life was not to compete in; is that

11   correct?

12       A.    Uh-huh.

13       Q.    Okay.  Did you also understand that the

14   Settlement Agreement was intended to effectuate the

15   winding down and termination of Mapleleaf?

16       A.    Yes.

17       Q.    Okay.  From Pet Life's perspective, why was

18   it that it wanted to wind down and terminate

19   Mapleleaf?

20       A.    I think the bigger why was that Dad's wanted

21   to.

22       Q.    Okay.

23       A.    They had grown unhappy with the arrangement.

24   There had been management turnover at Pet Life.  They

25   didn't feel like Pet Life was -- this is an assumption

29

1    on my part.  They didn't feel that Pet Life was doing

2    what they should have done under the various

3    agreements with Dad's.  And they just -- the whole

4    attitude of the Dad's management was changing.

5        Q.    The attitude with respect to Mapleleaf?

6        A.    With respect to Mapleleaf, yes.

7        Q.    Okay.  Did Pet Life want to wind down

8    Mapleleaf?

9        A.    Well, we would have liked to have had some

10   amendments.  We felt like we were paying the

11   distributor, White Cap, too much money for what they

12   were doing.  They were not keeping their customers.

13   They were losing customers, sales weren't growing.  So

14   if we could have had some amendments and made it a

15   little more -- a unified company, where it wasn't

16   everybody pointing fingers at who did what, who didn't

17   do what, Pet Life would have liked to have stayed in

18   some of the agreements.  We also got the sense that

19   Dad's was wanting to compete in the treat business.

20        Q.    Okay.

21        A.    They had told us about the injected molded

22   treats.  They were trying to buy a business that was

23   in this.  But we felt like they were really wanting to

24   get the treat business, and the agreements that were

25   with Mapleleaf would not allow them to do that.

30

1    Q.    Okay.  Was it your understanding that

2    pursuant to the restrictive covenant, then, that would

3    have precluded Dad's from getting into the treat

4    business?

5    A.    Yes.

6    Q.    Okay.  Do you believe that Dad's at any time

7    breached its obligations under their restrictive

8    covenant?

9    A.    They walked a very tight line.

10    Q.    Why do you say that?

11    A.    We know that they had salesmen go to Pet

12    Life customers and start, I would say, preselling,

13    advertise the fact that they were going to be in the

14    treat business.  I cannot prove that they ever

15    manufactured anything outside of the agreement and

16    sold it.  But they didn't wait until December 31st,

17    '02 to start telling Pet Life customers that they were

18    going to be selling treats directly in the future.

19    Q.    Okay.  Do you know if prior to December 31,

20    '02 they ever manufactured, distributed or otherwise

21    provided treats to any customers?

22    A.    Pet Life salespeople told me that they did,

23    but I have no proof of that.

24    Q.    Okay.  Do you know which customers?

25    A.    Some of the larger, what we call, pet store

31

```
 1    customers.  Like a PetSmart, Petco, a mass
 2    merchandiser like Wal-Mart.  It wasn't just one, it
 3    was several.  And here again, this is our salespeople
 4    telling management and then they had several examples.
 5    So I would -- you had to feel like there's some reason
 6    to believe it.  It wasn't just one time that I heard
 7    this complaint.
 8        Q.    Okay.  When you say "several examples," do
 9    you mean -- by that, do you mean, several examples in
10    some of the stores that you've indicated?  Are those
11    the examples?
12        A.    Yes.  It wouldn't be stores, it would be the
13    purchasing manager in corporate headquarters for these
14    accounts.
15        Q.    Okay.  You indicated Petco, PetSmart?
16        A.    I was using those as examples.
17        Q.    Okay.
18        A.    It was larger companies where a significant
19    impact could be made if they got the accounts -- got
20    the business.
21        Q.    Okay.  During that -- during the period of
22    time referenced under the restrictive portion of the
23    settlement agreement, did Pet Life lose any of those
24    types of larger companies that had previously been
25    clients?
```

32

1       A.    I don't remember losing any.  I just

2    remember the salespeople saying how it was hard to

3    keep the bids with Dad's in there whispering in their

4    ear, talking about what they are going to be doing in

5    early '03.  If they had suppliers that had trouble

6    delivering those product, don't worry, we'll be right

7    around the corner.

