1      Q.    Were you present at these meetings?

2      A.    I was not.

3      Q.    Who was present at these meetings on behalf of

4  Dad's?

5      A.    Doug Lang always would have been.

6      Q.    Okay.  So at some point the parties sit down and

7  start talking about Maple Leaf customers and who is going to

8  hold onto them.  Is that fair to say?

9      A.    Who is going to be responsible for the sales and

10  the service to that customer, yes.

11      Q.    And do you know, when Sergeant's first showed up

12  at this meeting, was this done at the request of Pet Life,

13  or do you have any idea how Sergeant's showed up at the

14  table?

15      A.    It certainly wasn't at our request.

16      Q.    Was this something that was run by you before

17  Sergeant's got involved?

18      A.    (No response.)

19      Q.    Did somebody from Pet Life call you up and say,

20  hey, we're thinking about bringing in Sergeant's to help

21  with this; what do you think?  Was that even discussed, or

22  did they just show up and --

23      A.    I would be the wrong person to ask that question

24  to, David.

25      Q.    Did somebody report back to you -- Doug report

1   back to you and say, hey, there was somebody from Sergeant's

2   at this meeting, and then you had a discussion with him

3   about Sergeant's role?

4       A.    We were -- as management of the company, we were

5   aware that Sergeant's had a presence at the table.  We were

6   also aware that Sowell had purchased Sergeant's prior to

7   that time period.

8       Q.    Okay.  Do you recall when you learned that Sowell

9   had purchased Sergeant's?

10      A.    No, I don't.  But it would have been -- I'm sure

11  not long after it actually happened; whenever that date was.

12  In our industry, those things aren't kept quiet for very

13  long.

14      Q.    And what did you understand to be Sergeant's

15  presence or role in these discussions?

16      A.    My understanding was that it was another arm of

17  the Sowell Pet Food group, and they had specific reasons why

18  they wanted certain customers put under that umbrella, as

19  opposed to Pet Life.  And as long as our people were

20  comfortable that that customer care was going to be correct

21  and accurate, we looked at that as being a decision for the

22  Sowell people to make.

23          In conjunction with those discussions, at exactly

24  the same time, the Sergeant's people would have sent us a

25  check for their share of the third-quarter royalty, which,

1   certainly, for all appearances to me and to members of our

2   organization, looked like that they were shuffling

3   responsibilities between the two companies.

4       Q.   I believe the royalty payments would have been

5   due -- one was due July 31st, and the next one would have

6   been due October 31st.

7       A.   Um-hum.

8       Q.   The first Sergeant's payment would have been in

9   October?

10      A.   Um-hum.

11      Q.   Is that correct?

12      A.   Um-hum.

13      Q.   All right.  So that would have been about three

14  months after this agreement -- the Settlement Agreement was

15  entered?

16      A.   It might have been after the Settlement Agreement,

17  but it was during the very time when the Sergeant's people

18  were at the table taking over accountability for specific

19  customers.  That -- that started in September, went through

20  October.  There was other meetings going on through November

21  and December with that group of people.

22      Q.   Would you agree with me that Sergeant's was not a

23  party to Exhibit 4 -- excuse me, Exhibit 6, the Settlement

24  Agreement?

25      A.   I guess I wouldn't agree with that, inasmuch as

1    they were at the table taking responsibility for customers.

2        Q.    Okay.

3        A.    Kind of hard to separate things when you have Alan

4    Brown chairing both of these organizations and representing

5    both of the organizations to you.

6        Q.    Would you agree with me that Sergeant's name

7    doesn't appear anywhere in the Settlement Agreement?

8        A.    Yes, sir.

9        Q.    Was there any consideration given by you to adding

10   Sergeant's to this Settlement Agreement?

11       A.    At the time that -- no, sir.  The answer is no.

12       Q.    Now, my understanding of your testimony with the

13   Settlement Agreement is that Maple Leaf was dissolved and

14   customers were divvied up between -- well, Dad's took back

15   its former customers, Pet Life held onto some customers, and

16   then some of Pet Life's customers, the responsibility for

17   those customers was shifted to Sergeant's.  Is that a fair

18   summary?

19       A.    I wouldn't know that that's accurate.  I would not

20   know that your statement is accurate.  I don't know that.

21       Q.    Was that your understanding of what was going on

22   at this time?

23       A.    My understanding is that accountability for

24   customers would have gone to the organization that could

25   best have serviced that customer.  And on the -- if it was a

1    customer that Pet Life could best service, then how the

2    decision got made as to whether it went to Pet Life or

3    Sergeant's, I wouldn't have a -- you've got the wrong guy

4    here for that discussion.  I don't know.

5        Q.    Okay.  As far as the accountability for which

6    customer, was that something that -- do you know whether or

7    not that was ever reduced to writing?

8        A.    Yes, sir.

9        Q.    Okay.  And was there an agreement entered between

10   Dad's and some other party?

11       A.    You mean a written legal agreement?

12       Q.    Or any agreement.  I mean, was there something

13   saying --

14       A.    There were -- there were memorandums -- or there

15   were schedules laid out with accountability that all the

16   parties to that signed off on, yes.

17       Q.    You're saying Sergeant's signed off on these

18   schedules?

19       A.    Um-hum.

20       Q.    Were these schedules, were they attached to any

21   type of formal legal document, that you're aware of?

22       A.    I don't know that.  Not that I'm aware of, but I

23   don't know that.

