# EXHIBIT "G"

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   DAD'S PRODUCTS COMPANY, INC., :
               Plaintiff        :
4                               :
      v.                        :    C.A. No. 03-350-Erie
5                               :
   SERGEANT'S PET PRODUCTS, INC.,:
6              Defendant        :

7

8

9              Deposition of ROBERT G. DWYER, ESQUIRE,

10      taken before and by Janis L. Ferguson, Notary

11      Public in and for the Commonwealth of Pennsylvania,

12      on Thursday, September 1, 2005, commencing at

13      2:03 p.m., at the offices of Knox McLaughlin

14      Gornall & Sennett, PC, 120 West 10th Street,

15      Erie, Pennsylvania 16501.

16

17

18   For the Plaintiff:
          Neal R. Devlin, Esquire
19        Knox McLaughlin Gornall & Sennett, PC
          120 West 10th Street
20        Erie, PA 16501

21   For the Defendant:
          David E. White, Esquire
22        Thorp Reed & Armstrong, LLP
          One Oxford Centre
23        Pittsburgh, PA 15219

24
                  Reported by Janis L. Ferguson, RPR
25                Ferguson & Holdnack Reporting, Inc.

1                          I N D E X

2

3    TESTIMONY OF ROBERT G. DWYER, ESQUIRE

4         Direct examination by Mr. White  . . . . . . .  3

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    R O B E R T   G.   D W Y E R, first having

2    been duly sworn, testified as follows:

3

4                   DIRECT EXAMINATION

5    BY MR. WHITE:

6

7    Q.    What is your name, sir?

8    A.    My name is Robert G. Dwyer.

9    Q.    Are you employed, Mr. Dwyer?

10   A.    Yes.

11   Q.    Where are you employed?

12   A.    I'm employed at the Knox Law Firm in Erie,

13   Pennsylvania.

14   Q.    What is your position with the Knox Law Firm?

15   A.    I am a shareholder/attorney.

16   Q.    Are you familiar with Dad's Products Company,

17   Inc.?

18   A.    Yes, I am.

19   Q.    Is that one of your clients?

20   A.    Yes, it is.

21   Q.    How long have you been providing legal services on

22   behalf of Dad's?

23   A.    I have represented Dad's for a little over 25

24   years.

25   Q.    Have you ever been deposed before?

1      A.    Yes, I have.

2      Q.    You were here when I was deposing Mr. Lang, and I

3  gave him a short set of instructions.  I'm not going to go

4  over all of them again, but --

5      A.    You can skip them.

6      Q.    Okay.  My understanding -- have you been

7  designated to testify with regard to any of the items listed

8  in my 30(b)(6) Notice of Deposition, that you're aware of?

9      A.    Yes, I have been.

10     Q.    Do you know which ones those are?

11           (Discussion held off the record.)

12     A.    I would have all of the -- or I would have

13  information regarding all of the points listed in your

14  Notice of Deposition, except for Item No. 4.  And if I could

15  see Paragraphs 36 and 37 of the Complaint, I would know

16  whether I have knowledge of Items No. 8 and 9.

17           I think that Item No. 4 would be the only item

18  that I don't have some information about.

19     Q.    Were you involved in the negotiations leading up

20  to the execution of the Asset Purchase Agreement between

21  Dad's, Pet Life, and Gaines?

22     A.    Yes, I was.

23     Q.    What was the nature of your involvement?

24     A.    I was one of the individuals included in the

25  negotiating team that negotiated with Gaines to purchase the

1    Gaines business.

2        Q.    And who was involved in negotiations from the Pet

3    Life viewpoint?

4        A.    The Pet Life representatives were Alan Brown and

5    Steven Smathers.

6        Q.    And what did you understand their positions to be

7    with Pet Life?

8        A.    At the time of the negotiations, I was unfamiliar

9    with their specific positions with Pet Life.  My familiarity

10   with them initially was as representatives of Sowell &

11   Company.  My familiarity at that time with them was as

12   representatives of Sowell & Company, who, I was told, was

13   the owner of Pet Life.

14       Q.    Did you believe that Mr. Brown and Mr. Smathers

15   were negotiating on behalf of Sowell & Company or on behalf

16   of Pet Life?

17       A.    Initially I believe that they were negotiating on

18   behalf of Sowell & Company.  During the course of the

19   discussions, I came to learn that they were negotiating on

20   behalf of Pet Life.

21       Q.    And this knowledge regarding the fact that they

22   were negotiating on behalf of Pet Life, is that learned by

23   you prior to the execution of the agreement?

24       A.    Yes, it was.

25       Q.    How did it come up?  Did somebody from -- did you

1  raise the issue that, hey, is Sowell going to be a party

2  here, or how did the whole issue come up with regard to who

3  they were representing?

4      A.    Dad's was invited to the negotiating table by Alan

5  Brown and Steven Smathers, who at that time I knew to be

6  involved with Sowell & Company.  When we began our

7  involvement in negotiations, it became immediately clear to

8  me that the negotiations with Gaines of Canada had been

9  ongoing and were very substantial, and that Canadian counsel

10  had been retained to represent the buyer, and that Gaines

11  had Canadian counsel representing it as seller.  And I'm

12  using Gaines and Shato somewhat synonymously here as

13  sellers.

14          And the initial discussions between the buyers,

15  which then included the Dad's group, contemplated a purchase

16  that was likely to be a cash purchase.  And as a result of

17  it being a cash purchase, I, on behalf of Dad's, didn't have

18  any particular interest in whether or not it was being

19  bought by Sowell or being bought by a company that had been

20  represented to me to be owned by Sowell, which was Pet Life.

21          In the course of our meetings discussing

22  negotiations, Smathers and Brown suggested that it was in

23  everyone's interests to negotiate a deferral -- and

24  "everyone", I mean the buyer group -- to negotiate a

25  deferral of the payment of the purchase price as much as

1    possible.  And in that context, the royalty notion and the

2    deferred payments was introduced as a way of paying a part

3    of the purchase price over a period of time.

4         The seller, Gaines, made it clear that any

5    deferral had to be a joint and several obligation.  And it

6    was at that time that it came up that Sowell did not

7    directly -- and by "Sowell", I mean Sowell & Company -- did

8    not directly own Pet Life, but some of its principals did;

9    individuals that were involved as part of the Sowell family

10   of investments.  And that because Sowell & Company was not

11   the direct owner, it would not, as a matter of policy of Mr.

12   Sowell, join in any guarantee.

13        And it was at that point in time that it became

14   apparent to me that there were two different legal entities

15   involved, and that Pet Life would be participating in the

16   agreement as a separate entity.

17   Q.   Did Dad's -- and you may just rely on the answer

18   you just gave.  But did Dad's attempt to get Sowell to be

19   party to this agreement?

20   A.   When the notion came up that from -- the notion

21   from Gaines that the obligation had to be joint and several,

22   in our private caucusing, we informed the Sowell/Pet Life

23   contingent that we expected Sowell to stand behind the Pet

24   Life portion of the obligation.  And it was at that time

25   that we were told that Sowell & Company wasn't the direct

1   owner of Pet Life and that Mr. Sowell would not be agreeing

2   to that, as a matter of policy that had been followed in all

3   of their transactions.

