# EXHIBIT "H"

1

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

     DAD'S PRODUCTS COMPANY,        )
3    INC.,                          )
               Plaintiff,           )
4                                   )  CIVIL ACTION
     VS.                            )
5                                   )  NO.: 03-350-ERIE
     SERGEANT'S PET PRODUCTS,       )
6    INC.,                          )
                                    )
7          Defendant.               )

8

          ------------------------------------

9                ORAL DEPOSITION OF

10                 ROBERT SCHARF

11               August 16, 2005

12                  Volume 1
          ------------------------------------

13

14          ORAL DEPOSITION OF ROBERT SCHARF, produced

15    as a witness at the instance of the Plaintiff, and duly

16    sworn, was taken in the above-styled and numbered cause

17    on the 16th of August, 2005, from 9:09 a.m. to 10:08

18    a.m., before Michelle L. Varner, CSR in and for the

19    State of Texas, reported by machine shorthand, at the

20    offices of Sergeant's Pet Products, 1601 Elm Street,

21    Suite 300, in the City of Dallas, County of Dallas, and

22    State of Texas, pursuant to the Federal Rules of Civil

23    Procedure and the provisions stated on the record or

24    attached hereto.

25

2

```
 1              A P P E A R A N C E S

 2

 3     Neal R. Devlin
       KNOX McLAUGHLIN GORNALL & SENNETT
 4     120 West Tenth Street
       Erie, Pennsylvania 16501
 5     (814) 459-2800

 6              FOR THE PLAINTIFF

 7
       David E. White
 8     THORP REED & ARMSTRONG, LLP
       301 Grant Street
 9     Suite 1400
       Pittsburgh, Pennsylvania 15219
10     (412) 394-2343

11
       Steven E. Smathers
12     Attorney at Law
       1601 Elm Street
13     Suite 300
       Dallas, Texas 75201
14     (214) 871-7227

15              FOR THE DEFENDANT

16

17

18     ALSO PRESENT:

19       Alan Brown

20

21

22

23

24

25
```

3

```
 1                    I N D E X

 2

 3      WITNESS:  Robert Scharf

 4                                          PAGE

 5      Examination by Mr. Devlin              4

 6

 7

 8

 9                  E X H I B I T S

10      NO.        DESCRIPTION              PAGE

11       1    Notice of Deposition            4

12       2    List of Sergeant's Directors, Officers
             and Shareholders                 6
13
         3    List of Pet Care Foods Directors, Officers
14           and Shareholders                 8

15       4    Trademark, License and Transfer
             Agreement                        9
16
         5    Trademark and License Mortgage Agreement 13
17
         6    Settlement Agreement           15
18
         7    Documents reviewed             22
19
         8    Notification and Cancellation Agreement 26
20
         9    Settlement and Cooperation Agreement    28
21
        10    Foreclosure Agreement          29
22
        11    Amended and Restated Supply Agreement   30
23
        12    Settlement and Cooperation Agreement    32
24
        13    1999 Supplier and Royalty Agreement     32
25
```

4

1            P R O C E E D I N G S

2                    ROBERT SCHARF,

3    having been first duly sworn, testified as follows:

4                    EXAMINATION

5    BY MR. DEVLIN:

6        Q.    Good morning, Mr. Scharf.  My name's Neal

7    Devlin.  We met a few moments ago.  And I represent

8    Dad's Products Company in this case.  This is a

9    deposition pursuant to Federal Rules of Civil

10   Procedure 30(b)(6).

11                   MR. DEVLIN:  And I'm going to ask

12   you to mark that as Exhibit 1.

13                   (Exhibit No. 1 marked.)

14       Q.    (By Mr. Devlin)  I'm going to show you

15   what's been marked as Plaintiff's Exhibit 1.  That is

16   a Notice of Deposition that was served out in this

17   case.  Actually, I think this one is unsigned because

18   I grabbed the unsigned one out of my file.  But have

19   you reviewed this?

20       A.    I've seen it, yes.

21       Q.    Okay.  And are you the designee for all of

22   the topics identified in this notice?

23       A.    Yes.

24       Q.    Okay.  I would also point out for the record

25   that the caption on this notice is incorrect.  Sowell

5

1    and Company should no longer be in the caption.  So I

2    apologize for that.

3                    All right.  Mr. Scharf, can I just

4    get you to state and spell your name for the record?

5         A.    Robert, R-o-b-e-r-t, Scharf, S-c-h-a-r-f.

6         Q.    Okay.  And who are you currently employed

7    by?

8         A.    Sergeant's Pet Care Products.

9         Q.    Okay.  And what is your position with

10   Sergeant's?

11        A.    President.

12        Q.    Okay.  How long have you been president of

13   Sergeant's?

14        A.    Five years.

15        Q.    Okay.  With respect to Sergeant's, it's an

16   incorporated entity, correct?

17        A.    Uh-huh.

18        Q.    And where is it incorporated, in what state?

19        A.    Nevada.

20        Q.    Okay.  Who are its current corporate

21   officers?

22        A.    Corporate officers would be myself, Alan

23   Brown, and, I believe, Joe Connealy is also an

24   officer.

25        Q.    Okay.  Just in broad terms, what is

6

1    Sergeant's general business?

2        A.    We are a manufacturer and distributor of pet

3    supplies.

4        Q.    Okay.  And in which states do you have a

5    presence -- does Sergeant's have a presence?

6        A.    Pretty much all of them.  I mean, once we

7    sell to a distributor, you can't be certain, but we

8    would say all of them.

9        Q.    Okay.  Is Sergeant's a publicly traded

10   company?

11       A.    No.

12       Q.    Okay.  Who is its current majority

13   shareholder?

14       A.    Jim Sowell.

15       Q.    Okay.  At what point in time did Mr. Sowell

16   become the majority shareholder of Sergeant's?

