# EXHIBIT "K"

## NOTIFICATION AND CANCELLATION AGREEMENT

This Agreement is entered into this 2nd day, of May, 2002 between Pet Life Foods, Inc., an Illinois corporation, ("Pet Life") and Sergeant's Pet Care Products, Inc., a Nevada Corporation ("Sergeant's").

### Background

Pet Life and Sergeant's have entered into a number of agreements including, but not limited to, the Trademark License and Transfer Agreement (the "Trademark Agreement"), numerous purchase orders and cost sharing agreements as to slotting arrangements. Pet Life has requested that Sergeant's pay all current invoices without deduction for defective products and both parties desire to terminate their existing contractual relationships.

NOW THEREFORE, in consideration of the premises and agreements set forth herein, the parties agree as follows:

1.      Sergeant's shall wire transfer to LaSalle Business Credit, Inc. for credit to Pet Life the amount of $363,707.33 which represents the current total of all invoices for products produced by Pet Life and shipped to Sergeant's for the account of Sergeant's, without deduction.  Sergeant's waives the defenses and deductions it has with respect to the foregoing invoices in exchange for the consideration set forth in Paragraph 5.  In addition Sergeant's shall pay the fair market value of all Sergeant's inventory owned by Pet Life not purchased by World Pet.

2.      Sergeant's cancels all purchase orders for product not shipped as of the date hereof and Pet Life acknowledges such orders have been cancelled.

3.      Pet Life acknowledges that it is obligated to Sergeant's in a total amount of $447,446.38  The components of the obligations due from Pet Life to Sergeant's are set forth on Exhibit A attached hereto.

4.      The license granted to Pet Life under the Trademark License and Transfer Agreement dated September 1, 2001 is revoked in its entirety and Pet Life shall have no further right to use any of the trademarks identified on Exhibit B attached hereto.

5.      In consideration of the payment made pursuant to Paragraph 1 and as an offset to the amount owed by Pet Life to Sergeant's, as set forth in Paragraph 3 hereof and on Exhibit A attached hereto, Pet Life acknowledges that Sergeant's is not obligated to make any further payment to Gaines Pet Foods Corp. pursuant to the Supplier and Royalty Agreement dated November 23, 1999 nor any amounts due to Whitecap, Inc., Gerald Schulman and David Kofsky pursuant to a Sales and Marketing Agreement.  The obligation of Sergeant's to make such payment under the Trademark Agreement is offset against the current amounts due to Sergeant's.



S 000092

6.    The No-Offset Letter dated September 1, 2001 shall be deemed of no force or effect and all parties hereto agree to the terms of the offset contained herein.

7.    The obligations due to Sergeant's, as described herein, are current and of the same nature as the obligations of Sergeant's to Pet Life and thus, the offset is of current mutual obligations.

8.    All notices, demands or other communications of any type (herein collectively referred to as "Notices") whether required by this Agreement or in any way related to the transaction contracted for herein shall be in writing and delivered to the person to whom the Notice is directed, either (i) in person, (ii) by United States Mail, postage prepaid, registered or certified mail with return receipt requested, (iii) delivered by a commercial delivery service, or (iv) delivered by a commercial delivery service, or (v) sent by telex, telecopy or facsimile transmission (provided it is confirmed by commercial delivery service or by mail in the manner provided herein). Notices delivered by mail shall be deemed given and received upon deposit in a post office or other depository under the care or custody of the United States Postal Service, addressed properly, with proper postage affixed. All notices shall be addressed as follows:

If to Pet Life Foods, Inc.          Alan Brown
                                    1601 Elm Street, Suite 300
                                    Dallas, TX 75201

If to Sergeants:                    Mr. Bob Scharf
                                    President
                                    Sergeant's Pet Care Products
                                    14748 West Center Road, Suite 303
                                    Omaha, NE 68144-2029
                                    facsimile: 402-938-7099

Either party hereto may change the address for Notice specified above by giving the other party two (2) days' advance written notice of such change of address. Notices given otherwise than by mail shall be deemed given and received upon actual receipt thereof.

9.    EXCEPT WHERE FEDERAL LAW IS APPLICABLE OR PREEMPTS STATE LAWS, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS. THIS AGREEMENT IS PERFORMABLE IN DALLAS COUNTY, TEXAS, AND VENUE FOR ANY LEGAL ACTION ARISING OUT OF THIS AGREEMENT SHALL BE EXCLUSIVELY IN DALLAS COUNTY, TEXAS.

10.    This Agreement embodies the entire Agreement between the parties and supersedes all prior agreements and understandings, if any, relating to the transactions described herein, and may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.    THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY

NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.   THERE ARE NO UNWRITTEN ORAL

11.    Parties Bound.   Subject to the limitations on assignment contained herein, this Agreement shall be binding upon and inure to the benefit of Pet Life and Sergeant's, and their respective successors and assigns.

12.    Further Acts.   In addition to the acts recited in this Agreement to be performed by Pet Life and Sergeant's, Pet Life and Sergeant's agree to perform or cause to be performed, on or after Closing, any and all such further acts as may be reasonably necessary to consummate the transactions contemplated hereby.

13.    Severability.   In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

14.    Assignment.   This Agreement may not be assigned by either party without the consent of the other.

15.    Headings.   Headings used in this Agreement are used for reference purposes only and do not constitute substantive material to be considered in construing the terms of this Agreement.

IN WITNESS WHEREOF, all parties have executed this Agreement to be effective for all purposes as of the Effective Date.


Sergeant's Pet Care Products, Inc.


By: _____
       Robert Scharf
       President


Pet Life Foods, Inc.


By: _____
       Alan D. Brown
       Chairman of the Board

S 000094

# EXHIBIT A

## OBLIGATIONS FROM PET LIFE TO SERGEANT'S

S 000095

Sergeant's Pet Care Products
Miscellaneous A/R - Pet Life
0245-00113-7000
Fiscal Year 2002

| Description | Beginning Balance | Debit | Credit | Ending Balance |
|---|---|---|---|---|
| Crosswind Petfoods for Pet Life | 0.00 | 15,141.40 | | 15,141.40 |
| Accrue Pet Life IRI Receivable | 0.00 | 15,000.00 | | 15,000.00 |
| Accrue Pet Life Crosswind Receivable | 0.00 | 3,500.00 | | 3,500.00 |
| Accrue Pet Life Receivable for M Levin | 0.00 | 21,371.38 | | 21,371.38 |
| Accrue Pet Life Receivable for A Shaddy | 0.00 | 1,053.00 | | 1,053.00 |
| Accrue Pet Life Receivable for Overweight Fine | 0.00 | 304.60 | | 304.60 |
| Accrue Pet Life for Shipping Error | 0.00 | 710.40 | | 710.40 |
| **Period 3 - Dec 2001** | 0.00 | 57,080.78 | 0.00 | 57,080.78 |
| | | | | |
| Crosswind Petfoods | 15,141.40 | | (15,141.40) | 0.00 |
| Accrue Pet Life IRI Receivable | 15,000.00 | | (5,000.00) | 10,000.00 |
| Accrue Pet Life Crosswind Receivable | 3,500.00 | | (3,500.00) | 0.00 |
| Accrue Pet Life Receivable for M Levin | 21,371.38 | | (4,426.88) | 16,944.50 |
| Accrue Pet Life Receivable for A Shaddy | 1,053.00 | | | 1,053.00 |
| Accrue Pet Life Receivable for Overweight Fine | 304.60 | | | 304.60 |
| Accrue Pet Life for Shipping Error | 710.40 | | | 710.40 |
| **Period 4 - Jan 2002** | 57,080.78 | 0.00 | (28,068.28) | 29,012.50 |
| | | | | |
| Accrue Pet Life IRI Receivable | 10,000.00 | | (5,000.00) | 5,000.00 |
| Accrue Pet Life Receivable for M Levin | 16,944.50 | | | 16,944.50 |
| Accrue Pet Life Receivable for A Shaddy | 1,053.00 | | | 1,053.00 |
| Accrue Pet Life Receivable for Overweight Fine | 304.60 | | | 304.60 |
| Accrue Pet Life for Shipping Error | 710.40 | | | 710.40 |
| **Period 5 - Feb 2002** | 29,012.50 | 0.00 | (5,000.00) | 24,012.50 |
| | | | | |
| Accrue Pet Life IRI Receivable | 5,000.00 | | (5,000.00) | 0.00 |
| Accrue Pet Life Receivable for M Levin | 16,944.50 | | | 16,944.50 |
| Accrue Pet Life Receivable for A Shaddy | 1,053.00 | | | 1,053.00 |
| Accrue Pet Life Receivable for Overweight Fine | 304.60 | | | 304.60 |
| Accrue Pet Life for Shipping Error | 710.40 | | | 710.40 |
| Accrue Pet Life Receivable on Winn Dixie | 0.00 | 284,292.03 | | 284,292.03 |
| Accrue Pet Life Royalty Nov 01 - Feb 02 | 0.00 | 27,433.40 | | 27,433.40 |
| **Period 6 - Mar 2002** | 24,012.50 | 311,725.43 | (5,000.00) | 330,737.93 |
| | | | | |
| **Subtotal Receivables from Pet Life in Misc A/R** | | 368,806.21 | (38,068.28) | 440,843.71 |

**Other Receivables & Deductions**

| | | | | |
|---|---|---|---|---|
| Spartan Stores Paid Pet Life for our Invoices | | | (2,046.22) | |
| Pricing Deduction on Pet Life Invoice 53207 of 4/10/02 | | | (3,399.20) | |
| Short Shipped on Pet Life Invoice 52782 of 3/11/02 | | | (1,800.00) | |
| Payment from Albertsons went to Pet Life for our Invoices | | 4,198.37 | | |
| Payment from Nash Finch went to Pet Life for our Invoices | | 1,690.00 | | |
| Smathers Travel to Chicago - LaSalle Business Corp | | 1,666.00 | | |
| Brown Travel to Chicago - LaSalle Business Corp | | 1,683.50 | | S 000096 |
| David Sparks Travel | | 3,409.34 | | |
| David Sparks to Backer Show 4/10-4/15 | | 1,200.88 | | |
| **Total Receivables from Pet Life in Misc Recv** | 440,843.71 | 13,848.09 | (7,245.42) | 447,446.38 |

