IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION LAW

| | |
|---|---|
| DAD'S PRODUCTS COMPANY, INC., | ) |
| | ) ELECTRONICALLY FILED BRIEF |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) C.A. No. 03-350-ERIE |
| SERGEANT'S PET PRODUCTS, INC. | ) |
| | ) |
| Defendant | ) |
| | ) |
| | ) |

**BRIEF IN SUPPORT OF DAD'S PRODUCTS COMPANY, INC.'S
MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case involves royalty payments that Dad's Products Company, Inc. ("Dad's"), Sergeant's Pet Products, Inc. ("Sergeant's") and a non-party, Pet Life Foods, Inc. ("Pet Life") owed to Gaines Pet Foods Corp. ("Gaines"). Because Sergeant's refused to pay its proportionate share of those royalty payments, Dad's was required to pay far in excess of its share of those payments to Gaines. The facts of this matter unequivocally establish Sergeant's liability for its proportionate share of the royalty obligations that Dad's was required to pay to Gaines. Sergeant's has admitted that it expressly assumed an obligation to make these royalty payments to Gaines and that this obligation was joint and several with Dad's. As a joint obligor, Sergeant's is obligated to pay its proportionate share of the obligation and Dad's is entitled to contribution for any payment it made in excess of its proportionate share. Dad's paid a total of $822,813.21 to Gaines in satisfaction of the royalty obligations and, based on the parties agreed to split of these payments, Sergeant's is obligated to pay to Dad's $493,687.92.

I. **FACTS**

    A. **The Trademark Purchase From Gaines and the Royalty Obligation**

The facts of this case are largely undisputed. On November 23, 1999, Dad's and a non-party to this suit, Pet Life Foods entered into an Asset Purchase Agreement with Gaines and several Gaines-related entities to purchase various trademarks used in the sale of pet food products (the "Trademarks"). (November 23, 1999 Asset Purchase Agreement, attached to Dad's Motion for Summary Judgment as Exhibit "A"). As payment for the Trademarks, and the book of customers these trademarks carried with them, Dad's and Pet Life agreed to pay to Gaines $2,550,000 at the time Dad's and Pet Life received the Trademarks, (Id. at ¶ 2.2). In addition to this up-front payment, the parties to this Asset Purchase Agreement also entered into a related Supplier and Royalty Agreement (the "Royalty Agreement"). (November 23, 1999 Royalty Agreement, attached to Dad's Motion for Summary Judgment as Exhibit "B"). Pursuant to relevant terms of the Royalty Agreement, Dad's and Pet Life agreed to make quarterly royalty payments to Gaines through December 31, 2004. (the "Royalty Obligation"). The specific terms governing the Royalty Obligation provided:

    (a)    Dad's and Pet Life jointly and severally agree to pay to [Gaines] a royalty equal to 2% of the Net Sales of Existing Pet Food Products made by Dad's to Existing Pet Food Customers for each Royalty Year during the Royalty Term.

    (b)    Dad's and Pet Life jointly and severally agree to pay to [Gaines] a royalty equal to 2% of the Net Sales of Existing Pet Treat Products made by Pet Life to Existing Pet Treat Customers for each Royalty Year during the Royalty Term.

    (c)    If the total royalty payments in any Royalty Year are less than $300,000, Dad's and Pet Life shall jointly and severally make additional payments which, in the aggregate, equal to the amount which results when the amount of royalty payments made in such

        Royalty Year is subtracted from $300,000.  Notwithstanding the foregoing, in no event shall Dad's and Pet Life pay to [Gaines] less than an aggregate of $75,000 per quarter as computed on a cumulative quarterly basis for the applicable Royalty Year.

    (d)    The maximum royalty payments payable by [Dad's and Pet Life] to [Gaines] hereunder in any Royalty Year shall be $440,000.

(Royalty Agreement, ¶ 3.1 (emphasis added)).

Between January 1, 2000 and September 1, 2001, Dad's and Pet Life made joint royalty payments to Gaines under the above-described terms. Dad's and Pet Life agreed to share in the joint and several Royalty Obligation in proportion to the estimated value of the Trademarks each received from Gaines.  (Deposition of Alan Brown, attached to Dad's Motion for Summary Judgment as Exhibit "C", pp. 10-11; Deposition of G. Thomas Lang, attached to Dad's Motion for Summary Judgment as Exhibit "D", pp. 21-22).  Thus, Dad's was responsible for 40% of the Royalty Obligation and Pet Life was responsible for 60%.

