IN THE COURT
OF COMMON PLEAS OF
CRAWFORD COUNTY, PENNSYLVANIA

| | |
|---|---|
| DAD'S PRODUCTS COMPANY, INC., )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>SERGEANT'S PET CARE PRODUCTS, )<br>INC. and SOWELL & COMPANY, )<br>)<br>Defendant ) | Civil Action No. AD 2005 1 5 8 |

## NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

LAWYERS REFERRAL SERVICE
302 West Ninth Street
Erie, Pennsylvania 16502
(814) 459-4411

EXHIBIT
1

IN THE COURT OF COMMON PLEAS OF
CRAWFORD COUNTY,
PENNSYLVANIA

| | |
|---|---|
| DAD'S PRODUCTS COMPANY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| SERGEANT'S PET CARE PRODUCTS, INC. and SOWELL & COMPANY, | ) Civil Action No. |
| | ) |
| | ) JURY TRIAL DEMANDED |
| Defendant | ) |

## COMPLAINT

Plaintiff, Dad's Products Company, Inc., through its counsel, Knox McLaughlin Gornall & Sennett, P.C., files this Complaint, alleging and averring as follows:

### Parties

1. Plaintiff, Dad's Products Company, Inc. ("Dad's"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and maintains a principal place of business located at 18746 Mill Street, Meadville, Pennsylvania 16335-3644. Dad's manufactures, distributes and sells a wide variety of pet food and pet treat products, including specialty dog biscuits, to wholesale and retail customers.

2. Defendant Sergeant's Pet Care Products, Inc. ("Sergeant's") is a corporation organized and existing under the laws of the State of Nevada and maintains a principal place of business located at 14748 West Center Road, Suite 303, Omaha, Nebraska

678144. Sergeant's markets, distributes and sells a broad product line of pet treat products throughout the United States, including Pennsylvania.

3. Defendant Sowell & Co. ("Sowell") is a diversified venture capital firm that maintains business interests and activities, including corporate, real estate, and telecommunications holdings, throughout the United States. Sowell is believed to be incorporated or organized under the laws of the State of Texas and to maintain offices at 3131 McKinney Avenue, Suite 200, Dallas, Texas. In or around September of 2000, Sowell acquired all or a majority of the common stock and/or assets of Sergeant's, and, based upon information and belief, Dad's avers that, at all times relevant to this action, Sergeant's has acted as an agent of Sowell.

### Material Facts

4. In or around June of 1999, Sowell acquired a company known as Pet Life Foods, Inc. ("Pet Life"), a manufacturer, distributor and seller of pet treats and pet food products. The acquisition of Pet Life was a material step in Sowell's business strategy to become a major participant in the pet food and pet treat industry and, based upon information and belief, Dad's avers that, at all times relevant to this action, Pet Life has acted as an agent of Sowell.

5. Sometime prior to November 23, 1999, Sowell and its subsidiary, Pet Life, learned that a major manufacturer and distributor of pet treats, dog biscuits and other pet food products known as Gaines Pet Foods Corporation and certain related entities (collectively "Gaines") intended to discontinue its pet treat and pet food business and potentially sell certain of its assets relative to that business.

2

6. The assets of Gaines included certain customer lists, customer relationships, and proprietary information such as trademarks, trade secrets, copyrights, recipes, formulae, and process guidelines and quality control specifications for pet treats, dog biscuits and other pet food products and certain tangible assets, such as equipment, used by Gaines to manufacture and sell pet treats, dog biscuits and pet food products.

7. In 1999, Dad's was also interested in purchasing certain assets of Gaines.

8. Specifically, Pet Life and Sowell were primarily interested in the pet treats/pet biscuits/soft-moist pet food products offered by Gaines, while Dad's was primarily interested in the "Kibble" style pet food products offered by Gaines.

9. Based upon their common interest in acquiring certain assets of Gaines, representatives of Pet Life, who also served as representatives of Sowell, and representatives of Dad's commenced negotiations concerning a possible joint agreement to purchase assets from Gaines. Several of the meetings between representatives of Pet Life/Sowell and Dad's took place at Dad's place of business in Meadville, Pennsylvania.

10. On or about November 23, 1999, Dad's, Pet Life, and Gaines, among other parties, entered into an Asset Purchase Agreement (the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit A, and a Supplier and Royalty Agreement (the "Royalty Agreement"), a copy of which is attached hereto as Exhibit B.

11. Under the Asset Purchase Agreement, Dad's and Pet Life agreed to purchase all intellectual property, customer and supply lists, licenses and permits, goodwill and other enumerated assets such as equipment relating to Gaines' pet treats and pet food business for $2,550,000.00.

