IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
CIVIL ACTION LAW

DAD'S PRODUCTS COMPANY, INC.,    )
        ) ELECTRONICALLY FILED BRIEF
        Plaintiff,    )
        )
        vs.    )
        ) C.A. No. 03-350-ERIE
SERGEANT'S PET PRODUCTS, INC.    )
        )
        Defendant    )
        )
        )

## CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF DAD'S PRODUCTS COMPANY, INC.'S MOTION FOR SUMMARY JUDGMENT

AND NOW, comes the plaintiff, Dad's Products Company, Inc., and files the following

Concise Statement of Material Facts in support of its Motion for Summary Judgment:

### The Trademark Purchase From Gaines and the Royalty Obligation

1.    On November 23, 1999, Dad's and a non-party to this suit, Pet Life Foods

entered into an Asset Purchase Agreement with Gaines and several Gaines-related entities to

purchase various trademarks used in the sale of pet food products (the "Trademarks").

(November 23, 1999 Asset Purchase Agreement, attached to Dad's Motion for Summary

Judgment as Exhibit "A").

2.    As payment for the Trademarks, and the book of customers these trademarks

carried with them, Dad's and Pet Life agreed to pay to Gaines $2,550,000 at the time Dad's and

Pet Life received the Trademarks, (Id. at ¶ 2.2).

3.      In addition to this up-front payment, the parties to this Asset Purchase Agreement also entered into a related Supplier and Royalty Agreement (the "Royalty Agreement"). (November 23, 1999 Royalty Agreement, attached to Dad's Motion for Summary Judgment as Exhibit "B").

4.      Pursuant to relevant terms of the Royalty Agreement, Dad's and Pet Life agreed to make quarterly royalty payments to Gaines through December 31, 2004.  (the "Royalty Obligation"). The specific terms governing the Royalty Obligation provided:

> (a)     Dad's and Pet Life jointly and severally agree to pay to [Gaines] a royalty equal to 2% of the Net Sales of Existing Pet Food Products made by Dad's to Existing Pet Food Customers for each Royalty Year during the Royalty Term.

> (b)     Dad's and Pet Life jointly and severally agree to pay to [Gaines] a royalty equal to 2% of the Net Sales of Existing Pet Treat Products made by Pet Life to Existing Pet Treat Customers for each Royalty Year during the Royalty Term.

> (c)     If the total royalty payments in any Royalty Year are less than $300,000, Dad's and Pet Life shall jointly and severally make additional payments which, in the aggregate, equal to the amount which results when the amount of royalty payments made in such Royalty Year is subtracted from $300,000.  Notwithstanding the foregoing, in no event shall Dad's and Pet Life pay to [Gaines] less than an aggregate of $75,000 per quarter as computed on a cumulative quarterly basis for the applicable Royalty Year.

> (d)     The maximum royalty payments payable by [Dad's and Pet Life] to [Gaines] hereunder in any Royalty Year shall be $440,000.

(Royalty Agreement, ¶ 3.1 (emphasis added)).

5.      Between January 1, 2000 and September 1, 2001, Dad's and Pet Life made joint royalty payments to Gaines under the above-described terms. Dad's and Pet Life agreed to share in the joint and several Royalty Obligation in proportion to the estimated value of the Trademarks each received from Gaines.  (Deposition of Alan Brown, attached to Dad's Motion

for Summary Judgment as Exhibit "C", pp. 10-11; Deposition of G. Thomas Lang, attached to

Dad's Motion for Summary Judgment as Exhibit "D", pp. 21-22).  Thus, Dad's was responsible

for 40% of the Royalty Obligation and Pet Life was responsible for 60%.

### Maple Leaf

6.      Once Dad's and Pet Life obtained the trademarks from Gaines, they divided them

such that Pet Life received trademarks associated with products that it produced and Dad's

received trademarks associated with products it produced.  Dad's and Pet Life also entered into a

marketing arrangement under which they were able to sell the Trademark products to Gaines'

former customers.  (Lang, pp. 28-29; Brown, p. 12).

7.      While this arrangement was fairly detailed, it generally involved Dad's or Pet Life

selling Trademark product to any customers with which they had an existing relationship.

