**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**
**ERIE DIVISION**

DAD'S PRODUCTS COMPANY, INC.,　　）
　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　）　Civil Action No. 03-350
　　　　　　Plaintiff,　　　　　　）
　　　　　　　　　　　　　　　　）
　　v.　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　）　The Honorable Sean J. McLaughlin
SERGEANT'S PET CARE PRODUCTS,　）
INC.　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　）
　　　　　　Defendant.　　　　　　）

**SERGEANT'S PET CARE PRODUCTS, INC.'S OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

Sergeant's Pet Care Products, Inc. ("SPCP") files this Opposition to Dad's Products

Company, Inc.'s Motion for Summary Judgment.

## I.　INTRODUCTION

The unambiguous agreements governing this dispute establish that Dad's Products

Company, Inc.'s ("Plaintiff" or "Dad's") claims against SPCP[1] cannot go forward as a matter of

law.  Under no circumstances or reasonable reading of the agreements at issue can Plaintiff

establish, as it now argues, that SPCP was or is "jointly and severally" obligated and/or a "joint

obligor" with Plaintiff for the royalty payments at issue and allegedly owed to Gaines Pet Foods

Corporation ("Gaines"), a non-party.  It is undisputed that Plaintiff and SPCP are not parties to a

contract.  It is also undisputed that at all times relevant, Plaintiff and Pet Life Foods, Inc. ("Pet

---

[1] Specifically, Plaintiff has asserted claims against SPCP for "fraudulent transfer" (Count I), contribution
(Count II), unjust enrichment (Count III) and breach of contract (Count IV).

Life"), another non-party,[2] expressly and unconditionally obligated themselves only, jointly and severally, to make such royalty payments to Gaines. At all times such obligations remained with Plaintiff and Pet Life, regardless of whether SPCP undertook any limited obligation on Pet Life's behalf to make certain payments to Gaines.

Plaintiff has also failed to establish that SPCP is liable for the alleged "fraudulent transfer" about which Plaintiff complains. Not only does Plaintiff's fraudulent transfer claim fail under any relevant authority, but it involves matters and seeks adjudication of issues that Plaintiff lacks standing to pursue. Rather, such matters (if proper at all) are within the exclusive jurisdiction of the Trustee in the Pet Life Bankruptcy Case.

Nevertheless, Plaintiff now contends that it is entitled to summary judgment on all of its claims (despite that Plaintiff's brief in support of its motion fails to even address its unjust enrichment or breach of contract claims). The sum and substance of Plaintiff's request is its invalid argument that SPCP purportedly "admitted" to an express assumption of a "joint and several" obligation, with Dad's, to make certain royalty payments to Gaines. *See* Brief in Support of Dad's Products Company, Inc.'s Motion for Summary Judgment ("Plaintiff's Brief"), p. 1. Plaintiff's argument is not only a gross mischaracterization of the governing agreements, but it is legally unsupportable. Because Dad's entire theory of liability against SPCP is predicated upon a fundamental misconception and misreading of the governing documents, Dad's claims against SPCP must fail.

---

[2] Pet Life's absence in this action is telling. Pet Life filed for bankruptcy in the United States Bankruptcy Court for the Western District of Michigan, Southern Division, Case No. SG-02-07387, (the "Pet Life Bankruptcy Case"). A copy of the docket is attached to SPCP's recently filed Memorandum in Support of its Motion for Summary Judgment Pursuant to Rule 56 of the *Federal Rules of Civil Procedure* as Exhibit 1. This Court may take judicial notice of the Pet Life Bankruptcy Case. *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426-427 (3d Cir. 1999).

As will be demonstrated below and as set forth in SPCP's moving summary judgment papers, Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") should be denied[3] and summary judgment against Plaintiff on all of Plaintiff's claims should be entered.

## II.    RELEVANT BACKGROUND AND SPCP'S SUMMARY JUDGMENT MOTION

On September 26, 2005, SPCP filed its Motion for Summary Judgment Pursuant to Rule 56 of the *Federal Rules of Civil Procedure* ("Motion"), Memorandum in support ("SPCP's Memorandum") and Concise Statement of Material Facts in support ("Concise Statement"). The relevant facts and background necessary to resolve both parties' motions for summary judgment are set forth in SPCP's Memorandum. *See* SPCP's Memorandum, pp. 2-7. SPCP's Memorandum establishes that judgment should be entered against Plaintiff and in favor of SPCP on each of the counts in Plaintiff's Complaint.[4] In opposition to Plaintiff's Motion, SPCP,

---

[3] In ruling upon Plaintiff's Motion, the Court must view the facts in the light most favorable to SPCP. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The burden of demonstrating the absence of genuine issues of material fact initially rests with the moving party regardless of which party would have the burden of persuasion at trial." *Piezo Crystal Co. v. The Uddeholm Corp.*, 870 F. Supp. 589, 594 (M.D. Pa. 1994) (citing authorities).

[4] Plaintiff contends in its Motion that Texas law controls the present dispute. Plaintiff's Brief, p. 8. SPCP's Memorandum focuses upon Pennsylvania law. However, the issue is unclear and complicated because (1) Plaintiff's Complaint does not specifically plead which documents and agreements govern which of Plaintiff's four counts against SPCP; and (2) the governing documents contain various choice-of-law provisions. Namely, the agreements contain Pennsylvania choice of law provisions (August 1, 2001 Settlement Agreement between Dad's and Pet Life ["Settlement Agreement"]; May 23, 2002 Agreement between Dad's, Pet Life, Gaines and Shato Holdings, Ltd. ["Agreement"]), Texas choice of law provisions (September 1, 2001 Trademark License and Transfer Agreement between Pet Life and SPCP ["Transfer Agreement"]; May 2, 2002 Notification and Cancellation Agreement between Pet Life and SPCP ["Notification Agreement"]), Illinois choice of law provisions (May 3, 2002 Foreclosure Agreement between World Pet, LLC, LaSalle Business Credit, Inc. ("LaSalle") and Pet Life; May 3, 2002 Settlement and Cooperation Agreement between Pet Life, SPCP, Brown and LaSalle ["Cooperation Agreement"]), among other such provisions. SPCP maintains that Pennsylvania law is applicable to most, if not all, of Plaintiff's claims. However, the choice-of-law employed by this Court is merely academic because Dad's claims fail under any state law applied. In this response, SPCP focuses upon the failure of Plaintiff's claims under Texas and Illinois law.

therefore, incorporates by reference its Motion, Memorandum and Concise Statement as if set forth fully herein.

For purposes of the Court's convenience, however, and to highlight the central arguments supporting a grant of summary judgment in favor of SPCP on Plaintiff's claims (as set forth in SPCP's Memorandum[5] and herein), Plaintiff's claims should be dismissed because, *inter alia*:

### As to Count I (Fraudulent Transfer)

- Count I involves property that is within the Pet Life bankruptcy estate and the rights of Pet Life's creditors.  Count I is an exclusive matter for the Trustee in the Pet Life Bankruptcy Case and Plaintiff lacks standing to pursue it in this Court.

- Count I fails to plead a claim.  It fails to plead that any transaction should be "avoided" because Pet Life was rendered insolvent as a result of a transfer of assets and, at the time of such transfer, Plaintiff was owed a debt *from Pet Life* which cannot now be paid *to Plaintiff* because assets were transferred away for less than market value.  Rather, it improperly seeks to recoup monies voluntarily paid *after* the alleged "fraudulent transfer" occurred instead of seeking an "unwinding" or "avoidance" of it.