8       Q.    Okay.

9       A.    I never had direct conversations with a

10   store.  But several salespeople that handled different

11   stores were reporting this back to me.

12      Q.    Okay.  Do you remember the names of any of

13   those salespeople?

14      A.    David Sparks who handled PetSmart.

15      Q.    Okay.  Can you spell that for me?

16      A.    P-e-t-s-m-a-r-t.

17      Q.    Okay.  I wasn't sure if it was mart or mark.

18      A.    Yes.

19      Q.    Okay.  Them, I've heard of.  David Sparks,

20   anyone else that you can think of?

21      A.    I think Grant Atkins.

22      Q.    Was Grant Atkins related to any -- or did he

23   go to any specific customer?

24      A.    I can't think of the particular customer.

25   He was involved in product management, product

33

1    development.

2        Q.    Okay.

3        A.    And we keep hearing that Dad's was ready to

4    bring out products that would compete with Pet Life as

5    soon as the Supply Agreement -- excuse me -- as soon

6    as the Settlement Agreement was over.

7        Q.    Okay.  Were you aware if Dad's supplied pet

8    food to any of the larger companies that you had

9    discussed that you thought they were, as you said,

10   preselling treats to?

11       A.    Dad's had a lot of the accounts.  Dad's was

12   a very large, well-known, private brand supplier.

13   They specialized in this variety mix, this kibble-type

14   product.  They were very competitive in that product.

15   I can't tell you for a fact which account they sold

16   to.  They just had a large market share, not just in

17   the northeast, but really to other accounts across the

18   country.

19       Q.    Okay.  At any time, either shortly before

20   the Settlement Agreement or after, did Pet Life have

21   any plans of entering into the food market?

22       A.    None.  Didn't have the equipment, didn't

23   have the management, know how.  It was never our

24   intent.

25       Q.    Okay.  The Settlement Agreement, which is

34

1   Exhibit 6, was executed August 1st, 2001; is that

2   correct?

3       A.    Yes.

4       Q.    Okay.  And if you look at Exhibit 4, which

5   is the Trademark, License and Transfer Agreement.

6                   THE WITNESS:  Let me get to it here.

7   I've got it right here.

8       Q.    (By Mr. Devlin)  That was executed

9   September 1st, 2001, correct?

10      A.    Yes.

11      Q.    Okay.  So that, obviously, that's a month

12  after the Settlement Agreement was executed, correct?

13      A.    Yes.

14      Q.    Okay.  At the time the Trademark, License

15  and Transfer Agreement was executed, you were chairman

16  of Pet Life; is that correct?

17      A.    Yes.

18      Q.    Okay.  And were you also chairman of

19  Sergeant's?

20      A.    Yes.

21      Q.    Okay.  Can you tell me the purpose of the

22  Trademark, License and Transfer Agreement?

23      A.    Sergeant's was purchasing certain trademarks

24  that related, I would think, totally to the treat

25  business.

35

1    Q.    Okay.

2    A.    And they paid cash and assumed certainly

3  liabilities.

4    Q.    Okay.  Why was it that Pet Life -- strike

5  that.

6                    Did Pet Life want to sell the

7  trademarks at issue in the Trademark, License and

8  Transfer Agreement to Sergeant's?

9    A.    Pet Life wanted to sell it to anyone that

10  would come in and offer it.  And they had very little

11  time to go out to the marketplace and solicit buyers.

12  They were in desperate need of cash.  They were under

13  pressure from their bank, breach of covenants.  And

14  they desperately needed someone that could see the

15  value of these trademarks to come in and try to make a

16  deal with them.

17    Q.    Okay.  So Pet Life -- if you remember, when

18  did Pet Life make the decision that it was interested

19  in selling these trademarks?

20    A.    After Pet Life started manufacturing these

21  treats, they went through management change, they went

22  through raw material supply, cost issues.  They

23  realized that they had to retool their business in

24  order to survive as a company.  And they were better

25  off to try to create a company that was in the biscuit

36

1    business and not in the formulated treat business.

2        Q.    Okay.

3        A.    That took a period of time, you know,

4    several weeks and months, not just one day.