24       Q.    Was one of the reasons -- did Dad's make the

25   decision to dissolve Maple Leaf because it wanted to get

1    into the pet treat business?

2        A.    No.

3        Q.    Was one of the discussions that was held

4    internally about dissolving Maple Leaf is because Dad's

5    wanted to go after Pet Life's customers?

6        A.    No.

7              (Discussion held off the record.)

8        Q.    We're looking at the Sales and Marketing

9    Agreement.  Could you just flip to Exhibit -- the very back

10   page.  I think it's Exhibit B to the agreement.

11       A.    (Witness complies.)

12             (Discussion held off the record.)

13             MR. WHITE:  It's Exhibit B to that exhibit, so it

14             might be kind of up front.  It says commissions.

15             MR. DEVLIN:  It's Exhibit B to Exhibit C of the

16             Complaint?

17             MR. WHITE:  Right.  It's the last page of Exhibit

18             C.

19       Q.    And Exhibit B to the Sales and Marketing Agreement

20   appears to list the different pet food products and pet

21   treat products to be covered by the Sales and Marketing

22   Agreement.  Do you see that?

23       A.    Yes, sir.

24       Q.    And there's a number of different product lines,

25   such as kibbles/variety mix.  Which one of those -- can you

1   just go down that list real quick for me and just tell me
2   which one of those products are manufactured by Dad's.
3        A.   At this time?
4        Q.   Yeah.  Right.  When you entered into that
5   agreement.
6        A.   The first one.
7        Q.   Kibbles and variety mix?
8        A.   Um-hum.  Now, I'm -- I'm not the right person to
9   answer this for you, David.  Because I -- the urinary dry
10  cat formula could have been, but I don't know.  I can't tell
11  you back then.  Dry dog and dry cat, premium dog, premium
12  cat, we were capable of doing all that.  But I -- I am not
13  the right person to answer this for you.
14       Q.   All right.  Well, is it fair to say that out of
15  those product lines that are listed on Exhibit B to the
16  Sales and Marketing Agreement, you know for certain that the
17  kibbles/variety mix was manufactured by Dad's --
18       A.   That's correct.
19       Q.    -- and some of the others, you're not really
20  sure --
21       A.   Soft moist dog definitely was Pet Life.
22  Milk-bone-style biscuit was definitely Pet Life.
23            (Witness asked for clarification by reporter.)
24       A.   Kibbles/variety mix is definitely a Dad's product.
25  And then soft moist dog, milk-bone-style biscuit, and soft

1   moist treats, those would be -- definitely be Pet Life

2   items.  And beyond that, I don't know.

3       Q.   Now, of those items, now, currently does Dad's

4   manufacture any of those items that are listed there?

5       A.   Well, let me make sure you understand what I told

6   you before.  In 1999, when we bought Gaines Canada, Dad's

7   was making everything on this list except soft moist dog

8   food, milk-bone-style biscuit, and jug dry cat and soft

9   moist treats.  We did not make those items.

10      Q.   Okay.

11      A.   Everything else we made.  Now, whether we were

12  making it for the Whitecap group or this agreement, I'm not

13  the person to answer that.  I don't know who was providing

14  what.

15      Q.   Well, of those four that you were not

16  manufacturing, do you currently manufacture any of those

17  products?

18      A.   We make soft moist treats today.  Soft treats.

19      Q.   And that would have been the late '03, early

20  '04 that we were talking about earlier?

21      A.   Yes, sir.  That's correct, um-hum.  Beginning with

22  the jerky and --

23      Q.   Now, at the time you entered into this Settlement

24  Agreement, which is Exhibit 6 that we were looking at

25  earlier, what was your understanding of Pet Life's financial

1    condition?

2        A.    I don't know that I would have a specific

3    understanding what -- it was a highly leveraged purchase

4    when Sowell bought it.  I knew that.  I knew that they

5    had --

6        Q.    Well, Sowell didn't purchase -- well, first of

7    all, I don't -- Sowell didn't purchase Pet Life until a

8    month later; September of 2001, I believe.

9        A.    No, they purchased Pet Life in the middle of '99.

10       Q.    I'm sorry.  You're right.  I'm thinking of

11   something else.

12       A.    Yeah.  Sergeant's, you're thinking of.

13       Q.    Right.  Right.  Okay, go ahead.  I'm sorry; I

14   didn't mean to interrupt you.  We were talking about the

15   financial condition of Pet Life at this time.  You said it

16   was highly leveraged and --

17       A.    Well, that's all I knew from the beginning.  I

18   wouldn't have any specific knowledge of whether, really, it

19   was particularly better or worse.  Certainly from Alan

20   Brown, I never would have been under the understanding that

21   there was any issue particularly around that.

22       Q.    At this point, did you request the financial

23   statements of Pet Life or do anything else to verify its

24   financial condition?