4        Q.   Were any other representations made by Sowell in

5   which they said even though we're not going to guarantee it,

6   we'll stand behind it, or anything of the like?

7        A.   There are no discussions of that kind in my

8   presence.

9        Q.   So is it fair to say that there were no

10  representations, formal or informal, made to you by anybody

11  on behalf of Sowell in which Sowell agreed to be responsible

12  for the royalty payments owed by Pet Life?

13       A.   That's correct.

14       Q.   And is it also fair to say that in the

15  negotiations leading up to the execution of the Asset

16  Purchase Agreement, the name "Sergeant's" was never

17  mentioned by any of the parties?

18       A.   That is correct.

19       Q.   Exhibit 14 is the purchase agreement Mr. Lang was

20  looking at previously.  Do you know who was responsible for

21  drafting this agreement?

22       A.   I believe that the document was initially prepared

23  by Canadian counsel retained by the Sowell/Pet Life group.

24  They came to represent all of the buyers.  I frankly don't

25  know for sure whether the document originated with the

1   buyer's Canadian counsel or the seller's, although I suspect

2   that it was probably originated from the buyer's Canadian

3   counsel.  Numerous parties were involved throughout the

4   negotiations with commentary and revisions, as would be

5   typical of something like that.

6       Q.   So is it fair to say that you were representing

7   Dad's with regard to this transaction?

8       A.   Yes.

9       Q.   Was this the first time that you had ever

10  represented Dad's with regard to a transaction of this type?

11      A.   I don't recall chronologically whether it was the

12  first step that Dad's had made in acquiring other

13  businesses.  I think not.  There would have been other

14  affiliates that Dad's had involvement in, and,

15  chronologically, I don't know whether they preceded this one

16  or not.

17      Q.   Was this the first type of transaction in which

18  you represented any client --

19      A.   No.

20      Q.   -- in this manner?

21      A.   No.

22      Q.   This is something that you do as part of your

23  practice on a day-to-day basis?

24      A.   That is correct.

25      Q.   And how long have you been practicing law?

1      A.    Nearly 30 years.

2            (Discussion held off the record.)

3      Q.    The Supplier and Royalty Agreement, Exhibit 13,

4   was that also, to the best of your knowledge, drafted by the

5   buyer's Canadian counsel?

6      A.    Yes.

7      Q.    It wasn't drafted by you personally?

8      A.    No, it was not.

9      Q.    The discussions we just went through regarding

10  Sowell and the guaranteeing and so forth of Pet Life, did

11  that also apply to this prior royalty agreement?

12     A.    It would be that specific document to which the

13  discussion applies.  Because that was the deferred portion

14  of the purchase price.

15     Q.    Okay.  So, obviously, the cash price up front and

16  the Asset Purchase Agreement, you didn't have to worry about

17  who was going to be responsible, but down the road, who was

18  going to be making some payments was potentially a concern.

19     A.    That's correct.

20     Q.    Was there any type of investigation performed on

21  the finances of Pet Life before this agreement was entered

22  into?

23     A.    I would have no knowledge of whether there was or

24  not.

25     Q.    Did you ask Pet Life to see any of their financial

1    statements or credit ratings or anything like that?

2        A.    I don't recall whether that was requested.  I

3    would think that that would have been appropriate and would

4    suspect that it may have been, but I don't have a direct

5    recollection, as we sit here today.

6        Q.    Is that something that you would typically do in

7    the course of your due diligence?  I hope I'm using the

8    right corporate term there.

9        A.    In the course of my due diligence, I would

10   traditionally advise a client as to the meaning of joint and

11   several and the exposure that the client would have as to

12   whether or not there was, in fact, a practical risk; that

13   discussion was held in this case.  And I was told by my

14   client that he had had subsequent discussions with Mr. Brown

15   and was satisfied that a joint and several arrangement was

16   acceptable for Dad's.

17       Q.    Did he phrase it just like that, or did he phrase

18   it differently?

19       A.    (No response.)

20       Q.    What specifically --

21       A.    I don't recall the exact words.  It was too -- but

22   I certainly explained to him the risk and was subsequently

23   told by him that he had had dinner with Mr. Brown and was

24   prepared to proceed.

25       Q.    Are you familiar with Maple Leaf Pet Care, LLC?

1    A.   Yes, I am.

2    Q.   Can you tell me what that is, in your

3 understanding.

4    A.   Maple Leaf Pet Care is a limited liability company

5 that was formed to be the vender of record with a number of

6 the accounts that were being purchased from Gaines by Pet

7 Life and Dad's.

8    Q.   Were you responsible for drafting the documents

9 creating Maple Leaf?

10    A.   I filed the certificate of organization which

11 created the entity.  I prepared, in concert with Steven

12 Smathers, operating -- an operating agreement that was

13 revised on numerous occasions and was never executed.

14    Q.   Would you have records of who the original

15 officers were of Maple Leaf?

16    A.   I don't believe that I would.  It would be my

17 recollection that the -- the members were Pet Life and

18 Dad's, and I would suspect that it was a 50/50 organization

19 that was, in all likelihood, governed by probably on Dad's

20 behalf Rick Moyer and Doug Lang.  And on the Sowell behalf

21 or the Pet Life behalf, by Alan Brown and either Steven

22 Smathers or Bruce Atherley.  It was a loosely formed

23 organization that was simply intended to act as an account

24 representative with certain accounts that neither Dad's, nor

25 Pet Life had any prior direct involvement.

1      Q.   I was asking Mr. Lang some questions regarding

2   Dad's entry into the soft treat business.

3      A.   Yes.

4      Q.   Would you be in a position to testify regarding

5   when that decision was made, when the decision was to begin

6   manufacturing product, when the first piece of equipment was

7   purchased to manufacture that product?

8      A.   Not directly, no.

9      Q.   I get nervous with the qualification of "not

10   directly".  Would you be able to indirectly testify to that?

11      A.   Well, I -- I've heard discussion of the Dad's

12   group that during the period for which they were -- they had

13   agreed not to solicit soft treat business from the customers

14   listed on that agreement for private label.  That during

15   that period of time, not only did they not solicit soft

16   treat business from those customers for private label, but

17   that they had no capability whatsoever of being able to

18   produce product.  And that, further, their soft treat

19   business, even as it exists today, is almost 100 percent

20   branded products, and that they have simply not taken

21   advantage of any private label business from any customers,

22   including those that were listed on that schedule.

23           I don't have direct knowledge of that, but I have

24   been privy to meetings where that has been discussed.

25      Q.   And when we -- and Mr. Lang was explaining to me

1   the idea of private label.  My understanding of that is if

2   you go into a Wal-Mart and just say, okay, we're going to

3   package the product on behalf of Wal-Mart, and you're going

4   to sell it as a Wal-Mart product.  Is that what private

5   label means to you?

6       A.   Yeah.  A private label is a retail seller who

7   sells product under its own name.  And most retail sellers

8   don't have their own pet food plants, so they hire a pet

9   food manufacturer to make product and put it in their bag.

10  And that's called private label.

11         A branded product is a pet food manufacturer who

12  has their own trademark names, that sells those products in

13  the retail marketplace.