17       A.    At the time it was purchased from ConAgra.

18   I believe that was in 2000.

19       Q.    Okay.  And it was previously owned by

20   ConAgra; is that right?

21       A.    Uh-huh.

22       Q.    Okay.  I'm going to show you --

23                      MR. DEVLIN:  If I can mark that as

24   Exhibit 2.

25                      (Exhibit No. 2 marked.)

1        Q.    (By Mr. Devlin)  This is a document that I

2    believe was produced in discovery, although it doesn't

3    have a Bates stamped number on it, but I think it was.

4    This purports to be a listing of the directors and

5    officers of Sergeant's Pet Care Products, but it's

6    undated.  I guess my question is, presently are the

7    directors identified on this document correct?

8        A.    Yes, I believe so.

9        Q.    Okay.  And we just went over the officers --

10    and I certainly wasn't trying to trick you at all --

11    but is Keith Martin currently an officer now?

12        A.    I'm uncertain.  I believe he may be.  I

13    believe that Joe Connealy is also.  I don't believe

14    that it was a substitution.

15        Q.    Okay.  Back in 2001, in particularly,

16    between September of 2001 and May of 2002, were the

17    directors of Sergeant's the same as indicated on

18    Exhibit 2, if you know?

19        A.    I was not a director at that time.

20        Q.    Okay.  Is that the only change between the

21    two?  Would Mr. Sowell, Martin, Brown and Shea have

22    been directors at that time?

23        A.    To be honest, I'm not sure if Jim Shea had

24    been added to the board at that time or not.

25        Q.    And with respect to officers for that same

8

1    time period, September of '01 through May of '02,

2    would the officers have been --

3         A.    Probably would be these three.

4         Q.    These three.  Probably not Mr. Connealy?

5         A.    No.

6         Q.    Okay.

7                    MR. DEVLIN:  I'm going to ask you to

8    mark this as Exhibit 3, please.

9                    (Exhibit No. 3 marked.)

10        Q.    (By Mr. Devlin)  What's just been marked as

11   Exhibit 3 purports to be directors, officers and

12   shareholders of Pet Care Foods as of June 28, 2002.  I

13   guess my question is, back in -- and if you know

14   this -- back between September of '01 and May of '02,

15   with respect to Pet Life, would these people have been

16   the directors and officers of Pet Life at that time?

17        A.    I'm sorry, I have no idea.

18        Q.    You don't know.  Do you know anything about

19   who would have been the directors of Pet Life at that

20   time?

21        A.    No.

22        Q.    Okay.  Were you a director or officer of Pet

23   Life at that time?

24        A.    No.

25        Q.    Okay.  Going back to September 1 of 2001,

9

1    did Sergeant's purchase trademarks from Pet Life?

2       A.    Yes.

3       Q.    Okay.

4                    MR. DEVLIN:   Could you mark this as

5    Exhibit 4?

6                    (Exhibit No. 4 marked.)

7       Q.    (By Mr. Devlin)   I'm going to show you

8    what's been marked as Deposition Exhibit Number 4.

9    This purports to be a Trademark, License and

10   Transfer Agreement.   Have you seen that agreement

11   before?

12      A.    Oh, yes.

13      Q.    Okay.  And if you'll look to what is page

14   seven on that, is that your signature for Sergeant's

15   Pet Care Products?

16      A.    Yes.

17      Q.    Okay.  In the agreement, it certainly speaks

18   for itself -- but just to make questioning a little

19   bit easier, is it your understanding that through this

20   agreement, Sergeant's was purchasing certain

21   trademarks from Pet Life?

22      A.    Yes.

23      Q.    Okay.  And did you understand how Pet Life

24   had acquired those trademarks?

25      A.    No, not really.

10

1      Q.    Okay.  Were you aware that Pet Life had

2   purchased those trademarks from Gains Pet Foods Corp.

3   at a time previous to this?

4      A.    At that time, no.

5      Q.    You were not?

6      A.    No.

7      Q.    Okay.  What was your understanding as to

8   what Sergeant's was paying to Pet Life in

9   consideration for getting the trademarks that was

10  transferred pursuant to this agreement?

11     A.    We were paying $600,000.  And then, there

12  was some brokers that, it was my understanding, that

13  Pet Life had used, that they were no longer using,

14  that we needed to compensate.  There was some kind of

15  a royalty agreement.

16     Q.    Okay.

17     A.    So we absorbed some liabilities that they

18  had had.

19     Q.    Okay.  So the consideration consisted of two

20  parts, a payment of $600,000; is that right?

21     A.    Uh-huh.

22     Q.    And then also the assumption of these

23  certain obligations that you've just talked about.

24     A.    Uh-huh.

25     Q.    Okay.  The $600,000, was that paid in a lump

1    sum?

2        A.    I believe so, yes.

3        Q.    Okay.  Now, with respect to the assumption

4    of royalty obligations, if you look at paragraph one,

5    subparagraph B, and I'm just going to read this into

6    the record, maybe to make things easier.

7                    "In addition to the payment of

8    $600,000, Sergeant's hereby agrees to assume and pay

9    any and all additional payments due to Gains Pet Foods

10   Corp. pursuant to the Supplier and Royalty Agreement

11   dated November 23, 1999, in an amount of up to

12   $270,000."  The paragraph goes on from there, but I'm

13   going to stop reading at that point.

14                    Were you familiar with the agreement

15   referenced in paragraph 1(B), specifically the

16   Supplier and Royalty Agreement dated November 23,

17   1999?

18       A.    No, I've never reviewed that document.

19       Q.    Okay.  So prior to signing this agreement,

20   you didn't look at what the royalty obligations

21   referred to in that?  You didn't review that

22   agreement?

23       A.    No.  We just knew that we had an obligation

24   of up to $320,000.