**EXHIBIT B**
**TRADEMARKS**

| Mark | Application No. | Filing Date | Registration No. | Registration Date |
|---|---|---|---|---|
| PEOPLE CRACKERS | | | 1,593,298 | 04/24/90 |
| | | | 843,886 | Mexico |
| LOLLI-PUPS | | | 569,205 | 01/13/53 |
| DOGGIE DONUTS | | | 1,273,795 | 04/10/84 |
| SAY CHEESE | | | 848,256 | Mexico |
| SIRLOINS | 76/015,808 | 04/03/2000 | | |
| MUNCHEEZ BEEF AND CHEESE TREAT | | | 2,084,349 | 07/29/97 |
| SCHNITZEL SNACKS | | | 1,691,000 | 06/02/92 |
| STEAKHOUSE STRIPS | 76/193,156 | 01/16/01 | | |
| NUTRI-DOG BARS | 76/057,760 | 05/26/2000 | | |
| SEASON'S TREATINGS | 76/073,539 | 06/19/2000 | | |
| DOG NOG | 76/071,358 | 06/16/2000 | | |
| BEER BONES | 76/073,519 | 06/19/2000 | | |
| NUTRI-CAT | 76/146,796 | 10/16/2000 | | |
| TREAT-TABS | 76/146,794 | 10/16/2000 | | |
| DENTA FRESH | 76/084,356 | 07/07/2000 | | |
| DENTAPLUS | 76/234,574 | 04/02/01 | | |
| ON POINT | 76/100,352 | 05/08/2000 | | |
| CATNIPTIONS | 76/146,795 | 10/16/2000 | | |
| TROPICAL TREATS | 76/193,155 | 01/16/01 | | |
| IT'S A DOG'S LIFE | 76/001,573 | 03/16/2000 | | |
| LICKS & KISSES | 76/015,809 | 04/03/2000 | | |
| PURRSCRIPTIONS | 76/146,793 | 10/16/2000 | | |
| PURRSUASIONS | 76/146,792 | 10/16/2000 | | |
| PURRS | 76/146,791 | 10/16/2000 | | |
| PURRSONALS | 76/146,790 | 10/16/2000 | | |
| CHEESEWICHES | 76/175,987 | 12/05/2000 | | |
| TREATWICHES | 76/175,986 | 12/05/2000 | | |
| CAT LIFE | | | 1,594,475 | 05/01/90 |
| BURGLAR CONFIGURATION | | | 1,657,561 | 09/17/91 |
| DOG CATCHER CONFIGURATION | | | 1,651,611 | 07/23/91 |
| MAILMAN CONFIGURATION | | | 1,667,782 | 10/10/91 |
| MILK MAN CONFIGURATION | | | 1,651,612 | 07/23/91 |
| POLICEMAN CONFIGURATION | | | 1,649,626 | 07/02/91 |
| TREATERS | | | 1,461,227 | 10/13/87 |
| DOG LIFE AND DESIGN | | | 577,878 | 07/28/53 |
| DOG LIFE TASTY VITTLES AND DESIGN | | | 748,854 | 04/30/63 |

| Mark | Application No. | Filing Date | Registration No. | Registration Date |
|---|---|---|---|---|
| DOGGIE DOGS | | | 1,438,257 | 04/28/87 |
| DOGGIE FRANKS | | | 1,438,258 | 04/28/87 |
| HI-LIFE AND DESIGN | | | 389,548 | 08/12/41 |
| LOLLI-PUPS CANADA | | | 209,689 | 09/26/75 |
| LOLLI-PUPS AND DESIGN | | | 569,205 | 01/13/57 |
| MY DOGGIES BAG | | | 1,460,847 | 10/13/87 |
| PEOPLE CRACKERS (MEXICO) | | | 552,254 | Not Available |
| TRAIL CALL | | | 889,124 | 04/07/70 |
| DOG HEAD LOGO | | | 1,882,414 | 03/07/95 |
| CAT HEAD LOGO | | | 1,859,904 | |
| HI-LIFE | | | 1,878,815 | 02/14/95 |
| FANTASY | | | 1,508,487 | 10/25/94 |
| LOVE MY CAT | | | 1,422,199 | 12/23/86 |
| ME & MY CAT | | | 1,461,218 | 10/13/87 |
| ME & MY DOG | | | 1,393,471 | 05/13/86 |
| PICK-OF-THE-LITTER | | | 1,476,130 | 02/09/88 |
| TRAINING WHEELS | | | 1,839,060 | 06/07/94 |

S 000098

# EXHIBIT "L"

# FORECLOSURE AGREEMENT

This Foreclosure Agreement (the "Agreement"), dated as of May 3, 2002, is entered into by and among **World Pet, LLC**, an Alabama limited liability company (the "Buyer"), **LaSalle Business Credit, Inc.**, a Delaware corporation (the "Lender") and **Pet Life Foods, Inc.**, an Illinois corporation (the "Borrower").

## RECITALS

A.    Pursuant to that certain Loan and Security Agreement dated as of June 21, 1999 between the Borrower and the Lender (as amended and modified from time to time, the "Loan Agreement"), and certain other documents, instruments and agreements executed pursuant thereto or in connection therewith (collectively, the "Related Agreements" and together with the Loan Agreement, the "Lender Loan Documents"), the Lender has made loans to, and made other financial accommodations to or for the benefit or account of, the Borrower (all such loans and other financial accommodations being herein referred to collectively as the "Loans"). The Loans and all other Liabilities (as defined in the Loan Agreement) of the Borrower to the Lender, howsoever created, arising or evidenced (collectively, the "Obligations"), are secured by substantially all of the Borrower's assets.

B.    As a result of continuing defaults in respect of the Obligations and other liabilities under the Loan Agreement, the Lender has determined that it is entitled under Sections 9-610 et seq. of the applicable Uniform Commercial Code (the "UCC"), other applicable law and Lender Loan Documents to sell and transfer to any person or entity for value in a private sale all of the Borrower's right, title and interest in and to any or all of the personal property subject to the Lender's security interest, and the Borrower has consented to such actions pursuant hereto and pursuant to a Reaffirmation, Release, Consent and Acknowledgment by and between the Lender and the Borrower dated even date herewith (the "Reaffirmation Agreement").

C.    Concurrently herewith, the Borrower and the Buyer have entered into a Co-Pack Agreement dated as of the date hereof (the "Co-Pack Agreement"), and the Borrower, the Lender and the Buyer (or its affiliate) will have entered into an Access, Indemnity and Non-Disturbance Agreement dated as of the date hereof (the "Non-Disturbance Agreement") relating to that certain real property commonly known as M40, Hamilton, Michigan 49419 and 144th Avenue, Holland, Michigan 49533 (collectively, the "Real Property") pursuant to which, and subject to the terms and provisions of which, the Buyer (or its affiliate) will have access to the Real Property.

D.    The Lender and the Borrower desire to sell and transfer to the Buyer, and the Buyer desires to acquire from the Lender and the Borrower for value in a private foreclosure sale pursuant to the UCC and on the terms and conditions hereinafter set forth, all of the Borrower's right, title and interest in the Subject Assets (as defined below), which have been surrendered by the Borrower to the Lender solely for the purpose of effecting such a private sale.

## AGREEMENT

**NOW THEREFORE**, in consideration of the mutual promises and agreements set forth herein, the parties hereto agree as follows:

CH_DOCS\394929.15[W2000]                                    S 000033

Δ π EXHIBIT ___10___
Deponent _Scharf_
Date _8/19/05_ Rptr. _TTT_

1.    <u>Incorporation of Recitals</u>.  The Recitals set forth above are incorporated into and form an integral part of the agreement between the parties contained in this Agreement.

2.    <u>Purchase and Sale</u>.  Subject to the terms and conditions set forth in this Agreement, in consideration of the Purchase Price (as hereinafter defined), at the Closing referred to in <u>Section 5</u> hereof, pursuant to Sections 9-610 et seq. of the UCC, other applicable law and the Lender Loan Documents, the Lender and the Borrower shall sell, assign and transfer to the Buyer, and the Buyer shall purchase, acquire and take assignment of, all of the Borrower's right, title and interest in and to all of the assets more particularly described on <u>Schedule 2</u> attached hereto (the "<u>Subject Assets</u>"), whereupon the Lender's lien and security interest, and all liens and security interests junior and/or subordinated thereto, will be discharged.

2.1    <u>Subject Receivables.</u>

(a)    On the Closing Date, the Lender and the Borrower shall sell, assign and transfer to the Buyer all Subject Receivables (as defined in <u>Schedule 2</u> hereto) as consideration for the amounts collected in accordance with this paragraph.

(b)    From the Closing Date through and including August 14, 2002 (the "<u>Transfer Period</u>"), the Lender shall continue to collect and be entitled to all payments with respect to the Subject Receivables received through the Lock Box (as defined in the Loan Agreement) or otherwise, <u>minus</u> five percent (5%) thereof (the "<u>Collection Fee</u>"), which the Lender will turn over to the Buyer on a monthly basis, on the last business day of each month during the Transfer Period following the Closing Date.  The Buyer agrees that it shall not, at any time prior to the end of the Transfer Period, (i) notify (orally or in writing) any account debtors in respect of the Subject Receivables (each, a "<u>Subject Receivable Debtor</u>") that it has any interest in the Subject Receivables or (ii) direct any Subject Receivable Debtor to make payments in respect of any Subject Receivables in any particular manner other than through payment into the Lock Box (or in such other manner as directed by the Lender).  On a monthly basis during the Transfer Period, the Lender shall, simultaneously with the delivery of the Collection Fee, deliver to the Buyer reasonable supporting documentation evidencing all Subject Receivables received through the Lock Box or otherwise for such month.

(c)    It is acknowledged and agreed that the Buyer will have opened and will have been conducting business through new bank accounts and the Lender will close all of the bank accounts with respect to the Borrower at the end of the Transfer Period.