### B.   Maple Leaf

Once Dad's and Pet Life obtained the trademarks from Gaines, they divided them such that Pet Life received trademarks associated with products that it produced and Dad's received trademarks associated with products it produced.  Dad's and Pet Life also entered into a marketing arrangement under which they were able to sell the Trademark products to Gaines' former customers.  (Lang, pp. 28-29; Brown, p. 12).  While this arrangement was fairly detailed, it generally involved Dad's or Pet Life selling Trademark product to any customers with which they had an existing relationship.  (Brown, pp. 12-13).

Another part of this marketing arrangement involved former Gaines customers with whom neither Dad's nor Pet Life had an existing relationship.  In an attempt to provide efficient

3

service to these customers, Dad's and Pet Life entered into a joint venture through Maple Leaf, LLC, ("Maple Leaf). (Lang, pp. 28-29; Brown, pp. 12-13). Maple Leaf was created by Dad's and Pet Life to serve as the customer contact for former Gaines customers that were not otherwise served by Dad's or Pet Life. (Id). When these "Maple Leaf customers" ordered product, they did so through Maple Leaf and its sales staff. Dad's and Pet Life produced product that would then be shipped from Maple Leaf to the customer. The Maple Leaf sales would then be allocated to Dad's and Pet Life based on the types of products sold. (Lang, pp. 28-31; Brown, pp. 12-25).

By August, 2001, Dad's and Pet Life agreed to wind-down Maple Leaf. (August 1, 2001 Settlement Agreement ("Maple Leaf Settlement Agreement"), attached as Exhibit "E" to Dad's Motion for Summary Judgment). They did so for various reasons, including Dad's experience that Pet Life was unable to provide sufficient product to Maple Leaf. (Lang, pp. 33-34). On August 1, 2001, Dad's and Pet Life entered into the Maple Leaf Settlement Agreement through which they agreed to wind-down Maple Leaf by December 31, 2001. (Maple Leaf Settlement Agreement, p 1). As part of this Agreement, Dad's and Pet Life reaffirmed their joint and several Royalty Obligation to Gaines and their respective 40% and 60% split of that Obligation. (Id. at 114).

### C. Sergeant's Acquisition of the Trademarks and Assumption of Pet Life's Royalty Obligation.

Unbeknownst to Dad's, at or before the time that Dad's and Pet Life were discussing the winding-down of Maple Leaf, Pet Life was also attempting to sell the Trademarks that it purchased from Gaines to an affiliate of Pet Life. (Brown, pp. 34-35). On September 1, 2001, exactly one month after Dad's and Pet Life executed the Maple Leaf Settlement Agreement, Pet

4

Life entered into a Trademark License and Transfer Agreement with Sergeant's. (Trademark License and Transfer Agreement ("Trademark Transfer Agreement"), attached to Dad's Motion for Summary Judgment at Exhibit "F"). Pursuant to relevant terms of the Trademark Transfer Agreement, Sergeant's purchased from Pet Life the Trademarks Pet Life had purchased from Gaines. (Id. at ¶ l(a)). To acquire these Trademarks, Sergeant's agreed to pay Pet Life $600,000 and to "assume and pay any and all additional payments due to Gaines Pet Foods Corp., pursuant to the Supplier and Royalty Agreement dated November 23, 1999, in an amount up to $270,000 . . ." (Id. at ¶ l(b); Brown, pp. 39-40).

     Neither Dad's nor Gaines was made aware of the existence or terms of the Trademark Transfer Agreement until after Sergeant's refused to make required royalty payment to Gaines. (Brown, pp. 40-41; Deposition of Robert G. Dwyer, attached to Dad's Motion for Summary Judgment as Exhibit "G", p. 18; Deposition of Robert Scharf, attached to Dad's Motion for Summary Judgment as Exhibit "H", p. 12). While Pet Life and Sergeant's did not notify Dad's of the existence or terms of the Trademark Transfer Agreement, Dad's was aware that Sergeant's had made Pet Life's share of the royalty payments for the 3rd and 4th quarters of 2001. (Lang, pp. 63-66). Sergeant's and Pet Life also made Dad's aware that as part of the wind-down of Maple Leaf, which primarily involved the allocation of Maple Leafs customers, Sergeant's would be taking responsibility for many customers that would have otherwise gone to Pet Life. (Lang, p. 59)