3

12. In Article 12.21 of the Asset Purchase Agreement, Dad's and Pet Life expressly agreed that their obligations to Gaines under the Asset Purchase Agreement were joint and several.

13. As a separate and collateral agreement, Pet Life and Dad's agreed that Pet Life would pay sixty percent (60%) of the purchase price under the Asset Purchase Agreement and that Dad's would pay the remaining forty percent (40%) of the purchase price, except that, in the case of specific items of equipment purchased by Pet Life or Dad's pursuant to the Asset Purchase Agreement, it was agreed that the party receiving the asset would pay the purchase amount attributed to that asset.

14. Pet Life and Dad's have fully paid their joint and several obligations under the Asset Purchase Agreement with each party bearing its proportionate share of the purchase price in accordance with the allocation described in paragraph 13 of this Complaint.

15. Under Article 3.1 of the Royalty Agreement, Dad's and Pet Life jointly and severally agreed to pay Gaines a royalty equal to two percent (2%) of the net sales of existing pet food products and pet treat products made by Dad's and Pet Life to existing customers of Gaines for each royalty year during the royalty term, with a minimum yearly royalty of $300,000.00 and a maximum annual royalty of $440,000.00 (the "Royalty").

16. Under Article 3.2 of the Royalty Agreement, Pet Life and Dad's were required to make royalty payments on a quarterly basis within thirty days from the end of each quarter of each royalty year.

17. In Article 4.16 of the Royalty Agreement, Pet Life and Dad's expressly agreed that their obligations to Gaines under the Royalty Agreement were joint and several.

18. Article 4.4 of the Royalty Agreement provided that "[n]either [the Royal Agreement] nor any of the rights, interest, or obligations [thereunder] shall be assigned by any of the parties [thereto] whether by operation of law or otherwise; provided, however, that upon notice to [Gaines] and without releasing either [Pet Life or Dad's] from any of their obligations or liabilities [thereunder], [Pet Life or Dad's] may assign or delegate any or all of its rights or obligations under [the Royalty Agreement] to any Affiliate of such Buyer or any person with or into which such Buyer or any parent company of such Buyer merges or consolidates."

19. Subsequent to the execution of the Royalty Agreement, Pet Life and Dad's began to make their quarterly royalty payments under the Royalty Agreement with each party bearing its proportionate share of the Royalty based upon the amount of product purchased by it.

20. As a separate and collateral agreement, Dad's and Pet Life formed a limited liability corporation, Maple Leaf Pet Care LLC ("Maple Leaf"), in order to provide administrative services for certain joint customer accounts purchased by Pet Life and Dad's from Gaines under the Asset Purchase Agreement and to serve as a repository for ownership of certain trademarks acquired from Gaines under the Asset Purchase Agreement.

21. On or about November 16, 1999, Dad's and Pet Life entered into a Sales and Marketing Agreement (the "Marketing Agreement") with Whitecap Inc., Gerald Shulman, and David Kofsky (collectively "Whitecap"), which obligated Whitecap to provide various sales and marketing services to some of the customer accounts acquired by Dad's and Pet Life under the Asset Purchase Agreement in exchange for the payment of certain commissions and other compensation to Whitecap. A copy of the Marketing Agreement is attached hereto as Exhibit C.

5

22. The Marketing Agreement allowed Dad's and Pet Life to terminate the Marketing Agreement with or without cause, provided, however, that in the event Dad's and Pet Life terminated the Marketing Agreement without cause, Dad's and Pet Life would be required to pay Whitecap a termination fee in the amount of $100,000.00.

23. On or about August 1, 2001, Dad's and Pet Life entered into a partial Settlement Agreement (the "Settlement Agreement") under which they agreed, *inter alia*, to dissolve Maple Leaf, terminate the Marketing Agreement and clarify the rights of the parties with respect to payment of the Royalty and any amounts owed to Whitecap. A copy of the Settlement Agreement is attached hereto as Exhibit D.

24. Under the Settlement Agreement, Pet Life and Dad's agreed that Pet Life would pay sixty percent (60%) of the Royalty obligation to Gaines under the Royalty Agreement and that Dad's would pay the remaining forty percent (40%) of the Royalty obligation.

25. Under the Settlement Agreement, Pet Life and Dad's also agreed that any fees and expenses related to the termination of the Marketing Agreement would be shared equally by Pet Life and Dad's.

26. On or about September 1, 2001, Pet Life sold, transferred and assigned all of its rights, title and interest in and to certain trademarks it had purchased from Gaines under the Asset Purchase Agreements and the Royalty Agreement to Sergeant's.