(Brown, pp. 12-13).

8.      Another part of this marketing arrangement involved former Gaines customers

with whom neither Dad's nor Pet Life had an existing relationship.  In an attempt to provide

efficient service to these customers, Dad's and Pet Life entered into a joint venture through

Maple Leaf, LLC, ("Maple Leaf).  (Lang, pp. 28-29; Brown, pp. 12-13).

9.      Maple Leaf was created by Dad's and Pet Life to serve as the customer contact for

former Gaines customers that were not otherwise served by Dad's or Pet Life.  (Id).

10.     When these "Maple Leaf customers" ordered product, they did so through Maple

Leaf and its sales staff.  Dad's and Pet Life produced product that would then be shipped from

Maple Leaf to the customer.  The Maple Leaf sales would then be allocated to Dad's and Pet Life

based on the types of products sold.  (Lang, pp. 28-31; Brown, pp. 12-25).

11.     By August, 2001, Dad's and Pet Life agreed to wind-down Maple Leaf. (August 1, 2001 Settlement Agreement ("Maple Leaf Settlement Agreement"), attached as Exhibit "E" to Dad's Motion for Summary Judgment).

12.     They agreed to this wind-down for various reasons, including Dad's experience that Pet Life was unable to provide sufficient product to Maple Leaf.  (Lang, pp. 33-34).

13.     On August 1, 2001, Dad's and Pet Life entered into the Maple Leaf Settlement Agreement through which they agreed to wind-down Maple Leaf by December 31, 2001. (Maple Leaf Settlement Agreement, p 1).

14.     As part of this Agreement, Dad's and Pet Life reaffirmed their joint and several Royalty Obligation to Gaines and their respective 40% and 60% split of that Obligation.  (Id. at 114).

### Sergeant's Acquisition of the Trademarks and Assumption of Pet Life's Royalty Obligation.

15.     Unbeknownst to Dad's, at or before the time that Dad's and Pet Life were discussing the winding-down of Maple Leaf, Pet Life was also attempting to sell the Trademarks that it purchased from Gaines to an affiliate of Pet Life.  (Brown, pp. 34-35).

16.     On September 1, 2001, exactly one month after Dad's and Pet Life executed the Maple Leaf Settlement Agreement, Pet Life entered into a Trademark License and Transfer Agreement with Sergeant's.  (Trademark License and Transfer Agreement ("Trademark Transfer Agreement"), attached to Dad's Motion for Summary Judgment at Exhibit "F").

17.     Pursuant to relevant terms of the Trademark Transfer Agreement, Sergeant's purchased from Pet Life the Trademarks Pet Life had purchased from Gaines.  (Id. at ¶ l(a)).

18.     To acquire these Trademarks, Sergeant's agreed to pay Pet Life $600,000 and to "assume and pay any and all additional payments due to Gaines Pet Foods Corp., pursuant to the

Supplier and Royalty Agreement dated November 23, 1999, in an amount up to $270,000 . . ." (<u>Id</u>. at ¶ l(b); Brown, pp. 39-40).

19.     Neither Dad's nor Gaines was made aware of the existence or terms of the Trademark Transfer Agreement until after Sergeant's refused to make required royalty payment to Gaines.  (Brown, pp. 40-41; Deposition of Robert G.  Dwyer, attached to Dad's Motion for Summary Judgment as Exhibit "G", p. 18; Deposition of Robert Scharf, attached to Dad's Motion for Summary Judgment as Exhibit "H", p. 12).

20.     While Pet Life and Sergeant's did not notify Dad's of the existence or terms of the Trademark Transfer Agreement, Dad's was aware that Sergeant's had made Pet Life's share of the royalty payments for the 3rd and 4th quarters of 2001.  (Lang, pp. 63-66).

21.     Sergeant's and Pet Life also made Dad's aware that as part of the wind-down of Maple Leaf, which primarily involved the allocation of Maple Leafs customers, Sergeant's would be taking responsibility for many customers that would have otherwise gone to Pet Life.  (Lang, p.  59)

22.     Thus, while Dad's was not privy to the terms of the Trademark Transfer Agreement or even of its existence, Dad's did understand that Sergeant's was taking on Pet Life's share of the Royalty Obligation and that it was taking responsibility for many of the customers that Pet Life would otherwise serve.  (Lang, pp. 59, 63-33).