- The necessary parties are not before the Court.  LaSalle – the party to whom the alleged fraudulently transferred funds were paid – is not a party.  Moreover, Count I is predicated upon the intent *of Pet Life* regarding actions that *Pet Life* took and transactions that *Pet Life* entered into.  Therefore, Count I also cannot be adjudicated without Pet Life.

- The elements for a fraudulent transfer claim do not exist.  The Supplier and Royalty Agreement between Plaintiff, Pet Life and Gaines, among other entities (the "Royalty Agreement") establishes that – at all times relevant – Pet Life retained the obligation to make Royalty Payments to Gaines.  Pet Life also plainly received fair consideration for the release of SPCP from any Royalty Payments.[6]

### As to Count II (Contribution)

- Count II does not plead that Plaintiff and SPCP are "joint tortfeasors" liable in tort to a party for injury to persons or property.  Count II, therefore, is not legally cognizable.

---

[5] All of the capitalized terms in SPCP's Memorandum shall have the same meaning herein.

[6] Specifically, SPCP offset its claim against Pet Life (for $447,446.38) against Pet Life's claim against it.  In addition, SPCP wired $362,112.13 to LaSalle on behalf of Pet Life and SPCP actually paid such amount in order to be relieved of up to $230,000 in liabilities.

00659429.DOC

- Plaintiff's argument that an "equitable contribution" theory supports Count II is fatally flawed. The theory, even if valid, does not apply to the facts at issue here. Furthermore, SPCP was *released* by Pet Life from any obligations for further Royalty Payments *before* Plaintiff made any alleged lump sum payment of the Royalty to Gaines.

### As to Count III (Unjust Enrichment)

- Each and every of Plaintiff's claims centers around the plain terms of written agreements. Therefore, Plaintiff cannot pursue an unjust enrichment claim as a matter of law.

### As to Count IV (Breach of Contract)

- Plaintiff is not a "third party beneficiary" to the Transfer Agreement because, *inter alia*, (1) there is no allegation that Pet Life and/or SPCP intended to confer any benefits *upon Plaintiff* therein; and (2) the express language of the Transfer Agreement defeats Plaintiff's claim.

- To the extent that Count IV is predicated upon an alleged "successor" liability theory, it fails because (1) there is no assumption by SPCP of liability for Pet Life's obligations under the Royalty Agreement (or Settlement Agreement); (2) Plaintiff concedes that under the Royalty Agreement, neither Pet Life nor Plaintiff were released from their obligations or liabilities even if they were assigned; and (3) SPCP's obligation for any Royalty Payments terminated with the Notification Agreement.

- There are no facts supporting that SPCP is the "alter ego" of Pet Life or vice versa. Even if SPCP was the "alter ego" of Pet Life, then the Trustee in the Pet Life Bankruptcy Case is charged with bringing Plaintiff's breach of contract action.

- SPCP is not a party to the Royalty Agreement. SPCP had no obligations under the Royalty Agreement (or Settlement Agreement) and cannot be in breach thereof.

### As to Counts II, III and IV

- Counts II, III and IV are also nothing more than a restatement of Count I for "fraudulent transfer." These claims also belong in the Pet Life Bankruptcy Case, if anywhere.

## III.   ARGUMENT

**A.   Plaintiff's Motion for Summary Judgment Should be Denied as to Each of Plaintiff's Claims[7]**

### 1.   Dad's has No Cognizable Claim for Contribution under Texas Law (or Any Other Potentially Applicable Law).

Plaintiff's Brief is predicated almost entirely upon, if not entirely upon, the invalid theory that SPCP is a purported "joint obligor" with Plaintiff and/or that SPCP is "jointly and severally liable" with Plaintiff to Gaines for the Royalty Payments. *See* Plaintiff's Brief, pp. 8-10. The applicable law as well as the operative agreements at issue squarely defeat Plaintiff's argument.

As an initial matter, Texas has *four* different contribution schemes, none of which is applicable to contract claims. *CTTI Priesmeyer v. K&O*, 164 S.W.3d 675, 684 (Tex. App. 2005) ("while Texas has four different contribution schemes, each is only applicable to particular types of tort claims and not to contract claims"), *citing First Title Co. of Waco v. Garrett*, 860 S.W.3d 74, 79 (Tex. 1993). Stated in other terms, "contribution is allowed in Texas only among joint tortfeasors." *CBI NA-CON, Inc. v. UOP Inc.*, 961 S.W.2d 336 (Tex. App. 1997); *see also CTTI Priesmeyer, supra*; Tex. Civ. Prac. & Rem. Code Ann. § 32.001 *et seq.*; Tex. Civ. Prac. & Rem. Code Ann. § 33.001 *et seq.*; and *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex. 1984).

Here, Plaintiff's claim for contribution in Count II, as pleaded, is and can only be predicated upon contract, not tort liability. Plaintiff alleges that "[h]aving paid more than its

---

[7] Again, Plaintiff's Brief fails to address Counts III (unjust enrichment) and IV (breach of contract) of Plaintiff's Complaint. Rather, Plaintiff's Brief solely focuses upon its "contribution" and "fraudulent transfer" claims. Nevertheless, Plaintiff seemingly seeks summary judgment on all of its claims. *See* Plaintiff's Brief, p. 18. Plaintiff's failure to address Counts III and IV in its Brief is grounds to disregard them and deny Plaintiff's Motion as to these claims with prejudice. Indeed, Plaintiff's silence should be viewed as a concession that they lack merit. For purposes herein, SPCP's arguments are directed to Plaintiff's contribution and fraudulent transfer claims, unless otherwise noted.

00659429.DOC

proportionate share of its liability for the Royalty under the Royalty Agreement [to which SPCP

is not a party], [Plaintiff] is entitled to contribution from [SPCP] to the extent of the benefit

conferred upon [SPCP] by [Plaintiff's] payment." Complaint ¶52. The pleaded basis for

Plaintiff's contribution claim is undoubtedly contractual – *i.e.*, the Royalty Agreement (and/or

the other written agreements at issue). For obvious reasons, Plaintiff has not pleaded that SPCP

is somehow liable in tort, or that SPCP and Dad's are joint tortfeasors to some other party for

some injury to persons or property. Absent such allegations, a contribution claim cannot exist.

*See CTTI Priesmeyer, CBI NA-CON, supra.* [8]

> ### 2.     Dad's Attempt to Apply a Purported "Equitable Contribution"
> ### Theory is Improper and Does Not Resurrect its Contribution Claim.

Despite the clear authority invalidating Plaintiff's contribution claim above, Plaintiff

attempts to resurrect it by arguing that "equitable" principles support it. *See* Plaintiff's Brief, pp.

8-10. Plaintiff's attempt to supplant the legislature should be rejected for various reasons.

*First*, the sole and outdated case relied upon by Plaintiff in Plaintiff's Brief, *Nelms v.*

*Chazanow*, 404 S.W.2d 359, 362 (Tex. Civ. App. 1966) (*see* pp. 8, 11), does not remotely

support Plaintiff's position. In *Nelms*, the central facts involved the parties' execution of one

promissory note, with one party (appellee) co-signing the note for one-half of the amount. The

appellee later failed and refused to make any payment thereon, and the other party (appellant)

---

[8] The result is the same under Illinois law. "[C]ontribution is predicated upon tort, not contract liability." *Cosey v. Metro East Sanitary Dist.*, 581 N.E.2d 914, 917-918 (Ill. App. Ct. 1991), *citing Coney v. J.L.G. Indus., Inc.*, 454 N.E.2d 197 (Ill. 1983). Contribution is a statutory remedy which involves a sharing of payment of damage awards and is available to parties who are subject to liability in *tort* arising out of the same injury. *Cosey*, 581 N.E.2d at 917-918, *quoting Hennepin Drainage & Levee Dist. v. Klingner*, 543 N.E.2d 967, 968 (Ill.App.Ct. 1989) (emphasis added). Claims for contribution sounding in contract are properly dismissed. *See Cosey; Hennepin*. Pennsylvania law is consistent. *See* SPCP's Memorandum, p. 16.

was compelled to pay the entire amount of the note.[9] Against this entirely distinguishable set of

facts, the *Nelms* court remarked that "[e]ach joint obligor in a contract is liable to the other for

contribution to indemnify him for any payments made in excess of his prorata share." *Nelms*,

404 S.W.2d at 362. Based primarily upon an analysis of statute of limitation issues, the court

found that summary judgment against appellee should not have been granted. *Id.* at 365.