5        Q.    Okay.

6        A.    I can't tell you the -- the exact day that

7    it was decided that's the best way to go.  But it was

8    an ongoing, what are we going to do to keep the

9    business healthy?

10       Q.    Okay.  Did Pet Life market the trademarks to

11   any entity, other than Sergeant's?

12       A.    Not aware of any.  We did tell the bank what

13   we were contemplating, to get their ideas.  Sometimes

14   banks will have names of people that you can sell

15   assets to.  They certainly had to approve the sale.

16   They were the, in my mind, the protector of arm's

17   length here.  Because I was in a tenuous spot being

18   the chairman of both companies.  And I wanted to make

19   sure that one company wasn't getting the upper hand

20   over the other.  And I felt like LaSalle Bank -- it's

21   owned by Ambro, one of the largest banks in the

22   world -- I felt like they were very capable, very

23   experienced bankers and they would not let a

24   transaction be completed to the detriment of their

25   customer.  So we kept LaSalle informed and our

37

1    attorney, really, handled all of the negotiations

2    between Sergeant's and the bank.

3        Q.    Okay.   Is that how the negotiations

4    generally went, that LaSalle -- well, did you

5    understand that LaSalle, to an extent, represented Pet

6    Life's interest in the negotiations with Sergeant's?

7        A.    I don't know if you could say legally

8    represented because they weren't on the board or a

9    shareholder.   But they had all of the assets under

10   mortgage and millions of dollars in debt and breach of

11   covenants.   So they had to approve any sale of an

12   asset.

13       Q.    Okay.   From Sergeant's perspective, why did

14   Sergeant's want to buy the trademarks?

15       A.    Sergeant's is a company over a hundred years

16   old that has a definite brand identity and marketplace

17   for it's flea and tick products.   We have got dog

18   collars and drops that kills fleas and ticks and so

19   forth.   And they were trying to become a broader based

20   pet care product company.   They were already in

21   rawhide and natural treats, they were in toys.   And it

22   was a planned market niche that they were wanting to

23   get in, and had studied that, and were familiar with

24   what formulated treat markets were, and they thought

25   it would be a good addition to their company.

38

```
1      Q.    Okay.  You had previously indicated that

2   there was a change in ownership in Sergeant's around

3   September of 2000; is that correct?

4      A.    Yes.

5      Q.    The business model that you just laid out

6   for Sergeant's, is that a model that existed prior to

7   that change in ownership?

8      A.    Not that I'm aware of.

9      Q.    Okay.

10     A.    What I'm aware of is that the former owner

11  was going to skinny-down many of the products that

12  Sergeant's had and just be a natural treat company.

13     Q.    Okay.  And then, upon the change in

14  ownership, to where Mr. Sowell was now the majority

15  shareholder, is that when the expansion of -- the

16  planned expansion of Sergeant's presence in different

17  markets came out?

18     A.    Yes.  It was over -- immediately following

19  that acquisition, we put together a different

20  long-term strategy for Sergeant's.

21     Q.    Okay.  And as part of that strategy

22  Sergeant's purchased the trademarks from Pet Life?

23     A.    It wasn't -- it wasn't, you know, the next

24  month, but it was --

25     Q.    Sure.
```

1    A.    And we had talked to other companies about

2  buying their treat business.  And so Sergeant's was

3  educated in the treat business and was really, from a

4  management point of view, willing to take on that

5  business and pay fair market price for that business.

6  It wasn't just an, Oh, we think we want to be in that

7  business.  They had been looking for a year.

8    Q.    Okay.  And as the consideration that

9  Sergeant's paid for the trademarks, did you understand

10  the consideration was in two parts, an initial payment

11  of $600,000, and then also the assumption of certain

12  obligations to Gains and then to the brokers, White

13  Cap, Schulman and Kofsky?

14    A.    Yes.

15    Q.    Okay.  What was -- let me ask this question.

16  Prior to the Trademark, License and Transfer

17  Agreement, had Pet Life been making its share of the

18  royalty payments to Gains that it was obligated to

19  make under the 1999 agreement?

20    A.    I believe so, yes.

21    Q.    Okay.  After the execution of the Trademark,

22  License and Transfer Agreement, did Pet Life continue

23  to make any payments pursuant to those royalty

24  obligations?