25       A.    At what point?

1     Q.   Right at this point when you entered into this
2  Settlement Agreement of August of -- August 1 -- excuse
3  me --
4     A.   Where we unwound Maple Leaf?
5     Q.   Yes.
6     A.   No, sir.
7     Q.   August 1 of 2001.  Now, at this point, were there
8  any statements made by Sergeant's about guaranteeing the
9  royalty payments being made by Pet Life under the original
10  agreement with you?
11     A.   Just by their actions.
12     Q.   Okay.  Why don't you explain to me what actions
13  we're talking about.
14     A.   Well, they were part and parcel of the customer
15  accountability.  It had been made very clear to us from Alan
16  Brown that Sergeant's was an owned entity by Sowell
17  Partners, and that they would be trying to grow certain
18  pieces of the business in that entity.
19          Certainly, when the third-quarter payment came
20  from Sergeant's, as opposed to Pet Life, that was brought to
21  both Rick and I's attention by our CFO, Rick Moyer.  We
22  didn't have a problem with that, understanding that they
23  were both jointly owned by Sowell partners.  And we
24  certainly relied on the fact that if that's the way they
25  wanted to have the payments made, that was fine with us.

1    Q.    Any other actions, other than what you just went
2    through?

3    A.    Not that I would have first-hand knowledge of, no.

4    Q.    Okay.  Now, I asked you just a couple seconds ago,
5    were there any statements made by Sergeant's to you that
6    they would continue to -- or they -- I wouldn't say
7    "continue".  Strike that.  That they would guarantee the
8    royalty payments owed by Pet Life under the Asset Purchase
9    Agreement?

10    A.    Only that they paid it in the third and fourth
11    quarter.  That's a pretty big statement to me.

12    Q.    Well --

13    A.    Relied on that as being the way it is.

14    Q.    And I appreciate and understand your position.
15    Did anybody from Sergeant's say to you, hey, we're going to
16    take care of this royalty payment, we're going to guarantee
17    it?

18    A.    Not to the best of my recollection.

19    Q.    Now, at the time that you entered into Exhibit 6,
20    the Settlement Agreement, is it fair to say that the royalty
21    payments were current?

22    A.    Yes, sir.

23    Q.    Do you have the Settlement Agreement?  Okay.  Can
24    you take a look at Page S-135, Paragraph 6, labeled
25    "Restrictive Covenant".

1       A.    Um-hum.

2       Q.    Do you see that?  What did you understand that

3  paragraph to generally provide for?

4       A.    It provided for the two principal companies, Dad's

5  and Pet Life, to have about 15 or 16 months of a time period

6  where neither company would compete with the other person's

7  products.  In the case of Pet Life, it was all soft treats.

8  In the case of Dad's, it was variety mix.  That neither

9  company would -- would sell or manufacture, distribute,

10 cause its products to be delivered to customers on the list

11 that was involved up through 2002.  Specifically soft

12 treats, Dad's was not permitted to deal with any of those

13 customers.  And variety mix, specifically Pet Life was not

14 allowed to provide to any of those customers.

15      Q.    Now, did Dad's comply with that restriction?

16      A.    Absolutely.

17      Q.    I see there's --

18      A.    As did Pet Life.

19      Q.    I see there's a reference to "shall not include

20 jerky products".  And I believe we touched upon that

21 earlier.

22      A.    Um-hum.

23      Q.    Is that correct?

24      A.    Um-hum.

25      Q.    And at that point was Dad's having discussions

1  with a potential merger partner in which Dad's may bring to

2  the table the jerky product line?

3  　　A.　Yes, sir.

4  　　Q.　Was that merger ever consummated?

5  　　A.　No, sir, it was not.

6  　　Q.　When did that fall apart?

7  　　A.　I really don't recall, and I should, because I was

8  up to my ears in it.  But I really don't recall.

9  　　Q.　How would you characterize the status of the

10 negotiations with this merger partner during this time

11 period?  I mean, was this just kind of the infant stage, or

12 were you pretty far along at that point?

13 　　A.　I don't know.

14 　　Q.　Did you ever enter into a letter of intent with

15 this potential merger partner?

16 　　A.　I believe we did.

17 　　　　(Discussion held off the record.)

18 　　　　(Recess held from 12:05 p.m. till 12:18 p.m.)

19 　　Q.　Now, we were talking a little bit in this

20 August 1999 time period about the dissolution of Maple Leaf

21 and the -- and some other matters.  Were you aware at this

22 point that Pet Life and Sergeant's were having discussions

23 about Sergeant's purchasing some of the assets of Pet Life?

24 　　A.　No, sir.

25 　　Q.　When did you first learn about that?

1      A.    I think it was May of '02.

2      Q.    Now, at some point you learned that Sergeant's was

3  going to make royalty payments --

4      A.    I learned that they did.

5      Q.    Okay.  And when did you first learn that they were

6  going to make royalty payments to Gaines?

7      A.    When they did, in October of '01.

8      Q.    Was that the first knowledge that you had that

9  Sergeant's was going to make a royalty payment to Gaines?

10     A.    Yes, sir.

11     Q.    I think you mentioned that when that payment came

12 in, it was brought to your attention?

13     A.    Yes, sir.

14     Q.    Who brought it to your attention?

15     A.    Rick Moyer.

16     Q.    And did you have any discussion about any impact

17 or effect that that would have?

18     A.    I don't recall any specific discussion with Rick.

19     Q.    Did you have a reaction when you learned that

20 Sergeant was making a royalty payment?

21     A.    I did.

22     Q.    What was your reaction?

23     A.    Reaction was that it -- for reasons unknown to me,

24 that it was a decision by Alan Brown that that's where the

25 royalty was going to be paid from.

1    Q.   Did you contact Alan Brown or anybody from

2    Sergeant's to determine why they were making that royalty

3    payment?