14      Q.   Can you take a look at Exhibit 6, please.  Do you

15  recognize this document?

16      A.   Yes, I do.

17      Q.   What is this document?

18      A.   This is the agreement by which Pet Life and Dad's

19  decided to terminate the operation of Maple Leaf and to

20  divide up the assets and accounts that were handled in the

21  Maple Leaf name -- or in the Maple Leaf entity.

22      Q.   Were you involved in the negotiation and

23  preparation of this agreement?

24      A.   Yes, I was.

25      Q.   What was your involvement?

1    A.   I was involved in the negotiations of the terms of

2    the agreement, and I worked with Steven Smathers, although I

3    may have been the original scribner in preparing an

4    agreement that was acceptable to both parties.

5    Q.   Now, were you aware at this time period that

6    Sergeant's was considering purchasing Pet Life's assets?

7    A.   No, I was not.

8    Q.   Were you aware that Sergeant's was involved or

9    came to the table to discuss the -- the, I guess, separation

10   of customers and perhaps the fact that Sergeant's was going

11   to be representing some of these customers?

12   A.   No, I was not.

13   Q.   When did you first get involved in the

14   negotiations leading up to the execution of this agreement?

15   And it's dated August 1st, 2001.

16   A.   I had been aware throughout much of the term of

17   Maple Leaf's operations that Dad's was disenchanted's with

18   Pet Life's performance in handling customers that were being

19   handled through Maple Leaf.  And on a somewhat regular

20   basis, I listened to discussions about the fact that that

21   was hurting the customer base and the pet food opportunities

22   that Dad's had with those customers.

23        Sometime in probably late spring or summer of

24   2001, I was advised by -- I believe it was probably Doug

25   Lang, that he was having discussions with Bruce Atherley and

1    Alan Brown about shutting down Maple Leaf and having each
2    company handle its business directly with the customers that
3    were previously handled by Maple Leaf.  Each company being
4    Pet Life and Dad's.
5        Q.   Okay.  And during this time period leading up to
6    the execution, I understand you didn't have any -- you did
7    not know that Sergeant's was participating in these meetings
8    between the parties?
9        A.   I did not.  I believe those meetings didn't occur
10   until after this agreement was signed.  But I did not know
11   even then.  I believe that this agreement was intended to
12   outline the structure by which Maple Leaf would be wound
13   down, but that the actual winding-down transition process
14   was to occur following its execution and was going to take a
15   considerable number of months, because of the mechanics of
16   moving accounts from Maple Leaf to the individual companies.
17       Q.   Was there any consideration at this point of
18   including Sergeant's as a party to this Settlement
19   Agreement?
20       A.   I had no knowledge of the existence of Sergeant's
21   at the time that this agreement was written.
22       Q.   At the time that -- at the negotiations leading up
23   to the execution of this Settlement Agreement, did you
24   request or do anything to verify Pet Life's financial
25   condition?

1      A.   I did not.

2      Q.   Were there any further discussions with -- that

3   you're aware of, between either Dad's or yourself and

4   Sowell, where Sowell more or less agreed that it would take

5   care of the payments owed by Pet Life?

6      A.   I was not involved in any discussions of that

7   kind.

8      Q.   Did Mr. Lang or anybody else on behalf of Dad's

9   indicate to you that they had, again, confirmed with Sowell

10  that they -- that Sowell would be responsible for Pet Life's

11  obligations?

12     A.   I was not advised of that.

13     Q.   The royalty payments that were due under the

14  Supplier and Royalty Agreement, did you monitor whether or

15  not those payments were being timely and properly made?

16     A.   I did not.  As I indicated -- and I believe that's

17  Point No. 4 -- that is -- that would be the subject matter

18  of which I have little knowledge.

19     Q.   Would you be able to estimate what portion of your

20  overall time you spend on Dad's matters?

21     A.   It would naturally vary, depending upon the

22  particular -- whether or not Dad's was involved in a

23  particular transaction.  If you would look to the course of

24  the year, year in and year out, it may be 15 percent.

25     Q.   I apologize; I may have asked this.  But the

1    Settlement Agreement appears to have been executed by Alan

2    Brown on behalf of Pet Life.  Was there any discussion

3    between you and Mr. Smathers or Mr. Brown about adding

4    Sowell as a party to this Settlement Agreement?

5        A.    There's not.  But I ought to add, because Maple

6    Leaf was, to the best of my knowledge, owned by Dad's and

7    Pet Life, that this was an agreement among the owners to

8    cause that business to be terminated.

9        Q.    Are you aware that at some point Sergeant's

10   purchased certain assets of Pet Life?

11       A.    As we sit here today, yes, I am aware of that

12   fact.

13       Q.    When did you first learn of that?

14       A.    I believe that I learned that in May of 2002.

15       Q.    Prior to learning in May of 2002 that Sergeant's

16   had purchased some of the assets of Pet Life, were you ever

17   advised that royalty payments were being made by Sergeant's

18   to Gaines or Shato?

19       A.    No, I wasn't.

20       Q.    When, in May of 2002, did you learn about the

21   transfer of assets from Pet Life to Sergeant's?

22       A.    It was approximately the 14th, I think -- it was

23   the middle of May.  I was informed by Steven Smathers that

24   Pet Life had assumed -- or, excuse me, that Sergeant's had

25   assumed Pet Life's obligation to pay the royalty, but that

1    that transaction had been unwound and that the obligation

2    remained with Pet Life and not with Sergeant's.

3            (Discussion held off the record.)

4            (Record read back by reporter.)

5        Q.    So he characterized it as being unwound?

6        A.    Yes.

7        Q.    And what was your reaction?

8        A.    I expressed surprise, to be informed of -- that a

9    transaction had occurred that had not been brought to my

10   attention, or that it had been unwound without being brought

11   to my attention.  Asked him whether there were any documents

12   that evidenced those transactions and asked him to send them

13   to me.

14       Q.    And did he do that?

15       A.    Yes, he did.

16       Q.    Do you recall what he sent to you?

17       A.    He sent me copies of the documentation that had

18   occurred or been executed in 2001 by which Sergeant's had

19   acquired trademarks and business from Pet Life and had

20   assumed certain obligations and made certain payments to Pet

21   Life.  And he also, I believe, sent me documentation

22   executed in 2002 by which the assumption of the royalty

23   payment by Sergeant's was retracted and revested back in Pet

24   Life.

25       Q.    Can you take a look at the exhibits there.  I

1    believe Exhibit --

2         A.   Well, the notification and cancellation exhibit

3    would be Exhibit 8.

4         Q.   Look at Exhibit 4.

5         A.   (Witness complies.)  And the Trademark, License,

6    and Transfer Agreement, Exhibit No. 4, would have been two

7    of the documents.  I do not know whether Exhibit No. 5, the

8    Trademark and License Mortgage, would have been shown to me

9    at that time or not.  It could have been.  I don't know as

10   we sit here today.

11        Q.   What about Exhibit 9?

12        A.   I don't know whether I saw that document at the

13   same time or not.