25       Q.    Okay.  Did you know whether that obligation

1    was joint of several with anybody else?

2       A.    No.

3       Q.    Okay.  Did you understand that your

4    obligation would be -- strike that.

5                  You did understand the obligation

6    you were assuming was the obligation referenced in the

7    November 23rd, 1999 agreement, though?

8       A.    Oh, yes.

9       Q.    Okay.  At any time did Sergeant's notify

10   Gains Pet Foods Corporation of the transfer of these

11   trademarks pursuant to the agreement that's marked

12   Exhibit 4?

13      A.    No.

14      Q.    Okay.  Did Sergeant's notify Dad's Pet Food

15   of this -- of the transfer of the trademarks?

16      A.    No.

17      Q.    Okay.  At any time did Sergeant's notify

18   Gains or Dad's of its assumption of the royalty

19   obligations referred to in paragraph 1(B) of the

20   agreement?

21      A.    No.

22      Q.    Okay.  Are you aware if Pet Life notified

23   either of those entities of either of those transfers?

24      A.    I don't have any idea.

25      Q.    Okay.  The next document I want to go over,

13

1   unfortunately, I didn't make copies of.  And I

2   apologize for that.

3                   MR. DEVLIN:  Let me show it to you

4   first, Dave, if that's all right.  I don't know.

5                   MR. WHITE:  Okay.

6       Q.    (By Mr. Devlin)  This document is entitled

7   Trademark and License Mortgage.  Are you familiar with

8   this?

9                   MR. WHITE:  Do you want to mark that

10  as an exhibit?

11                  MR. DEVLIN:  I think I will, yes.

12      A.    Yes.

13      Q.    Okay.

14                  MR. DEVLIN:  Can you mark that as

15  the next sequential exhibit?

16                  (Exhibit No. 5 marked.)

17      Q.    (By Mr. Devlin)  And what's your

18  understanding of what this agreement -- well, prior to

19  that question.  The date of this agreement is

20  September 1, 2001, correct?

21      A.    Yes.

22      Q.    Okay.  And that is the same date as the

23  Trademark, License and Transfer Agreement that's

24  Exhibit 4; is that correct?

25      A.    Yes.

14

1    Q.    Okay.  What's your understanding of what the

2    Trademark and License Mortgage did with respect to the

3    trademarks at issue?

4    A.    It was my understanding that the bank,

5    LaSalle Business, had a mortgage on the entire

6    business and that this document basically broke a

7    portion of that liability out and tied it to the

8    trademarks.

9    Q.    Okay.  So it was your understanding that

10   pursuant to this agreement, LaSalle would have a

11   security interest or a mortgage interest in the

12   trademarks you were purchasing from Pet Life; is that

13   correct?

14   A.    That's correct.

15   Q.    Okay.  Thank you.

16            MR. DEVLIN:  When we take a break,

17   if we can get copies of this, Dave.

18            MR. WHITE:  Sure.

19   Q.    (By Mr. Devlin)  Going back to Exhibit 4,

20   did you also understand, pursuant to this agreement,

21   that you were granting a license to Pet Life to use

22   certain of the trademarks that you were purchasing?

23   A.    For a period of time until we could get our

24   own, yes.

25   Q.    Okay.  Also, was there any obligation or

15

1    reference to Sergeant's utilizing Pet Life to actually

2    produce product that would be sold under those

3    products, if you know?

4        A.    Yes.

5        Q.    Okay.  Subsequent to the transfer of the

6    trademarks on September 1 of 2001, did Sergeant's use

7    the trademarks it purchased from Pet Life?

8        A.    Yes.

9        Q.    Okay.  How did Sergeant's use those?

10       A.    To market products.

11       Q.    Okay.  Did it -- at any time did Sergeant's

12   utilize anything known as Mapleleaf Pet Care as part

13   of its use of these trademarks?

14       A.    I'm not aware of it.

15       Q.    Okay.  Were you at any time aware of the

16   existence of Mapleleaf Pet Care?

17       A.    No.

18       Q.    Okay.

19                    MR. DEVLIN:  Could you mark that as

20   the next exhibit, please?

21                    (Exhibit No. 6 marked.)

22       Q.    (By Mr. Devlin)  I'm going to show you

23   what's been marked as Plaintiff's Exhibit 6.  It's

24   entitled, Settlement Agreement.  Have you ever seen

25   that agreement before?

16

1    A.    It does not ring a bell.  No, I don't
2    believe so.
3    Q.    Okay.  Are you aware if at any time any
4    Sergeant's representative had any dealings with Dad's
5    Pet Products -- Dad's Products Company with respect to
6    Mapleleaf Pet Care?
7    A.    Not that I'm aware of.
8    Q.    Okay.  After purchasing the trademarks from
9    Pet Life, did Sergeant's experience any increase or
10   decrease in its revenues?
11   A.    In the revenue of these products?
12   Q.    Well, let me ask a back-up question.  Was
13   Sergeant's previously producing the products that it
14   would utilize the trademarks to produce under
15   different trade names?
16   A.    No.
17   Q.    Okay.  So after purchasing the trademarks
18   and selling product under those trademarks, did that
19   -- are you aware if that increased or decreased or had
20   no effect on Sergeant's revenues?
21   A.    Revenues would have gone up.
22   Q.    Okay.  Are you aware if it had any effect,
23   positive or negative, on Sergeant's profits?
24   A.    Profits would have gone down in the short
25   term.

17

1    Q.    Okay.  How about in the long term?

2    A.    We've invested a great deal in it.  At this

3    point, it's difficult to break that out separate.

4    Q.    Okay.  Did Sergeant's continue to own all of

5    the trademarks that were transferred pursuant to the

6    September 1, 2001 agreement with Pet Life?

7    A.    I can't say all.  We were going to have a

8    preponderance of them.