(d)    At all times during the Transfer Period and thereafter until September 14, 2002, the Buyer will use its commercially reasonable efforts (which efforts shall include contacting each Subject Receivable Debtor but shall not be deemed to require efforts to settle or otherwise compromise any Subject Receivables) to collect the Subject Receivables (other than any Subject Receivables owed by Sergeant's Pet Care Products, Inc ("Sergeant's")), and immediately upon any such collection, the Buyer (to the extent it has possession or control over same) shall turn over such collections to the

Lender, minus the Collection Fee with respect thereto, which the Buyer will be entitled to retain; provided that the Collection Fee shall not be assessed against any Subject Receivables owed by Sergeant's. The Buyer and the Lender agree that all collections of the Subject Receivables shall be applied to the oldest Subject Receivables of a Subject Receivable Debtor, unless otherwise specifically designated in writing by that Subject Receivable Debtor, or unless the remittance is in the exact amount of a particular invoice, in which case such remittance will be applied to such invoice, or unless a Subject Debtor has otherwise indicated in writing an invoice to which a remittance is to be apply. The Buyer shall not settle or otherwise compromise any Subject Receivables without the prior written consent by the Lender. On September 14, 2002, the Buyer shall furnish the Lender with an accounting (in form and substance reasonably acceptable to the Lender) of all collections of Subject Receivables and all other payments received from any Subject Receivable Debtor on or before September 14, 2002. In the event that any Subject Receivables have not been collected by September 14, 2002, the Buyer shall, and hereby agrees to, sell, transfer and assign, for no consideration and without any payment of the Collection Fee, all of its right, title and interest in and to such uncollected Subject Receivables and all books and records relating thereto back to the Lender, free and clear of all liens and claims, and without any right of setoff, recoupment or deduction (except as expressly permitted in Section 9(a) hereof).

(e)     The Lender may at any time prior to September 14, 2002 designate in writing to the Buyer the Subject Receivables owed by Sergeant's and any other Subject Receivables in dispute that it wishes to purchase back from the Buyer, and upon such designation, which shall set forth the date of repurchase, the Buyer shall, and hereby agrees to, sell, transfer and assign, for no consideration and without any payment of the Collection Fee for any proceeds collected thereupon after the repurchase date, all of its right, title and interest in and to such designated Subject Receivables and all books and records relating thereto back to the Lender, free and clear of all liens and claims, and without any right of setoff, recoupment or deduction (except as expressly permitted in Section 9(a) hereof). Upon such reassignment of any such Subject Receivable, Buyer's obligation to use commercially reasonable efforts to collect such Subject Receivable shall cease.

(f)     The Lender agrees to turn over to the Buyer any proceeds received by Lender in respect of any receivables (not constituting Subject Receivables) on account of the goods sold or services provided by the Buyer after the Closing Date reasonably promptly after the Buyer has furnished the Lender reasonable supporting documentation therefor.

(g)     As security for the payment of the Purchase Price for the Subject Receivables and performance of the obligations with respect thereto, the Buyer hereby grants to the Lender a continuing security interest in the Subject Receivables, and all books and records related thereto and all products and proceeds thereof (collectively, the "Foreclosure Receivables Collateral"). If the Buyer defaults with respect to any provision of the Agreement relating to the payment of the Purchase Price for the Subject Receivables or relating to the Buyer's obligations with respect thereto, the Lender may exercise from time to time any rights and remedies available to it under the Uniform

-3-

Commercial Code and any other applicable law in addition to, and not in lieu of, any rights and remedies expressly granted in this Agreement or in any other Transaction Document and all of the Lender's rights and remedies shall be cumulative and non-exclusive to the extent permitted by law. In particular, but not by way of limitation of the foregoing, the Lender may, without notice, demand or legal process of any kind, take possession of any or all of the Foreclosure Receivables Collateral. Upon the exercise of any such rights by Lender, the Buyer's obligation to use commercially reasonable efforts to collect the Subject Receivables shall cease. Any notification of intended disposition of any of the Foreclosure Receivables Collateral required by law will be deemed reasonably and properly given if given at least five (5) calendar days before such disposition. Any proceeds of any disposition by the Lender of any of the Foreclosure Receivables Collateral may be applied by the Lender to the payment of expenses in connection with the Foreclosure Receivables Collateral, including, without limitation, legal expenses and reasonable attorneys' fees, and any balance of such proceeds may be applied by the Lender toward the payment of such obligations and liabilities of the Buyer to the Lender, and in such order of application, as the Lender may from time to time elect.

2.2     <u>Excluded Assets</u>.  Notwithstanding the foregoing, the Lender is not selling, and the Buyer is not purchasing, any of those assets more particularly described on Schedule 2.2 hereto (such assets being referred to hereinafter as the "<u>Excluded Assets</u>"). Prior to the Transfer Date, the Buyer may elect to exclude any of the other Subject Assets from the sale and the list of Excluded Assets in <u>Schedule 2.2</u> shall be correspondingly amended, but such an exclusion shall not result in any reduction of the Purchase Price (as hereinafter defined).

2.3     <u>Compliance with Sections 9-610</u>.  It is the express intent of the parties hereto that the sale of the Subject Assets contemplated hereby be consummated pursuant to Sections 9-610 et. seq. of the UCC. To the extent not waived in writing to the satisfaction of the Lender, the Lender has sent notices with respect to the foreclosure sale contemplated hereby to (i) the Borrower, (ii) any secondary obligor (as defined in the UCC), (iii) any person from whom the Lender has received before the notification date (as defined in Section 9-611(a) of the UCC) an authenticated notification of a claim of an interest in the Subject Assets and (iv) any secured party or lienholder pursuant to Sections 9-611(c)(3)(B) of the UCC. Notwithstanding any term to the contrary herein, but subject to the Lender's obligation under <u>Section 9(a)</u> hereof, in the event the transactions contemplated hereby are, or are deemed for any reason to be, void or voidable, then the Lender's agreement to release any of its liens, or deem or treat any of the Obligations paid, shall be null and void, and neither the Lender nor the Buyer shall have any further liability to each other. Without limiting the foregoing, in the event the sale of the Subject Assets pursuant hereto is consummated after the commencement of a voluntary or involuntary bankruptcy case by or against Borrower, the sale shall be deemed void, without any further liability to any of the parties, and the parties shall promptly take all actions necessary to unwind the sale in such manner as to put the parties in the same position as they were immediately prior to the Closing (i.e., the portion of the Purchase Price paid pursuant to clauses (i), (ii) and (iii) of Schedule 3 shall be refunded to Buyer, without interest, Lender shall retain all proceeds of any Subject Receivables without deduction for any Collection Fee , Lender's liens on the Subject Assets shall remain in full force and effect, and the Obligations to which any portion of the proceeds of the Purchase Price was applied shall be reinstated).

2.4 <u>No Assumption of Obligations or Liabilities; Creditor Payments</u>. The Buyer shall not assume or be deemed to assume any liabilities or accrued liabilities of the Borrower except that the Buyer shall assume the liabilities specifically set forth on <u>Schedule 2.4</u> hereto (collectively, the "<u>Assumed Liabilities</u>". Without limiting the generality of the foregoing, and except for the Assumed Liabilities, the Buyer shall not assume or be responsible at any time for any liability, obligation, debt or commitment of the Lender or the Borrower, whether absolute or contingent, accrued or unaccrued, asserted or unasserted, or otherwise, including but not limited to any liabilities, obligations, debts or commitments of the Lender or the Borrower incident to, arising out of or incurred with respect to, this Agreement and the transactions contemplated hereby, and the Buyer shall not assume or otherwise be obligated to pay, perform, defend or discharge (a) any liability of the Lender or the Borrower for taxes, whether measured by income or otherwise, (b) any liability of the Lender or the Borrower in connection with or relating to any employee related obligations including payroll, accrued vacation or other liabilities under any employee benefit plans or agreements, including without limitation any liabilities for union dues, health insurance premiums or payments, 401(k) contributions or otherwise relating to or accruing on or after the Closing Date or as a result of any termination by the Borrower, (c) any liability of the Lender or the Borrower under any federal, state or local law, rule, regulation, ordinance, program, permit, or other legal requirement relating to health, safety, hazardous materials, environmental matters or otherwise and applicable to the Borrower's business and/or the Real Property, (d) any warranty or product liability pertaining to products sold or manufactured by the Borrower prior to the Closing Date, (e) any liability or obligation of the Borrower under any of its contracts, or (f) any trade accounts payable or other accrued expenses of the Borrower. The Lender shall not assume, nor shall the Lender be deemed to have assumed, any liability or obligation of the Borrower whatsoever. If the Buyer elects to make any payment to any creditor of the Borrower (a "<u>Creditor Payment</u>"), such payment shall not reduce the Purchase Price or constitute an assumption of any other liabilities by any of the parties.

2.5 <u>Sale As Is; Where Is</u>. Except as set forth in <u>Sections 8</u> and <u>9</u> hereof, the Lender specifically disclaims (and the Buyer expressly agrees that the Lender is not making or giving any covenant, undertaking, representation or warranty, express or implied, in connection with this Agreement, the Subject Assets, the Real Property, or any other matter relating hereto or thereto) as to the following matters:

(a) non-infringement of any of the copyrights, trademarks, trade names, patents or other intellectual property which may be owned or licensed by the Borrower;

(b) the existence on the Transfer Date of any specific items constituting the Subject Assets and the Real Property, or the quantity or quality thereof; or

(c) the condition, quality, suitability, value, merchantability or fitness for a particular purpose of any of the Subject Assets and the Real Property or of the Borrower or any aspect of the Borrower's financial condition, businesses, prospects, or operations.

CH_DOCS\394929.15[W2000]

024265-0008

THE BUYER ACKNOWLEDGES AND AGREES THAT EXCEPT AS, AND ONLY TO THE EXTENT SET FORTH IN <u>SECTIONS 8</u> AND <u>9</u> HEREOF: (A) THE SALE OF SUBJECT ASSETS TO THE BUYER IS: WITHOUT RECOURSE TO THE LENDER, ON AN "AS IS, WHERE IS" BASIS; WITHOUT ANY REPRESENTATIONS OR WARRANTIES AS TO ITEMS, EXISTENCE, OWNERSHIP, TITLE (OTHER THAN AS SET FORTH IN <u>SECTIONS 8</u> and <u>9</u> HEREOF), CONDITION, OR QUANTITY; (B) THE LENDER IS SELLING TO THE BUYER ALL ACCOUNTS RECEIVABLE WITHOUT RECOURSE TO THE LENDER WITH RESPECT TO THE COLLECTABILITY OF THE ACCOUNTS RECEIVABLE OR THE CREDITWORTHINESS OF ANY OBLIGOR WITH RESPECT TO SUCH ACCOUNTS RECEIVABLE OR ANY OTHER ASPECT OF THE ACCOUNTS RECEIVABLE; (C) THE LENDER MAKES NO REPRESENTATION AS TO THE VALUE, IF ANY, OF THE SUBJECT ASSETS BEING TRANSFERRED HEREBY AND THE REAL PROPERTY; (D) THE LENDER MAKES NO REPRESENTATION OR WARRANTY CONCERNING THE POSSIBLE INFRINGEMENT OF ANY COPYRIGHTS, TRADEMARKS, TRADE NAMES PATENTS OR OTHER INTELLECTUAL PROPERTY ARISING OUT OF THE USE BY THE BUYER OF ANY OF THE SUBJECT ASSETS OR THE REAL PROPERTY; (E) THE LENDER MAKES NO REPRESENTATIONS OR WARRANTIES THAT ALL OR A PORTION OF THE SUBJECT ASSETS OR THE REAL PROPERTY ARE MERCHANTABLE (IN THE SENSE OF AN IMPLIED WARRANTY OF MERCHANTABILITY UNDER THE UCC OR OTHERWISE) OR FIT FOR A PARTICULAR PURPOSE; AND (F) THE SOLE REPRESENTATIONS AND WARRANTIES OF THE LENDER REGARDING THE SUBJECT ASSETS AND THE REAL PROPERTY ARE THOSE SPECIFICALLY PROVIDED IN <u>SECTIONS 8</u> AND <u>9</u> OF THIS AGREEMENT, RESPECTIVELY.