     Thus, while Dad's was not privy to the terms of the Trademark Transfer Agreement or even of its existence, Dad's did understand that Sergeant's was taking on Pet Life's share of the Royalty Obligation and that it was taking responsibility for many of the customers that Pet Life would otherwise serve. (Lang, pp. 59, 63-33). This shift did not strike Dad's as odd because, by

5

September, 2001, both Pet Life and Sergeant's were commonly owned and controlled. (Lang, p. 51; Brown, pp. 5, 34). The majority shareholder of both was James Sowell. (Brown, p. 5). Alan Brown was also a shareholder in both and served as the chairman of board for both Sergeant's and Pet Life. (Brown, p. 34).

### D. Sergeant's refusal to honor its Royalty Obligation

Between September 1, 2001 and May 1, 2002, Dad's and Pet Life/Sergeant's completed the Maple Leaf wind-down. (Lang, p. 52). During that same period of time, Sergeant's made 60% of the royalty payments that were due to Gaines. Specifically, Sergeant's provided Dad's a check for $39,515.24 for the 3rd quarter of 2001 payment and paid $44,821.60 directly to Shato Holdings, Ltd. (Gaines sole shareholder), for the 4th quarter of 2001 payment. (Payment Records, attached to Dad's Motion for Summary Judgment as Exhibit "I").

The 1st quarter of 2002 royalty payment to Gaines was due by the end of April, 2002. On April 29, 2002, Dad's sent its share of the royalty payment to Gaines with an explanation that Sergeant's had not yet provided their share of the payment. (April 29, 2002 Letter from Dad's to Gaines, attached to Dad's Motion for Summary Judgment as Exhibit "J"). Shortly after this letter, Dad's came to learn that in early May, 2001, Sergeant's and Pet Life entered into a series of transactions in an attempt to relieve Sergeant's of the Royalty Obligation it had assumed and with the end result of vesting ownership of the Trademarks previously owned by Pet Life in Sergeant's and leaving Pet Life insolvent. (Dwyer, p. 18; Brown, p. 52; May 2, 2002 Notification and Cancellation Agreement, attached to Dad's Motion for Summary Judgment as Exhibit "K"; May 3, 2002 Foreclosure Agreement, attached to Dad's Motion for Summary Judgment as Exhibit "L"). Pet Life and Sergeant's were commonly owned and controlled at this point and

6

entered into these transactions with full knowledge that Pet Life was financially unable to make any royalty payments to Gaines. (Brown, pp. 51-52).

Sergeant's and Pet Life informed Dad's that neither party would be making any royalty payment under the Royalty Agreement. (Lang, p. 67; Dwyer, p. 21). Therefore, as a joint and several obligor with Pet Life and Sergeant's, Dad's was obligated to Gaines for 100% of the Royalty Obligation. To mitigate its damages, Dad's paid the full $72,813.21 1st quarter of 2002 royalty payment to Gaines. (Dwyer, pp. 32-34). Dad's and Gaines then entered into a settlement Agreement pursuant to which Gaines accepted a lump sum payment of $750,000 in satisfaction of Dad's, Pet Life's and Sergeant's royalty obligations. (May 23, 2002 Settlement Agreement (the "Settlement Agreement"), attached to Dad's Motion for Summary Judgment as Exhibit "N"). Dad's agreed to this settlement in an attempt to mitigate its damages and after receiving notification from Pet Life and Sergeant's that they refused to make the required royalty payments. (Dwyer, pp. 32-34). Absent Dad's payment of the 1st quarter of 2002 royalty payment and the Settlement Agreement with Gaines, Dad's, Pet Life and Sergeant's would have been obligated to make a minimum of $900,000 in future royalty payments. (Dwyer, p. 33).

## II. ARGUMENT

### A. Sergeant's, as a joint obligor on the Royalty Obligation, is liable to Dad's for 60% of the amount Dad's was required to pay in satisfaction of the Royalty Obligation.