27. As consideration for the sale, transfer and assignment of the trademarks, Sergeant's agreed, *inter alia*, to assume and pay any and all additional payments due to Gaines under the Royalty Agreement in an amount up to $270,000.00 and any and all additional amounts payable to Whitecap under the Marketing Agreement in an amount up to $50,000.00.

28. Pet Life's sale, transfer and assignment of the trademarks to Sergeant's and Sergeant's assumption of certain payment obligations of Pet Life to Gaines and Whitecap, among other obligations, were memorialized in a Trademark License and Transfer Agreement ("Transfer Agreement") dated September 1, 2001 between Pet Life and Sergeant's.

29. On or about September 1, 2001, Pet Life and Sergeant's also entered into a Trademark and License Mortgage (the "Mortgage") with LaSalle Business Credit, Inc. ("LaSalle"), Pet Life's secured lender.

30. Under the Mortgage, Sergeant's granted LaSalle a security interest in the trademarks that Pet Life had transferred to Sergeant's under the Transfer Agreement and LaSalle consented to the transfer of the trademarks from Pet Life to Sergeant's.

31. On or about September 1, 2001, Sergeant's also executed a "No-Offset Letter" in favor of Pet Life and LaSalle under which Sergeant's agreed that, *inter alia*, it would not offset, deduct or withhold payment of any amounts that from time to time may be owed to Pet Life by Sergeant's against any amounts that may from time to time be payable by Pet Life to Sergeant's or against any property or monies of Pet Life or equity interests in Pet Life held by Sergeant's for any claims or defenses that Sergeant's may possess at any time against Pet Life.

32. Subsequent to the execution of the Transfer Agreement and in accordance with its terms and the terms of the Settlement Agreement, Sergeant's began to pay Pet Life's sixty percent (60%) share of the Royalty payable under the Royalty Agreement while Dad's continued to pay its forty percent (40%) share of the Royalty.

33. Sometime between September 1, 2001 and May 3, 2002, Sowell and Sergeant's conspired and ultimately agreed to engage in a series of transactions designed to relieve Sergeant's of its remaining obligations under the Transfer Agreement and to impose upon Dad's alone the remaining obligations of the parties under the Royalty Agreement while allowing Sergeant's to retain assets transferred from Pet Life under the Transfer Agreement or to transfer those assets to third parties for the benefit of Sergeant's or Sowell.

34. Pursuant to the agreement between Sowell and Sergeant's, on or about April 30, 2002, Sergeant's failed and refused to tender its share of the Royalty and, thereafter, communicated its intention not to make any further quarterly royalty payments pursuant to the Transfer Agreement and the Royalty Agreement.

35. At or about the time that Pet Life and Sergeant's defaulted on the payment of their share of the Royalty to Gaines, Sowell and Sergeant's caused certain agreements to be executed that purport to release Sergeant's from its obligations, including its obligations under the Transfer Agreement.

36. At or about the time of the default of Pet Life and Sergeant's with respect to the Royalty, representatives of Sowell and Sergeant's advised Dad's that Dad's would be provided an opportunity to purchase the assets of Pet Life that were under the control of Sowell, Sergeant's and LaSalle only if Dad's agreed to make certain monetary payments to Sowell.

37. When Dad's declined to agree to make such payments to Sowell, Sowell caused Sergeant's and LaSalle to transfer the assets in question to certain third parties with the understanding that Sowell and/or Sergeant's or other parties or persons related to Sowell would

8

receive payments and/or other consideration from those third parties in the future, without any benefit or consideration to Pet Life.

38. No further royalty payments under the Royalty Agreement have been made by Sergeant's or Pet Life after Sergeant's payment on or about [date].

39. Despite the default of Pet Life and Sergeant's, Dad's continued to pay its forty percent (40%) share of the Royalty under the Royalty Agreement in accordance with the Settlement Agreement.

40. Subsequent to Pet Life's and Sergeant's default of their obligations under applicable agreements, Gaines made demand upon Dad's to pay the share of Pet Life and Sergeant's under the Royalty Agreement.

41. As a consequence of the defaults and repudiations by Pet Life and Sergeant's, Dad's was required to undertake and satisfy the obligations of Pet Life and Sergeant's under the Royalty Agreement and the Transfer Agreement.

42. In order to mitigate its losses and damages, on or about May 23, 2002, Dad's made a lump sum prepayment of the Royalty in the amount of seven hundred fifty thousand dollars ($750,000.00) in full satisfaction of Gaines' right to receive the Royalty as otherwise provided in Article 3.1 of the Royalty Agreement.

43. Contemporaneous with Dad's lump sum prepayment of the Royalty, Gaines assigned to Dad's all of its rights under the Royalty Agreement.