23.     This shift did not strike Dad's as odd because, by September, 2001, both Pet Life and Sergeant's were commonly owned and controlled.  (Lang, p. 51; Brown, pp. 5, 34).  The majority shareholder of both was James Sowell.  (Brown, p. 5).  Alan Brown was also a shareholder in both and served as the chairman of board for both Sergeant's and Pet Life. (Brown, p. 34).

**Sergeant's refusal to honor its Royalty Obligation**

24.    Between September 1, 2001 and May 1, 2002, Dad's and Pet Life/Sergeant's completed the Maple Leaf wind-down.  (Lang, p. 52).

25.    During that same period of time, Sergeant's made 60% of the royalty payments that were due to Gaines.  Specifically, Sergeant's provided Dad's a check for $39,515.24 for the 3rd quarter of 2001 payment and paid $44,821.60 directly to Shato Holdings, Ltd.  (Gaines sole shareholder), for the 4th quarter of 2001 payment.  (Payment Records, attached to Dad's Motion for Summary Judgment as Exhibit "I").

26.    The 1st quarter of 2002 royalty payment to Gaines was due by the end of April, 2002.  On April 29, 2002, Dad's sent its share of the royalty payment to Gaines with an explanation that Sergeant's had not yet provided their share of the payment.  (April 29, 2002 Letter from Dad's to Gaines, attached to Dad's Motion for Summary Judgment as Exhibit "J").

27.    Shortly after this letter, Dad's came to learn that in early May, 2001, Sergeant's and Pet Life entered into a series of transactions in an attempt to relieve Sergeant's of the Royalty Obligation it had assumed and with the end result of vesting ownership of the Trademarks previously owned by Pet Life in Sergeant's and leaving Pet Life insolvent.  (Dwyer, p. 18; Brown, p. 52; May 2, 2002 Notification and Cancellation Agreement, attached to Dad's Motion for Summary Judgment as Exhibit "K"; May 3, 2002 Foreclosure Agreement, attached to Dad's Motion for Summary Judgment as Exhibit "L").

28.    Pet Life and Sergeant's were commonly owned and controlled at this point and entered into these transactions with full knowledge that Pet Life was financially unable to make any royalty payments to Gaines.  (Brown, pp. 51-52).

29.     Sergeant's and Pet Life informed Dad's that neither party would be making any royalty payment under the Royalty Agreement.  (Lang, p. 67; Dwyer, p. 21).

30.     Therefore, as a joint and several obligor with Pet Life and Sergeant's, Dad's was obligated to Gaines for 100% of the Royalty Obligation.  To mitigate its damages, Dad's paid the full $72,813.21 1st quarter of 2002 royalty payment to Gaines.  (Dwyer, pp. 32-34).

31.     Dad's and Gaines then entered into a settlement Agreement pursuant to which Gaines accepted a lump sum payment of $750,000 in satisfaction of Dad's, Pet Life's and Sergeant's royalty obligations.  (May 23, 2002 Settlement Agreement (the "Settlement Agreement"), attached to Dad's Motion for Summary Judgment as Exhibit "N").

32.     Dad's agreed to this settlement in an attempt to mitigate its damages and after receiving notification from Pet Life and Sergeant's that they refused to make the required royalty payments.  (Dwyer, pp. 32-34).

33.     Absent Dad's payment of the 1st quarter of 2002 royalty payment and the

Settlement Agreement with Gaines, Dad's, Pet Life and Sergeant's would have been obligated to

make a minimum of $900,000 in future royalty payments.  (Dwyer, p. 33).

Respectfully submitted,

KNOX McLAUGHLIN GORNALL &
SENNETT, P.C.


BY:     /s/Richard A. Lanzillo_____
        Richard A. Lanzillo
        Neal R. Devlin
        120 West Tenth Street
        Erie, PA  16501
        (814) 459-2800

        Attorneys for Plaintiff,
        Dad's Products Company, Inc.