The *Nelms* case is plainly inapplicable here. It is undisputed that Plaintiff and SPCP are

not parties to any contract, promissory note or the like. It also cannot be disputed that SPCP did

not "co-sign" on any obligations with Plaintiff for any Royalty Payments owed to Gaines.

Further, no relevant terms of any operative agreements created a "joint obligor" relationship

between SPCP and Plaintiff. *See also* Section III.A.3., *infra*. Therefore, the *Nelms* has no

bearing on the case at hand.

*Second*, neither the Restatement of Restitution nor Williston on Contracts validate

Plaintiff's contribution claim. Indeed, Plaintiff's reliance upon such treatises (Plaintiff's Brief, p.

8), rather than any controlling case law, tellingly reflects that Plaintiff's argument lacks

foundation. In fact, and for example, application of Section 81 of the Restatement on Restitution

actually defeats Dad's argument that SPCP could ever be liable to Dad's. It states:

> a person is under no duty of contribution to another if the first is a surety for one
> debt and the other is a surety for another debt, even though both debts are owed to
> the same creditor by the same debtor.

Restatement of Restitution, § 81, comment c. Here, Pet Life and Plaintiff were obligated

to Gaines. Assuming *arguendo* that SPCP ever became a surety of Pet Life's obligations,

which Dad's improperly contends, SPCP's obligation was based upon a separate contract;

---

[9] Alternative (and convoluted) facts involving the parties' alleged joint purchase of an interest in certain leases were also discussed, but are not germane to the relevant statements of the Court cited herein.

was limited in its amount; and was subject to further agreements between Pet Life and SPCP. This debt was distinct from the joint and several obligation owed by Pet Life and Plaintiff to the same creditor - Gaines. Accordingly, contribution is entirely inapplicable to the present facts.[10]

*Third,* Dad's attempt to have this Court apply equitable principles to defeat express, unambiguous contractual language should be rejected. In Texas (as in Pennsylvania and Illinois), "when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract or unjust enrichment theory." *Dardas v. Fleming, Hovenkamp & Grayson,* 2005 WL 1981133 (Tex. App. August 18, 2005), *citing Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671, 684 (Tex. 2000). "The rationale behind this rule is that parties should be bound by their express agreements and that recovery under an equitable theory is generally inconsistent with the express agreement when a valid agreement already addresses the matter." *See id.*

It is undisputed that valid, express contracts fully cover the subject matter of the parties' dispute. *See* Plaintiff's Brief, pp. 8-12. The Royalty Agreement and the Transfer Agreement, in particular, cover the exact subject matter of the parties' present disputes. As such, application of purported "equitable" principles is prohibited. *See Dardas, supra.* Dad's, therefore, cannot

---

[10] Plaintiff also attempts to support its "equitable contribution" theory by unfounded arguments that SPCP, somehow, limited Pet Life's ability to generate revenue by purchasing trademarks through the Transfer Agreement. In fact, Plaintiff accuses SPCP of "stripping" Pet Life of generating assets that could have been used to make Royalty Payments. Plaintiff's Brief, p. 11. The terms of the Transfer Agreement (Ex. 3 to SPCP's Memorandum) disprove such accusations. In no way was the debt associated with trademarks that Pet Life received as part of the Gaines' purchase related to SPCP's later purchase of certain trademarks from Pet Life through the Transfer Agreement. Moreover, no agreement imposed any restriction on Pet Life's ability to sell trademarks or any of its assets. In any event, Plaintiff's accusations are not relevant to its motion. If anything, they raise issues regarding Pet Life's revenue and actions that Pet Life took -- issues that belong to the Trustee in the Pet Life Bankruptcy Case.

recover, as a matter of law, under quasi-contract principles and/or for unjust enrichment. *See*

*id.*[11] For these reasons, Plaintiff's Motion should be denied with respect to Count II (and Count

III) and summary judgment entered in favor of SPCP.

> **3.     No Joint and Several Obligation Exists between Dad's and SPCP Upon**
> **which Dad's Can Properly Seek Contribution, Assuming *Arguendo*, that**
> **Any Contribution Claim Even Exists (Which it Does Not).**

"It is elementary that if there is no ambiguity, the construction of the written instrument is

a question of law for the Court." *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d

515, 518 (Tex. 1968) (citation omitted).  In fact, it is the rule of contract interpretation that:

> where an unambiguous writing has been entered into between the parties, the
> Courts will give effect of the intention of the parties *as expressed or as is*
> *apparent in the writing.*  In the usual case, the instrument alone will be deemed to
> express the intention of the parties for it is objective, not subjective, intent that
> controls.

*Id.*, *citing Woods v. Sims*, 273 S.W.2d 617, 620 (Tex. 1954), 3 Williston on Contracts § 610

(1936); Restatement of the Law of Contracts § 230 (1932);[12] *see also Baroid Equip., Inc. v.*

*Odeco Drilling, Inc.*, 2005 WL 2615049 (Tex. App. Oct 13, 2005) ("Under the parol evidence

---

[11] Illinois law is consistent.  "The theory of unjust enrichment is an equitable remedy based upon a contract implied in law." *Nesby v. Country Mutual Ins. Co.,* 805 N.E.2d 241, 243, (Ill. App. Ct. 2004). "Because it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law." *Id.*, (citation omitted).  Moreover, even if, as Plaintiff contends, contribution is sought based upon an equitable right, it is undisputed that there are specific contracts governing the relationships of the parties.  Accordingly, the doctrine of unjust enrichment, or other similar equitable remedies [such as contribution], should have no application.  Dismissal of these theories alleging an entitlement to equitable relief is, therefore, appropriate. *The Sharrow Group v. Zausa Dev. Corp.,* No. 04 C 6379, slip op. at (N.D. Ill. December 6, 2004); *Cooper v. Durham School Servs.*, No. 03 C 2431, slip op. at ___ (N.D. Ill. September 22, 2003).  Pennsylvania law follows. *See* SPCP's Memorandum, p. 17.

[12] Pennsylvania and Illinois law are consistent. *See Sanford Invest. v. Ahlstrom Mach. Holdings*, 198 F.3d 415, 421 (3d Cir. 1999), SPCP's Memorandum, pp. 7-8; *see also e.g.*, *Lenzi v. Hahnemann University,* 664 A.2d 1375 (Pa.Super.Ct. 1995) (parol evidence inadmissible to alter or vary contract terms which have been reduced to an integrated writing. . . neither oral testimony nor prior written agreements or other writings are admissible to explain or vary the terms of that contract); *J & B Steel Contractors v. C. Iber & Sons*, 617 N.E.2d 405, (Ill. App.3d 1993) (same).

-10-

rule, if the parties have integrated their agreement into a single written memorial, all prior negotiations and agreements with regard to the same subject matter are excluded from consideration, whether they were oral or written."), *Smith v. Smith*, 794 S.W.2d 823, 827 (Tex. App. 1990) (a written instrument presumes all prior agreements relating to the transaction have been merged into it and will be enforced as written).