25    A.    I think Sergeant's assumed those

40

1    obligations.

2        Q.    Okay.  Did Pet Life notify Gains of the

3    assumption of those obligations?

4        A.    I don't have personal knowledge that they

5    did or didn't.

6        Q.    Okay.  With respect to Dad's, did Sergeant's

7    notify Dad's?

8        A.    I don't -- I can't tell you for sure one way

9    or the other.

10       Q.    Okay.  Do you know if -- let me ask this

11   question.  Did Pet Life notify -- I may have misspoken

12   on that last question, I apologize.

13               Did Pet Life notify Dad's?

14       A.    I'm not aware of it.

15       Q.    Okay.

16               MR. DEVLIN:  Can we take a break for

17   two minutes?  Is that okay?

18               THE WITNESS:  You bet.

19               MR. WHITE:  Sure.

20               (Break taken from 11:02 a.m. to

21               11:11 a.m.)

22       Q.    (By Mr. Devlin)  Okay.  When we finished, I

23   believe, I was asking you some questions about whether

24   Pet Life and Sergeant's had notified Gains or Dad's of

25   the transfer of the trademarks and the assumption of

41

1    the obligations.  And just to make sure that I hit the

2    right names, did Pet Life notify either Dad's or Gains

3    of the transfer of the trademarks to Sergeant's?

4        A.    I personally don't know.

5        Q.    Okay.  And is that the same answer for the

6    assumption of obligations?

7        A.    Yes.

8        Q.    Okay.  Was Pet Life aware at or around

9    August of 2001, when the Mapleleaf Settlement

10   Agreement was executed, that it would be selling the

11   trademarks it had -- that it had obtained from Gains?

12       A.    Was Pet Life aware?

13       Q.    Uh-huh.

14       A.    Pet Life was in negotiations and discussions

15   with the bank selling, really, any asset that would

16   help keep the company's cash -- cash, meaning payroll

17   and so forth.  So I'm sure that the trademarks had

18   been talked about.  I can't tell you just -- that was

19   the only discussion.  I think the discussions were

20   much broader than just, Are we going to sell the

21   trademarks or not?

22       Q.    Okay.  During the negotiations and

23   discussions that Pet Life had with Dad's regarding the

24   restrictive covenant and the settlement agreement and

25   the winding down of Mapleleaf, do you know, did Pet

42

1    Life ever let Dad's know that it was a possibility

2    that the trademarks would be transferred to another

3    entity and be sold?

4        A.    I don't know that we ever told Dad's.

5        Q.    Okay.  During the wind down of Mapleleaf, do

6    you know that in the -- well, let me ask the back up

7    question.  Were there discussions between Pet Life and

8    Dad's during the wind down of Mapleleaf, specifically,

9    with respect to determining where the Mapleleaf

10   customers were going to go?

11       A.    Yeah.  That -- those type of discussions

12   started before August and were really initiated

13   outside of the realm of, is Pet Life going to sell

14   assets.  Pet Life became pretty discouraged with the

15   Mapleleaf arrangement not long after it started,

16   because we admitted we didn't have the personnel and

17   accounting and so forth to handle the Mapleleaf

18   operation, didn't have the warehouse.  Dad's said, Oh,

19   we have all of it.  We'll volunteer.  We just heard

20   how they were trying to help us -- help Pet Life.  We

21   soon found out that who has the cash is king.  All of

22   the money would go up there and we couldn't get our

23   money for Pet Life, we couldn't get bills paid, they

24   were offsetting credits quote/unquote screw ups of Pet

25   Life.  We have didn't like the arrangement, after a

43

1    short period of time, because we felt like Dad's was

2    taking advantage of Pet Life through the Mapleleaf

3    arrangement and through their ability to hold the

4    checkbook, so to speak.

5         Q.    Okay.

6         A.    So we had already started talking to them

7    about, Gee, this isn't fair.  We can't get any

8    response.  You know, Where's all of this help you said

9    you had?

10                   So those discussions had already

11   started and were overriding a lot of other issues with

12   Dad's and Pet Life.  You had the salespeople saying,

13   you know, White Cap wasn't doing their job, we ought

14   to take them over.  Just a lot of issues.  When

15   something is not going right, you know, the finger

16   starts being pointed and then all of a sudden a

17   different finger gets pointed and things fall apart.