4    A.   Not that I recall.

5    Q.   Did you direct anybody underneath you to do that?

6    A.   I don't -- I don't have any recollection of that.

7    I don't recall the conversation with Rick Moyer when he

8    would have brought that to our attention, as to whether he

9    had already talked with someone or not.  I don't have any

10   recollection of that time frame.

11          My reaction was that it was consistent with them

12   divvying customers under Maple Leaf into Sergeant's, it was

13   consistent with the fact that they had brought a salesperson

14   for Pet Life into Sergeant's, they had a Sergeant's sales

15   manager working with Doug on projects.  You had two

16   companies under the same ownership that we just relied that

17   Alan Brown was doing what was right for them, I guess.

18   Q.   Do you know how many checks Dad's received from

19   Sergeant's for payment to Gaines?

20   A.   I know that we received a royalty check in October

21   of '01.

22   Q.   Do you know how much that was for?

23   A.   I can't give you the exact number off the top of

24   my head.

25   Q.   Do you have an approximate number?

1        A.    It would have been approximately for 60 percent of

2    $75,000.  There were usually some adjustments that were made

3    based on our agreement with Shato, so I don't know what

4    exactly the numbers were.

5        Q.    Okay.  Did you get another check after that?

6        A.    I don't believe that the check came to -- was made

7    out to Dad's as reimbursement.  I think the check came from

8    Sergeant's directly to Shato for the fourth quarter of '01's

9    payment, which was made in January of '02, I believe.

10       Q.    What was the process prior to Sergeant's sending

11   you a check?  Would Pet Life send a check payable to Dad's,

12   and then Dad's would just send a big check off to Gaines?

13       A.    For the royalty payment?

14       Q.    For the royalty payment.

15       A.    No.  What happened was we would send the check off

16   to Shato, and then we would submit an invoice to Pet Life

17   for that.  Or a request for the funds.

18       Q.    And that's the way it was generally done up until

19   October of '01, and then you just received a check from

20   Sergeant?  Or was it done the same way; where you sent off a

21   check to Shato and then billed Pet Life?

22       A.    I don't have the exact specific information you're

23   looking for there.

24       Q.    And then the check in January of '02, that was

25   made payable to Shato?

1      A.   It was not made payable to Dad's.

2      Q.   Was it sent to Dad's, or was it received by Dad's?

3      A.   I don't know the answer to that.  I do know that

4   it was received by Shato.

5      Q.   What about payments to Whitecap?  Were any

6   payments made by Sergeant's to Whitecap?

7      A.   I don't know that.

8      Q.   Are you aware of any written agreement between

9   Sergeant's and Dad's dealing with the assumption of royalty

10  payment?

11     A.   No, sir.

12     Q.   Do you know whether or not Dad's attempted to have

13  an agreement signed with Sergeant's?

14     A.   Could you elaborate a little bit more by what you

15  mean by "attempted"?

16     Q.   Sure.  Did you ever contact Sergeant's and say,

17  hey, we received this check from you, we want to put in

18  writing the fact that you're responsible for the royalty

19  payments of Pet Life?

20     A.   No, I didn't feel the need to do that.  I felt

21  that their actions in all of the venues that we have

22  discussed here were pretty consistent with a decision on the

23  part of Alan Brown that that's where he wanted those royalty

24  payments made.  My only attempt to deal with that issue came

25  in May of '02, when I was informed as to what had happened

1    to the royalty obligation between Pet Life and Sergeant's.

2        Q.   What do you mean by that, when you were informed

3    as to what had happened?

4        A.   Well, when there was no first-quarter payment by

5    Pet Life or Sergeant's, there was a little bit of angst on

6    the part of the people up in Canada, and so I took it upon

7    myself to contact Sowell to find out what was going on.  And

8    I had a phone call back from Steven Smathers, where he

9    explained to me where certain obligations of Pet Life had

10   been with Sergeant's, but suddenly weren't with Sergeant's,

11   and now Pet Life is no longer alive, so, unfortunately,

12   Dad's, you're holding the bundle.  That's when I found out

13   about it.

14           So I would look at that as an attempt to go back

15   to the owners of Sergeant's and make them accountable for

16   what they should be doing.

17       Q.   And just so we're clear, that was in the May 2002

18   time period?

19       A.   That's correct.

20       Q.   Let me have you take a look at Exhibit 4, please,

21   of the exhibits.  It's labeled Trademark, License, and

22   Transfer Agreement, dated September 1, 2001, between Pet

23   Life and Sergeant's.  Do you recognize this document?

24       A.   No, sir.

25       Q.   Have you ever seen this document?

1      A.   No, sir.

2      Q.   The exchange of payments and the process followed,

3  especially when Sergeant's started making payment, is that

4  something that Rick Lang would be familiar with, as far as

5  you can tell?

6      A.   Sure.

7      Q.   When I say -- I'm trying to figure out exactly

8  the -- who paid what and where it went and so forth, that we

9  were discussing.  And you weren't completely familiar with

10  it, but he would know that, for example, payment came in

11  payable to Dad's and it was sent off -- that's something he

12  would --

13      A.   Rick Moyer would be the person with that specific

14  information.

15      Q.   I'm sorry, Rick Moyer.  Okay.  Now, my

16  understanding is that -- of your testimony, that Dad's

17  missed the first payment of 2002.  Is that correct?

18      A.   Dad's did not.

19      Q.   I'm sorry.  That Sergeant's did not -- and,

20  frankly, that Pet Life -- nobody made a payment in 2002 on

21  the royalty.  Is that correct?