14        Q.   Okay.  So you spoke with Mr. Smathers, asked him

15   to send some documents to you.  He mailed at least the

16   Trademark License and Transfer Agreement, Exhibit 4; Exhibit

17   8, the Notification and Cancellation Agreement, and there

18   may or may not have been a couple of others.  Is that fair

19   to say?

20        A.   That would be fair to say.

21        Q.   Okay.  When you received those documents, did you

22   review those?

23        A.   Yes, I did.

24        Q.   After reviewing them, what did you do?

25        A.   By way of background, those documents were

1    received by me at a point in time where the bank had

2    already -- the bank -- I ought to say LaSalle Bank had

3    repossessed the assets of Pet Life and had sold them to

4    another party.  And as a result of my knowledge of that fact

5    and my knowledge that the obligation to pay royalties to

6    Gaines that had formerly been assumed by Sergeant's was now

7    being denied, based on a retraction-type document, I advised

8    my client that legal action had to be taken against the

9    Sowell group, Pet Life, and Sergeant's for having defrauded

10   Dad's.

11       Q.   In what way do you believe that Sergeant's or

12   Sowell defrauded Dad's?

13       A.   I believe that the -- that valuable assets that

14   were acquired by the Sowell enterprise had been moved from a

15   legal entity that had a joint and several obligation with

16   Dad's to pay Gaines, had been moved to another entity

17   controlled by the very same people.  That that entity had

18   assumed an obligation to continue to pay that royalty

19   obligation, and now was giving up that -- or attempting to

20   give up its responsibility.

21       Q.   Have you ever analyzed or determined how much was

22   paid by Sergeant's for the Pet Life assets?

23       A.   I have reviewed the agreement to see -- the

24   initial transfer agreement.  I'm familiar with the

25   consideration that is described in that agreement.

1      Q.   And what do you recall being the consideration

2    that was described in that agreement?

3      A.   As I recall, Sergeant's assumed the royalty

4    obligation to a maximum amount of something like 480,000.

5    The agreement speaks for itself.

6      Q.   Right.

7      A.   What number is that, again?

8      Q.   Exhibit 4.  I think it's actually right on the

9    front page.

10     A.   Okay.  Save me the trouble here.  It assumed the

11   obligation up to $270,000.  It assumed an obligation of --

12   and by "it", I mean Sergeant's -- assumed an obligation of

13   Pet Life to Whitecap of $50,000.  And --

14          (Discussion held off the record.)

15     A.   And it agreed to make a $600,000 payment to Pet

16   Life.

17     Q.   If you take a look at Exhibit 8, which is the

18   Notification and Cancellation Agreement, which I believe you

19   testified you received from Mr. Smathers, is this the

20   agreement which you -- which you believe is being relied on

21   by Mr. Smathers when he said that the obligation of

22   Sergeant's was unwound?

23     A.   I don't know whether this is the only agreement.

24   This is an agreement that purports to allow Sergeant's to

25   relieve itself of the obligation for royalty payments, which

1    it had previously assumed.

2        Q.   Okay.   And if you look at Paragraph 3, under the

3    background, there's a statement that Pet Life acknowledges

4    that it is obligated to Sergeant's in a total amount of

5    $447,000.   Do you see that?

6        A.   Um-hum.

7        Q.   And I believe, if you go down a little bit further

8    in this agreement, that it more or less indicates that

9    Sergeant's is willing to forgive that obligation in return

10   for wiping out any future royalty payments that are owed by

11   Sergeant's.   Is that -- and I know I'm paraphrasing

12   somewhat.

13        My question to you is did you do any independent

14   investigation to determine whether or not the $447,000

15   claimed as due and owing to Sergeant's by Pet Life was a

16   valid amount?

17       A.   I have no idea whether it's a valid amount, but I

18   do know that the assets of Pet Life that ostensibly would

19   have paid that obligation were pledged to LaSalle Bank.   And

20   that if that money had been paid to Sergeant's, LaSalle Bank

21   would have taken it back and applied it against that debt.

22   It was an attempt to transfer encumbered assets or to cancel

23   an obligation that ran in favor of a bank.

24        In reality, Pet Life had no ability whatsoever to

25   ever make good on that obligation.   And, therefore, the

1    cancellation of it was of no value to Sergeant's.

2        Q.    I apologize.  Exhibit 4, the Trademark License and

3    Transfer Agreement, the first time you saw that document was

4    in May of 2002?

5        A.    That's correct.

6        Q.    LaSalle Bank was the lender for Pet Life.  Was

7    that your understanding?

8        A.    Yes.

9        Q.    And at some point LaSalle decided that Pet Life

10   couldn't continue to operate and that it needed to foreclose

11   on the assets of Pet Life.  Are you familiar with that?

12       A.    Yes, I am.

13       Q.    Did you discuss with anybody from LaSalle the fact

14   that LaSalle was considering foreclosing on the assets of

15   Pet Life?

16       A.    In a sense, I did, in that I represented Dad's in

17   discussions with LaSalle regarding a possible transfer of

18   the assets of Pet Life or change in the ownership of Pet

19   Life, due to the financial problems of Pet Life.

20       Q.    Okay.  When were these discussions held?

21       A.    They were held in April of 2002.

22       Q.    Were they held before or after LaSalle foreclosed

23   on the Pet Life assets?

24       A.    They were held before foreclosure.

25       Q.    What were the nature of those discussions; whether

1    or not Dad's would consider purchasing Pet Life assets or

2    some other kind of ownership agreement?

3        A.   If I may, I'll give you a little different --

4    rather than -- I need to give you some background.

5        Q.   Yes.

6        A.   In very early April, Dad's and I were contacted by

7    a broker who sells businesses that are in financially

8    troubled situations.  The broker had been retained either by

9    LaSalle Bank or by Pet Life or by both of them together.

10   And the broker indicated that he was attempting to market

11   Pet Life and wanted to know whether or not Dad's would have

12   an interest.

13        At the same time, Alan Brown and Steven Smathers

14   contacted Dad's and indicated that ownership of Pet Life was

15   going to have to change; that they had made a very

16   substantial investment in Pet Life and were looking for a

17   capital partner to invest enough money into Pet Life to

18   satisfy the bank's requirements.  And that their goal was to

19   continue to own some position in Pet Life in hopes that over

20   a period of time that they would be able to recoup some or

21   all of their investment.  And they expressed an interest in

22   Dad's in looking at that transaction.

23        Now, whether that call occurred before or after

24   the investment banker, I don't know.  They would have been

25   almost simultaneous.  And there were immediate discussions

1    by Dad's and myself as to whether or not Dad's should become

2    involved in a transaction that would result in Dad's having

3    substantial ownership and control of the Pet Life business.

4    There was a strong interest in that, and almost immediately

5    thereafter, LaSalle came forward and communicated that since

6    they had the liens on the assets, they were the party with

7    whom Dad's should be negotiating.

8           Now, that's a long answer to your question.  But,

9    yes, I knew LaSalle became involved within a matter of days

10   after having been contacted by the broker and by Mr. Brown

11   and Mr. Smathers.