9    Q.    Okay.

10    A.    I believe so.

11    Q.    Okay.  Do you know if you sold any of them?

12    A.    Not that I'm aware of.  I think some of them

13    were abandoned.

14    Q.    Some were abandoned, okay.  Subsequent to

15    the September 1st, 2001 transfer of trademarks with

16    Pet Life, did Sergeant's make any royalty payments

17    that it assumed as part of that agreement?

18    A.    Yes.

19    Q.    Okay.  To whom did Sergeant's make those

20    payments?

21    A.    At one point, I think we made a payment to

22    Dad's.  And then I think we made a payment or some

23    payments directly to the brokers in question.

24    Q.    Okay.  With respect to the payment to Dad's,

25    you believe you made one payment to Dad's subsequent

18

1   to September 2001?

2        A.    I think that's correct.

3        Q.    Do you know the amount of that payment?

4        A.    I did.  It's -- I don't know, $40,000 or

5   something like that.

6        Q.    Okay.

7        A.    I could look that up.

8        Q.    Okay.  Ballpark is fine right now.  If it

9   becomes necessary, I maybe will ask you to do that in

10  a minute.

11              How is it that you made the payment

12  to Dad's?

13       A.    We were instructed that that's where the

14  money should go.

15       Q.    Okay.  Who instructed you of that?

16       A.    Steven Smathers.

17       Q.    Okay.  And who is Steven Smathers?

18       A.    He was our counsel.

19       Q.    Okay.  Did he tell you why you were supposed

20  to make the payment to Dad's?

21       A.    Pursuant to the agreement.

22              MR. WHITE:  I'm just going to

23  object.

24              MR. DEVLIN:  I didn't hear the

25  answer, so if you want to object, go ahead.

19

1          MR. WHITE:  That's fine.  I just

2    wanted to caution the witness not to go into anything

3    that perhaps is attorney/client privileged.  I don't

4    think it is, if he's just telling you to make the

5    payment to Dad's pursuant to the agreement.  I think

6    that's okay.  But just be careful not to tread on

7    that.

8          THE WITNESS:  Okay.

9    Q.    (By Mr. Devlin)  And I'm not trying to get

10   any information from you that's protected.  I'm just

11   trying to figure out what reason it is that you made

12   the payment to Dad's.  And if it's simply that

13   Mr. Smathers told you to, that -- that's fair enough.

14   Is that correct?

15   A.    Uh-huh.

16   Q.    Okay.  How is it that you knew to make a

17   $40,000 payment to Dad's?

18   A.    Again, that would have come from Steven.

19   Q.    Okay.  Other than Mr. Smathers telling you

20   to whom to make the payment and the amount, you didn't

21   have conversation with anybody else or any other

22   reason to make the payment in that way or in that

23   amount?

24   A.    No.

25          MR. WHITE:  Just to be clear.  I

20

1    think you had no other reason.  I think the answer

2    would be yes to be clear on the record.

3                    MR. DEVLIN:  Okay.

4                    MR. WHITE:  Sometimes we get these

5    double meanings coming out of these things.

6                    MR. DEVLIN:  It was a poor question.

7        Q.    (By Mr. Devlin)  Did you have an

8    understanding as to what Dad's was going to do with

9    the $40,000 payment that you were making to it?

10       A.    Other than that there was a royalty due to

11   this group, I assumed it would be handled.

12       Q.    Okay.  When you say "this group," looking at

13   paragraph 1(B), there are a couple of entities

14   referenced, the first being Gains Pet Foods

15   Corporation and after that it references the November

16   23rd, 1999 agreement.  And then below that it

17   references White Cap, Inc., Gerald Schulman and David

18   Kofsky.  And that references a separate agreement, a

19   Sales and Marketing Agreement dated November 16, 1999.

20   Did you have an understanding as to whether Dad's was

21   going to be making payments to one or both of these

22   entities with that $40,000 payment?

23       A.    I can only speculate.  I mean, we were told

24   that this is where we were to make the payment.

25       Q.    Okay.  So when you made the payment -- and

21

1    correct me if this is wrong -- but when you made the

2    payment, did you understand that it was simply a

3    satisfaction or it was pursuant to your total

4    obligations under paragraph 1(B)?

5        A.    I believe that it was separate payments

6    made, in looking through the documents.  So I don't

7    know.  It probably would have only been for one.

8        Q.    Okay.  Do you know which one?

9        A.    I assume by the size, it had to have been

10   the first one.

11       Q.    Okay.  You indicated previously that in

12   addition to the one payment to Dad's that we just

13   discussed, there may have been other payments directly

14   to brokers; is that right?

15       A.    Yeah.

16       Q.    Okay.  And when you say "brokers" are you

17   referring to White Cap, Gerald Schulman and David

18   Kofsky?

19       A.    Yeah.  I believe they were the brokers in

20   question.

21       Q.    Okay.  And you believed that Sergeant's may

22   have made payments directly to those individuals and

23   that entity?

24       A.    Yes.

25       Q.    Okay.  How many payments were made directly

22

1    to the brokers?

2              THE WITNESS:  I don't have it off

3    the top of my head.  Can I review it?

4              MR. WHITE:  You may.

5    A.    Let's see.  There was six made to one

6    address and one made to another.

7              MR. DEVLIN:  Can we go off the

8    record for a second?

9              (Brief discussion off the record.)

10   Q.    (By Mr. Devlin)  Prior to going off the

11   record, we were discussing payments Sergeant's made to

12   brokers.  And you were reviewing a collection of

13   documents that I'd like to mark as an exhibit now.

14   A.    Okay.

15              (Exhibit No. 7 marked.)

16   Q.    (By Mr. Devlin)  These have now been marked

17   as Exhibit 7.  And they're five documents there.  Can

18   you tell me what those are?