2.6    <u>Restrictions on Assignability</u>.  The Buyer acknowledges that the Lender has not made, pursuant to this Agreement or otherwise, any representation, warranty or covenant regarding the assignability of any contracts, agreements, purchase orders, intellectual property or other intangible property.  The Lender shall not have any liability or obligation, nor does Lender hereby assume any liability or obligation, in the event that such contracts, agreements, purchase order, intellectual property or other intangible property are not or cannot be assigned or otherwise transferred to the Buyer.

3.    <u>Purchase Price</u>.  For purchase of the Subject Assets, at the Closing (as hereinafter defined), the Buyer shall (i) pay the Lender the amount set forth on <u>Schedule 3</u> hereto as the Purchase Price (the "<u>Purchase Price</u>") in the manner set forth on <u>Schedule 3</u> hereto and without any right of setoff, recoupment or deduction (whether based on any breach of this Agreement or otherwise, except as expressly permitted in <u>Section 9(a)</u> hereof), and (ii) assume the Assumed Liabilities as described in <u>Schedule 2.4</u> hereto. .

4.    <u>Liabilities and Liens Remain Outstanding; Lender Assumes No Liabilities; Creditors' Payments</u>.

4.1    Except to the extent of cash received from the Buyer and actually and finally applied by the Lender to such liabilities, the Obligations shall remain outstanding, and the Lender does not release any, but instead specifically reserves all, security interests, liens and other encumbrances and rights relating thereto, in all assets and collateral described in the

Lender Loan Documents and the other applicable loan documents which are not included in the Subject Assets and the assets which are not sold to the Buyer hereunder, including, without limitation, all of the Excluded Assets.

4.2    The Buyer agrees that, to date, the Lender has assumed no liability with respect to any of the Subject Assets, the Real Property, or the Excluded Assets, and the Lender under no circumstances (including, without limitation, with respect or pursuant to this Agreement) assumes or shall assume any liability with respect to any of such assets.

4.3    The Buyer hereby agrees that to the extent that the Buyer now or hereafter has or acquires any claims, whether by virtue of subrogation to mechanics lien rights, outright assignment or otherwise, as a result of the Buyer's making any Creditor Payment (i) the Buyer releases the Lender from any and all liability relating to such claim and Creditor Payment and (ii) upon the request of the Lender, the Buyer shall release (pursuant to such documents as are reasonably requested by the Lender) the Lender from any and all such rights and claims which the Buyer may obtain as a result of making such Creditor Payments.

5.    Closing.

5.1    Transfer Date.  The "Transfer Date" and the "Closing Date" shall each mean May 3, 2002, which is the date upon which the Borrower's right, title and interest in the Subject Assets is transferred by the Lender and the Borrower to the Buyer.

5.2    Time and Place.  The transfer and delivery of all documents and instruments necessary to consummate the transactions contemplated by this Agreement (the "Closing") shall be held at the offices of Latham & Watkins, Chicago, Illinois, on the Transfer Date.

5.3    Transactions at Closing.  At the Closing:

(a)    The Lender shall execute and deliver to the Buyer the General Assignment and Bill of Sale in substantially the form of Exhibit B hereto.

(b)    The Borrower shall execute and deliver to the Buyer the General Assignment and Bill of Sale in substantially the form of Exhibit C hereto.

(c)    The Borrower shall execute and deliver to the Buyer the Assignment of Registered Trademarks, in substantially the form of Exhibit D hereto (the "Assignment of Trademarks").

(d)    The Buyer shall deliver to the Lender that portion of the Purchase Price delineated and in accordance with clauses (i) and (ii) of Schedule 3 hereto.

(e)    The Lender's security interests and liens shall immediately attach to and be perfected with respect to the proceeds of the sale of Subject Assets.

(f)    Upon the Lender's receipt of any portion of the Purchase Price, the Lender shall apply it to the Obligations as the Lender shall determine in its sole discretion.

6.    <u>Taxes</u>. Any personal property taxes, sales taxes, and transfer taxes arising as a result of the transactions and sales contemplated by this Agreement shall be shared equally by the Buyer and the Lender.

7.    <u>Representations, Warranties, and Covenants of the Buyer</u>. The Buyer represents, warrants and covenants to the Lender as follows:

7.1    <u>Organization of the Buyer</u>. The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Alabama. The Buyer has the limited liability company power and authority (i) to purchase the Subject Assets under applicable law, (ii) to execute and deliver this Agreement and the other documents, instruments or agreements to be executed and delivered by it in connection herewith (the "Transaction Documents"), and (iii) to carry out all of the actions required of it pursuant to the terms of this Agreement and the other Transaction Documents.

7.2    <u>Approval; Binding Effect</u>. The Buyer has obtained all necessary authorizations and approvals required for the execution and delivery of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby. This Agreement has been duly executed and delivered by the Buyer and constitutes the legal, valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, except as such enforcement may be limited by general equitable principles or applicable bankruptcy, insolvency, moratorium or similar laws and judicial decisions from time to time in effect which affect creditors' rights generally. All approvals of the Buyer, including approval of its members and managers, if any required, to consummate the transactions provided for in this Agreement and the other Transaction Documents will have been obtained prior to the Closing. The Buyer has the absolute and unrestricted limited liability company right, power, authority and capacity to purchase the Borrower's right, title and interest in the Subject Assets and to enter into this Agreement, the other Transaction Documents. Neither the execution and delivery of this Agreement nor the other Transaction Documents by the Buyer nor the consummation of the transactions contemplated hereby and thereby will result in a breach of, or constitute a default (or with notice or lapse of time or both result in a breach of or constitute a default) under, or otherwise give any person or entity the right to terminate, any material license, contract or other agreement or instrument to which the Buyer or any affiliate thereof is a party. Neither the execution and delivery of this Agreement nor the other Transaction Documents nor the consummation of the transactions contemplated hereby and thereby will (A) violate or conflict with any provision of the articles of organization, operating agreement or any other organizational documents of the Buyer or any affiliate thereof, (B) violate or conflict with any provision of any law, rule, regulation, order, permit, certificate, writ, judgment, injunction, decree, determination, award or other decision of any court, government, governmental agency or instrumentality, domestic or foreign, or arbitration by which the Buyer or any affiliate thereof is bound or affected or (C) result in a breach or violation of any license, contract or other agreement or instrument to which the Buyer is party, which violation, conflict, breach of default as described in clauses (A), (B) or (C) of this <u>Section</u> would have a materially adverse effect on

-8-

S 000040                    024265-0008

the Buyer or any affiliate thereof. The execution of this Agreement and the other Transaction Documents to be executed and delivered by the Buyer in connection herewith, and the consummation of the transactions contemplated hereby and thereby, are within the authority of the individual who shall execute this Agreement on behalf of the Buyer.

   7.3 <u>Indemnification and Hold Harmless</u>. The Buyer hereby indemnifies and holds harmless the Lender from any and all claims, rights and causes of action arising out of the actions, omissions or use by the Buyer with regard to the Subject Assets accruing and first arising after the Closing Date or relating to any Assumed Liabilities.

   7.4 <u>Brokers</u>. The Buyer has not retained, utilized or been represented by any broker or finder in connection with the transactions contemplated by this Agreement.

   7.5 <u>Assumption of Liabilities</u>. The Buyer shall assume, satisfy, and pay the Assumed Liabilities of the Borrower.

   7.6 <u>Good Faith</u>. The Buyer is acting in good faith (as such term is defined in Section 9-102(a)(43) of the UCC) in connection with this Agreement and the other Transaction Documents.

   7.7 <u>Lender's Liens on the Subject Assets</u>. Except for any defect in the filed UCC-1 financing statements, the Buyer is not aware of any fact or circumstance that would lead the Buyer to conclude that the Lender fails to hold a perfected, first priority (to the extent that priority can be determined from a search of the public records) security interest in or lien upon the Subject Assets.

   7.8 <u>Access to Business Records</u>. The Buyer agrees to allow the Lender and the Borrower access to inspect and copy any books and records of the Borrower relating to the Subject Receivables, whether in tangible or electronic form, transferred to the Buyer upon reasonable request and reasonable notice during the business hours of 9:00 a.m. Central Time and 5:00 Central Time, Monday through Friday, excluding legal holidays.

   7.9 <u>Equipment Removal</u>. Without limitation or modification of the relevant provisions in the Non-Disturbance Agreement, the Buyer hereby agrees to remove all Subject Assets from the Real Property (including any furniture, machinery, safes, trade fixtures and other items of movable personal property of the Buyer of every kind and description from the Real Property) and agrees to leave the Real Property in broom-clean condition, ordinary wear and tear excluded, upon removal of the Subject Assets, and the Buyer shall repair any damage to the Real Property and any improvements thereon to the extent caused by the Buyer's removal of the Subject Assets and as requested by the Lender upon the Lender's inspection of the Real Property, such removal and repair to be performed prior to the earlier of (i) the ten (10) days following termination of the Non-Disturbance Agreement or (ii) ten (10) days following termination of Buyer's right to access to the Real Property.