The law relevant to this case is fundamental and straightforward. "[E]ach joint obligor in a contract is liable to the other for contribution ... for payments made in excess of his pro-rata share. The joint obligor making such payment in excess of his share has a right of action upon the implied promise of the other joint obligor for reimbursement." Nelms v. Chazanow, 404 S.W. 2d 359, 362 (Tex. Civ. App. 1966).[1] This well established point of law is succinctly described in Section 81 of the Restatement of Restitution

> Unless otherwise agreed, a person who has discharged more than his proportionate share of a duty owed by himself and another as to which, between the two, neither had a prior duty of performance, is entitled to contribution from the other ...

The right of contribution held by a person who has discharged more than his proportionate share of a duty is a right founded in equity, not contract. 12 Williston on Contracts §36:14 (4th ed. 2005). The right is "an attempt by equity to distribute equally among those who have a common obligation, the burden of performing that obligation." Id.

On September 1, 2001, Sergeant's purchased the Trademarks that Pet Life had acquired from Gaines. These Trademarks formed the assets that determined the amount of Dad's and Pet Life's Royalty Obligation to Gaines and were intended to generate the revenue to pay that obligation. As part of the purchase price for those Trademarks, Sergeant's expressly assumed Pet Life's obligations pursuant to the joint and several Royalty Obligation. Specifically, Sergeant's agreed to "assume and pay any and all additional payments due to Gaines Pet Foods Corp.,

---

[1] Texas law applies to this action because Sergeant's purchase of the Trademarks and express assumption the joint and several Royalty Obligations resulted from an agreement that is controlled by Texas law. (Trademark Transfer Agreement, ¶ 13).

8

pursuant to the Supplier and Royalty Agreement dated November 23, 1999, in an amount up to 270,000 . . ." (Trademark Transfer Agreement, ¶ l(b)).  Having expressly assumed this joint and several obligation to Gaines, Sergeant's became a joint obligor with Dad's.  Stated another way, as of September 1, 2001, Sergeant's shared, jointly and severally, with Dad's in the duty created by the Royalty Obligation.[2]

In addition to the clear language of the September 1, 2001 Trademark Transfer Agreement, other facts in this case establish that Sergeant's was aware that it was assuming an obligation to Gaines that was joint and several with Dad's:

1) To satisfy the first Royalty Payment that was due after the Trademark Transfer Agreement, Sergeant's sent a check to Dad's. (Payment Records).

2) At the time Sergeant's assumed the Royalty Obligations, it and Pet Life were commonly owned and controlled and, thus, was fully aware of the nature of the obligation it was assuming. (Brown, pp. 51-52).

3) The Trademark Transfer Agreement specifically refers to the Royalty Agreement and states that Sergeant's is assuming the Royalty Obligation pursuant to the terms of the Royalty Agreement. (Trademark Transfer Agreement, ¶ 1(b)).

Thus, the plain language of the relevant agreement, the facts surrounding the relevant transactions, and the actions of Pet Life and Sergeant's establish that Sergeant's was jointly and severally liable with Dad's for the Royalty Obligation to Gaines.  The facts of also establish that Sergeant's proportionate share of that liability was 60%.  This was the share of the obligation that Sergeant's assumed from Pet Life, it was the share specifically referenced in the Maple Leaf

---

[2] The fact that Sergeant's became a joint obligator through a transaction that occurred after the obligation was originally created does not affect Sergeant's status as a joint obligator.  When one entity pays more than its fair share of a common duty it is entitled to contribution for the excess payment, regardless of whether the entities "are parties to a single document or [whether] they are parties to separate documents." Restatement of Restitution, § 81 cmt. b.

9

Settlement Agreement and it was the proportionate share that Sergeant's paid in the 3rd and 4th quarters of 2001.

Because Pet Life and Sergeant's refused to make their proportionate share of the required royalty payments in the 1st quarter of 2002, Dad's was forced to make 100% of that payment to Gaines. This total payment was $72,813.21. At this time, Sergeant's also refused to make any future payments under its Royalty Obligation and Pet Life was rendered insolvent through transactions involving Sergeant's. Thus, Dad's was left jointly and severally liable to Gaines for the Royalty Obligation. The minimum Royalty Obligation remaining after Pet Life and Sergeant's notified Dad's that they would not make any future payments, and after Dad's paid 100% of the 1st quarter of 2002 payment, was $825,000. To settle this obligation, Dad's entered into the Settlement Agreement with Gaines whereby Dad's satisfied the entire Royalty Obligation in exchange for a lump sum payment of $750,000. Thus, Dad's made total payments of $822,813.21 to Gaines to satisfy the Royalty Obligations.