## COUNT I
### Dad's vs. Sergeant's and Sowell
### (Fraudulent Transfer)

44. Dad's incorporates by reference paragraphs 1 through 43 of its Complaint.

45. Pet Life's release of Sergeant's under the Transfer Agreement was made with actual intent to hinder, delay and defraud Dad's and Gaines as creditors of Pet Life.

46. In the alternative, Pet Life's release of Sergeant's under the Transfer Agreement was made without Pet Life receiving a reasonably equivalent value in exchange for the transfer and Pet Life was engaged in a business or transaction for which the remaining assets of Pet Life were unreasonably small in relation to the business or transaction or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

47. Sergeant's and Sowell are insiders and/or affiliates of Pet Life with respect to the transfers and transactions at issue herein.

48. As a direct and proximate result of the fraudulent transfers described herein, Dad's, in its own right, and as the assignee of and successor to Gaines under the Royalty Agreement, has sustained damages, including the amounts paid by Dad's in excess of its proportionate share of the Royalty under the Royalty Agreement and the Transfer Agreement.

WHEREFORE, Dad's demands judgment against Sergeant's and Sowell in an amount in excess of $25,000.00, plus interest, costs of suit and such other relief as the Court deems appropriate.

## COUNT II
### Dad's vs. Sergeant's
### (Contribution)

49. Dad's incorporates by reference paragraphs 1 through 48 of its Complaint.

50. Pet Life's purported release of Sergeant's under the Transfer Agreement was ineffective to discharge or release Sergeant's from its obligations with respect to the

payment of Pet Life's share of the Royalty and Pet Life's share of the obligations to Whitecap, pursuant to the Marketing Agreement because, *inter alia*, the release was not supported by adequate consideration and was given with the intent to defraud Dad's and Gaines as creditors of Pet Life.

51. Dad's has satisfied the joint and several obligations of the parties under the Royalty Agreement and the Transfer Agreement in excess of Dad's agreed upon forty percent (40%) share of the Royalty as provided for in the Settlement Agreement.

52. Having paid more than its proportionate share of its liability for the Royalty under the Royalty Agreement, Dad's is entitled to contribution from Sergeant's to the extent of the benefit conferred upon Sergeant's by Dad's payment.

WHEREFORE, Dad's demands judgment against Sergeant's in an amount in excess of $25,000.00, plus interest, costs of suit and such other relief as the Court deems appropriate.

### COUNT III
### Dad's vs. Sergeant's and Sowell
### (Unjust Enrichment)

53. Dad's incorporates by reference paragraphs 1 through 52 of its Complaint.

54. Sergeant's and Sowell have been unjustly enriched as a result of Dad's being compelled to pay in excess of its proportionate share of the Royalty under the Royalty Agreement.

WHEREFORE, Dad's demands judgment against Sergeant's and Sowell in an amount in excess of $25,000.00, plus interest, costs of suit and such other relief as the Court deems appropriate.

## COUNT IV
### Dad's vs. Sergeant's
### (Breach of Contract)

55. Dad's incorporates by reference paragraphs 1 through 55 of its Complaint.

56. Gaines and Dad's were intended third-party beneficiaries of the payment obligations of Sergeant's under the Transfer Agreement.

57. All rights of Gaines against Sergeant's and Pet Life under the Royalty Agreement and the Transfer Agreement accrued to Dad's by operation of law and pursuant to Gaines' assignment to Dad's on or about May 23, 2002.

58. In the alternative, based upon information and belief, it is averred that Sergeant's is the successor to or alter ego of Pet Life under the Royalty Agreement and the collateral agreements between Pet Life and Dad's.

59. Sergeant's has materially breached the Transfer Agreement, the Royalty Agreement, and the Settlement Agreement by failing and refusing to pay its share of the Royalty.

60. As a direct and proximate result of Sergeant's breaches of contract, Dad's, in its own right, and as the assignee of and successor to Gaines under the Royalty Agreement and the Transfer Agreement, has sustained damages, including the amounts paid by Dad's in excess of its proportionate share of the Royalty under the Royalty Agreement and the Transfer Agreement.

WHEREFORE, Dad's demands judgment against Sergeant's in an amount in excess of $25,000.00, plus interest, costs of suit and such other relief as the Court deems appropriate.

Respectfully submitted,

KNOX McLAUGHLIN GORNALL & SENNETT, P.C.

By: _____
Richard A. Lanzillo
Pa. I.D. 53811
120 West Tenth Street
Erie, PA 16501-1461
(814) 459-2800

Attorneys for Plaintiff
Dad's Products Company, Inc.

# 486156