Here, and as set forth in SPCP's Memorandum, only the operative written agreements need to be examined to resolve the parties' present dispute. Neither party has raised the prospect of an ambiguity. Accordingly, the extraneous "facts" that Plaintiff references in various parts of Plaintiff's Brief need not be regarded -- the plain terms of the contracts control. And, even if any extraneous "facts" were considered, they do not advance Plaintiff's arguments.

> a)   **SPCP's limited obligations to Gaines arose under the Transfer Agreement, a discrete agreement between SPCP and Pet Life to which Dad's is neither a party nor an intended beneficiary.**

Undisputedly, the original obligation between Pet Life and Dad's to make payment to Gaines is set forth in the Royalty Agreement. Pet Life and Dad's executed the Royalty Agreement on August 1, 2001. Plaintiff concedes that pursuant to Article 4.4 of the Royalty Agreement, and *without releasing either Pet Life or Plaintiff from any of their obligations or liabilities* thereunder, Pet Life or Plaintiff could assign or delegate any or all of its rights or obligations under the Royalty Agreement. *See* Complaint ¶18 and Complaint Ex. B (Ex. 2 to SPCP's Memorandum), ¶4.4.[13]

---

[13] Moreover, under the Royalty Agreement, *Plaintiff and Pet Life* jointly and severally agreed to pay to Gaines the Royalty Payments. Complaint ¶¶10, 15 and Complaint Ex. B (Ex. 2 to SPCP's Memorandum), *see* Article 3; Plaintiff's Brief, p. 2-3. While the Settlement Agreement later entered into between Plaintiff and Pet Life, *inter alia*, fixed their respective obligations under the Royalty Agreement,

SPCP thereafter agreed to assume limited obligations (*in an amount up to $270,000 only*) relative to Pet Life's payments in the Transfer Agreement – executed by Pet Life and SPCP on September 1, 2001.  However, as set forth above, the unambiguous terms of the Royalty Agreement and Plaintiff's own pleading establish that, at all times relevant, Pet Life had the joint and several obligation with Plaintiff only to make the Royalty Payments under the Royalty Agreement.  Complaint ¶18 and Complaint Ex. B (Ex. 2 to SPCP's Memorandum), ¶4.4.

Plaintiff's Brief, nevertheless, leaps to the unsupported conclusion that because SPCP merely assumed an obligation to make payments to Gaines on Pet Life's behalf (up to an amount of $270,000 only), "Sergeant's became a joint obligor with Dad's."  Plaintiff's Brief, p. 9. Plaintiff's argument defies the applicable authority, logic and the governing documents.[14]

Separate contracts, executed a month apart, between Pet Life and a non-party to any prior agreement, simply fail to create a joint obligation between SPCP and Dad's.  *See S.W. Drug Corp. v. Taylor*, 131 S.W.2d 995 (Tex. 1939); *see also* 12 Williston on Contracts, § 36:4 (promises contained in separate instruments, though in identical terms, has been held to show that promises are several); *see also* Restatement (Second) of Contracts § 289, comment c (promises made in separate documents shows an intention to undertake several duties). Moreover, courts look for express language in a contract establishing joint and several liability between two parties before finding that "joint and several" liability exists.  *See, e.g., Complete Care Svcs v. Holt*, 2005 WL 1365128 (Tex. App. June 9, 2005) (contract did not expressly or

---

it did not change Plaintiff and Pet Life's obligations to Gaines.  Complaint ¶¶23-25 and Complaint Exhibit D, *see* ¶¶1, 4.

[14] The extraneous "facts" cited by Plaintiff on page 9 (and elsewhere) of Plaintiff's Brief simply are of no moment and need not be considered.  *See* Section III.A.3., *supra*.

00659429.DOC

implicitly create joint and several liability since it clearly stated that the parties thereto were only deemed to owe a specific portion of the total amount).[15]

Here, SPCP's limited assumption of Pet Life's payments is set forth in the Transfer Agreement to which Dad's is not even a party. That agreement is entirely distinct from the original Royalty Agreement, and further, was executed a month after the Royalty Agreement. There simply is no language in the Transfer Agreement that possibly creates a "joint obligor" or "joint and several" relationship between SPCP and Plaintiff. SPCP's pure, limited "assumption" of certain payments to Gaines on Pet Life's behalf is undoubtedly insufficient to do so. Likewise, whether, *inter alia*, SPCP sent a check to Gaines or Dad's in furtherance thereof (*see* Plaintiff's Brief, p. 9) is of no moment and simply cannot give rise to a "joint" relationship between SPCP and Plaintiff. All of the foregoing culminates to establish that no relevant party intended a joint and several relationship or a joint obligation as between Dad's and SPCP.

Moreover, Dad's is neither a party to, nor a third-party beneficiary of, the Transfer Agreement. Texas law is clear that:

> The fact that a person might receive an incidental benefit from a contract to which he is not a party does not give that person a right of action to enforce the contract. . . . A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit. . . A court will not create a third-party

---

[15] Similarly, Texas law supports that, generally, the assignor remains liable for the performance of obligations which he has assumed therein, even after it is assigned. *See Jones v. Cooper Industries, Inc.*, 938 S.W.2d 118 (Tex. App. 1997), *cert denied,* 522 U.S. 1112 (1998). In *Jones*, a patent assignor brought action against a subsequent assignee seeking to recover royalties relative to intellectual property rights. The suit against the assignee, like the suit against SPCP, was predicated upon quasi-contractual and contractual theories. The court carefully examined the governing agreements and determined that the assignee had neither expressly nor impliedly assumed payment of the royalty obligations. The court observed that "implied covenants are not favored, and courts will not lightly imply additional covenants enlarging the terms of the contract." Accordingly, even if the assignee has notice of the initial royalty agreement, an implied assignment of royalty obligations will not lightly be inferred. As a result of the foregoing, the court granted the assignee's motion for summary judgment.

00659429.DOC

beneficiary contract by implication. The intention to contract or confer a direct benefit to a third party must be clearly and fully spelled out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it "clearly appears" that they intended a third party to benefit from the contract.

*MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647 (Tex. 1999) (internal citations omitted); *see also McCoy v. Illinois Intl. Port Dist.*, 778 N.E.2d 705 (Ill. App. Ct. 2002) (setting forth similar requirements to establish claims of third-party beneficiaries).

Plaintiff's Complaint contains a single allegation that Gaines and Plaintiff "were intended third-party beneficiaries of the payment obligations of [SPCP] under the Transfer Agreement." Complaint ¶56. Plaintiff's claim is groundless. Not once in any of the documents signed by SPCP is Plaintiff mentioned. SPCP had no intention to become a joint obligor and made sure the relevant documents did not reflect that. *See* SPCP's Memorandum, pp. 19, 20.[16] For these additional reasons, Plaintiff's "contribution" claim – to the extent that Plaintiff attempts to argue that it is predicated upon some "third party beneficiary" status – also must fail.

**b)** **The plain language of the Transfer Agreement between SPCP and Pet Life further evidences that any obligations SPCP once had were limited, and not "joint and several."**

In accord with fundamental principles of contract interpretation (*see* pp. 9, 10 above), Texas courts examine the applicable agreements to determine the type of obligation that the parties intended, *i.e.*, several, joint, or joint and several. *Darnall v. Lyon*, 22 S.W. 304 (Tex.