18        Q.    Okay.  I believe you had indicated, though,

19   that at -- around the time of the Settlement

20   Agreement, the August 1st Settlement Agreement, that

21   Pet Life -- had it been Pet Life's sole decision,

22   would have wanted to proceed and continued proceeding

23   with Mapleleaf with some changes; is that right?

24        A.    With changes in amendments, yes.

25        Q.    Okay.  All right.  With respect to the

44

1     discussions about -- for lack of a better word --

2     divvying up or dealing with the Mapleleaf customers,

3     whether those discussions occurred before or after the

4     settlement agreement.  At any time did those

5     discussions include that Sergeant's was now the owner

6     of those trademarks?

7         A.    I can't remember that discussion, no.

8         Q.    Okay.  I believe you also had testified that

9     after selling the trademarks to Sergeant's, Pet Life

10    was -- Pet Life held the position that Sergeant's had

11    now assumed the obligations to make the royalty

12    payments to Gains; is that right?

13        A.    Yes.

14        Q.    Okay.  Did Pet Life ever determine whether

15    Sergeant's had actually made those payments?

16        A.    I am not aware of what effort took place.

17    Pet Life underwent another series of management

18    changes.  The gentleman I just mentioned, Mr. Atherly,

19    left and we hired another person.  And so there was

20    quite a bit of turmoil at Pet Life by this point in

21    time.  The name Sergeant's wasn't a secret to Dad's.

22    We didn't try to keep the secret that investors,

23    myself, Jim Sowell and others, bought Sergeant's.  I

24    mean, you could ask the Dad's management, did you ever

25    -- were you ever told that Jim Sowell and his group

45

1    bought Sergeant's.  And I think they'd say, yes.  I

2    mean, it wasn't a secret.

3        Q.    Okay.  Did you understand that Sergeant's

4    assumption of the obligations to pay the royalty

5    obligations, to pay Gains or the brokers, was capped

6    at $270,000 for Gains and $50,000 for the brokers?

7        A.    Yes.

8        Q.    Okay.  Did you also understand that the

9    settlement and royalty agreement -- or the supply and

10   royalty agreement that created those obligations

11   provided for royalty payments that could exceed that

12   amount?

13       A.    The original agreement stated that, yes.

14       Q.    Okay.  Do you know if Pet Life ever inquired

15   to see if it would be obligated to make any payments

16   that were in excess of the $270,000?

17       A.    I don't know.

18       Q.    Okay.  Subsequent to selling the trademarks

19   to Sergeant's, did Pet Life continue to manufacture

20   the pet treat products for Sergeant's?

21       A.    For a period of time, yes.

22       Q.    Okay.  For how long a period of time?

23       A.    A short period of time.  I'd have to go back

24   and look at the files or documents.  But it was more,

25   like, a matter of months, not years.

46

1     Q.   Okay.  If we go to Exhibit 8, which is the

2    Notification and Cancellation Agreement.  That

3    agreement's dated May 2nd, 2002.  Do you know if

4    between September 2001 and May of 2002, for that

5    entire period of time, did Pet Life continue to

6    manufacture product for Sergeant's to be sold under

7    the trademarks that have been sold to Sergeant's?

8    A.   I would think a lot of the products, yes.

9    Q.   Okay.  The Notification and Cancellation

10    Agreement that's Exhibit 8, that agreement was

11    executed at or around the same time a number of other

12    agreements were executed that dealt with the

13    foreclosure and sale of substantial assets of Pet

14    Life; is that correct?

15    A.   Yes.

16    Q.   Okay.  Would it be fair to say that that

17    agreement was executed at or around the time when Pet

18    Life, as you said before, became a much more

19    restricted and much more limited entity?  The majority

20    of its assets and business had been either foreclosed

21    upon or sold at that point in time.

22    A.   I'm sorry.  I lost the train of your

23    question there.

24    Q.   It was a bad question.

25                At or around that time, did -- was

47

1    that -- did Pet Life sell the vast majority of its

2    business to World Pet?

3        A.    At and around that time, yes.  It was

4    sometime after this, but it was at and around that

5    time.  I'd just have to get the date of the agreement

6    for World Pet.