22      A.   Got you.  Yes.

23      Q.   All right.  Were you notified in advance that Pet

24  Life was not going to be making that payment?

25      A.   No, sir.

1    Q.   Were you notified that nobody was going to be
2  making that payment?
3    A.   No, sir.
4    Q.   And so then when you didn't -- when you didn't
5  receive the payment at that point, that's when you contacted
6  Sergeant's and were told that they weren't going to be
7  making any further payments?  Is that correct?
8    A.   I believe the sequence was Rick Moyer contacted
9  Sergeant's and was told that, and then I made my connection
10  with the Sowell people in Dallas.
11    Q.   And that was Mr. Smathers that you spoke with?
12    A.   That's correct.
13    Q.   Did you speak to anybody else about this issue
14  from Sergeant's?
15    A.   No, sir.
16    Q.   And the discussion that you had with Mr. Smathers,
17  you just called him and said, hey -- and I'm, again,
18  paraphrasing -- well, why don't you tell me the nature of
19  the discussion.  I think you mentioned it or touched upon
20  it, and I don't know if you completely covered it; when you
21  called Mr. Smathers.  Can you just go over the exchange
22  between the two of you at that point.
23    A.   Well, that would be easy, because there was no
24  exchange.  I left him a voicemail, and he responded by
25  leaving me one.

1   Q. Okay.  And what was your voicemail?

2   A. That it's been brought to my attention that their

3 first-quarter payment had not been made, and that Rick Moyer

4 had been informed that it was not going to be, and asking

5 the people down there to explain to me what's going on.

6   Q. Okay.  And then you received a voicemail back from

7 Steven?

8   A. Yes, sir.

9   Q. And what did that say?

10   A. To the best of my recollection, it would have

11 stated a -- something around the series of transactions

12 that -- we had no idea.  It's probably memorialized by this

13 agreement here that I'm looking at (indicating); that

14 indicated that the obligation that either Pet Life had or

15 Sergeant's had is now no longer operable because Pet Life

16 was bankrupt and Sergeant's no longer had the obligation.

17   Q. How did you respond to that voicemail?

18   A. I am reasonably sure I wrote Alan Brown a letter

19 that expressed, I guess, my consternation and surprise, and

20 reminded him of discussions that he and I had had in Toronto

21 several years before.  And to the best of my knowledge, I

22 don't recall getting a response out of that.

23   Q. Were you asked to provide to your counsel any

24 documents or letters that you had touching upon any of the

25 issues in this case?

1    A.    Yes.

2    Q.    Did you produce those to your counsel?

3    A.    Some documents and letters.

4    Q.    Do you remember turning that letter over to him?

5    A.    No, I don't.

6    Q.    And I --

7    A.    I don't remember if I did or didn't.

8          (Discussion held off the record.)

9          MR. WHITE:  Counsel just had a discussion.  We're

10         not completely clear whether or not that letter

11         that was just being referred to by Mr. Lang was

12         produced, so we have asked Mr. Lang to go back to

13         his office and get a copy of that letter and

14         provide it to counsel at his earliest convenience.

15         Fair enough?

16         MR. DEVLIN:  Fair enough.  If the letter, in

17         fact, exists.

18         MR. WHITE:  Right.  And if it doesn't exist --

19   BY MR. WHITE:

20   Q.    But it's your recollection that you did send a

21   letter to Mr. Brown?

22   A.    I certainly either did that, or I talked with him.

23   And I don't recall.  But I'll search my files.  Okay?

24   Q.    If you checked your files and you couldn't find a

25   copy of that letter, would that indicate to you that you did

1   not send the letter?

2       A.   Not necessarily.

3       Q.   Do you have a specific recollection, sitting here

4   today, that you talked to Mr. Brown about this issue?

5       A.   I don't.  It would be pretty unbelievable that in

6   one way or another I didn't connect with Alan Brown.  And he

7   was really the main guy from the beginning here.

8       Q.   Okay.  Well, sitting here today, is it fair to say

9   that you don't have a specific recollection one way or the

10  other --

11      A.   That's accurate.

12      Q.   -- what -- okay.  All right.  Taking a look at the

13  Complaint that was filed by your counsel in this case, and

14  specifically Paragraph 36, there's a reference to -- let's

15  see -- "At or about the time of default of Pet Life and

16  Sergeant's with respect to the royalty, representatives of

17  Sowell and Sergeant's advised Dad's that Dad's would be

18  provided an opportunity to purchase the assets of Pet Life

19  that were under the control of Sowell, Sergeant's, and

20  LaSalle, only if Dad's agreed to make certain monetary

21  payments to Sowell."  Do you see that?

22      A.   Yes, sir.

23      Q.   Were such representations made directly to you?

24      A.   No, sir.

25      Q.   Do you know who these representations were made

1   to?

2        A.   Yes, sir.

3        Q.   Who were they made to?

4        A.   Bob Dwyer.

5        Q.   So to find out exactly what was said to Mr. Dwyer,

6   we should probably talk to Mr. Dwyer, huh?

7        A.   (Witness nods head.)

8             (Discussion held off the record.)

9        Q.   Do you know what certain monetary payments were

10  being requested that is referred to in this Complaint?

11       A.   Not firsthand, I don't know.

12       Q.   So you don't know how much they were asking for or

13  anything like that?