12       Q.   In speaking to Mr. Brown and Mr. Smathers, you

13   mentioned that -- you used the word "they".  They meaning

14   Sowell?

15       A.   Yes.  They were indicating -- and I knew -- that

16   the Sowell consortium had made a very substantial investment

17   in Pet Life, and they were looking for someone that could

18   improve the financial health of Pet Life, in hopes that

19   their investment could be recouped in whole or in part.

20       Q.   I was asking Mr. Lang regarding some language

21   which appeared in the Complaint, and he actually mentioned

22   that you would be the person to talk to about this.  And

23   under Paragraph 36 of the Complaint, it states, "At or about

24   the time of the default of Pet Life and Sergeant's with

25   respect to the royalty, representatives of Sowell and

1   Sergeant's advised Dad's that Dad's would be given the

2   opportunity to purchase the assets of Pet Life that were

3   under the control of Sowell, Sergeant's, and LaSalle only if

4   Dad's agreed to make certain monetary payments to Sowell."

5       Was that advice communicated directly to you?

6       A.   Yes, it was.  But I'd have to expound a bit, if I

7   can.

8       Q.   That's fine.

9       A.   In the early discussions which I just described,

10  Mr. Smathers made it clear to me that the expectation and

11  desire of the Sowell group as owners of Pet Life was that a

12  transaction be put together that resulted in the Sowell

13  group having an opportunity to financially recover the

14  investment that they had made in whole or in part.  Dad's

15  was interested in Pet Life and its business, so we agreed to

16  look at the investment banker's brochures and financial

17  information about Pet Life.

18      On review of that information, it became clear to

19  me and to Dad's folks that the business of Pet Life had a

20  value less than was owed to LaSalle Bank, and that,

21  therefore, there would be no opportunity for any recovery of

22  equity in a transaction, because the business simply wasn't

23  worth more than the debt.

24      It was at that time that LaSalle was saying they

25  were the party that had to be dealt with.  And we had

1  concluded that that was correct, because they had liens on
2  all the assets.  And whatever number we were going to offer
3  was going to be a smaller number than the amount of their
4  debt.  And we began negotiating terms of the transaction
5  directly with LaSalle Bank that would have involved payment
6  of all consideration to LaSalle Bank, knowing, by way of
7  background, that I had been told by Mr. Smathers that he was
8  looking for an opportunity to recover their investment.
9  That is by way of background.
10          Several days into our negotiations with LaSalle
11  Bank, I got a phone call from Mr. Smathers in which he
12  indicated that he understood that our negotiations and the
13  transaction that we were putting together was with LaSalle
14  Bank, and that I had to understand very clearly that Pet
15  Life was owned and controlled by the Sowell people, and that
16  any transaction that was going to be put together was going
17  to occur only if they were satisfied with its terms.  I told
18  him that I -- that our understanding was that the amount of
19  indebtedness was going to exceed the value of its assets,
20  and that we, therefore, thought that the party we should be
21  dealing with is the bank.  And that was the end of our
22  discussion.
23      Q.   What was the truth, for lack of a better term?
24  Was it that the amount of the indebtedness exceeded the
25  amount of the assets?

1      A.   Considerably.  LaSalle Bank, I believe, is still

2   under water, and that's why I tell you that the cancellation

3   of Sergeant's claim for $300,000 was a meaningless and token

4   forgiveness, because there's no way in the world that Pet

5   Life was ever going to be able to pay a penny of that.  They

6   would be paying it with money over which the bank had a

7   lien, and the bank was going to require that money.

8      Q.   Take a look at Paragraph 37 of the Complaint.

9      A.   (Witness complies.)

10      Q.   Did you have a chance to look at that?

11      A.   Um-hum.

12      Q.   Are you familiar with the allegations that are

13   made in that paragraph?

14      A.   Having just read them, I am, yes.

15      Q.   You hadn't seen that before?

16      A.   No, I'm familiar with them.

17      Q.   I guess my question is, the allegations in this

18   paragraph seem to be somewhat at odds with what we just

19   discussed, where you were more or less indicating that

20   LaSalle was kind of directing everything, because, frankly,

21   that was the big secured lender.

22          So my question is, do you agree with the statement

23   that's made in Paragraph 37?

24      A.   I do.  And I think that you are somewhat

25   mischaracterizing what I said.  My statement was that in

1  Dad's view, because the business of Pet Life was worth less

2  than the amount that was owed to LaSalle, that Dad's ought

3  to be dealing with LaSalle as an interested buyer of those

4  assets.

5         That is not to say that there might not be other

6  parties in the world that might view Sowell's interests as

7  being worth satisfying in order to be an acquirer.  It was

8  not Dad's interest to participate in the transaction, other

9  than one that involved payments solely to -- all present and

10 future payments solely to the bank.

11     Q.   Was that something that was communicated to the

12 bank or Pet Life?

13     A.   No.

14     Q.   I believe Mr. Lang testified that the first

15 quarterly payment due in 2002 was not made by Pet Life.

16     A.   That is correct.

17     Q.   Or by Sergeant's.

18     A.   That is correct.

19     Q.   Did you at some point learn that the payment had

20 been missed or not made?

21     A.   Yes.

22     Q.   When were you first notified of the fact that

23 payment had not been made?

24     A.   It probably would have been at some point in

25 April, which was the very same time that we were dealing

1    with -- it had all happened at once.  The payment didn't

2    come in, the bank and Pet Life and Sowell were contacting us

3    about a possible involvement in the business.

4        Q.   When the payment was not made, were you contacted

5    by Gaines to discuss the reason why the payment was not

6    being made?

7        A.   I was not.

8        Q.   Were you made aware at some point that Gaines had

9    contacted Dad's to inquire about the missing payment?

10       A.   Yes.

11       Q.   And what did you learn about that?

12       A.   I learned that Sultan Thiara of Gaines had sent a

13   letter to Rick Moyer acknowledging receipt of Dad's portion

14   of the payments.  And -- I may have this wrong.  It may have

15   been a letter from Rick Moyer to Sultan.  But there was

16   communication between the parties to the effect that Dad's

17   had made its portion of the payment, and that Sultan Thiara

18   should contact Sergeant's in order to get the payment of the

19   balance of the royalty.  And I don't recall whether the

20   letter originated from Mr. Moyer or from Mr. Thiara.

21       Q.   What was Gaines' response to that suggestion?

22       A.   I know that Mr. Thiara's response was "who is

23   Sergeant's".

24       Q.   Did Gaines threaten a lawsuit at this point to

25   recover the outstanding royalty obligation?

1    A.    I do not recall.  I know that they demanded

2 payment of the balance of the royalty.

3    Q.    The balance of the royalty at that point was,

4 what, approximately $40,000?

5    A.    60 percent of $75,000.

6    Q.    And I believe shortly thereafter, Dad's decided to

7 pay $750,000 to satisfy the entire royalty amount that was

8 due over the next three years.  Is that --

9    A.    That's correct.

10    Q.    Were you involved in that decision?

11    A.    Yes, I was.

12    Q.    How did the parties reach the $750,000 figure?

13    A.    It was negotiated between Mr. Thiara and me.

14    Q.    What number -- why don't you explain to me or just

15 go through the negotiations that you had with Mr. Thiara.