19   A.    Those are print-outs out of our accounts

20   payable system.

21   Q.    Okay.  And this might just be the easiest

22   way to go through this.

23   A.    Okay.

24   Q.    Can you just go through and indicate to me,

25   on the first page of Exhibit 7, who it indicates the

23

1  payment was made to?

2       A.   Chateau Holdings.

3       Q.   Okay.  And do you understand -- and what was

4  the amount of the payment made to Chateau?

5       A.   $44,821.60.

6       Q.   Okay.  And do you know why Sergeant's made a

7  payment in that amount to Chateau Holdings?

8       A.   It indicates miscellaneous accruals.  But I

9  believe it was in connection with the royalty.

10      Q.   Okay.  And do you know with respect to -- if

11 it was connection to the royalty, whether it was a

12 payment that was intended to go to Gains Pet Foods

13 Corp.?

14      A.   I don't know the final destination.  It

15 indicates Chateau Holdings.

16      Q.   Okay.  So, just so I understand, you believe

17 that payment was made as part of Sergeant's

18 obligations pursuant to paragraph 1(B) of this

19 agreement?

20      A.   Right.

21      Q.   Do you believe it was made as part of its

22 obligations to Gains Pet Foods or as part of its

23 obligations to the three brokers listed, White Cap,

24 Schulman and Kofsky?

25      A.   I don't know that it was our obligation to

24

1    any of those individuals.  It was the obligation that

2    we got in this agreement.  So as far as we were

3    concerned, it was an obligation to Pet Life.

4        Q.    Okay.  But you understood that you were

5    assuming an obligation to make payments due to the

6    various entities and individuals listed in that

7    paragraph 1(B), correct?

8        A.    It was my understanding that we had an

9    obligation to Pet Life and that Pet Life was giving us

10   the direction on where this money should go.

11       Q.    Okay.  So you received direction from Pet

12   Life?

13       A.    Actually, I received direction from counsel.

14       Q.    Okay.  And you don't know where counsel

15   received direction as to whom to make the payments to?

16       A.    No.

17       Q.    Okay.  So the first payment you referenced

18   was to Chateau Holdings in the amount of $44,821.61?

19       A.    Correct.

20       Q.    Okay.  I believe --

21       A.    I think this is just the second page of the

22   same payment.

23       Q.    Okay.

24       A.    I'm not sure why there's two.  I think it

25   was just a print screen.

25

1    Q.    Okay.  In looking at the third page.

2    A.    This one is for White Cap, Inc.  And there's

3  six of these payments.

4    Q.    Okay.  And this would be part of the record,

5  so you don't need to read in the amount of those

6  payments.

7    A.    Okay.

8    Q.    And again, do you understand that those

9  payments were made pursuant to your obligations under

10  paragraph 1(B)?

11    A.    To Pet Life, yes.

12    Q.    Okay.  Then the fourth page of Exhibit 7,

13  does that indicate a payment?

14    A.    Yeah.  The fourth and fifth are a payment to

15  Dad's.

16    Q.    Okay.  And what was the amount of that

17  payment?

18    A.    $39,515.24.

19    Q.    And just so that the record is clear, is

20  that the payment that we discussed previously when you

21  said there was one payment to Dad's?

22    A.    Uh-huh.

23    Q.    Okay.

24              MR. DEVLIN:  Would you mark this as

25  the next exhibit, please?

1          (Exhibit No. 8 marked.)

2     Q.    (By Mr. Devlin)  We've marked as Plaintiff's

3  Exhibit 8, this is entitled Notification and

4  Cancellation Agreement.

5     A.    Uh-huh.

6     Q.    Have you ever seen that agreement before?

7     A.    Yes.

8     Q.    Okay.  And what's your understanding as to

9  what this agreement did?

10     A.    It was an agreement whereby Sergeant's would

11  wire transfer to the bank, basically, cash in return

12  for clearing us from other obligations.

13     Q.    Okay.  What other obligations?

14     A.    Most notably, the royalty -- or the

15  obligations noted in 1(B) of the Trademark and

16  Transfer Agreement.

17     Q.    Okay.  Prior to the Notification and

18  Cancellation Agreement that's Exhibit 8, had

19  Sergeant's ordered product from Pet Life?

20     A.    Yes.

21     Q.    Okay.  And at the time of the Notification

22  and Cancellation Agreement, were there outstanding

23  invoices that Pet Life claimed were due to it?

24     A.    Yes.

25     Q.    Okay.  And was the amount of those

27

1   outstanding invoices, the $353,707.38, referenced in

2   that agreement?

3       A.   Yes, that's correct.

4       Q.   Okay.  And did Sergeant's dispute whether it

5   owed that money to Pet Life?

6       A.   Yes.

7       Q.   Okay.  And then, pursuant to this agreement

8   -- and this, I guess, is a partial rephrasing of what

9   you just said, so correct me if I'm wrong.  But

10  Sergeant's was to pay that amount directly to LaSalle

11  Bank; is that correct?

12      A.   That's correct.

13      Q.   Okay.  And in exchange for that, you

14  understood that Sergeant's would be relieved of its

15  obligations under paragraph 1(B) of the Trademark,

16  License and Transfer Agreement?

17      A.   That's correct.

18      Q.   Okay.  And did Sergeant's, in fact, make

19  that payment to LaSalle Business Credit?

20      A.   Yes.

21      Q.   Are you aware, did Sergeant's ever receive

22  any portion of that payment back as a refund for any

23  defective product?

24      A.   I'm not aware.

25      Q.   Okay.

28

1           MR. DEVLIN:  Would you mark this as

2  Exhibit 9?

3           (Exhibit No. 9 marked.)

4      Q.    (By Mr. Devlin)  I'm going to show you

5  another agreement which is entitled, Settlement and

6  Cooperation Agreement.  Have you ever seen this

7  document before?