   8. <u>Representations, Warranties, and Covenants of the Lender</u>. The Lender represents, warrants and covenants to the Buyer that:

CH_DOCS\394929.15[W2000]         S 000041        024265-0008

8.1    Security Interest. The Lender has a valid and enforceable security interest in and lien on the Subject Assets.

8.2    Perfection. The Lender has a perfected, first priority security interest in and lien upon the Subject Assets.

8.3    Warranty of Title. The Lender represents and warrants to the Buyer that it is conveying good and marketable title to the Subject Assets on the Transfer Date.

8.4    Binding Effect. This Agreement has been duly executed and delivered by the Lender and constitutes the legal, valid and binding obligation of the Lender, enforceable against the Lender in accordance with its terms.

8.5    Section 9-610. The Lender has the authority and right to sell the Subject Assets to the Buyer pursuant to Section 9-610 of the UCC and other applicable law in accordance with the provisions of this Agreement. The Lender is and has been in compliance in all material respects with any and all requirements of the UCC to the extent applicable to the private sale contemplated by this Agreement. The transfer of the Subject Assets is being made in compliance with the UCC to the extent applicable to the private sale contemplated by this Agreement.

8.6    Valid Obligation. All of the Obligations of the Borrower to the Lender are valid, binding, enforceable and due and owing, and the Borrower is in default of such Obligations in a manner that vests in the Lender the authority to sell the Subject Assets to the Buyer pursuant to this Agreement.

8.7    Brokers. The Lender has not retained, utilized or been represented by any broker or finder in connection with the transactions contemplated by this Agreement.

8.8    Good Faith. The Lender is acting in good faith (as such term is defined in Section 9-102(a)(43) of the UCC) in connection with this Agreement and the transactions contemplated hereby.

8.9    Commercially Reasonable. Every material aspect of the disposition of the Subject Assets by the Lender pursuant hereto is "commercially reasonable" as defined in the UCC.

9.    Limitation of the Lender's Liability. The Buyer agrees that the Lender shall have no liability whatsoever, and hereby releases Lender from any liability, in the event that any of the Lender's representations, covenants, warranties or other agreements set forth herein are breached, except:

(a)    (i) in the case of any breach of any representation and warranty set forth in any or all of Sections 2.3, 8.1, 8.2, 8.3, 8.4 8.5, 8.6, 8.8 and 8.9 hereof arising from the Lender's failure to convey good and marketable title to any Subject Equipment, Subject Inventory or Specific Trademarks on the Closing Date (other than Subject Receivables, Subject Records or Subject Intellectual Property other than Specific Trademarks) and (ii) in the case of the Lender otherwise failing to convey good and

-10-

S 000042

marketable title to any Subject Equipment or Subject Inventory as a result of Borrower's not having any right, title or interest therein (each such claim described in clause(i) or (ii) above, a "Specified Breach Claim"), including, without limitation, by reason of any defect in the filed UCC-1 financing statements, the Lender's liability to the Buyer shall be limited to the following amounts:

(A)     In the case of any Subject Assets constituting Subject Equipment, an amount equal to the product of the applicable purchase price times a fraction, the numerator of which is the appraised value of the applicable Subject Assets as set forth in the Loeb appraisal and the denominator of which is the aggregate appraised value of all Subject Equipment as set forth in the Loeb appraisal (excluding the Excluded Equipment);

(B)     In the case of any Subject Assets constituting Subject Inventory, an amount equal to the product of (i) the Borrower's cost of such Subject Inventory (determined from the Borrower's perpetual inventory accounting system) times (ii) 1.262 (in the case of finished goods and work-in-process) or 1.0 (in the case of all Subject Inventory other than finished goods or work-in-process);

(C)     In the case of any Subject Asset constituting a Specific Trademarks, $12,500 (or $25,000 for both Specific Trademarks).

provided the Lender shall not be liable for any Specified Breach Claim involving any Subject Equipment having an appraised value (based on the Loeb appraisal) less than $5,000 individually, or $10,000, in the aggregate.

(b)     any breach of the representations and warranties set forth in Section 8.7 hereof or any breach of the covenants set forth in Section 14.8 hereof.

(c)     without duplication of any liability of Lender pursuant to Section 9(a) above, in the event any third party asserts any claim against Buyer challenging the Buyer's title to any Subject Assets (other than the Subject Receivables) or asserting against any Subject Assets (other than the Subject Receivables) any lien, security interest or other encumbrance that existed prior to the Closing Date, then the Lender, on behalf of itself and the Buyer, (i) shall defend against such claim, and shall bear all attorneys' fees and expenses and other defense costs, and (ii) to the extent any final and non-appealable judgment is entered against Buyer or the Subject Assets in respect of such claim, Lender shall be obligated to pay or reimburse Buyer for the amount of such judgment; provided, however, that the Buyer shall be entitled, at the Buyer's expense, to participate in any legal proceeding involving such claim.  The Lender shall have the exclusive right to compromise or settle any such claim without the consent of the Buyer provided that the compromise or settlement contains a release in favor of Buyer with respect to the asserted claim and a waiver of any lien, security interest or other encumbrance asserted against the applicable Subject Assets and does not materially affect the Subject Assets.

024265-0008

10.    <u>Agreement Concerning Possession of Subject Assets</u>.    The Buyer acknowledges that the Lender has not been in possession or control of the Subject Assets or the Real Property and that it is the Buyer's responsibility to make arrangements for the occupancy of the Real Property and any other premises formerly occupied by the Borrower and for obtaining possession of the Subject Assets and the Real Property after the purchase hereunder.  Except as provided in <u>Sections 8 and 9</u> hereof the Lender shall have no liability to the Buyer with respect to any of the foregoing matters.  The Lender and the Borrower hereby surrenders the Subject Assets pursuant to the Non-Disturbance Agreement and grants the Buyer access to, and possession and control of, the Subject Assets. The Borrower and the Lender have granted the Buyer access to the Real Property for the purposes set forth in, and subject to terms of, the Non-Disturbance Agreement.

11.    <u>Agreement Concerning Proceeds of Excluded Assets and Subject Assets</u>. The Buyer agrees that it will promptly turn over to the Lender, in the form received and for application to the Obligations in such manner as the Lender elects in its sole discretion (without any deduction against the Purchase Price), all cash, cash equivalents, checks and other items of payment which are received by it or otherwise come into its possession and which are part of the Excluded Assets (all such cash, cash equivalents, checks and other items of payment, collectively, the "<u>Lender Cash</u>").  Prior to delivery to the Lender of any Lender Cash, the Buyer will hold all such Lender Cash in trust for the Lender.  The Lender and the Borrower agree that they will promptly turn over to the Buyer, in the form received all cash, cash equivalents, checks or other items of payment which are received by them or otherwise come into their possession after the Closing with respect to the Subject Assets (all such cash, cash equivalents, checks and other items of payment collectively the "<u>Buyer Cash</u>"), other than the Purchase Price.  Prior to the delivery to the Buyer of any Buyer Cash, the Lender or the Borrower, as the case may be, will hold all such Buyer Cash in trust for the Buyer.

12.    <u>Buyer's Conditions to Closing; Deliveries to the Buyer at Closing</u>.  The obligation of the Buyer to consummate the Closing shall be subject to the satisfaction, at or prior to Closing, of the following conditions (to the extent non-compliance is not waived in writing by the Buyer in its sole discretion):

12.1    <u>Notice of Sale</u>.  Notice of the sale of the Subject Assets shall have been given (in the form substantially similar to <u>Exhibit A</u>) to all other persons and entities entitled to notice under the UCC or applicable law and who have not effectively waived in writing after default their right to receive such notice prior to the Transfer Date

12.2    <u>Bills of Sale</u>.  The Buyer shall have received the duly executed General Assignments and Bills of Sale in the form of <u>Exhibit B</u> and <u>Exhibit C</u> hereto, dated as of the Closing Date.

12.3    <u>Assignment of Trademarks</u>.  The Buyer shall have received the duly executed Assignment of Trademarks in the form of <u>Exhibit D</u> from the Borrower.

12.4    <u>Co-Pack Agreement</u>.  The Buyer shall have received the duly executed Co-Pack Agreement from the Borrower.

-12-

12.5    <u>Non-Disturbance Agreement</u>.    The Buyer (or its affiliate) shall have received the duly executed Non-Disturbance Agreement from the Lender.

12.6    <u>Supply Agreement</u>.    The Buyer and Sergeant's Pet Care Products Inc. and shall have entered into a supply agreement in form and substance satisfactory to the Buyer.

12.7    <u>Representations and Warranties True</u>.    All representations, certifications and warranties of the Lender and the Borrower hereunder shall be true as of the Closing Date in every material respect.

12.8    <u>No Default by the Lender or the Borrower</u>.    The Lender and the Borrower shall each have performed and complied with, in all material respects, all agreements, covenants and conditions required by this Agreement, or by any other Transaction Documents, to be performed or complied with by the Lender and the Borrower, prior to or at the Closing.

12.9    <u>No Statutes, Rules or Orders</u>.    There will be no statute, rule, regulation or order of any court or administrative agency in effect which prohibits the Lender, the Borrower or the Buyer from consummating the transactions contemplated hereby.

12.10    <u>No Violation of Law</u>.    No violations of law shall have occurred which could, in the Buyer's reasonable judgment, have an adverse impact on the Buyer's ability to consummate the transactions contemplated hereby.

12.11    <u>No Violation of Agreements</u>.    The making, execution, delivery and performance of this Agreement by the Lender, the Borrower and the Buyer will not violate or conflict with any restriction binding upon or relating to the Buyer or its business, operations, properties or assets.

12.12    <u>Other Documents</u>.    The Buyer shall have received such other documents, instruments or certificates as the Buyer may reasonably request with respect to any matter relevant to this Agreement, the transfer of the Subject Assets or the transactions contemplated by this Agreement and the other Transaction Documents.

12.13    <u>Closing</u>.    The Closing and the other transactions contemplated by this Agreement shall have occurred on or before May 3, 2002, or such later date as the Buyer and the Lender may mutually agree upon in writing.

12.14    <u>No Litigation</u>.    No action, inquiry or investigation shall have been instituted or pending which (unless dismissed with prejudice) is reasonably likely to make illegal, or to otherwise restrain or prohibit, the consummation of the transactions contemplated by this Agreement or other Transaction Documents.    There will be no stay, bankruptcy or insolvency petition, appointment of a receiver by or on behalf of the Borrower or any other action, suit, proceeding or order against the Borrower which would prohibit the consummation of the transaction contemplated by this Agreement or other Transaction Documents or which would impair, restrain or prohibit the Buyer's right to obtain good and marketable title to the Subject Assets.