Sergeant's is responsible for 60% of this payment, or $493,687.92. Despite demand from Dad's, Sergeant's has failed to pay any portion of this obligation. Dad's, as a joint-obligor who was forced to pay $493,687.92 in excess of its proportionate share of the Royalty Obligations, is entitled to contribution from Sergeant's for that amount.

**B.    The "cap" that Sergeant's and Pet Life attempted to place on Sergeant's obligation to Gaines does not operate to limit Dad's right of contribution.**

It is anticipated that Sergeant's will argue that, pursuant to the terms Trademark Transfer Agreement, it only assumed a joint and several Royalty Obligation up to a total amount of $270,000. Thus, the argument goes, because Sergeant's made previous payments on that obligation in a total amount of $84,336.84 its total obligation was $185,663.13 at the time it

refused to make any further royalty payments. For the reasons that follow, this argument is incorrect on the law and facts applicable to this case. However, it should be noted that even if the Court were to accept this argument, Sergeant's is still liable to Dad's for $185,663.13, which represents far less than its proportionate share of the total Royalty Obligation.

As stated above, contribution between joint obligors is a claim that arises in equity, not contract. 12 Williston on Contract, § 36:14. While contracts are normally at issue in any contribution claim between joint obligors, the purpose of the right of contribution is to insure that those that have an obligation pay their proportionate share. Id.; Nelms, 404 S.W.2d 362. Here, Sergeant's purchased the Trademarks that Pet Life had received as part of the Gaines purchase. The Royalty Obligation is directly tied to those Trademarks; the amount of the Royalty Obligation is based on the revenue those Trademarks generate and that revenue should allow the obligor to satisfy the Royalty Obligation. Thus, Sergeant's purchased the Trademarks that determine the magnitude of the Royalty Obligation and, as part of the purchase price, assumed Pet Life's share of that very obligation. In so doing, it stripped Pet Life of revenue generating assets that could have been used by Pet Life to make the royalty payments.

At the time Sergeant's and Pet Life executed the Trademark Transfer Agreement, Dad's had no knowledge of that Agreement or its terms. Dad's was simply aware that during the second half of 2001 Sergeant's, an entity owned and controlled by the owners of Pet Life, became involved in the allocation of former Maple Leaf Customers and made the share of the royalty payments associated with the Trademarks that had previously been owned by Pet Life. The interplay of these two items of knowledge is important. During the Maple Leaf wind-down, customers had to be allocated between Dad's and Pet Life. Based on Dad's understanding that Sergeant's was simply a commonly controlled and owned entity and that it was making Pet Life's

11

share of the royalty payments, Dad's did not object to the transfer of Maple Leaf customers to Sergeant's. (Lang, pp. 51-52). At this time, of course, neither Sergeant's nor Pet Life made Dad's or Gaines aware that Sergeant's had purchased the Trademarks previously owned by Pet Life in exchange for a lump sum payment and the assumption of Pet Life's share of the Royalty Obligation up to a cap of $270,000. At the time of the Trademark transfer between Pet Life and Sergeant's, the minimum Royalty Obligation stood at $1,050,000, of which Pet Life/Sergeant's were responsible for $630,000. Obviously, a $270,000 cap on Sergeant's total liability is far short of the true nature of that liability. This is especially true given the fact that Sergeant's was stripping Pet Life of the very assets that determined the magnitude of the Royalty Obligation and that could provide the revenue to pay those obligations.

  Dad's right to contribution against Sergeant's is not circumscribed by the contractual agreement between Sergeant's and Pet Life. Once Sergeant's purchased the Trademarks from Pet Life and assumed its obligation to make the royalty payments, Dad's and Sergeant's became jointly and severally liable for those payments. Having paid more than its fair share, Dad's is entitled to the equitable relief of contribution from Sergeant's. Sergeant's share of the Trademarks was 60% as was its share in the Royalty Obligation. Considering the uncontradicted facts that Sergeant's and Pet Life were jointly owned and controlled and that neither party made Dad's aware of the true nature of their transaction that transferred Pet Life's Trademarks to Sergeant's, the only equitable result in this case is for Sergeant's to pay to Dad's its full share of the obligation Dad's has been forced to pay -- $493,687.92.