---

[16] As SPCP's Memorandum sets forth, there is no allegation that Pet Life and/or SPCP intended to confer any benefits *upon Plaintiff* when they executed the Transfer Agreement (Ex. 3 to SPCP's Memorandum), to which Plaintiff was not a party. The Transfer Agreement neither alludes to, nor identifies Plaintiff in any manner. There is no obligation contained in the agreement to any third party other than Gaines. In addition, the Transfer Agreement contains an integration clause (¶17). Accordingly, there was and can be no intent to include Plaintiff as a beneficiary as the parties fully set forth their agreement in its written form. The Transfer Agreement also contains a "confidentiality" provision in paragraph 10 which likewise defeats any claim that Pet Life intended to bestow some benefit upon Plaintiff by entering into it.

1893).[17]  A several obligation is created where the agreement indicates the express amounts of

liability for each party.  *Id.*

Apparent from the Transfer Agreement, and reiterated throughout Plaintiff's Brief, SPCP,

if anything, only agreed to assume payments due to Gaines pursuant to the Royalty Agreement

"***in an amount of up to $270,000 . . .***" (emphasis added).  (*See* Ex. 3 to SPCP's Memorandum, ¶

1.b.).  The plain language of the Transfer Agreement is clear.  By virtue of the express limitation

of SPCP's liability contained therein, SPCP only held, *at best*, a several obligation for payment –

at least until the release of such liability, which is discussed below.[18]

Moreover, Plaintiff's reliance on *Stine v. Stewart*, 80 S.W.3d 586 (Tex. 2002) (Plaintiff's

Brief, p. 13), is misplaced.  Plaintiff cites *Stine* (and no other cases) for the proposition that a

party is a "creditor beneficiary" when under a contract, the performance thereof will satisfy a

legal duty owed to him by the promisee.  Plaintiff's Brief, p. 13.  Plaintiff then argues that any

"cap" on SPCP's obligations under the Transfer Agreement should be disregarded because

"Gaines was a creditor beneficiary under the Trademark Transfer Agreement."  *Id.*  Plaintiff

further argues that as such an "intended beneficiary," "Gaines had the right to enforce the joint

---

[17] Similarly, pursuant to Illinois law, "[c]ontracts will be construed to be joint and several as the case may be, where the intent of the parties appears on the face of such obligations, and that construction will be adopted which is most consistent with the words employed to express the undertaking of the several parties."  *Filosa v. Pecora*, 309 N.E.2d 356, 360 (Ill. App. Ct. 1974), *see also Combs v. Steele*, 80 Ill. 101 (Ill. 1875).  Most notably, separate payments by each party, as set forth in the governing contractual documents, demonstrate that such a contract is several, and not joint.  Ill. Law & Practice, § 283, *citing Robertson v. March*, 4 Ill. 198 (1841).

[18] Plaintiff's Brief in fact supports SPCP's position.  Plaintiff states that at the time of the Trademark transfer between Pet Life and Sergeant's, the minimum Royalty Obligation stood at $1,050,000, of which Pet Life/Sergeant's were responsible for $630,000.  Plaintiff then argues that "[o]bviously, a cap on Sergeant's total liability is far short of the true nature of that liability."  Plaintiff's Brief, p. 12.  Plaintiff's own statement highlights the obvious -- SPCP did not assume any joint and several obligation to Gaines for 60% of the Royalty Payments.  Rather, SPCP only agreed to pay a limited amount of such payments, on Pet Life's behalf, to Gaines – *i.e.*, $270,000.

and several Royalty Obligation that Sergeant's assumed against Sergeant's. Thus, Sergeant's was a joint obligor, with Dad's, to Gaines." *Id*. Plaintiff's argument is fatally flawed and misconstrues the law and the facts of this case.

The *Stine* case involved entirely distinguishable facts. *Stine* involved a party's refusal to pay proceeds from the sale of property as required under an Agreement Incident to Divorce ("Divorce Agreement"). The plaintiff, Stine, loaned her daughter ("Daughter") and son-in-law ("Stewart") $100,000 to buy a home. The couple jointly executed a promissory note for such amount, payable on demand. The couple failed to pay $50,000 on the note when due. The couple later divorced, and entered into the Divorce Agreement. In that agreement, they agreed that Stewart could lease the house they had owned, but if he sold it, he would pay Stine the $50,000 owed to her. They further agreed that if proceeds from the sale of the house were not sufficient to pay the $50,000, then each Stewart and Daughter would equally pay the remaining balance on the note then owed to Stine. *Stine*, 80 S.W.3d at 588-89.

In light of the Divorce Agreement's clear language regarding both Stewart's and Daughter's obligations to Stine, the court found that the parties had expressly indicated an intent to secure a benefit upon Stine through the Divorce Agreement. The court also found that Stine was a third-party creditor beneficiary thereunder. *Id*. at 590-92. In so finding, the court noted, *inter alia*, that the agreement specifically referred to *Stine* as a creditor, it expressly required Stewart and Daughter to equally satisfy their existing obligation to Stine, and it spelled out that each was responsible for equal payment of obligations owed to Stine after sale of the home. *Id*.

00659429.DOC

None of the facts or factors present in *Stine* exist here.[19]  There is no contract by and between SPCP and Plaintiff, let alone any agreement like the one in *Stine*.  Further, there is no document that indicates any express agreement between SPCP and Plaintiff to jointly pay any debt to Gaines like the document at issue in *Stine*.  Moreover, SPCP had no legal obligation to Gaines under the Transfer Agreement.  Gaines is not a party to that agreement and SPCP's only obligations thereunder were to Pet Life, the other party to it.  For these separate reasons, Plaintiff's contribution claim fails.

**c)      Pet Life effectively released SPCP from any obligation SPCP held pursuant to the Transfer Agreement.**

Assuming *arguendo* that SPCP had any obligation sufficient to support Plaintiff's purported "contribution" theory, SPCP was effectively released by Pet Life from any obligations for further Royalty Payments by the Cooperation Agreement and/or Notification Agreement. "Where two or more persons have either jointly or severally undertaken to render a single performance, the legal duty or duties so created can be discharged in exactly the same ways as can any contractual duty of any one person.  They may be discharged by . . . release . . .").  Corbin on Contracts, Volume 9 (Int. Ed.), § 935.  Texas law expressly permits the release of one joint and several obligor.  *See J.M. Hollis Const. Co., Inc. v. Paul Durham Co.*, 641 S.W.2d 354 (Tex. App. 1982) (acknowledging validity of release pertaining to joint and several obligor and confirming that a release of one joint and several obligor does not release another joint and several obligor).

---

[19] In addition, as set forth above in Section III.A.3.(a) above, under no circumstances is Plaintiff or Gaines a third party beneficiary to the Transfer Agreement.

Here, the Notification Agreement provides as follows:

> [i]n consideration of the payment made pursuant to Paragraph 1 and as an offset to the amount owed by Pet Life to [SPCP], as set forth in Paragraph 3 hereof and on Exhibit A attached hereto, Pet Life acknowledges *that Sergeant's is not obligated to make any further payment to Gaines Pet Foods Corp. pursuant to the [Royalty Agreement] . . . The obligation to make such payments under the [Transfer Agreement] is offset against the current amounts due to [SPCP].*

Notification Agreement, Ex. 5 to SPCP's Memorandum, ¶ 5.

It is undisputed that the foregoing release occurred *before* Plaintiff made any alleged lump sum payment of the Royalty to Gaines.  It also must be undisputed that the foregoing operated to extinguish SPCP's future liabilities relative to the Transfer Agreement – even if they were, assuming *arguendo*, joint and several.  Because the only parties to the Transfer Agreement were Pet Life and SPCP, the release by Pet Life properly released SPCP from liability from any further Royalty Payments.