7        Q.    Okay.  Let's do that.

8        A.    The bank, really, was the driving force as

9    far as who was going to buy the vast majority of the

10   assets, the timing, and dollar amount, and so forth.

11       Q.    Okay.  All right.  Let's look at these.  You

12   have there Exhibit 8, which is the Notification and

13   Cancellation agreement.

14       A.    Yes.

15       Q.    Here's Exhibit 10, which is a Foreclosure

16   Agreement.

17       A.    Okay.

18       Q.    Is that Foreclosure Agreement the agreement

19   that effectuated the transfer of the majority of Pet

20   Life's assets to World Pet?

21       A.    It is.

22       Q.    Okay.  And that agreement occurred the day

23   after the Notification and Cancellation Agreement,

24   correct?

25       A.    Yes.

48

1    Q.    Okay.  And you had indicated that this

2   Foreclosure Agreement was at the -- you didn't use

3   this word and tell me if it's wrong -- that LaSalle

4   was the entity that was pushing for this foreclosure

5   agreement.

6    A.    LaSalle was pushing for a friendly

7   foreclosure to try to get their debt paid.

8    Q.    Okay.  Pursuant to the Notification and

9   Cancellation Agreement, from Pet Life's perspective,

10   what was your understanding of the purpose of that

11   agreement?

12    A.    It set upon the terms which Sergeant's --

13   the method and the amount that would pay LaSalle

14   Business Credit for certain invoices and product that

15   Pet Life had shipped to Sergeant's and so forth.

16    Q.    Okay.  And in exchange for that, Sergeant's

17   was to be relieved of its obligations to continue to

18   make royalty payments that had been assumed in the

19   September 2001 agreement; is that right?

20    A.    That's correct.

21    Q.    Okay.  The amount of money that Sergeant's

22   was to pay to Pet Life, which is indicated in the

23   Notification and Cancellation Agreement, was that the

24   amount of outstanding invoices that existed between

25   Pet Life and Sergeant's?

49

1    A.    That -- that exercise was put together by

2    the Pet Life people and the $447,000 here.  I think

3    I've seen a 446 number, but yeah, that's -- that's an

4    attempt to say that was the total amount.

5    Q.    Okay.  So in paragraph three, Pet Life -- of

6    the Notification and Cancellation Agreement, Pet Life

7    is discussing the amount that it is obligated to

8    Sergeant's for; is that right?

9    A.    Yes.

10    Q.    Okay.  In paragraph one of that agreement,

11    that's the paragraph that indicates what Sergeant's is

12    going to pay directly to LaSalle.  And that's the

13    $353,000 number, right?

14    A.    Right.

15    Q.    Okay.  I'm just trying to -- I believe the

16    agreement says that, but I just want to make sure I'm

17    right.  That number -- the $353,000 number, I guess,

18    I'll just read the agreement -- "Which represents the

19    current total of all invoices for products produced by

20    Pet Life and shipped to Sergeant's, for the account of

21    Sergeant's, without deduction."  Correct?  Is that

22    your understanding of where that number came from?

23    A.    Yes.

24    Q.    Okay.  Was it your understanding that

25    Sergeant's believed they had deductions as to that

50

1    amount for whatever reason, defective product or

2    something like that?

3        A.    I can't tell you that they knew for certain.

4    But you could just guess that all product wasn't 100

5    percent.

6        Q.    Okay.

7        A.    I mean there was discussions, what about

8    deductions, what about bad product, you know.  There

9    was conversation there and the bank was pretty

10   insistent that they wouldn't give Sergeant's much of a

11   open door to come back and claim deductions.

12       Q.    Okay.

13       A.    But there's -- there's always deductions.

14       Q.    Okay.

15       A.    And Sergeant's was trying to leave that

16   concept open.  But the bank wouldn't stand for it.

17       Q.    Okay.  All right.  So some of that $353,000

18   number was contested by Sergeant's, but some of it

19   wasn't; is that fair?

20       A.    Well, I don't know that we could even

21   legally contest it after you signed this agreement.

22   But we were being told by Sergeant's people that some

23   of this stuff just didn't ever -- be good, it's just

24   common sense.