14       A.   That's correct.

15       Q.   Did Dad's make any more payments to Gaines after

16  the April 2002 time period?  Royalty payments.

17       A.   Yes.

18       Q.   When was the next payment made?

19       A.   I'm not sure, but probably in May or thereabouts.

20       Q.   Was that the payment that was due at that point?

21       A.   We negotiated a settlement of the final amount

22  due, which was 900,000, we negotiated payment of $750,000.

23  And I believe that was paid in May of '02.  As well as we

24  paid the entire first-quarter payment of $75,000.

25       Q.   Was a demand made by Gaines at that point to pay

1    the entire amount due and owing?

2        A.    No, sir.

3        Q.    Did Gaines approach Dad's and say, hey, you're

4    defaulting on these royalty payments, we need you to pay the

5    full amount that's due and owing at this point?  Or how did

6    this come about?

7        A.    It came about between -- discussions between Rick

8    Moyer and Sultan Thiara, T-H-I-A-R-A, who was the CFO of

9    Shato.  And we felt it was a way to mitigate our costs.

10   Based on current interest rates, we felt we got a good

11   discount rate on it.

12       Q.    Well, how did this come about?  The royalty

13   payment was not made by Pet Life or Sergeant's in the

14   April 2002 time period.

15       A.    Correct.

16       Q.    And at that point, Dad's would have made its

17   $30,000 payment, give or take a little bit of money, and

18   then -- so you were missing about 40 grand at that point.

19   Is that fair to say?

20       A.    Shato was missing that.

21       Q.    Right.  Shato was missing 40 grand.  So then three

22   weeks later, you negotiate a settlement of all of the money

23   that's due for the next, what, two or three years?  Is that

24   fair to say; 300,000 a year?

25       A.    Um-hum.

1      Q.   For the next three years.  What precipitated the

2  discussions between Dad's and Gaines about paying off the

3  entire 900,000 that was owed for the next three years?

4      A.   Just felt it was the least cost solution.

5      Q.   Was there any type of legal requirement under

6  which Dad's was operating which required it to make the

7  750,000 advanced payment?

8          MR. DEVLIN:  I'm just going to lodge an objection

9          to the extent it calls for a legal conclusion.

10          You can answer the question.

11      Q.   Do you know whether or not Dad's was legally

12  required to make that payment?

13      A.   I don't have a clue.

14      Q.   Do you have an understanding one way or the other

15  that it was legally required to make that payment?

16      A.   I simply don't know.

17      Q.   Did Rick Moyer and Sultan -- they were the chief

18  parties negotiating this number.

19      A.   Yes, sir.

20      Q.   Before making the payments, did you advise Pet

21  Life that you were going to satisfy the outstanding royalty

22  payments owed to Gaines on its behalf?

23      A.   I wouldn't know the answer to that, sir.

24      Q.   Do you know whether or not Dad's advised

25  Sergeant's that they were going to make this payment to

1   satisfy Pet Life's obligations?

2       A.   I don't know that.

3       Q.   Did you personally notify either Pet Life or

4   Sergeant's?

5       A.   Did I personally?

6       Q.   Did you.

7       A.   No, sir.

8       Q.   And you're not aware of anybody -- whether or not

9   they did that?

10      A.   But I wouldn't be aware.

11      Q.   Did you personally -- do you know whether or not

12  Pet Life or Sergeant's were notified when the payment was

13  made?

14      A.   I don't know that.

15           (Deposition Exhibit 15

16            marked for identification.)

17      Q.   I'm just going to show you what's been marked as

18  Exhibit 15.  Do you recognize that document?

19      A.   I don't.  Meaning have I seen it before?  I don't

20  think so.

21      Q.   Okay.  Would it be fair to say that Rick Moyer and

22  Mr. Dwyer were chiefly responsible for negotiating and

23  finalizing the Settlement Agreement between --

24      A.   And our CEO.

25      Q.   And, I'm sorry, that person is, again?

1      A.    Rick Lang.  Richard A. Lang, Junior.

2      Q.    In the April, May 2002 time period, did you become

3  aware of the fact that LaSalle Bank was foreclosing on the

4  assets of Pet Life?

5      A.    Yes.

6      Q.    When did you first learn that LaSalle was planning

7  to foreclose on the assets of Pet Life?

8      A.    I don't know that specifically, David.

9      Q.    Did you learn in advance -- did you have any

10  discussions with LaSalle prior to the foreclosure that

11  LaSalle was planning to do that?

12      A.    My knowledge of that is pretty slim.  It might be

13  best if I tell you what I do know, and then you can go from

14  there.

15      Q.    That's fine.

16      A.    I had had a phone call from Smathers sometime in

17  the early part of '02 indicating that they had a desire to

18  sell Pet Life.  And he threw some numbers around on the

19  telephone and wanted me to know that they were pretty

20  serious about doing it.  If we wanted to do anything, we

21  needed to respond quickly.

22          Since I was no longer the president of the

23  company, I shared that information with Rick Lang, who put a

24  team together to deal with that issue and move that issue

25  forward.  That really ends my own personal firsthand

1  knowledge of the events that occurred from there.

2         There was certainly a point in time when I would

3  have known that LaSalle was in the driver's seat, I guess,

4  so to speak.  But I was not involved in those negotiations,

5  nor was I in Chicago when all the transactions were being

6  discussed.