16    A.    During the month of May, I had been advised that

17 LaSalle had taken over Pet Life's assets and had resold them

18 to a third party.  So at that point in the time -- at that

19 point in time I knew that Pet Life was no longer an entity

20 that was in business.  I knew that Dad's had a joint and

21 several obligation.  I was personally unfamiliar with

22 Sergeant's, but I knew that -- or I suspected from the

23 negotiations that had occurred during April, that there was

24 information that existed that I wasn't sure what it was, in

25 terms of where some of these assets had gone.  And at the

1  same time, I was being advised by Steven Smathers that some

2  of the assets that had been acquired by Pet Life had been

3  transferred to an affiliated organization.

4       I also knew that Dad's had a joint and several

5  obligation for $900,000 that was an absolute number, not

6  subject to defense or setoff.

7       So I contacted Mr. Thiara and reminded him that he

8  was in control of a company that was in liquidation, and

9  that there would be, in all likelihood, substantial benefits

10  to him if he could accelerate recovery of those monies and

11  move forward with the more rapid liquidation of Gaines.  He

12  acknowledged that was the case.

13       We had discussions about present value, interest

14  rates, and things of that nature.  We had discussions about

15  eliminating any further risks or headaches in trying to get

16  his money.  And after a series of phone calls, we agreed

17  that $750,000 was a reasonable price to prepay in full that

18  obligation.

19       Q.   Now, at this point, is it your belief that

20  Sergeant's is joint and severally liable, along with Dad's

21  and Pet Life for the obligation owed to Gaines?

22       A.   By that point in time, I assumed that if Dad's --

23  or I believed that if Dad's made payment of that obligation,

24  it would have a legal claim against Sergeant's for the Pet

25  Life/Sergeant's share of it.

1      Q.   And that legal claim, was that based on any
2   particular document entered into between Dad's and
3   Sergeant's, or was it just based on the fraud that you more
4   or less outlined earlier in this deposition?
5      A.   It was based on my knowledge that assets of Pet
6   Life had been transferred to an affiliated organization.  I
7   don't know whether or not at that moment in time I was aware
8   of the actual transfer documents, because I don't recall on
9   what day I saw one document, versus negotiated the
10  settlement of the other.
11          So I don't recall whether I was aware that there
12  was at least a contractual limitation on Sergeant's
13  assumption of that obligation or whether I also knew of the
14  attempt to retract that assumption.
15     Q.   I guess I'm a little bit -- I don't want to say
16  "confused", but what was the rush to get Gaines paid off?  I
17  mean, there is a company in liquidation.  If you would have
18  satisfied the Pet Life obligation, it would have been about
19  $40,000.
20     A.   I believe that the rush was because Sultan Thiara
21  had been concerned about Pet Life not having made its share;
22  our having referred Sergeant's to Sultan as someplace that
23  he should go to get his money, and his comments back of, I
24  don't care; I've got joint and several, I want you to pay.
25  But it was creating a level of concern about where is my

34

1   money going to come from, that I thought it was worth taking

2   advantage of.  And I feel very strongly that all parties who

3   had that royalty obligation benefited from that settlement.

4       Q.   Did you personally notify anybody from Pet Life or

5   Sergeant's that Dad's was going to make a $750,000 advance

6   payment to Gaines?

7       A.   I don't recall.

8       Q.   Did you at any time advise anyone from Pet Life or

9   Sergeant's that such a payment was made?

10      A.   I don't recall.

11           (Discussion held off the record.)

12      Q.   This (indicating) is an agreement between Dad's

13  and Gaines and Shato regarding the royalty pre-payment of

14  $750,000.  Do you recognize this document?

15      A.   Yes, I do.

16      Q.   Did you draft this document?

17      A.   Yes, I did.

18      Q.   At the time that --

19      A.   Actually, I -- when I see the notations at the

20  bottom of it, I -- I don't know whether I drafted it or I

21  reviewed it.  I mean, I can tell from the small lettering at

22  the bottom of the page that it may have involved Canadian

23  counsel.  I certainly would have been involved in the

24  preparation of it.  But that notation indicates that at

25  least this revision probably originated from the Gaines end.

1    But I was involved materially in the text of this document.

2        Q.    Now, at the time that the decision was made to

3    prepay $750,000, had Gaines or Whitecap obtained any type of

4    a judgment or judicial determination as to how much money

5    was owed under the Supplier and Royalty Agreement?

6        A.    No.

7        Q.    Did you have any discussions with anyone from Pet

8    Life regarding possible defenses that Dad's and/or Pet Life

9    may have had with regard to the payment that was owed to

10   Gaines?  Setoff or anything like that?

11       A.    No, I did not.

12       Q.    At the time that this agreement was entered into,

13   did you believe that Sergeant's had somehow agreed to be

14   joint and severally liable along with Dad's and Pet Life to

15   Gaines?

16       A.    I don't know whether it could be worded exactly

17   that way.  I did believe that Sergeant's had an

18   indemnification obligation to Dad's, if they were jointly

19   and severally liable, so I suppose the answer to your

20   question would have to be yes.

21       Q.    Well, is there some kind of a distinction -- in

22   your mind, are you aware of a distinction between the term

23   indemnification and the phrase joint and several, or do you

24   consider those to be one and the same?

25       A.    Well, I believe when Dad's made the payment of a

1    joint and several obligation, it had a right of contribution

2    against the party that was jointly and severally obligated.

3    And against any successor to that party to whom a valid

4    legal claim could be asserted.

5        Q.    So --

6        A.    And I considered, frankly, both Sergeant's and

7    Sowell to be parties to whom Dad's could look for

8    contribution.

9        Q.    Okay.  So at the time that the payment was made,

10   you believed Sergeant's and Sowell to be joint and severally

11   liable, along with Gaines -- excuse me, along with Dad's and

12   Pet Life to Gaines.

13       A.    Yes, I think that's true.

14       Q.    And you would agree with me that there's no

15   written agreement in which either Sergeant's or Sowell

16   agreed to be joint and severally liable along with Pet Life

17   and Dad's to Gaines?

18       A.    Well, there was a written agreement in which

19   Sergeant's agreed to be liable to the extent of $270,000.  I

20   had seen that agreement, I believe, at the time -- in fact,

21   I know I had seen it at the time of execution of this

22   document.

23       Q.    And "this document", you're referring to Exhibit

24   15?

25       A.    The Settlement Agreement between Dad's and Shato.

1     Q.   Well, the agreement that, I believe, you're

2  referring to is between Pet Life and Sergeant's.

3     A.   Yes.  But it was an agreement in which Sergeant's

4  acknowledged a legal obligation that happened to be joint

5  and several with Dad's.  So they were assuming an

6  obligation -- the joint and several obligation which would

7  have given Dad's the right to insist that they perform it.

8     Q.   So you believe that by entering into an agreement

9  with Pet Life, Dad's was given the right to insist on

10  Sergeant's living up to the agreement?

11     A.   That's -- that's one of several reasons why I

12  believe that's the case.

13     Q.   When you drafted Exhibit 15, when you were in the

14  process of drafting it, did you have any discussions with

15  Gaines about including in the whereas clauses or anywhere

16  else in the agreement that Sergeant's and/or Sowell were

17  also joint and severally liable?