8      A.    Yes.

9      Q.    If you turn to the third page of this

10 document, under paragraph two, the last sentence of

11 that paragraph.  And you can certainly read,

12 obviously, as much of it as you'd like.  But my

13 question is going to be with respect to the last

14 sentence.

15     A.    Yes, I'm familiar with that.

16     Q.    Did you understand that if any product that

17 Sergeant's would receive from Pet Life that's

18 referenced in paragraph two were to be found

19 defective, Sergeant's would receive a refund?

20     A.    Yes, I'm very aware of that.

21     Q.    Okay.  And that would have been a refund of

22 the $353,000 -- $353,707.38 referenced in the

23 Notification and Cancellation Agreement?

24     A.    That is correct.

25     Q.    Okay.  And I know I've asked this already.

29

1    But, to your knowledge, did you receive any such

2    refund pursuant to paragraph two?

3        A.    No.  There was -- no.

4        Q.    Okay.  Pursuant -- looking at Exhibit 8

5    again, the Notification and Cancellation Agreement.

6    Did you also understand that pursuant to that

7    agreement, Sergeant's was revoking the license that it

8    had granted to Pet Life to use the trademarks at

9    issue?

10       A.    Yes, I'm aware of that.

11       Q.    Okay.  Did Sergeant's notify Gains of the

12   Notification and Cancellation Agreement at any time?

13       A.    No.

14       Q.    Okay.  Did Sergeant's notify Dad's of the

15   Notification and Cancellation Agreement at any time?

16       A.    No.

17       Q.    Okay.  Are you aware if Pet Life notified

18   either of those entities?

19       A.    No, I'm not aware.

20       Q.    You're not aware, okay.

21                    Looking at Exhibit 9, again and

22   also --

23                    MR. DEVLIN:  Would you mark this as

24   Exhibit 10?

25                    (Exhibit No. 10 marked.)

30

1     Q.   (By Mr. Devlin)  -- and what we've just

2  marked as Exhibit 10.  And Exhibit 10 is entitled

3  Foreclosure Agreement.  I believe it's dated May 3,

4  2003.  Have you ever seen that Foreclosure Agreement

5  before?

6     A.   No.

7     Q.   Okay.  And just so the record is clear,

8  Sergeant's is not listed in that agreement and you

9  certainly did not sign that agreement.  I was just

10  wondering if you'd ever seen that before?

11     A.   No.

12     Q.   Okay.

13            MR. DEVLIN:  This is the last one.

14  Can you mark that as 11?

15            (Exhibit No. 11 marked.)

16     Q.   (By Mr. Devlin)  Looking at Exhibit --

17  what's just been marked as Exhibit 11, which is an

18  Amended and Restated Supply Agreement.  Have you ever

19  seen that agreement before?

20     A.   Yes.

21     Q.   Okay.  And what is your understanding as to

22  the purpose of that agreement?

23     A.   It was an agreement whereby we were to get

24  supplies of formulated treats from a company called

25  World Pet.

31

1      Q.    Okay.  The Amended and Restated Supply

2   Agreement is dated -- it indicates it was made as of

3   May 3rd, 2002; is that correct?

4      A.    Yes.

5      Q.    Okay.  And looking back at Exhibit 9, the

6   date on that agreement is also May 3rd of 2002; is

7   that correct?

8      A.    That's correct.

9      Q.    Okay.  The Amended and Restated Supply

10  Agreement, you indicated that it was to receive

11  certain product from World Pet.  It was an agreement

12  that Sergeant's would receive certain product from

13  World Pet; is that correct?

14     A.    That's correct.

15     Q.    Okay.  And the product is identified in that

16  agreement; is that also correct?

17     A.    Yes.

18     Q.    Okay.  Are you aware if the product that was

19  going to be provided or produced by World Pet for

20  Sergeant's was to be sold under any of the trademarks

21  that Sergeant's acquired from Pet Life?

22     A.    Yes.

23     Q.    Okay.  Prior to the Amended and Restated

24  Supply Agreement, from whom had Sergeant's purchased

25  that product from?

32

1     A.    Pet Life.

2     Q.    Okay.  Did you understand that World Pet had

3  purchased the assets of Pet Life when you entered into

4  the Amended and Restated Supply Agreement?

5     A.    Yes.

6     Q.    Okay.  Were you aware that at around the

7  time of the Notification and Cancellation Agreement,

8  which I believe is Exhibit 8, the Settlement and

9  Cooperation Exhibit, which is Exhibit 9, and the

10  Amended and Restated Supply Agreement, which is

11  Exhibit 11, Pet Life was going through -- a cumbersome

12  question -- substantial assets of Pet Life were being

13  sold to World Pet, in that Pet Life was ceasing

14  operations?

15     A.    Yes.

16     Q.    Okay.

17               MR. DEVLIN:  If we could take a

18  two-minute break.  Let me look through some things.

19  I'm pretty much done, I think I may have a couple more

20  questions.

21               MR. WHITE:  Sure.

22               (Break taken from 9:48 a.m. to.

23               10:01 a.m.)

24               (Exhibits No. 12 and 13 marked.)

25     Q.    (By Mr. Devlin)  I just have a couple more

33

1    questions.

2        A.    Okay.

3        Q.    I'm going to show you what we've marked as

4    Exhibit 12.  This purports to be a May 3rd, 2002

5    Settlement and Cooperation Agreement.  Are you

6    familiar with this agreement?

7        A.    Yes.

8        Q.    Okay.  What's your understanding of the

9    purpose of this agreement?

10       A.    Well, again, it was to quantify that we were

11   going to make a payment and that it did not -- we were

12   not making any -- any issues or positives or negatives

13   for our debt that they owed us, and that -- let's see

14   -- and that the -- any other issues would go away.