Notwithstanding anything to the contrary, the Buyer specifically agrees that its obligation to consummate the transactions embodies in this Agreement or the other Transaction Documents is not conditioned or contingent upon:  (a) the satisfactory results of any further due diligence by the Buyer; or (b) the obtaining of any financing.

13.    <u>Lender's Conditions to Closing; Delivery to the Lender at Closing</u>.  The obligation of the Lender to consummate the Closing shall be subject to the satisfaction, at or prior to Closing, of the following conditions (to the extent noncompliance is not waived in writing by the Lender in its sole discretion):

13.1    <u>Consideration Paid</u>.  The Lender shall have received the Purchase Price in accordance with this Agreement.

13.2    <u>No Statutes, Rules or Orders</u>.  There shall be no statute, rule, regulation or order of any court or administrative agency in effect which prohibits the Lender, the Borrower or the Buyer from consummating the transactions contemplated by this Agreement or the other Transaction Documents.

13.3    <u>Representations and Warranties True</u>.  All representations, certifications and warranties of the Buyer hereunder shall be true as of the Transfer Date in every material respect.

13.4    <u>No Default by the Buyer</u>.  The Buyer shall have performed and complied with, in all material respects, all agreements, covenants and conditions required by this Agreement or by any other Transaction Documents, to be performed or complied with by the Buyer, prior to or at the Closing.

13.5    <u>No Violation of Law</u>.  No violations of law shall have occurred which could, in the Lender's reasonable judgment, have an adverse impact on the Lender's ability to consummate the transactions contemplated hereby.

13.6    <u>Closing</u>.  The Closing and the other transactions contemplated by this Agreement shall have occurred concurrently on or before May 3, 2002, or such later date as the Lender, the Borrower and the Buyer may mutually agree upon in writing.

13.7    <u>No Litigation</u>.  No action, inquiry or investigation shall have been instituted or pending which (unless dismissed with prejudice) is reasonably likely to make illegal, or to otherwise restrain or prohibit, the consummation of the transactions contemplated by this Agreement or the other Transaction Documents.  There will be no stay, bankruptcy or insolvency petition, appointment of a receiver by or on behalf of the Borrower or any other action, suit, proceeding or order against the Borrower which would prohibit the consummation of the transaction contemplated by this Agreement or other Transaction Documents.

14.    <u>General</u>.

14.1    <u>Expenses</u>.  Except as otherwise agreed herein, all expenses of the preparation, execution and consummation of this Agreement and other Transaction Documents and of the transactions contemplated hereby and thereby, including, without limitation,

attorneys', accountants' and outside advisor's fees and disbursements, shall be borne by the party incurring such fees; provided, however, that nothing contained herein shall in any manner alter, limit, or modify the Lender's right to have such fees and expenses reimbursed pursuant to the provisions of the Loan Agreement and other Lender Loan Documents.

14.2    Notice.  All notices, demands and other communications hereunder shall be in writing or by written telecommunication, and shall be deemed to have been duly given if delivered personally, if mailed by certified mail return receipt requested, if delivered by overnight courier, if mailed, postage prepaid, or if sent by written telecommunication, confirmation of receipt received, as follows:

If to the Lender, to:

> LaSalle Business Credit, Inc.
> 135 South LaSalle Street, Suite 425
> Chicago, Illinois  60603-4105
> Attn:   Herbert "Bert" Kidd II and William Stapel
> Fax:    (312) 904-7418

With copies sent contemporaneously to:

> LaSalle Business Credit, Inc.
> 135 South LaSalle Street, Suite 425
> Chicago, Illinois  60603-4105
> Attn:   Mike Carsella, Esq.
> Fax:    (312) 904-0291

and

> Latham & Watkins
> 5800 Sears Tower
> 233 South Wacker Drive
> Chicago, Illinois  60606
> Attn:   David Heller, Esq.
> Fax:    (312) 993-9767

If to the Borrower, to:

> Pet Life Foods, Inc.
> Attn: Scott Fickes.
> A5491 144th Ave.
> Holland, MI 49523
> Facsimile:  (616) 396-4690

With copies sent contemporaneously to

> Steven Smathers

CH_DOCS\394929.15[W2000]

S 000047

024265-0008

Sowell & Co.
1601 Elm Street, Suite 300
Dallas, TX  75201
Fax:  214-871-1620

If to the Buyer, to:

World Pet, LLC
P.O. Box 676
Red Bay, Alabama 35582
Attn: Alan Bostick
Fax:    (256)-356-4627

With a copy sent contemporaneously to:

Pitts & Eckl, P.C.
401 East Tuscaloosa Street
Florence, Alabama  35630
Phone:  (256) 718-3600
Attn:    Conrad C. Pitts, Esq.
Fax:     (256) 718-0905

and

Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd.
55 East Monroe Street
Suite 3700
Chicago, Illinois  60603
Attn:    David M. Mason, Esq.
Fax:     (312) 332-2196

14.3    Entire Agreement.  This Agreement and the related schedules, exhibits and the other Transaction Documents delivered in connection herewith contain the entire understanding of the parties with respect to the subject matter hereof, supersede all prior agreements and understandings relating to the subject matter hereof, and shall not be amended except by a written instrument hereafter signed by all of the parties hereto.

14.4    Governing Law.  The validity and construction of this Agreement shall be governed by the internal laws of the State of Illinois without regard to principles of conflicts of laws.

14.5    Sections, Section Headings and Defined Terms.    All enumerated subdivisions of this Agreement are herein referred to as "sections" or "subsections."  The headings of the sections and subsections are for reference only and shall not limit or control the meaning thereof.  Capitalized terms contained in the exhibits or schedules to this Agreement, which are not otherwise defined in such exhibits or schedules, shall have the meanings ascribed to them in this Agreement.

-16-

14.6    <u>Successors</u>.    This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and their respective heirs, successors and assigns; provided, however, that no party may assign, whether absolutely or merely for collateral purposes, its rights, claims and benefits hereunder to any other person or entity without the express written consent of each of the other parties to this Agreement.

14.7    <u>Survival of Representations and Warranties</u>.    The representations and warranties of each party hereto contained in this Agreement, notwithstanding any investigation by any other party hereto, shall be deemed to have been relied upon by each such other party, and shall survive the Closing and consummation of the transactions contemplated hereby.

14.8    <u>Further Assurances</u>.    From time to time, at the reasonable request of another party hereto, each party hereto shall execute and deliver such further instruments and take such further actions at the expense of the requesting party, as such requesting party may in good faith deem necessary or desirable in order to assure that the transfers, purposes and objectives of this Agreement and other Transaction Documents are fully accomplished. Without limitation of the foregoing, the Buyer hereby authorizes the Lender to file financing statements (and amendments, if any) showing the Buyer as debtor and the Lender as secured party describing the Foreclosure Receivables Collateral in such jurisdictions as the Lender deems appropriate.    Without limiting the generality of the foregoing, Lender shall execute such documents and take such action as reasonably requested by Buyer to effectuate the transfer to Buyer of any Subject Assets constituting Canadian trademarks, and as soon as reasonably practicable, Lender shall execute and deliver to Buyer partial UCC releases with respect to the Subject Assets.

14.9    <u>No Implied Rights or Remedies</u>.    Except as otherwise expressly provided herein, nothing herein express or implied is intended or shall be construed to confer upon or to give any person, firm, or corporation other than the Lender and the Buyer any rights or remedies under or by reason of this Agreement.

14.10    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.  Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile transmission a signature page of this Agreement signed by such party, and any such facsimile signature shall be treated in all respects as having the same effect as an original signature.  Any party delivering by facsimile transmission a counterpart executed by it shall promptly thereafter also deliver a manually signed counterpart of this Agreement.

14.11    <u>Risk of Loss</u>.    Except with respect to a violation of any of the representations and warranties made herein by the Lender or the Borrower, the risk of any loss that may occur with respect to any of the Subject Assets being purchased hereunder shall be borne by the Buyer immediately upon and at all times after the Transfer Date.  Except solely as provided in <u>Sections 8</u> and <u>9</u> hereof, the Lender shall have no liability whatsoever to the Buyer for any loss or damage to the Subject Assets being purchased hereunder that may occur on and after consummation of the Closing.

-17-

14.12   Limited Responsibility. Each party hereto acknowledges and agrees that it is the mutual intent of the parties hereto that the obligations, representations, warranties and undertakings under this Agreement and the other Transaction Documents or as a result hereof or of the transactions contemplated hereby or thereby are and be limited to only those expressly set forth herein, and not enlarged by implication, operation of law or otherwise.  Without limiting the generality of the foregoing, the Lender shall have no responsibility, liability or any other obligation whatsoever to the Buyer or any other person or entity for any breach by the Borrower or any other person or entity of any of its respective representations, warranties, covenants or other person or entity in connection with this Agreement or other Transaction Documents or the transactions contemplated hereby or thereby.

**[Signature Page on the Following  Page]**

**IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed by their duly respective officers as of the date and the year first above written.