    **C.    Sergeant's attempt to rid itself of its joint royalty obligation on the eve of Pet Life's Bankruptcy does not frustrate Dad's right to contribution.**

It is also anticipated that Sergeant's will argue that its Notification and Cancellation Agreement with Pet Life and LaSalle Bank, which was executed on May 2, 2002, extinguished its obligations under the Royalty Agreement. This argument fails for at least two reasons.

First, Gaines was an intended third party beneficiary to the Trademark Transfer Agreement. Gaines was a creditor beneficiary under the Trademark Transfer Agreement. <u>Stine v. Stewart</u>, 80 S.W. 3d 586, 589 (Tex. 2002). That Agreement specifically provides that Sergeant's agreed to "assume and pay any and all additional payments due to Gaines Pet Foods Corp., pursuant to the Supplier and Royalty Agreement dated November 23, 1999, in an amount up to 270,000. . ." (Trademark Transfer Agreement, ¶ l(b)). Thus, Sergeant's was expressly assuming an obligation that Pet Life owed to Gaines and specifically agreed to make payments to Gaines in satisfaction of and consistent with the terms of that obligation. This contractual language is squarely within the definition of a creditor beneficiary and, therefore, Gaines was an intended third party beneficiary under the Trademark Transfer Agreement. <u>Stine</u>, 80 S.W. 3d at 589 (holding that a party is a creditor beneficiary under a contract when "under the agreement [the] performance will come to him in satisfaction of a legal duty owed to him by the promisee" (internal quotation marks omitted)). As an intended beneficiary, Gaines had the right to enforce the joint and several Royalty Obligation that Sergeant's assumed against Sergeant's. <u>Id</u>. Thus, Sergeant's was a joint-obligor, with Dad's, to Gaines. The fact that this joint obligation arose in Sergeant's through a separate document does not undermine its existence or its joint and several nature. Restatement of Restitution, § 81 cmt. b.

Second, the May 2, 2003 attempted transfer of the Royalty Obligation back to Pet Life was a fraudulent transfer. Under Texas' version of the Uniform Fraudulent Transfer Act, a

fraudulent transfer exists as to present or future creditors, "[W]hen a transfer is made, or obligation incurred . . . with the actual intent to hinder, delay, or defraud any creditor of the debtor; or...

>   (2)  without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>       (A)  was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
>       (B)  intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code Ann. § 24.005 (Vernon 2005).

Texas' fraudulent conveyance laws "exist to prevent debtors from moving their property beyond the reach of their creditors." National Loan Investors, L.P. v. Robinson, 98 S.W. 3d 781, 783 (Tex. App. Div. 2003). Here, Sergeant's and Pet Life entered into the May 2, 2003 Notification and Cancellation Agreement with the actual intent to defraud both Gaines and Dad's, to move Sergeant's assets out of the reach of its creditors and leave Pet Life financially unable to pay its share of the Royalty Obligation.

Pet Life's and Sergeant's intent behind the Notification and Cancellation Agreement is clear. At the time that Agreement was executed, Pet Life and Sergeant's were commonly owned and controlled. (Brown, p.5, 34). Alan Brown was the chairman of both Pet Life and Sergeant's. (Brown, p. 34). Mr. Brown testified that at the time of the Notification and Cancellation Agreement, Pet Life was financially incapable of making any royalty payments to Gaines. (Brown, pp. ¶ 52-54). The express purpose of the Notification and Cancellation Agreement was

14

to vest full and unencumbered ownership of the Trademarks in Sergeant's and to relieve Sergeant's of its share of the Royalty Obligation – an obligation for which it was jointly and severally liable. (Notification and Cancellation Agreement, ¶ 5). Because Pet Life was financially unable to make any payments to Gaines or Dad's by May 2, 2003 and because the purpose of the Notification and Cancellation Agreement was to relieve Sergeant's of its royalty obligations, if that Agreement were effective it would result in neither party making any payment to Gaines or Dad's. This is, of course, what has thus far occurred in this matter and is exactly was Texas' Uniform Fraudulent Transfer Act is designed to prevent. National Loan Investors, L.P., 98 S.W. 3d at 783.