Nevertheless, Dad's now endeavors to impose upon SPCP a non-terminable contractual obligation from which it could never be released.  *See* Plaintiff's Brief, pp. 10-12.  This notion is preposterous and clearly contrary to basic black letter law.  *See* Corbin on Contracts, Volume 9 (Int. Ed.), § 67.9(1); *J.M. Hollis Const. Co.*, *supra*.

Moreover, at the time of the release, Pet Life owed SPCP $447,446.38.  Through the Notification Agreement and/or Cooperation Agreement, SPCP offset its claim against Pet Life against Pet Life's claim against it.  *See* Ex. 4 to SPCP's Memorandum, Recital C.  In addition, SPCP wired $362,112.13 to LaSalle on behalf of Pet Life and SPCP paid such amount in order to be relieved of up to $230,000 in liabilities.  *See id.*[20]  The entire amount of liability for which

---

[20] SPCP was not prepared to pay $362,112.13 to LaSalle on behalf of Pet Life unless and until SPCP was released from its obligation to make payments to Gaines on behalf of Pet Life.  The offset was designed

SPCP could ever have been held liable under the Transfer Agreement is $270,000. It is undisputed that SPCP in fact paid $84,336.84 to Gaines on Pet Life's behalf. Accordingly, SPCP paid approximately $446,000 combined (to La Salle and to Gaines) when its total liability for Royalty Payments was only ever $270,000 (before the release). Plainly, therefore, Pet Life's release of SPCP was given for sufficient consideration. Plaintiff's efforts to argue otherwise (and to argue that alleged insufficient consideration extinguishes Pet Life's release of SPCP) are without merit. For these separate reasons, judgment in favor of SPCP should be entered on Count II.

### d) SPCP and Pet Life are distinct corporate entities, with separate obligations.

"Courts will recognize the separate identities of corporations *even when one corporation dominates or controls another, or even treats the other corporation as a mere department, instrumentality, or agency of the other*. This presumption applies to a parent corporation and its separate corporate subsidiary as well, presuming, again, they are distinct legal entities." *Sitaram v. Aetna*, 152 S.W.3d 817, 825 (Tex. App. 2004) (emphasis added); *see also Daley v. American Drug Stores, Inc.* 691 N.E.2d 846, 849 (Ill. App. Ct. 1998) (employing similar principles and holding that wholly-owned subsidiaries of same corporation were separate and distinct corporate entities). The party seeking to disregard the presumed corporate separateness of entities bears the burden of establishing a relationship between or among those entities that would justify doing so. *Le Meridien Hot. v. LaSalle Hot.*, 141 S.W.3d 870 (Tex. App. 2004).

---

as additional protection for SPCP. The offset cleaned up any other possible obligation due to Pet Life by SPCP. It is worthwhile to note that Plaintiff has not objected to the offset.

Plaintiff improperly disregards the corporate separateness of SPCP and Pet Life in a vain attempt to convince this Court that both entities somehow agreed to joint and several liability under the Royalty Agreement. *See* Plaintiff's Brief, pp. 9, 11, 12. However, Plaintiff merely argues that SPCP and Pet Life were "commonly owned and controlled," (Plaintiff's Brief, pp. 9, 11, 14) and that Alan Brown was the chairman of both Pet Life and SPCP (Plaintiff's Brief, p. 14). This is insufficient under Texas law to impute identical contractual liability onto SPCP, which squarely, and solely, belongs to Pet Life. *See Sitaram*, *supra*. For this additional reason, Plaintiff's contribution claim (as well as any other possible claim Plaintiff attempts to support with this argument) must be dismissed.

**B.      Plaintiff's Brief Reaffirms that the Resolution of Dad's Fraudulent Transfer Claim Properly Rests in the Exclusive Jurisdiction of the Bankruptcy Court.**

As set forth in SPCP's Memorandum, in July 2004, the Chapter 7 Trustee in the Pet Life Bankruptcy Case brought fraudulent transfer and other claims against SPCP with respect to, *inter alia*, the transactions and agreements at issue in or related to those raised in Plaintiff's Complaint. A copy of the Trustee's Complaint is attached to SPCP's Memorandum as Exhibit 7. The Trustee Complaint seeks to have various transfers avoided for the benefit of Pet Life's estate and its creditors. *See* Ex. 7, Counts I – IV.

As further set forth in SPCP's Memorandum, pursuant to 11 U.S.C. § 544(b), it is within the power of the *trustee* in a bankruptcy proceeding to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . .." 11 U.S.C. § 544(b); *see e.g., In re INA Mfg. Corp.*, 2002 WL 1740700 (D.Minn. 2002) (the power vested in the trustee to avoid fraudulent transfers is exclusive) (*aff'd* 60 Fed.Appx. 653 (8th Cir. 2003)), *cert. denied* 540 U.S. 1011;

00659429.DOC

*Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (trustee has sole responsibility to represent

the estate and bring actions to marshal assets for the benefit of estate's creditors).[21]

### 1. Plaintiff's "fraudulent transfer" claim is an exclusive matter for the Trustee in the Pet Life Bankruptcy Case.

Plaintiff's Brief confirms that Plaintiff's "fraudulent transfer" claim in Count I

necessarily and undisputedly involves not only property that is within the Pet Life bankruptcy

estate, but also the rights of Pet Life's creditors with respect to the same. Indeed, nothing

evidences the intimate relationship between Pet Life and all of Plaintiff's claims in its Complaint

as Plaintiff's Brief itself. The express and implied statements in Plaintiff's Brief reaffirm that

Plaintiff is attempting to litigate the intent of Pet Life relative to the transactions at issue. For

example, as Plaintiff's Brief's argues:

- "Sergeant's and *Pet Life* entered into the . . . Notification and Cancellation Agreement *with the actual intent* to defraud . . .." Plaintiff's Brief, p. 14 (emphasis added);
- "*Pet Life's* . . . *intent* behind the Notification and Cancellation Agreement is clear." Plaintiff's Brief, p. 14 (emphasis added);
- "In addition to *Pet Life's* . . . fraudulent *intent* . . .." Plaintiff's Brief, p. 15 (emphasis added);
- "[F]rom the *creditor perspective* . . . this exchange did not involve reasonably equivalent value going between Sergeant's and Pet Life and resulted in *Pet life being unable to pay the debt* . . .." Plaintiff's Brief, p. 16 (emphasis added).

Such arguments validate SPCP's position that all of Plaintiff's claims come within the

ambits of 11 U.S.C. § 544 and Plaintiff lacks standing to pursue them in this Court. *See* SPCP's

Memorandum, pp. 10, 11. Plaintiff cannot dispute that the Trustee in the Pet Life Bankruptcy

---

[21] As further set forth in SPCP's Memorandum (pp. 9, 10), district courts have refused to adjudicate claims or allow fraudulent transfer claims to proceed against a non-debtor where the claims involve property of a debtor's estate and/or are properly before a bankruptcy court on behalf of a debtor's estate. *See Cedarbrook Plaza, Inc. v. Gottfried*, 1997 WL 330390 (E.D. Pa. 1997); *Constitution Bank v. DiMarco*, 155 B.R. 913 (E.D. Pa. 1993); *see also, In Re: Stein*, 314 B.R. 306 (D.N.J. 2004); *In the Matter of Eagle Enterprises, Inc.* (Bankr. E.D. Pa. 2001).

00659429.DOC

Case has already brought claims against SPCP on behalf of the estate of Pet Life seeking to, *inter alia*, avoid various transactions related to and/or at issue in Plaintiff's Complaint. The Trustee has elected to act within the broad powers afforded under 11 U.S.C. § 544 and pursue SPCP on behalf of Pet Life's estate with respect to alleged fraudulent transactions. Therefore, not only can summary judgment not be entered against SPCP, but Plaintiff's claims should be dismissed to, *inter alia*, avoid duplicative litigation, inconsistent results and to allow the Trustee to exercise the exclusive power bestowed upon it by statute on behalf of Pet Life's estate and its creditors.[22] It appears that Plaintiff is attempting to have this Court award it an exclusive benefit that Plaintiff will not be required to share with other creditors. Such a result is not permitted under the Bankruptcy Code.