25       Q.    Okay.  All right.  After this agreement was

51

1    executed, which purports to relieve Sergeant's of the

2    obligation to make any future royalty payments to

3    Gains or the brokers, was it your understanding that

4    Pet Life now had the obligation to do that again?  To

5    make those royalty payments?

6        A.    No, that's not my understanding.  Because

7    the bank may have stepped in and said, you can't make

8    the payments.  I mean, I don't know what was happening

9    between the bank and Pet Life at this point in time.

10        Q.    Okay.  At this point in time, were you still

11    the chairman of Pet Life?

12        A.    I think at the time Pet Life sold its

13    assets, I resigned.  So it may have been on this day

14    or a week or two later, all the other directors had

15    resigned by now and I was left, really, just trying to

16    cooperate with the bank.  We had indicated all along

17    we'd cooperate with the bank.  So they needed a board.

18    They needed an officer to sign the documents.  And so

19    I really was just in a perfunctory role at that point

20    in time.  I wasn't involved in running the business.

21    The bank had brought in outside consultants to run the

22    business.  I was simply there to keep the bank from

23    having to reconstitute a board and taking an

24    unfriendly action in starting over.  We saved the bank

25    thousands and thousands of dollars by our cooperation.

52

1      Q.    Okay.  Let me just ask this question, did

2   you have any understanding as to what was supposed --

3   what would have been the status of the royalty

4   obligations on Pet Life's obligations that were

5   assumed by Sergeant's in '01 after the execution of

6   this Cancellation and Notification Agreement?

7      A.    No.

8      Q.    Okay.  As of May 2nd, 2002, would Pet Life

9   have been in a financial position to be able to make

10  these payments?

11     A.    The bank would have been totally in charge

12  of whether they make the payments or not.

13     Q.    Okay.  And to your knowledge, as of May 2nd,

14  2002, was the bank's security interest in Pet Life at

15  a point where -- I mean, did it exceed the value of

16  Pet Life?

17     A.    In our mind it did.

18     Q.    Okay.  And shortly after --

19     A.    Let me make sure I understood the question.

20  The loan amount exceeded the value of the assets?

21     Q.    Correct.

22     A.    Yes.

23     Q.    So Pet Life in your mind was insolvent at

24  that point?

25     A.    Yes.

53

1      Q.    And sometime after May 2nd, 2002, Pet Life

2    did go into bankruptcy; is that correct?

3      A.    They went into bankruptcy.  I can't tell you

4    what chapter, you know.  But, yes, I understand they

5    were put into bankruptcy.

6      Q.    Okay.  Do you know, after the Notification

7    and Cancellation Agreement, if Pet Life notified Dad's

8    that the obligations that had been assumed by

9    Sergeant's had now been -- that Sergeant's was now

10   relieved of those obligations?

11     A.    I do not know.

12     Q.    Okay.  Do you know if Sergeant's had any

13   conversations with Dad's regarding that issue?

14     A.    I do not know.

15     Q.    Okay.  Do you know, subsequent to this

16   agreement, the Notification and Cancellation

17   Agreement, whether Dad's had any obligation -- whether

18   Dad's had to make any payments on those royalty

19   obligations to Gains?

20     A.    Because of this agreement being signed?

21     Q.    Or after that agreement?

22              MR. WHITE:  Are you saying "had to"

23   or "did"?

24              MR. DEVLIN:  I guess, had to.

25     A.    Well, I remember the original agreement was

54

1    jointly and severally.  So I would assume they had to.

2    Q.    (By Mr. Devlin)  Okay.

3    A.    Unless there had been another agreement

4    signed between Gains and Chateau and Dad's, which

5    there may have been.  I might not have been aware of

6    it.

7    Q.    You say the original agreement was joint and

8    several.  Did you assume -- or did you understand that

9    when Sergeant's assumed the obligation in the

10   September 2001 Agreement, it was assuming that

11   obligation as a joint and several obligation?

12   A.    It was assuming all of Pet Life's

13   obligations, yes.

14   Q.    Okay.

15                    MR. DEVLIN:  That's all of the

16   questions I have.

17                    MR. WHITE:  Okay.  We will sign.

18                    (Off the record at 11:31 a.m.)

19

20

21

22

23

24

25