7         Q.   And who was there on behalf of Dad's?

8         A.   I believe that would have been Rick Lang and Bob

9  Dwyer and Rick Moyer and Elliott Haverlack, I believe.

10        Q.   When did you step down as president of Dad's?

11        A.   I think it was January of '01.

12        Q.   How long were you president prior to that?

13        A.   Too long.

14        Q.   20, 30 -- a number of years?

15        A.   Yeah.  From the middle 70's.

16        Q.   So when the discussions were occurring in the

17  November '99 time period with Pet Life, were you the

18  president and chairman of the Board of Dad's?

19        A.   No.  I was the president/CEO.

20        Q.   CEO.

21        A.   Um-hum.

22        Q.   Did you also preside as the CEO in January of

23  2001?

24        A.   Yep, I did.

25        Q.   And when were you elevated to chairman of the

1    Board?   Same time period?

2        A.    (Witness nods head.)   You can look at that as an

3    elevation, I guess.   Yes.

4        Q.    When did it change?

5        A.    Same time.

6        Q.    Who was the chairman of the Board prior to you?

7        A.    My dad, George A. Lang, Junior.

8        Q.    Did your dad have any involvement in these

9    discussions regarding Pet Life?

10       A.    None whatsoever.

11       Q.    And then Rick Lang succeeded you as president?

12       A.    Yes, sir.

13       Q.    And he more or less handled the issues that were

14   going on with Pet Life foreclosure and the auction and so

15   forth?

16       A.    That's correct.

17       Q.    Did he keep you apprised of what was going on?

18       A.    I'm sure to some degree.

19       Q.    Do you have any recollection of the discussions

20   that you had with him regarding whether or not Pet -- or

21   whether or not Dad's bid on the Pet Life assets; you know,

22   what was the winning bid, any of that stuff?

23       A.    I know we bid, and I know we didn't win.   I know

24   there was some unhappiness about the process.   I don't know

25   the specifics.   And I know that -- the people who bought it,

1    I know who -- who did do the purchase.  That's about what I

2    know.

3        Q.   Any discussions that occurred between Dad's and

4    Pet Life regarding the purchase of Pet Life's assets in this

5    time period, would those have been handled by Rick Lang or

6    Bob Dwyer, as far as you -- well, let's put it another way,

7    you were not involved in that?

8        A.   Not by me.  That's correct.

9             (Discussion held off the record.)

10       Q.   I'm just going to show you a document, and I'm not

11   going to mark it as an exhibit.

12            (Discussion held off the record.)

13       Q.   I'm going to show you what's been marked as a --

14   or it hasn't been marked.  It's a Notification and

15   Cancellation Agreement.  Do you recognize that document?

16       A.   I sure don't.

17       Q.   Actually, I think that's -- I believe that's

18   Exhibit 8.  Is that correct?

19            MR. DEVLIN:  Yes, it is.  Just for the record,

20            that is Exhibit -- previously marked as Exhibit 8.

21       Q.   I'd just have you take a look at Exhibit 9,

22   please.  It's labeled Settlement and Cooperation Agreement.

23   Do you recognize that document?

24       A.   I do not.

25       Q.   Do you agree with me that Dad's has never entered

1    into any written agreement with Sergeant's?

2        A.    I would agree with you that I'm not aware of any.

3            (Discussion held off the record.)

4        Q.    We're just taking a look at Paragraph 1.  I'm sure

5    that being the president, CEO, and chairman of the company,

6    you're fairly familiar with the litigation process.  And all

7    these were, were just some questions that we asked you, your

8    company, and these are your responses.  Okay?

9        A.    (Witness nods head.)

10        Q.    If you look under No. 1, there's a reference

11    that -- your answer was, "The Plaintiff," meaning Dad's,

12    "first learned of Defendant's," meaning Sergeant's,

13    "secession to the trademark's customer at issue on or around

14    August 1st."

15            And I guess my question is, is that accurate?  Is

16    that an accurate response?

17        A.    I can speak for myself and tell you that I

18    wouldn't have had knowledge of that specifically until two

19    events happened.  One was the participation of Sergeant's in

20    the allocation of customers that occurred in September and

21    October, November, December of the same year, and the

22    Sergeant's royalty payment that was made in October of the

23    same year.

24        Q.    Okay.  So your contention that Sergeant's

25    seceded -- or assumed the responsibility of Pet Life, based

1    on, number one, that they participated in the divvying up of

2    customers, and then, number two, they made a royalty payment

3    in October of --

4        A.    They actually -- actually managed those customers.

5    It isn't like we put them into a slot somewhere and they

6    disappeared.  They were actively managing that group of

7    customers as employees of Sergeant's.  All under the

8    direction, obviously, of Alan Brown.  And that's the way he

9    wanted things done.  Which was fine with us.

10        Q.    Now, if you look under Paragraph 2, you know, I

11    asked your counsel to identify any notice given by Dad's to

12    Sergeant's contending that Sergeant's had assumed the

13    obligations of Pet Life.  Do you see that?

14        A.    Yes, sir.

15        Q.    And I don't believe that your counsel -- probably

16    not purposefully, but didn't really answer my question.  And

17    my question is, did you ever say to Sergeant's, hey,

18    Sergeant's, you've assumed the responsibilities of Pet Life;

19    under this Royalty Agreement, you owe this money?