18     A.   Not in the whereas clauses.

19     Q.   Anywhere else?

20     A.   In Paragraph No. 3 --

21     Q.   Yes.

22     A.   -- I wanted to make sure that whatever claims

23  Shato would have had for payment against Pet Life were

24  available to Dad's, including successors and assigns of Pet

25  Life.  And I considered both Sowell and Sergeant's to be

1   successors to Pet Life as to this agreement.

2       Q.    In any draft that you proposed, did you

3   specifically name Sergeant's or Sowell?

4       A.    No.

5       Q.    So when I take a look at this agreement, Exhibit

6   15, Paragraph 3 -- I believe it's the second sentence --

7   there's a reference to Dad's reserving its rights to recover

8   damages from Pet Life.  And then it says, "Its successors

9   and assigns as a result of Pet Life's failure to participate

10  in the payment of the royalty."

11          It's your testimony that you were attempting to

12  reserve any rights that Dad's had against Sergeant's and

13  Sowell by including that language?

14      A.    That's exactly my testimony.  It was there for

15  that specific reason.

16      Q.    In any of the drafts that you proposed to Gaines,

17  did you list either Sergeant's or Sowell as potential

18  successors and/or assigns?

19      A.    I don't believe that I did.

20      Q.    Is that something that you even considered?

21      A.    I considered making certain that whatever

22  obligation Pet Life had would be claimable against or

23  recoverable against any of the affiliates that were part of

24  the Sowell group, including Sowell and Sergeant's and

25  potentially other entities that I had no knowledge of their

1    existence, for the purpose of Dad's being able to recover

2    the 60 percent share of this obligation that it was paying.

3        Q.   Well, I mean, I'm certainly not a corporate

4    attorney, but my understanding is you try to be as specific

5    as possible whenever possible.  Is that --

6        A.   That would not be the case, in my experience.

7        Q.   That's not your --

8        A.   It would be, in my experience, better not to be

9    precise and to be generic.  But I can tell you under oath

10   that that language was put there by me expressly for the

11   purpose of including members of the Sowell family of

12   corporations in actions that were recoverable against them

13   as successors to Pet Life.

14       Q.   Did you give any consideration to perhaps adding

15   the language "its successors and assigns, including but not

16   limited to Sergeant's and Sowell"?

17       A.   I cannot tell you that I gave any consideration,

18   because I have no recollection of having thought that.

19       Q.   Did you personally provide copies of this

20   agreement to either Sergeant's or Sowell?

21       A.   I don't believe that I personally did, but I don't

22   recall specifically.

23       Q.   Well, did you ever -- did you draft a letter to

24   either Pet Life or Sowell or Sergeant's saying, hey, we made

25   this $750,000 advanced payment, and we expect your

1    contribution on it?

2        A.    Well, at -- at the moment in time that we paid

3    this, I knew that Pet Life was defunct.  And I knew that

4    Sowell and Sergeant's had participated in an effort to

5    transfer Pet Life assets to another Sowell affiliate; i.e.,

6    Sergeant's, and then had made an effort to divest itself of

7    that obligation.

8            I discussed that situation with other members of

9    our firm, and our decision, in concert with our client, was

10   that they would be hearing from us by virtue of a Complaint

11   to recover $450,000.

12       Q.    Which more or less leads to my next question.  How

13   much do you contend is owed by Sergeant's or Sowell or Pet

14   Life to Dad's?

15       A.    60 percent of the $750,000 settlement, which is

16   $450,000.  60 percent of the first-quarter payment, which is

17   $40-some thousand.  And interest on those obligations

18   through the date of payment.

19       Q.    Well, let me ask you a question.  The Transfer and

20   License Agreement provided that the royalty obligation of

21   Sergeant's would be capped at 270.

22       A.    Yes.

23       Q.    Yet you're contending that Sergeant's is

24   responsible for 450.

25       A.    Correct.

1          Q.    Can you reconcile the two numbers?

2          A.    Yes.  I think that -- as I indicated in my earlier

3     testimony, I think there are several reasons why Sowell and

4     Pet Life owe Dad's -- or excuse me, Sowell and Sergeant's

5     owe Dad's.  One of them is Sergeant's obligation under that

6     Transfer Agreement.

7               In addition to that, I believe that the parties

8     participated in an intentional plan to move valuable assets

9     out of Pet Life, which shared a joint and several obligation

10    with Dad's, without gaining either the consent of Dad's or

11    Shato, the primary obligee, which resulted in Dad's being

12    defrauded.  And Dad's was not told that there was a $270,000

13    limit.  Dad's was not asked whether they agreed that a

14    $270,000 limit was fair.  All that happened is those assets

15    disappeared, the value of those assets disappeared, and then

16    there was an attempt to limit the assumption of the

17    obligation and then a further attempt to give it up in full.

18         Q.    Do you believe -- are you aware that Sergeant's

19    made approximately $80,000 of payments, royalty payments?

20         A.    Yes, I am.

21         Q.    Do you believe that Sergeant's is entitled to a

22    credit for that payment?

23         A.    Only under the theory that would arise as a result

24    of this Transfer and Trademark License Agreement.  If that

25    were the only theory that Dad's had, then the $270,000 would

1    be reduced by the payments that had been made by Sergeant's
2    towards the royalty obligation.  They certainly would not
3    apply to reduce the obligation if this was a conspiracy that
4    resulted in Dad's being defrauded.  And, frankly, I believe
5    that that is exactly what happened.
6        Q.   At the time -- I asked Mr. Lang this previously.
7    At the time that LaSalle foreclosed on Pet Life's assets,
8    was Dad's a creditor of Pet Life?
9        A.   Yes.
10       Q.   And what was Dad's claim against --
11       A.   Dad's claim was, at a minimum, the obligation for
12   recovery of the joint and several royalty, along with
13   Sergeant's and Sowell.  I believe that all of those parties
14   were obligated -- all of the members of the Sowell group
15   that had participated in this shell game were obligated to
16   Dad's for the full amount of the initial Pet Life obligation
17   under the Royalty Agreement.
18       Q.   Did you monitor or follow the foreclosure
19   action -- actions taken by LaSalle?
20       A.   I did not.
21       Q.   Do you contend one way or another whether or not
22   the foreclosure was conducted properly?
23       A.   I have no knowledge.
24       Q.   Did you have any discussions in this time period
25   with representatives of Pet Life about the purchase of Pet

1  Life's assets?

2      A.   The discussions were primarily with the brokers

3  that we were told to deal with.  Then they moved to the

4  bank.  Then I had the conversation with Mr. Smathers in

5  which he told me that the decision as to who bought this

6  business was going to be made by the Sowell people.

7      Q.   Did Dad's attempt to purchase the assets of Pet

8  Life after the foreclosure action brought by LaSalle?

9      A.   I don't -- if you could tell me when the

10 foreclosure action occurred, I would be able to tell you

11 that.  Dad's attempt to acquire the assets was in the month

12 of April of 2002.

13     Q.   Okay.  My understanding -- and it may be different

14 than yours -- is that LaSalle foreclosed on the assets of

15 Pet Life at some point and then scheduled an auction to sell

16 those assets.  Is that consistent with your recollection?