15       Q.    Okay.  Did you understand that pursuant to

16   this agreement, Sergeant's would also cooperate with

17   LaSalle in any actions it was going to take with

18   respect to foreclosure of Pet Life?  I'm specifically

19   looking at paragraph one, subsentences G and H, if you

20   want to look at those.

21       A.    Okay.  Yes, I'm familiar with that.

22       Q.    Okay.  And just to be clear, actually, to

23   make sure you read what I'm going to be asking about,

24   also subsentence F.  I don't know if you read that,

25   too, or not.

34

1       A.      Okay.

2       Q.      Okay.  Do you know if Sergeant's took any

3    actions to assist LaSalle in the sale, foreclosure or

4    other disposition of the assets of Pet Life?

5       A.      We took some product we didn't want.

6       Q.      Okay.  Anything else?

7       A.      Not that I can remember.

8       Q.      Okay.  This has been marked Exhibit 13.

9    This is a -- I'm now out of agreements.  This is a

10   1999 Supplier and Royalty Agreement.  You do not

11   appear to have signed this agreement and Sergeant's is

12   not a party to this agreement.  I believe I asked you

13   this already without showing it to you, but have you

14   ever seen this agreement before?

15      A.      No.

16      Q.      Okay.  If you look at the first page of the

17   agreement.  It's indicated that it was made as of

18   November 23rd, 1999.  Do you understand this to be the

19   agreement that's referenced in paragraph 1(B) of the

20   Trademark, License and Transfer Agreement?

21      A.      It appears to be, yeah.

22      Q.      Okay.  You've indicated that you've never

23   seen this Supply and Royalty Agreement.  But did you

24   understand -- was it your understanding that pursuant

25   to the Trademark, License and Transfer Agreement,

35

1    which is Exhibit 4, Sergeant's was assuming

2    obligations that Pet Life had pursuant to this

3    November 23rd, 1999 agreement?

4        A.    Yes.

5        Q.    Okay.  So did you have any understanding or

6    did you believe there was any restriction as to

7    Sergeant's assumption of those obligations, other than

8    the cap on the amount Sergeant's would have to pay?

9        A.    No.

10        Q.    Okay.  Do you have any knowledge as to why

11    Pet Life wanted to sell the trademarks to Sergeant's?

12        A.    I would just be speculating.

13        Q.    Okay.  During the negotiations with -- let

14    me ask this question.  Were you personally involved in

15    the negotiations for the purchase of the trademarks

16    from Pet Life?

17        A.    Through counsel, yes.

18        Q.    Okay.  Were you aware if Pet Life ever

19    indicated why it wanted to sell the trademarks?

20        A.    No, I'm not aware of that.

21        Q.    Okay.  How did Sergeant's come to know that

22    Pet Life had these trademarks?

23        A.    Again, through counsel we were made aware of

24    an opportunity to make the acquisition.

25        Q.    Okay.  Are you aware if Mr. Sowell or any

36

1    related entity had an interest in Pet Life at the time

2    Sergeant's purchased the trademarks?

3        A.    I knew that Alan Brown was involved in that

4    in some way, shape, or form, but not any specifics.

5        Q.    Okay.

6        A.    We'd only been a part of the organization a

7    very short period of time.

8        Q.    Okay.  Were you part of Sergeant's prior to

9    its purchase by Mr. Sowell?

10       A.    Yes.

11       Q.    Okay.

12                    MR. DEVLIN:  Okay.  That's all of

13   the questions I have.

14                    MR. WHITE:  We'll read.

15                    (Off the record at 10:08 a.m.)

16

17

18

19

20

21

22

23

24

25

# EXHIBIT "I"

SPC tls 2005/08/16 - Innotrack Accounts Payable - AP

Application  File Maint  Process  Inquiry  Reports  Utilities  Special Apps  Help

**TAP007: AP Voucher Inquiry**

Voucher #  100359       Batch #   164        Hold Code

**Vendor Information**

| Vendor ID | 0140630 | Pay Alt Payee # |
|---|---|---|
| Name | SHATO HOLDINGS | |
| Address | C/o Dad's Pet Foods | |
| City | MEADVILLE | State  PA |
| Zip Code | 16335 | Country  USA |

**Invoice Information**

| Invoice Date | 12/31/01 | Invoice Amt | 44821.60 |
|---|---|---|---|
| Terms | NO  NET 0 | Disc Amt | |
| Terms Due | 01/01/02 | Freight Amt | |
| Manual Due | 01/25/02 | Sales Tax | |
| Invoice # | DEC 2001 | Curr Code | DL |
| Reference | | Curr Rate | 1.0000000 |
| Auto Dist | | Sep Check? | N |
| Note | ROYALTY 4TH QTR | | |

Exit
LookUp
<<   >>
Distribute
Vendor
History
Alt Payee
Receipt
Detail

| | Paid | Rcpt Inv? |
|---|---|---|
| Financial Inst | 0001 | |
| 1099? | | |
| Receipt Detail? | N | 821.60  N |

**Voucher Information**

| Original Date | 01/21/02 |
|---|---|
| Fiscal Period | 4  2002 |
| Vch Source | AP |
| Status | Paid |

Exit
<<   >>   Lookup
Voucher
Inquiry
Check
Inquiry
Print Rcpt
Invoice

Key

**TAP007A:  Voucher Distribution Inquiry**

Voucher #   100359          Vch Source  AP        Status  P

**Fiscal Period & Currency**

| Eff Date | |
|---|---|
| Fiscal Pd | |
| Curr Code | DL |
| Exch Rate | 1.0000000 |

**Voucher Amounts**

| Invoice | 44821.60 |
|---|---|
| Discount | |
| Freight | |
| Distributed | 44821.60 |