<u>**LENDER**</u>:

**LASALLE BUSINESS CREDIT, INC., a Delaware corporation**

By _____
Its _____

<u>**BUYER**</u>:

**WORLD PET, LLC, an Alabama limited liability company**

By _____
Its _____

<u>**BORROWER**</u>:

**PET LIFE FOODS, INC., an Illinois corporation**

By _____
Its _____

S 000051

**[Signature Page to Foreclosure Agreement]**

024265-0008

## LIST OF SCHEDULES TO FORECLOSURE AGREEMENT[*]

Schedule 2      List of Subject Assets

Schedule 2.2    Excluded Assets

Schedule 2.4    Assumed Liabilities

Schedule 3      Purchase Price

---

[*] *Capitalized terms used but not defined in the Schedules have the meanings ascribed thereto in the Agreement.*

## LIST OF EXHIBITS TO FORECLOSURE AGREEMENT

A.    Notice of Disposition of Assets

B.    General Assignment and Bill of Sale – Lender's Form

C.    General Assignment and Bill of Sale – Borrower's Form

D.    Assignment of Trademarks

S 000053

## SCHEDULE 2 - LIST OF SUBJECT ASSETS

Except for any Excluded Assets as set forth, and defined in, Schedule 2.2 to the Agreement, the following personal property of the Borrower:

(a)    any or all of the Borrower's right, title and interest in inventory, including, without limitation, raw materials (including ingredients), packaging, work-in-process, finished goods (including bulk finished goods), service parts and supplies, in its possession or in transit on the Closing Date ("Subject Inventory");

(b)    any or all of the Borrower's right, title and interest in furniture, fixtures, machinery, parts, computer hardware, and other tangible personal property and equipment in its possession on the Closing Date described in the appraisal prepared by Loeb Equipment and Appraisal Company attached as Annex 1 hereto (the "Loeb Appraisal") and specifically excluding the Excluded Equipment (as defined in Schedule 2.1) ("Subject Equipment");

(c)    any or all of the Borrower's right, title and interest in accounts receivable, arising from shipments of inventory on or prior to May 2, 2002 ("Subject Receivables"); it being understood that receivables arising from shipments of inventory on or after May 3, 2002 are not conveyed hereby but are owned by the Buyer;

(d)    any and all of the Borrower's right, title and interest in intellectual property, including, but not limited to, formulas, trade secrets, and other proprietary information and any and all of the Borrower's right title and interest in the trademarks "Pet Life" and "Pet Life Foods" (the "Specific Trademarks") (collectively, "Subject Intellectual Property");

(e)    all books, records, purchase orders and other information needed to process orders for the Borrower's customers, including but not limited to customer lists and names, contacts at customers and telephone numbers ("Subject Records").

CH_DOCS\394929.15[W2000]

024265-0008

# ANNEX 1 TO SCHEDULE 2 – LOEB APPRAISAL

## [attached hereto]

## SCHEDULE 2.1 - EXCLUDED ASSETS

1.     Any and all claims of the Borrower for tax refunds and tax attributes and any and all claims of the Borrower for cancelled insurance premiums;

2.     Originals of the corporate charter, corporate seal, minute books, stock transfer books and records and other documents relating to the organization, maintenance and existence of the Borrower as a corporation;

3.     Inventory set forth on Annex 1 to this Schedule 2.1 and all inventory relating to Dad's;

4.     Leased equipment and equipment which is subject to a perfected security interest in favor of a party other than the Lender consisting of the equipment described on Annex 2 to this Schedule 2.1 ("Excluded Equipment"); and

5.     Steve White's computer and all contents, software embedded therein and information stored or retrievable therefrom.

6.     Any and all of the Borrower's cash and cash equivalents, bank accounts and funds on deposit therein.

7.     Any inventory located in Canada as of the Closing Date.

8.     Any and all assets and property of the Borrower other than the Subject Assets.

CH_DOCS\394929.15[W2000]

024265-0008

## ANNEX 1 TO SCHEDULE 2.1 – EXCLUDED INVENTORY

### [attached hereto]

024265-0008

## ANNEX 2 TO SCHEDULE 2.1 – EXCLUDED EQUIPMENT

1.    All equipment and other tangible property described in the Loeb Appraisal as being leased.

2.    All equipment described on the UCC financing statements filed on 10/11/2001, as document no. 4446915 FS in the Secretary of State of Illinois, showing The CIT Group/Equipment Financing, Inc. as the secured party and Borrower as the debtor.

3.    All equipment described on the UCC financing statement filed on 9/23/1997, as document no. D282682 in the Secretary of State of Michigan showing Ice Rentals, Inc. as the secured party and Borrower as the debtor.

4.    All equipment described on the UCC financing statement filed on 9/29/2000, as document no. D698970 in the Secretary of State of Michigan showing New Equipment Leasing, Inc. as the secured party and Borrower as the debtor.

5.    All equipment described on the UCC financing statement filed on 6/19/2001, as document no. D786888 in the Secretary of State of Michigan showing Citicorp Del Lease, Inc. As Agent for Harrison Credit Corp. as the secured party and Borrower as the debtor.

## SCHEDULE 2.4 - ASSUMED LIABILITIES

     1.    All obligations and liabilities under purchase orders constituting part of the Subject Assets.

024265-0008

## SCHEDULE 3 - PURCHASE PRICE

"Purchase Price" means the sum of the following:

      (i)     $1,975,000 payable in cash by certified check or wire transfer of immediately available funds at the Closing for Subject Equipment, Subject Records and Subject Intellectual Property (excluding Specific Trademarks); plus

      (ii)     for the Subject Inventory, an amount equal to the product of  (x) the aggregate cost of the Subject Inventory based on the Borrower's perpetual inventory accounting system, times (y) 1.262 (in the case of finished goods and work-in-process), or 1.0 (in the case of all Subject Inventory other than finished goods or work-in-process). This portion of the Purchase Price will be provisionally paid at Closing in the estimated amount of $2,000,000 for Subject Inventory. No later than the first business day after the completion of the physical inventory count of the Subject Inventory (which is scheduled to occur on May 3, 2002), the parties will calculate the actual amount of this portion of the Purchase Price (based on the results of the inventory physical), and any positive or negative difference between the $2,000,000 and the actual amount of this portion of the Purchase Price will be paid on such date by the applicable party to the other party; plus

      (iii)     $25,000 for both Specific Trademarks; plus

      (iv)     Collections received by the Lender with respect to the Subject Receivables in accordance with Section 2.1 of the Agreement, and all right, title and interest in those Subject Receivables not collected by the Buyer by September 14, 2002.

## EXHIBIT A

## NOTICE OF DISPOSITION OF COLLATERAL
## UNDER UNIFORM COMMERCIAL CODE

April 24, 2001

**BY FAX, CERTIFIED MAIL AND**
**FEDERAL EXPRESS DELIVERY**

TO:    The Persons Listed on Schedule A

FROM:        LASALLE BUSINESS CREDIT, INC.,
             as Lender
             Address: 135 South LaSalle St., Suite 400
             Chicago, Illinois  60603
             Attention: William Stapel
             Telephone: (312) 904-5311
             Telecopier: (312) 904-0291

NAME OF DEBTOR: Pet Life Foods, Inc.

PLEASE TAKE NOTICE THAT, pursuant to §9-611 of the applicable Uniform Commercial Code and that certain Loan and Security Agreement dated as of June 21, 1999 (the "Loan Agreement") among Pet Life Foods, Inc., an Illinois corporation ("Borrower"), and LaSalle Business Credit, Inc., a Delaware corporation  ("Lender") the Lender will sell any and all Collateral (as such term is defined below) of the Borrower at one or more private sales to be held on or after the 30th day of April, 2002.  The Collateral secures the indebtedness of the Borrower to the Lender under the Loan Agreement and the Other Agreements (as such term is defined in the Loan Agreement.).

*DESCRIPTION OF THE COLLATERAL:* The Lender will offer for sale all of the Borrower's Accounts, Goods, Chattel Paper, Contracts, Documents, Equipment, Fixtures, General Intangibles (including, without limitation, all patents, patent applications, trademarks, trademark applications, tradenames, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against

carriers and shippers, guarantee claims, contract rights, payment intangibles, security interests, security deposits and rights to indemnification), Instruments, Investment Property, Inventory, books and records pertaining to any of the foregoing and Proceeds of any of the foregoing.

*TERMS OF AND CONDITIONS OF SALE:* THE COLLATERAL WILL BE SOLD ON AN "AS IS, WHERE IS" BASIS, WITHOUT RECOURSE, REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE LENDER EXPRESSLY DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND THE LENDER WILL NOT BE LIABLE FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES. The Lender reserves (i) the right to withdraw or withhold all or any portion of the Collateral from the sales for any reason whatsoever, (ii) the right to sell the Collateral in any number of sales or unit divisions and (iii) the right to conduct further public sales of any of the Collateral which is not sold pursuant to private sale, in which case the Lender shall have the right to credit bid all or a portion of its remaining debt at such public sale. The Lender may cancel or postpone any scheduled sale for any reason whatsoever. The Lender does not currently intend to take possession or control of the Collateral during the period prior to the sales. The Lender reserves the right at the time and place of the sale to change the terms of sale or to announce additional terms, and reserves the right to provide financing to any bidder.

*DEFICIENCY CLAIM AND NOTICE OF RIGHT TO ACCOUNTING.* The Lender reserves all of its rights against Borrower and any other obligor for any and all deficiencies under any underlying indebtedness remaining due to the Lender after such sale. The Borrower is entitled to an accounting of the unpaid indebtedness secured by the Collateral; any such accounting should be requested by contacting the Lender, as shown below.

***PRIOR NOTICES GIVEN; RIGHT TO CONDUCT EARLIER SALES.*** This notice is in addition to and supplements the prior notice of default and enforcement of liens delivered on April 24, 2002, and shall not prejudice the rights of the Lender to act pursuant to such notice. This notice shall also not prevent the Lender from selling the Collateral before April 30, 2002, if the Lender determines that the Collateral's value is declining speedily, as permitted by §9-611(b) of the Uniform Commercial Code.

## SCHEDULE A – LASALLE / PET LIFE-
## NOTICE OF DISPOSITION OF COLLATERAL

The CIT Group/Equipment Financing, Inc.
P.O. Box 27248
Tempe, AZ 85285

Ice Rentals, Inc.
188 Wealthy SW
PO Box 1923
Grand Rapids, MI 49501-1923

New Equipment Leasing, Inc.
2892 Thornhill Square
Grand Rapids, MI 49546
P.O. Box 97
Ada, MI 49301

Citicorp Del Lease, Inc. As Agent for Harrison Credit Corp.
450 Mamaroneck Avenue
Harrison, NY 10528
Attn: Patti Karovic

Pet Life Foods, Inc.
A5491 144th Ave.
Holland, MI 49523
Attn: Scott Fickes

Sergeant's Pet Care Products, Inc.
14748 W. Center Road, Suite 303
Omaha, NE 68144
Attn: Robert Scharf

## EXHIBIT B

## GENERAL ASSIGNMENT AND BILL OF SALE

LASALLE BUSINESS CREDIT, INC., a Delaware corporation (the "Lender"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby sell, convey, assign, transfer and deliver to WORLD PET, LLC, an Alabama limited liability company (the "Buyer"), and its successors and assigns forever, pursuant to Section 9-610 of the Illinois Uniform Commercial Code, all the right, title and interest of PET LIFE FOODS, INC., an Illinois corporation (the "Company"), in and to all of the personal property and assets of the Company (collectively, the "Property") listed on Schedule I hereto.