In addition to Pet Life's and Sergeant's fraudulent intent, the Notification and Cancellation Agreement also did not involve the exchange of assets and obligations of reasonably equivalent value and left Pet Life unable to pay its debts. Sergeant's was attempting to rid itself of its share of the Royalty Obligation, which was currently $540,000.[3] In order to have Pet Life reassume this obligation, Sergeant's simply paid outstanding invoices related to product that Pet Life had sold to Sergeants. (Brown, pp. 49-50; Notification and Cancellation Agreement, ¶ 1). Further, not only did Sergeant's pay an amount based on completely separate obligations to Pet Life, but it paid that amount directly to LaSalle Bank, Pet Life's largest secured creditor. In consideration for this payment, LaSalle Bank released its liens against assets of Sergeant's, which had previously been pledged as collateral for Pet Life's obligations to LaSalle Bank. (May 3, 2002 Settlement and Cooperation Agreement, attached as Exhibit "N" to Dad's Motion for Summary Judgment). From Gaines and Dad's perspective, Sergeant's rid itself of its share of the Royalty Obligation in exchange for the payment of unrelated, outstanding invoices

---

[3] Even if the contractual cap that Pet Life and Sergeant's attempted to place on this obligation is effective, which is disputed by Dad's and addressed above, Sergeant's obligation still stood at $185,663.13.

15

and made that payment directly to an unrelated creditor - essentially paying no consideration beyond amounts owed under outstanding invoices for Pet Life's assumption of this obligation. National Loan Investors, L.P., 98 S.W. 3d at 783 (holding that a fraudulent transfer must be viewed from the creditors' perspective).

      This left Sergeant's claiming it no longer owed any part of the Royalty Obligation and left Pet Life financially unable to pay that obligation. Further, Sergeant's ownership of the Trademarks was cleared of all liens formerly held by LaSalle Bank. Thus, from the creditor perspective that must be taken, this exchange did not involve reasonably equivalent value going between Sergeant's and Pet Life and resulted in Pet Life being unable to pay the debt it had purportedly reassumed from Sergeant's. Sergeant's was the only beneficiary of this obviously fraudulent transfer.

      Finally, both the fraudulent nature of the Notification and Cancellation Agreement and the unequal exchange of value that it involved is perhaps best highlighted by the fact that on May 3, 2003, one day after that Agreement, Pet Life entered into a Foreclosure Agreement that resulted in the surrender of substantially all of its assets to LaSalle Bank, for resale to a third party. (Foreclosure Agreement attached as Exhibit O to Dad's Motion for Summary Judgment). This Foreclosure Agreement ended Pet Life's operating existence, purportedly leaving Dad's and Gaines to deal with the Royalty Obligation on their own. (Foreclosure Agreement, Brown, pp. 52-54).

      As a fraudulent transfer, the entire Notification and Cancellation Agreement should be avoided in order to satisfy Dad's contribution claim. Tex. Bus. & Com. Code Ann. § 24.008 (Vernon 2005). Thus, Sergeant's is left in the position it occupied before the fraudulent

Notification and Cancellation Agreement - as a joint obligor with Dad's to Gaines on the Royalty Obligation. As such, Sergeant's is liable to Dad's for its pro-rata share of that obligation.

      **D.**      **Sergeant's has presented no facts to support is Counterclaim.**

Sergeant's has raised a Counterclaim against Dad's styled as a breach of fiduciary duty. Sergeant's will be unable to support the material elements of its Counterclaim with record evidence sufficient to establish a triable issue of fact. Indeed, Sergeant's has presented no facts to support this claim. Under Fed. R. Civ. P. 56, a party may move for summary judgment concerning a claim or defense upon which the opposing party bears the burden of proof based upon the opposing party's failure of proof on a necessary element of that claim or defense. Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552 (1986). Sergeant's can offer no evidence of record to support its Counterclaim for breach of fiduciary duty. Therefore, Dad's is entitled to judgment as a matter of law on that Counterclaim.

### III. CONCLUSION

For the foregoing reasons, Dad's is entitled to judgment as a matter of law on its claims against Sergeant's in the amount of $493,687.92 and is further entitled to judgment as a matter of law on Sergeant's Counterclaim.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.


BY:   /s/Richard A. Lanzillo
      Richard A. Lanzillo
      Neal R. Devlin
      120 West Tenth Street
      Erie, PA  16501
      (814) 459-2800

      Attorneys for Plaintiff,
      Dad's Products Company, Inc.

# 634313