### a) Count I fails to state a valid, cognizable claim for relief.

Count I of Plaintiff's Complaint fails to state a claim under the Uniform Fraudulent Transfer Act ("TUFTA") and should be dismissed. To prevail on its "fraudulent transfer" claim, Plaintiff must plead and prove the requisite elements under TUFTA (which coincide with those elements set forth on p. 8 of SPCP's Memorandum).[23] Count I of Plaintiff's Complaint alleges that "Pet Life's release of [SPCP] under the Transfer Agreement was made with actual intent to hinder, delay and defraud [Plaintiff] and Gaines *as creditors of Pet Life*." Complaint ¶45 (emphasis supplied). Alternatively, Plaintiff alleges that Pet Life's release of SPCP under the Transfer Agreement was made *without Pet Life receiving a reasonably equivalent value* in

---

[22] For all of the reasons set forth in SPCP's Memorandum, pp. 15, 16, Counts II, III and IV – just like Count I – are claims that belong in the Pet Life Bankruptcy Case, if anywhere, because they are nothing more than poorly pleaded "fraudulent transfer" claims.

[23] Illinois is consistent, *see* Illinois Uniform Fraudulent Transfer Act, Ill. Comp.Stat.Ann. 160/1, *et. seq.*

exchange for the transfer and Pet Life "was engaged in a business or transaction for which the remaining *assets of Pet Life* were unreasonably small in relation to the business or transaction or intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due." Complaint ¶46 (emphasis supplied).

Plaintiff has not properly pleaded the requisite elements under TUFTA including, among other things, that any transaction at issue should be "undone" or "avoided" because Pet Life was rendered insolvent as a result of a transfer of assets and, at the time of such transfer, *Plaintiff was owed a debt* from Pet Life which cannot now be paid *to Plaintiff* because assets were transferred away for less than market value. Rather, Plaintiff alleges that "as a direct and proximate result of the fraudulent transfers described herein, [Plaintiff], in its own right, and as the assignee of and successor to Gaines under the Royalty Agreement, has sustained damages, including the amounts paid by [Plaintiff] in excess of its proportionate share of the Royalty under the Royalty Agreement and Transfer Agreement." Complaint ¶48. Count I, *which seeks monetary damages*, improperly seeks to utilize a "fraudulent transfer" claim to recoup monies that Plaintiff voluntarily paid *after* the alleged "fraudulent transfer" occurred instead of seeking an "unwinding" or "avoidance" of the allegedly fraudulent transfer as permitted under TUFTA. Given Pet Life's bankruptcy filing, the reason for Plaintiff's pleading as such is obvious.[24] Under no circumstances can summary judgment on Count I be entered against SPCP.

---

[24] If the transaction is undone SPCP will recover the $362,112.13 payment made to a secured creditor (which payment benefited all creditors) and then will be obligated to pay approximately $230,000 to or for the Pet Life bankruptcy estate. This is a case the Trustee is not willing to bring since it is a net detriment to the bankruptcy estate.

00659429.DOC

### b) Plaintiff fails to establish the requisite elements of a fraudulent transfer claim in Count I of its Complaint.

Plaintiff is correct that there are no genuine issues of material fact with respect to the viability of Count I. However, no genuine issues of material fact exist with respect to *Plaintiff's inability* to establish any of the other requisites for proceeding with Count I.

*First*, there is no evidence that Pet Life's release of SPCP under the Transfer Agreement was done with the alleged "intent to hinder, delay or defraud." Tex. Bus. & Com. Code Ann. § 24.005. Plaintiff's Complaint concedes that, pursuant to Article 4.4 of the Royalty Agreement, *without releasing either Pet Life or Plaintiff from any of their obligations or liabilities* thereunder, Pet Life or Plaintiff could assign or delegate any or all of its rights or obligations under the Royalty Agreement. *See* Complaint ¶18 and Complaint Ex. B (Ex. 2 to SPCP's Memorandum), ¶4.4. Plaintiff's Brief does not attempt to challenge such provision. Accordingly, at all times relevant – Pet Life retained the joint and several obligation with Plaintiff to make the Royalty Payments under the Royalty Agreement. SPCP's assumption of certain payments to Gaines on Pet Life's behalf simply did not hinder, delay or defraud anybody.

*Second*, the May 23, 2002 Agreement is telling. The Agreement provides that Plaintiff has "[b]een advised by Pet Life that Pet Life will not be making any further payments of the Royalty." Ex. 6 to SPCP's Memorandum, p.1. It also provides that "[Gaines] and Shato hereby release and discharge [Plaintiff] from all further obligations of every kind and nature whatsoever otherwise arising out of the Royalty Agreement; and *[Gaines] hereby assigns to [Plaintiff] all rights of [Gaines], if any, against Pet Life arising out of the Royalty Agreement. Id.*, ¶2. The Agreement was entered into *after* the Cooperation Agreement whereby Pet Life released SPCP from making Pet Life's royalty payments to Gaines. The Agreement evidences that Plaintiff was fully aware that Pet Life did not intend to make any further payments of the Royalty.

Nevertheless, Plaintiff was not assigned any rights as against SPCP, even though Plaintiff argues that SPCP is liable for Pet Life's failure to make certain Royalty Payments. The foregoing establishes that there likewise was no intent to "hinder, delay or defraud." Accordingly, summary judgment should not be entered against SPCP but should be entered against Plaintiff and in SPCP's favor.[25] *See* SPCP's Memorandum, pp. 10-14.

*Third*, Plaintiff's Complaint requests relief of money damages related to its alleged overpayment of the Royalty. Such relief is not a proper remedy for a "fraudulent transfer" claim. *See* Tex. Bus. & Com. Code Ann. § 24.008. Apparently, Plaintiff has conceded this point of law, electing now, for the first time, to "avoid" the allegedly fraudulent transaction at issue. Plaintiff's Brief, pp. 16, 17; *see also* Illinois' Uniform Fraudulent Transfer Act, Ill. Comp. Stat. Ann. 160/8.[26] Regardless, avoiding the transfer and granting the relief requested herein would undoubtedly involve and affect Pet Life's creditors and property of the Pet Life bankruptcy

---

[25] Count I also must fail because, as set forth above, there is no genuine issue of material fact that Pet Life received value for the release of SPCP from obligations regarding the Royalty Payments. Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied. Tex. Bus. & Com. Code Ann. § 24.004 (a), *see also* Illinois' Uniform Fraudulent Transfer Act, Ill. Comp. Stat. Ann. 160/4. Equivalent value is also given if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or the execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust or security agreement. Tex. Bus. & Com. Code Ann. § 24.004 (b), *see also* Illinois' Uniform Fraudulent Transfer Act, Ill. Comp. Stat. Ann. 160/4. A transfer is not fraudulent if the transfer results from enforcement of a security interest, subject to certain exceptions and limitations. *See* Tex. Bus. & Com. Code Ann. § 24.008 (a), Illinois' Uniform Fraudulent Transfer Act, Ill. Comp. Stat. Ann. 160/4. Here, under the plain definitions of value above, Pet Life received fair value in exchange for SPCP's release. Moreover, the transfer of the assets was pursuant to LaSalle's exercising its rights pursuant to 9-610 of the UCC and sufficient consideration is deemed to exist. *See* Cooperation Agreement, Ex. 4 to SPCP's Memorandum, ¶B.