20        A.    Did I say that to Sergeant's?

21        Q.    Yes.

22        A.    No.

23        Q.    Do you know if anybody did say that to Sergeant's?

24        A.    I don't know that.  Now, there was a very clear

25    set of conversations over that course of that year when

1   Sowell bought Sergeant's with Alan Brown.  He would sit and
2   share strategy with me about Sergeant's; where they were
3   trying to go, what they were trying to do, the fact that he
4   was going to incorporate some of the specialty capability of
5   Pet Life into the Sergeant's organization because they were
6   better marketers.  I mean, you've got to understand, from
7   our perspective, our relationship was with the Sowell
8   people.  And when they bought Sergeant's, in addition to Pet
9   Life, whether -- whether their actions and their cash was
10  coming from Pet Life or Sergeant's or Sowell was -- it
11  really didn't matter to us, because we depended on them to
12  operate their businesses, you know, in their best interests,
13  obviously.
14          So, I mean, the fact that -- we certainly didn't
15  know that they had transferred trademarks to Sergeant's at
16  this date.  At least I'm not aware that anyone in the
17  company knew that.  I think we would have gone ballistic if
18  we would have known that.  We didn't know that.  We relied
19  on the fact that they were making payments, that they were
20  actively involved in servicing customers, they were actively
21  involved in working with our people on the sales and perhaps
22  even on -- on the product development side.
23          So it was, geez, here is another entity under
24  Sowell who is involved in pet food, and there's some things
25  maybe they can do better than the others.

1          So in my opinion, that's a pretty aggressive date

2     for us to have knowledge of the secession of trademarks.

3     Certainly from the customer and the business issues, there's

4     no doubt that that would have been common knowledge at that

5     point in time.  Certainly a little bit before that, because

6     discussions would have already been happening with Atherley,

7     Brunell, and Doug Lang about, hey, what's the right way to

8     handle these customers.

9          You know, the dissolution with Maple Leaf really

10    happened because you had a group of professional salespeople

11    saying this isn't working.  You know, not just Dad's people.

12    You had a group of professional salespeople, Sergeant's, Pet

13    Life, and Dad's, saying this isn't working, we need to do

14    something different.

15         Q.    That dissolution of Maple Leaf, was that in any

16    way dependent on the involvement of Sergeant's in the

17    subsequent negotiations?

18         A.    Define what you mean by "dependent".

19         Q.    Well, would the dissolution have gone forward, but

20    for the fact that Sergeant's was involved in taking over

21    some of the customer relationships of Pet Life?

22         A.    I can't speak to that from Pet Life's end.  The

23    Sowell end, perhaps from the Sowell end, the answer to that

24    is it would have made a difference.  I don't know that.

25    From our end, it wouldn't have.

1      Q.   I mean, this dissolution was happening whether

2    Sergeant's was involved or not; is that fair to say?

3      A.   It was going to happen as long as we could come to

4    an amicable agreement that served all the customers

5    properly.

6           (Deposition Exhibit 16

7            marked for identification.)

8      Q.   I'm just going to show you what's been marked as

9    Exhibit 16, a group of exhibits.

10          (Discussion held off the record.)

11     Q.   Exhibit 16 is marked as Maple Leaf Divorce

12   Schedule.  Do you see that?

13     A.   I was afraid it was my own.  Yes, sir, I see it.

14     Q.   Do you recognize this document?

15     A.   I have seen this document before.

16     Q.   Can you explain to me your understanding of this

17   document.

18     A.   In the "for what it's worth" department, it's some

19   documentation of a series of meetings between Pet Life,

20   Sergeant's, and Dad's people to indicate who was going to do

21   what with what accounts.  The first page is probably a first

22   crack at where they got.  Second page looks like a follow-up

23   meeting where certain actions had been taken.  Someone had

24   probably revised where they were going with it.

25     Q.   So was this --

1      A.    I wasn't a part of any of the meetings or
2   discussions that led to this document.
3      Q.    So it's your understanding that this document was
4   generated to indicate how the customers were being divvied
5   up as a result of the Maple Leaf dissolution?
6      A.    That would be my understanding.
7      Q.    At the time that LaSalle foreclosed on the assets
8   of Pet Life, did Dad's have -- was Dad's a creditor of Pet
9   Life?
10     A.    It's pretty interesting, David, when you look at
11  this document, isn't it, that all of the Pet Life
12  responsibilities are going to Sergeant's.  Just an
13  observation.  I haven't looked at this before.  It's pretty
14  interesting.  Excuse me.  Your question?
15     Q.    No problem.  At the time that LaSalle foreclosed
16  on the assets of Pet Life, was Dad's owed any money by Pet
17  Life?  Was it a creditor?
18     A.    I don't know.  I don't know that.
19     Q.    Do you know anything about the Pet Life bankruptcy
20  proceeding?
21     A.    Anything I would know about it would be second- or
22  third- or fourth-hand, at best.
23     Q.    Do you know whether -- are you generally familiar
24  with bankruptcy terms?
25     A.    No, sir.

1      Q.   Do you know the distinction between an involuntary
2  and voluntary bankruptcy filing?
3      A.   I could guess, but, no, I don't.
4      Q.   Were there any discussions in which you
5  participated internally at Pet Life where it was discussed
6  whether or not Dad's should try to force Pet Life into
7  bankruptcy?  You're not aware of any of those?
8      A.   No.
9           MR. WHITE:   That's all the questions I have for
10          you.
11
12          (Deposition concluded at 1:06 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25