17     A.   I don't have specific knowledge as to how it

18 happened.  I believe that the transfer occurred in May, in

19 early May of 2002.  At that moment in time, Dad's had been

20 told that it was not the successful bidder, and Dad's did

21 not attempt thereafter to acquire those assets, because we

22 were told they were sold to a third party.

23     Q.   Now, the auction, I understand, was -- that

24 occurred in Chicago?

25     A.   I have no knowledge.

1          Q.    Did you attend the auction?

2          A.    No.

3          Q.    Do you know what Dad's bid on at that auction?

4          A.    I don't believe Dad's bid at an auction.  All that

5     Dad's did was make an expression of interest to LaSalle

6     Bank, and LaSalle was going to decide who, when they took

7     those assets over, they were going to sell them to.  Dad's

8     was led to believe that we were the leading candidate for

9     that.  And at the eleventh hour, we were advised by LaSalle

10    Bank that we were not; that it was being sold to a third

11    party.

12         Q.    So you don't know whether or not Dad's was asked

13    to participate in an auction of the Pet Life assets?

14         A.    I don't believe Dad's was invited to participate

15    in an auction.

16         Q.    And it's your understanding that Dad's --

17         A.    Could I clarify a minute?  It is possible -- and

18    I'm just speculating, based on your question, to avoid

19    confusion on your part.  It's possible that the bank did not

20    sell all of the assets of Pet Life in the going concern

21    transaction.  And it is possible that there were additional

22    assets of Pet Life, equipment or things of that nature, that

23    were not part of that transaction.  And it is possible that

24    Dad's, along with perhaps hundreds of other people, might

25    have been advised that there was an equipment auction of

1   some type.  But that was not -- would not have been the

2   transaction that I am discussing that occurred in April of

3   2002, where Dad's was invited to participate in buying the

4   business of Pet Life.

5        Q.   Well, was a formal offer developed or put together

6   by Dad's to purchase Pet Life assets?

7        A.   There was a formal offer.  Whether it was in

8   writing or not, I don't know.  But there was definitely an

9   offer communicated to LaSalle Bank.

10       Q.   Okay.  And were you involved in communicating that

11  offer?

12       A.   I certainly would have been involved in the

13  development of it.  Whether I was on the phone when it was

14  communicated, I don't know.

15       Q.   Do you know what that number was that was

16  presented to --

17       A.   I don't recall as we sit here today.  But it would

18  have been an amount less than the total indebtedness owed to

19  the bank.

20       Q.   And what was the indebtedness that was owed to the

21  bank?

22       A.   I don't recall, as we sit here today.

23       Q.   What about rough numbers?

24       A.   Boy, you're putting me on the spot there.  I'm

25  guessing probably 70 percent of whatever that number was.

1      Q.    Okay.  I'm not asking you to guess.  Do you recall

2  the indebtedness being above or below $5 million?

3      A.    I believe it was above 5 million.

4      Q.    Above 10?

5      A.    Again, I'm guessing, but I think it was somewhere

6  in the range of 10.

7      Q.    And you recall that Dad's put together a bid for

8  the assets -- 70 percent of --

9      A.    Something like that, yes.

10     Q.    And that was communicated to LaSalle Bank?

11     A.    Yes.

12     Q.    And that communication, was that done by you?

13     A.    I may have been one of several people on the

14  phone.  I don't recall specifically.  I know there was a

15  communication.  It may have been by phone, it may have been

16  by e-mail, it may have been by fax.  We went to Chicago, to

17  LaSalle Bank, and participated in day-long negotiations with

18  them during the month of April.  And we were led to believe

19  at that time that we were the likely buyer of those assets.

20  And that was two or three days after my conversation with

21  Mr. Smathers, where he had indicated that Pet Life and

22  Sowell were calling the shots.  I was not told anything

23  about Sergeant's.

24     Q.    Do you know whether or not Pet Life filed for

25  bankruptcy?

1       A.    I don't know whether they filed.  I believe that
2    the process commenced with an involuntary petition.   Whether
3    it was converted to voluntary, I don't know.
4       Q.    When was the involuntary petition filed?
5       A.    I believe that it was late June of 2002.
6       Q.    Did you have any discussions with any creditors of
7    Pet Life about forcing an involuntary petition?
8       A.    Yes, I did.
9       Q.    Is it fair to say that Dad's did participate in
10   the involuntary petition?
11      A.    I believe that Dad's may have been one of the
12   filing creditors.
13      Q.    And why was the decision made to push Pet Life
14   into bankruptcy?
15      A.    Because -- the decision was made because the party
16   that bought the Pet Life assets from LaSalle Bank was
17   continuing to operate the business at the same location.
18   And as creditors, we were uncertain whether there may be --
19   whether or not there would be assets of Pet Life that the
20   bank should not have made a claim against that might
21   disappear, if a trustee doesn't step in and look at the
22   situation and determine whether or not there are assets that
23   should not be going the direction of LaSalle Bank.
24      Q.    Did Dad's solicit other creditors to file --
25      A.    I believe Dad's was, as I recall, solicited by

1    another creditor, and that other party inquired as to

2    whether or not Dad's might know of any others that may be

3    owed money.  It was not -- I don't believe the initial

4    inquiry or the activity began at Dad's end.

5        Q.   Do you practice bankruptcy and creditor rights

6    personally?

7        A.   Not anymore, but I did at one time in my legal

8    career.

9        Q.   Do you have anybody that specializes in that here?

10       A.   Yes.

11       Q.   You have a department that does that?

12       A.   Yes.

13       Q.   Do you know whether or not Dad's has filed a proof

14   of claim in the Pet Life bankruptcy?

15       A.   I don't know for sure.  I don't.  I mean, I know

16   that the conclusion was reached early on that there were no

17   assets left in the estate.  Whether or not a claim was

18   filed, I don't know.

19       Q.   Do you think that that's something that should

20   have been filed, if it had not been filed?

21       A.   I don't have an opinion.

22       Q.   Is there somebody from this firm monitoring the

23   Pet Life bankruptcy on behalf of Dad's?

24       A.   Not to my knowledge.

25       Q.   And, obviously, the way I understand it is that

1  one of the reasons you wanted to push Pet Life into

2  bankruptcy was to protect any assets that possibly could be

3  dissipated by the party that purchased the Pet Life assets.

4  Is that --

5      A.   Or -- or have been improperly taken by LaSalle

6  Bank.

7      Q.   Okay.  Now, once the bankruptcy was filed, is

8  there somebody that you would consider who is protecting

9  Dad's interests in the bankruptcy?

10     A.   I think that we -- and by "we", I mean Dad's

11 concluded, after the bankruptcy had been filed, that there

12 were no assets that appeared to be recoverable at that point

13 in time from Pet Life.

14     Q.   And those assets -- those would have been the

15 assets that were purchased by the third party from LaSalle

16 Bank?

17     A.   Or the receivables that Pet Life had from third

18 parties that were presumably collected by LaSalle Bank, or

19 its cash.

20          MR. WHITE:  Okay, Mr. Dwyer, those are all the

21          questions I have.  Thank you very much.

22

23          (Deposition concluded at 3:39 p.m.)

24

25