Exit
<<   >>
Detail

| Seq | Type | Account Number | Amount | Description |
|---|---|---|---|---|
| 1 | MISC | 005502450021499900 | 44821.60 | A/P-MISC ACCRUALS |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

00214

Δ π EXHIBIT 7
Deponent _____
Date 8/19/05  Rpt _____
WWW.DEPOBOOK.COM

Start    SPC tls  2005/08/16 - ...        Teri Smith - Inbox - Lotu...        2:32 PM

src tls 2005/08/16 - Innatrack Accounts Payable - AP

Application   File Maint   Process   Inquiry   Reports   Utilities   Special Apps   Help

TAP001: Vendor Lookup & Maintenance

TAP001B: Vouchers For Selected Vendor By Invoice Date

Vendor #  0140630   SHATO HOLDINGS

| Inv Date | Voucher | Due Date | Stat | Invoice | Invoice Amt | Last Payment Check No | Last Payment Date | Total Amt Paid | Rcpt Inv? |
|---|---|---|---|---|---|---|---|---|---|
| 123101 | 100359 | 01/25/02 | P | DEC 2001 | 44821.60 | 207207 | 01/25/02 | 44821.60 | N |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Exit
<<   >>
Lookup
Key

Voucher Inquiry
Check Inquiry
Print Rcpt Invoice

Start   SPC tls 2005/08/16 - ...   Teri Smith - Inbox - Lotu...   00214




2:32 PM

SPC tls 2005/08/16 - Innatrack Accounts Payable - AP

Application  File Maint.  Process  Inquiry  Reports  Utilities  Special Apps  Help

**TAP007: AP Voucher Inquiry**

Voucher # 97423    Batch # 105    Hold Code

**Vendor Information**

| | |
|---|---|
| Vendor ID | 0141534 |
| Name | DADS |
| Address | 18746 MILL STREET |
| City | MEADVILLE |
| Zip Code | 16335 |

Pay Alt Payee #

Financial Inst 0001
10992

State PA
Country USA

Receipt Detail? N

**Invoice Information**

| | |
|---|---|
| Invoice Date | 10/29/01 |
| Terms | NO_NET 0 |
| Terms Due | 10/30/01 |
| Manual Due | 10/29/01 |
| Invoice # | ROYALTY |
| Reference | |
| Alt'd Dist | |
| Note | |

Invoice Amt 39515.24
Disc Amt
Freight Amt
Sales Tax
Curr Code DL
Curr Rate 1.0000000
Sep Check? N

**Voucher Information**

| | |
|---|---|
| Original Date | 10/29/01 |
| Fiscal Period | 1  2002 |
| Vch Source | AP |
| Status | Paid |

Paid    515.24
Rcpt Inv? N

Exit
LookUp
<<  >>
Distribute
Vendor
History
Alt Payee
Receipt Detail

Exit
LookUp
<<  >>
Key
Voucher Inquiry
Check Inquiry
Print Rcpt Invoice

**TAP007A: Voucher Distribution Inquiry**

Voucher # 97423    Vch Source AP    Status P

**Fiscal Period & Currency**

Eff Date
Fiscal Pd.
Curr Code DL
Exch Rate 1.0000000

**Voucher Amounts**

| | |
|---|---|
| Invoice | 39515.24 |
| Discount | |
| Freight | |
| Distributed | 39515.24 |

| Seq | Type | Account Number | Amount | Description |
|---|---|---|---|---|
| 1 | MISC | 0005411338501030800 | 39515.24 | ROYALTY EXPENSE |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |

Exit
<<  >>
Detail

Start    SPC tls 2005/08/16 - ...    Teri Smith - Inbox - Lotu...    Variances    10:00 AM

SPC tls 2005/08/16 - Innatrack Accounts Payable - AP

Application  File Maint  Process  Inquiry  Reports  Utilities  Special Apps  Help

TAP001: Vendor Lookup & Maintenance
TAP001B: Vouchers For Selected Vendor by Invoice Date

Vendor #  0141534  DADS

| Inv Date | Voucher | Due Date | Stat | Invoice | Invoice Amt | Check No | Date | Total Amt Paid | Rcpt Inv? |
|----------|---------|----------|------|---------|-------------|----------|------|----------------|-----------|
| | | | | | | — Last Payment — | | | |
| 102901 | 97423 | 10/29/01 | P | ROYALTY | 39515.21 | 206021 | 10/29/01 | 39515.24 | N |

Exit
<<  >>
Lookup
Key

Voucher Inqiry
Check Inqiry
Print Rcpt Invoice

Start  |  SPC tls 2005/08/16 - ...  |  Teri Smith - Inbox - Lotu...  |  Variances

10:00 AM

# EXHIBIT "J"



PET FOODS

April 29, 2002

Mr. Sultan Thiara
Shato Holdings, Ltd.
Suite 200
4088 Cambie Street
Vancouver, B.C. Canada V5Z 2X8

Dear Mr. Thiara:

Enclosed you will find Dad's share of the 1st quarter 2002 royalty payment, the allocation of the royalty between Dad's and Sergeant's (formerly Pet Life) and the back up documentation for deductions against the royalty.

I contacted Sergeant Pet Care last week to request their payment be sent to me so that I could send the total payment with the related documentation. I also contacted them today and still have not received the payment.

We want to make our payment in a timely manner and I will give you the contact information for the responsible person at Sergeant's.

The contact person is:
Bob Scharf
14748 West Center Road, Ste 303
Omaha, NE 68144

I can be contacted at (814) 724-7710 extension 4545 if you have questions.

Sincerely,

Edward C. Shields, CPA
Controller

Cc:    Rick Moyer

18746 Mill Street, P.O. Box 451 • Meadville, PA 16335
Phone (814) 724-7710 • Fax (814) 332-5001
www.dadsproducts.com