EXCEPT AS EXPRESSLY SET FORTH IN THAT CERTAIN FORECLOSURE AGREEMENT DATED AS OF MAY 3, 2002 AMONG THE LENDER, THE COMPANY AND THE BUYER, THE LENDER MAKES NO REPRESENTATION, WARRANTY, COVENANT OR UNDERTAKING, EXPRESS OR IMPLIED, WITH RESPECT TO THE EXISTENCE OF ANY SPECIFIC ITEMS CONSTITUTING THE PROPERTY OR THE QUANTITY THEREOF, OR THE COMPANY'S BUSINESS OR PROSPECTS, OR THE CONDITION, QUALITY, MERCHANTABILITY (IN THE SENSE OF A UCC WARRANTY), FITNESS FOR A PARTICULAR PURPOSE OR VALUE OF THE PROPERTY; AND THE PROPERTY IS SOLD WITHOUT RECOURSE ON AN ABSOLUTE "AS IS, WHERE IS" BASIS.

On or after the date hereof, the Lender will, at the Buyer's sole expense, from time to time at the Buyer's reasonable request, execute and deliver such further instruments and take or cause to be taken such other action to carry out the effect, intent and purpose of the conveyance, assignment and transfer to the Buyer hereunder and otherwise in the carrying out of the intent and purposes of this General Assignment and Bill of Sale.

Dated this _____ day of May, 2002.

LASALLE BUSINESS CREDIT, INC.

By _____

Its _____

S 000065

024265-0008

## SCHEDULE I

All of the following Company's personal property in which Lender has a security interest, other than Excluded Assets (as defined below):

(a)  any or all of the Company's right, title and interest in inventory, including, without limitation, raw materials (including ingredients), packaging, work-in-process, finished goods (including bulk finished goods), service parts and supplies, in its possession or in transit on the Closing Date ("Subject Inventory");

(b)  any or all of the Company's right, title and interest in furniture, fixtures, machinery, parts, computer hardware, and other tangible personal property and equipment in its possession on the Closing Date described in the appraisal prepared by Loeb Equipment and Appraisal Company attached as Annex 1 hereto (the "Loeb Appraisal") and specifically excluding the Excluded Equipment (as defined in Schedule 2.1) ("Subject Equipment");

(c)  any or all of the Company's right, title and interest in accounts receivable, arising from shipments of inventory on or prior to May 2, 2002 ("Subject Receivables"); it being understood that receivables arising from shipments of inventory on or after May 3, 2002 are not conveyed hereby but are owned by the Buyer;

(d)  any and all of the Company's right, title and interest in intellectual property, including, but not limited to, formulas, trade secrets, and other proprietary information and any and all of the Company's right title and interest in the trademarks "Pet Life" and "Pet Life Foods" (the "Specific Trademarks") (collectively, "Subject Intellectual Property");

(e)  all books, records, purchase orders and other information needed to process orders for the Company's customers, including but not limited to customer lists and names, contacts at customers and telephone numbers ("Subject Records").

As used herein, the term "Excluded Assets" shall mean:

1.  Any and all claims of the Company for tax refunds and tax attributes and any and all claims of the Company for cancelled insurance premiums;

2.  Originals of the corporate charter, corporate seal, minute books, stock transfer books and records and other documents relating to the organization, maintenance and existence of the Company as a corporation;

3.  Inventory set forth on Annex 1 to this Schedule I and all inventory relating to Dad's;

4.  Leased equipment and equipment which is subject to a perfected security interest in favor of a party other than the Lender consisting of the equipment described on Annex 2 to this Schedule I ("Excluded Equipment");

5.  Steve White's computer and all contents, software embedded therein and information stored or retrievable therefrom;

6.      Any and all of the Company's cash and cash equivalents, bank accounts and funds on deposit therein;

7.      Any inventory located in Canada as of the Closing Date; and

8.      Any and all assets and property of the Company other than the Subject Assets.

2

## ANNEX 1 TO SCHEDULE I – EXCLUDED INVENTORY

**[attached hereto]**

## ANNEX 2 TO SCHEDULE I – EXCLUDED EQUIPMENT

1.      All equipment and other tangible property described in the Loeb Appraisal as being leased.

2.      All equipment described on the UCC financing statements filed on 10/11/2001, as document no. 4446915 FS in the Secretary of State of Illinois, showing The CIT Group/Equipment Financing, Inc. as the secured party and Borrower as the debtor.

3.      All equipment described on the UCC financing statement filed on 9/23/1997, as document no. D282682 in the Secretary of State of Michigan showing Ice Rentals, Inc. as the secured party and Company as the debtor.

4.      All equipment described on the UCC financing statement filed on 9/29/2000, as document no. D698970 in the Secretary of State of Michigan showing New Equipment Leasing, Inc. as the secured party and Company as the debtor.

5.      All equipment described on the UCC financing statement filed on 6/19/2001, as document no. D786888 in the Secretary of State of Michigan showing Citicorp Del Lease, Inc. As Agent for Harrison Credit Corp. as the secured party and Company as the debtor.

## EXHIBIT C

## GENERAL ASSIGNMENT AND BILL OF SALE

PET LIFE FOODS, INC, an Illinois corporation (the "Company"), for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby sell, convey, assign, transfer and deliver to WORLD PET, LLC, an Alabama limited liability company (the "Buyer"), and its successors and assigns forever, all the right, title and interest in and to all of the personal property and assets of the Company (collectively, the "Property") listed on Schedule I hereto.

EXCEPT AS EXPRESSLY SET FORTH IN THAT CERTAIN FORECLOSURE AGREEMENT DATED AS OF MAY 3, 2002 AMONG THE LENDER, THE COMPANY AND THE BUYER, THE COMPANY MAKES NO REPRESENTATION, WARRANTY, COVENANT OR UNDERTAKING, EXPRESS OR IMPLIED, WITH RESPECT TO THE EXISTENCE OF ANY SPECIFIC ITEMS CONSTITUTING THE PROPERTY OR THE QUANTITY THEREOF, OR THE COMPANY'S BUSINESS OR PROSPECTS, OR THE CONDITION, QUALITY, MERCHANTABILITY (IN THE SENSE OF A UCC WARRANTY), FITNESS FOR A PARTICULAR PURPOSE OR VALUE OF THE PROPERTY; AND THE PROPERTY IS SOLD WITHOUT RECOURSE ON AN ABSOLUTE "AS IS, WHERE IS" BASIS.

On or after the date hereof, the Company will, at the Buyer's sole expense, from time to time at the Buyer's reasonable request, execute and deliver such further instruments and take or cause to be taken such other action to carry out the effect, intent and purpose of the conveyance, assignment and transfer to the Buyer hereunder and otherwise in the carrying out of the intent and purposes of this General Assignment and Bill of Sale.

Dated this _____ day of May, 2002.


PET LIFE FOODS, INC

By _____
Its _____

## SCHEDULE I

All of the following personal property of Company other than Excluded Assets (as defined below):

(a)    any or all of the Company's right, title and interest in inventory, including, without limitation, raw materials (including ingredients), packaging, work-in-process, finished goods (including bulk finished goods), service parts and supplies, in its possession or in transit on the Closing Date ("Subject Inventory");

(b)    any or all of the Company's right, title and interest in furniture, fixtures, machinery, parts, computer hardware, and other tangible personal property and equipment in its possession on the Closing Date described in the appraisal prepared by Loeb Equipment and Appraisal Company attached as Annex 1 hereto (the "Loeb Appraisal") and specifically excluding the Excluded Equipment (as defined in Schedule 2.1) ("Subject Equipment");

(c)    any or all of the Company's right, title and interest in accounts receivable, arising from shipments of inventory on or prior to May 2, 2002 ("Subject Receivables"); it being understood that receivables arising from shipments of inventory on or after May 3, 2002 are not conveyed hereby but are owned by the Buyer;

(d)    any and all of the Company's right, title and interest in intellectual property, including, but not limited to, formulas, trade secrets, and other proprietary information and any and all of the Company's right title and interest in the trademarks "Pet Life" and "Pet Life Foods" (the "Specific Trademarks") (collectively, "Subject Intellectual Property");

(e)    all books, records, purchase orders and other information needed to process orders for the Company's customers, including but not limited to customer lists and names, contacts at customers and telephone numbers ("Subject Records").

As used herein, the term "Excluded Assets" shall mean:

1.    Any and all claims of the Company for tax refunds and tax attributes and any and all claims of the Company for cancelled insurance premiums;

2.    Originals of the corporate charter, corporate seal, minute books, stock transfer books and records and other documents relating to the organization, maintenance and existence of the Company as a corporation;

3.    Inventory set forth on Annex 1 to this Schedule I and all inventory relating to Dad's;

4.    Leased equipment and equipment which is subject to a perfected security interest in favor of a party other than the Lender consisting of the equipment described on Annex 2 to this Schedule I ("Excluded Equipment");

5.     Steve White's computer and all contents, software embedded therein and information stored or retrievable therefrom;

6.     Any and all of the Company's cash and cash equivalents, bank accounts and funds on deposit therein;

7.     Any inventory located in Canada as of the Closing Date; and

8.     Any and all assets and property of the Company other than the Subject Assets.

## ANNEX 1 TO SCHEDULE I – EXCLUDED INVENTORY

**[attached hereto]**

## ANNEX 2 TO SCHEDULE I – EXCLUDED EQUIPMENT

6.    All equipment and other tangible property described in the Loeb Appraisal as being leased.

7.    All equipment described on the UCC financing statements filed on 10/11/2001, as document no. 4446915 FS in the Secretary of State of Illinois, showing The CIT Group/Equipment Financing, Inc. as the secured party and Borrower as the debtor.

8.    All equipment described on the UCC financing statement filed on 9/23/1997, as document no. D282682 in the Secretary of State of Michigan showing Ice Rentals, Inc. as the secured party and Company as the debtor.

9.    All equipment described on the UCC financing statement filed on 9/29/2000, as document no. D698970 in the Secretary of State of Michigan showing New Equipment Leasing, Inc. as the secured party and Company as the debtor.

10.    All equipment described on the UCC financing statement filed on 6/19/2001, as document no. D786888 in the Secretary of State of Michigan showing Citicorp Del Lease, Inc. As Agent for Harrison Credit Corp. as the secured party and Company as the debtor.

S 000074