[26] Since this relief was neither pled, nor sought until now, such a dilatory attempt to correct Plaintiff's pleadings is improper and impermissible under the Federal Rules and must be disregarded. *See* Fed. R. Civ. P. 15; *see also, e.g., Jones v. Blockbuster, Inc.*, 2002 WL 32130102 (E.D. Pa. Jan. 9, 2003). SPCP objects to the interjection of such relief which is absent from Plaintiff's Complaint at this late juncture.

00659429.DOC

estate. Count I, therefore, implicates 11 U.S.C. § 544 and the exclusive powers of the Trustee in the Pet Life Bankruptcy Case, and Plaintiff lacks standing to pursue it.[27] For these additional reasons, SPCP is entitled to judgment on Count I and Plaintiff's Motion should be denied.

## C.        Plaintiff is Not Entitled to Summary Judgment on SPCP's Counterclaim.

SPCP's Counterclaim alleges that immediately after the purchase of the Gaines' assets, Plaintiff and Pet Life formed a partnership known as Maple Leaf Pet Care, LLC ("Maple Leaf"), to handle customers who wanted to purchase goods from both Plaintiff and Pet Life and to hold certain trademarks which were shared by Plaintiff and Pet Life. Pursuant to the Maple Leaf partnership arrangement, Plaintiff owed certain fiduciary duties to its partner, Pet Life. SPCP alleges that Plaintiff breached its fiduciary duties by improperly taking Maple Leaf partnership assets; using information obtained as a partner to the detriment of Pet Life; improperly competing with Pet Life for Pet Life's customers; improperly soliciting Pet Life's customers; and improperly forcing the dissolution of the partnership. In effect, Plaintiff used partnership information to build a pet treat business which competed with Pet Life and Pet Life's successor in the pet treat business, SPCP, causing SPCP to lose customers and business. SPCP's Answer, Affirmative Defenses and Counterclaim, ¶¶ 68-76.

Plaintiff now moves for summary judgment on SPCP's Counterclaim, improperly arguing that SPCP has been "unable to support the material elements of its Counterclaim with record evidence sufficient to establish a triable issue of fact." Plaintiff's Brief, p. 17. However, the law is clear that Plaintiff must identify portions of the record that demonstrate the absence of

---

[27] Because Plaintiff's claim in Count I – as pleaded – fails, as a matter of law, for multiple reasons and/or more properly belongs, if anywhere, in the Pet Life Bankruptcy Case, Plaintiff's jumbled description of various, extraneous events and testimony on pages 14-16 need not be considered.

00659429.DOC

a genuine issue of material fact to entitle it to summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 327 (U.S. 1986); *see also Josey v. John R. Hollingsworth, Corp.*, 996 F.2d 632, 637 (3d Cir. 1993); *Richardson Freeman v. Norristown Areas School Dist., et al.*, 2001 Dist. LEXIS 2467, *5 (E.D. Pa. 2001). Nevertheless, Plaintiff fails to support its conclusory argument by identifying portions of the record (or otherwise), which would support a grant of summary judgment in its favor on SPCP's Counterclaim. Indeed, Plaintiff seemingly confuses its burden as the moving party with that of SPCP. Plaintiff's improper attempt to shift the burden to SPCP should be rejected and summary judgment should not and cannot be entered against SPCP on SPCP's Counterclaim.

In addition, credible evidence of record supports SPCP's Counterclaim. For example, it is undisputed that prior to the dissolution of Maple Leaf, Plaintiff did not manufacture soft treats/pet treats. *See* G. Thomas Lang Deposition Transcript, p. 57, Exhibit D to Plaintiff's Motion. Rather, it was only after the dissolution that Plaintiff began manufacturing such product. *Id.* In addition, Alan Brown, SPCP's chairman, testified that instead of winding down Maple Leaf, Pet Life would have liked to amend the Maple Leaf partnership agreement so that a more "unified" company could have existed. However, Pet Life had the sense that Dad's wanted to compete in the treat business and, therefore, wanted to dissolve Maple Leaf. As Mr. Brown testified:

> A.    [Dad's] told us about the injected molded treats. They were trying to buy a business that was in this. But we felt like they were really wanting to get the treat business, and the agreements that were with Mapleleaf would not allow them to do that.
>
> . . .
>
> A.    We know that they had salesmen go to Pet Life customers and start, I would say, preselling, advertise the fact that they were going to be in the treat business . . . [t]hey didn't wait until December 31st, '02 to start telling Pet Life customers that they were going to be selling treats directly in the future.

> Q.     Okay.  Do you know if prior to December 31, '02 they ever manufactured, distributed or otherwise provided treats to any customers?
>
> A.     Pet Life salespeople told me that they did, but I have no proof of that.
>
> Q.     Okay.  Do you know which customers?
>
> A.     Some of the larger, what we call, pet store customers.  Like a PetSmart, Petco, a mass merchandise like Wal-Mart.  It wasn't just one, it was several.  And here again, this is our salespeople telling management and then they had several examples.  So I would – you had to feel like there's some reason to believe it.  It just wasn't one time that I heard this complaint.

Alan Brown Deposition Transcript, pp. 29-31, attached hereto as **Exhibit 1**.

Mr. Brown further testified that he remembered salespeople saying that it was hard to keep bids with customers because Dad's was "in their whispering" in the customers' ears, talking about what Dad's was going to be doing in '03 – *i.e.*, compete with SPCP in the treat business. Mr. Brown testified that several salespeople that handled different stores were reporting this back to him.  Indeed, Mr. Brown expressly testified that he kept hearing that Dad's was ready to bring out products that would compete with Pet Life as soon as the Settlement Agreement (dissolving Maple Leaf) was concluded.  Brown Deposition, pp. 32, 33, **Exhibit 1**.  He also testified that Pet Life felt like Dad's was taking advantage of Pet Life through the Maple Leaf arrangement and through Dad's "ability to hold the checkbook, so to speak."  Brown Deposition, pp. 42-43, **Exhibit 1**.

It is apparent that Plaintiff forced the dissolution of the partnership so that it could steal Pet Life's customers.  The solicitations of these customers breached Plaintiff's duties to Pet Life as its general partner.  The foregoing facts and evidence of record, among other facts and evidence of record and that will be submitted at time of trial, are unquestionably sufficient to raise genuine issues of material fact with respect to SPCP's Counterclaim.  Plainly, they rise

above the mere "scintilla of evidence" necessary to defeat Plaintiff's Motion on SPCP's

Counterclaim.  For these reasons, Plaintiff's request for summary judgment on SPCP's

Counterclaim must be denied.

## IV.  CONCLUSION

For all of the reasons set forth herein, this Court should deny Plaintiff's Motion for

Summary Judgment and grant Defendant's Motion for Summary Judgment.


Dated:  October 25, 2005                    Respectfully submitted,



                                            By:  /s/ David White, Esquire
                                                 David E. White
                                                 THORP REED & ARMSTRONG, LLP
                                                 Pa. I.D. No. 59659
                                                 One Oxford Centre
                                                 301 Grant Street, 14th Floor
                                                 Pittsburgh, PA 15219
                                                 (412) 394-2343

                                                 Attorneys for Defendant,
                                                 Sergeant's Pet Care Products, Inc.

OF COUNSEL

Sally C. Helppie
Texas Bar No. 09403800
Gregory P. Supan
Texas Bar No. 24005892
BELL NUNNALLY & MARTIN LLP
1400 One McKinney Avenue
232 McKinney Avenue
Suite 1400
Dallas, Texas 75204
(214) 740-1400

00659429.DOC