1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DAD'S PRODUCTS COMPANY,          )
INC.,                            )
            Plaintiff,           )
                                 )  CIVIL ACTION
VS.                              )
                                 )  NO.: 03-350-ERIE
SERGEANT'S PET PRODUCTS,         )
INC.,                            )
                                 )
            Defendant.           )

------------------------------------

ORAL DEPOSITION OF

ALAN BROWN

August 16, 2005

Volume 1

------------------------------------

    ORAL DEPOSITION OF ALAN BROWN, produced as
a witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on the 16th of August, 2005, from 10:12 a.m. to 11:31
a.m., before Michelle L. Varner, CSR in and for the
State of Texas, reported by machine shorthand, at the
offices of Sergeant's Pet Products, 1601 Elm Street,
Suite 300, in the City of Dallas, County of Dallas, and
State of Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

FULLER & ASSOCIATES, INC.   214.744.1250   214.744.1252 (fax)

EXHIBIT

1

29

1    on my part.  They didn't feel that Pet Life was doing

2    what they should have done under the various

3    agreements with Dad's.  And they just -- the whole

4    attitude of the Dad's management was changing.

5        Q.    The attitude with respect to Mapleleaf?

6        A.    With respect to Mapleleaf, yes.

7        Q.    Okay.  Did Pet Life want to wind down

8    Mapleleaf?

9        A.    Well, we would have liked to have had some

10   amendments.  We felt like we were paying the

11   distributor, White Cap, too much money for what they

12   were doing.  They were not keeping their customers.

13   They were losing customers, sales weren't growing.  So

14   if we could have had some amendments and made it a

15   little more -- a unified company, where it wasn't

16   everybody pointing fingers at who did what, who didn't

17   do what, Pet Life would have liked to have stayed in

18   some of the agreements.  We also got the sense that

19   Dad's was wanting to compete in the treat business.

20       Q.    Okay.

21       A.    They had told us about the injected molded

22   treats.  They were trying to buy a business that was

23   in this.  But we felt like they were really wanting to

24   get the treat business, and the agreements that were

25   with Mapleleaf would not allow them to do that.

FULLER & ASSOCIATES, INC.    214.744.1250    214.744.1252 (fax)

30

1     Q.    Okay.  Was it your understanding that

2  pursuant to the restrictive covenant, then, that would

3  have precluded Dad's from getting into the treat

4  business?

5     A.    Yes.

6     Q.    Okay.  Do you believe that Dad's at any time

7  breached its obligations under their restrictive

8  covenant?

9     A.    They walked a very tight line.

10     Q.    Why do you say that?

11     A.    We know that they had salesmen go to Pet

12  Life customers and start, I would say, preselling,

13  advertise the fact that they were going to be in the

14  treat business.  I cannot prove that they ever

15  manufactured anything outside of the agreement and

16  sold it.  But they didn't wait until December 31st,

17  '02 to start telling Pet Life customers that they were

18  going to be selling treats directly in the future.

19     Q.    Okay.  Do you know if prior to December 31,

20  '02 they ever manufactured, distributed or otherwise

21  provided treats to any customers?

22     A.    Pet Life salespeople told me that they did,

23  but I have no proof of that.

24     Q.    Okay.  Do you know which customers?

25     A.    Some of the larger, what we call, pet store

31

1    customers.  Like a PetSmart, Petco, a mass

2    merchandiser like Wal-Mart.  It wasn't just one, it

3    was several.  And here again, this is our salespeople

4    telling management and then they had several examples.

5    So I would -- you had to feel like there's some reason

6    to believe it.  It wasn't just one time that I heard

7    this complaint.

8         Q.    Okay.  When you say "several examples," do

9    you mean -- by that, do you mean, several examples in

10   some of the stores that you've indicated?  Are those

11   the examples?

12        A.    Yes.  It wouldn't be stores, it would be the

13   purchasing manager in corporate headquarters for these

14   accounts.

15        Q.    Okay.  You indicated Petco, PetSmart?

16        A.    I was using those as examples.

17        Q.    Okay.

18        A.    It was larger companies where a significant

19   impact could be made if they got the accounts -- got

20   the business.

21        Q.    Okay.  During that -- during the period of

22   time referenced under the restrictive portion of the

23   settlement agreement, did Pet Life lose any of those

24   types of larger companies that had previously been

25   clients?

32

1        A.    I don't remember losing any.  I just

2    remember the salespeople saying how it was hard to

3    keep the bids with Dad's in there whispering in their

4    ear, talking about what they are going to be doing in

5    early '03.  If they had suppliers that had trouble

6    delivering those product, don't worry, we'll be right

7    around the corner.

8        Q.    Okay.

9        A.    I never had direct conversations with a

10   store.  But several salespeople that handled different

11   stores were reporting this back to me.

12       Q.    Okay.  Do you remember the names of any of

13   those salespeople?

14       A.    David Sparks who handled PetSmart.

15       Q.    Okay.  Can you spell that for me?

16       A.    P-e-t-s-m-a-r-t.

17       Q.    Okay.  I wasn't sure if it was mart or mark.

18       A.    Yes.

19       Q.    Okay.  Them, I've heard of.  David Sparks,

20   anyone else that you can think of?

21       A.    I think Grant Atkins.

22       Q.    Was Grant Atkins related to any -- or did he

23   go to any specific customer?

24       A.    I can't think of the particular customer.

25   He was involved in product management, product

33

1    development.

2         Q.    Okay.

3         A.    And we keep hearing that Dad's was ready to

4    bring out products that would compete with Pet Life as

5    soon as the Supply Agreement -- excuse me -- as soon

6    as the Settlement Agreement was over.

7         Q.    Okay.  Were you aware if Dad's supplied pet

8    food to any of the larger companies that you had

9    discussed that you thought they were, as you said,

10   preselling treats to?

11        A.    Dad's had a lot of the accounts.  Dad's was

12   a very large, well-known, private brand supplier.

13   They specialized in this variety mix, this kibble-type

14   product.  They were very competitive in that product.

15   I can't tell you for a fact which account they sold

16   to.  They just had a large market share, not just in

17   the northeast, but really to other accounts across the

18   country.

19        Q.    Okay.  At any time, either shortly before

20   the Settlement Agreement or after, did Pet Life have

21   any plans of entering into the food market?

22        A.    None.  Didn't have the equipment, didn't

23   have the management, know how.  It was never our

24   intent.

25        Q.    Okay.  The Settlement Agreement, which is

FULLER & ASSOCIATES, INC.    214.744.1250    214.744.1252 (fax)

42

1    Life ever let Dad's know that it was a possibility

2    that the trademarks would be transferred to another

3    entity and be sold?

4         A.    I don't know that we ever told Dad's.

5         Q.    Okay.  During the wind down of Mapleleaf, do

6    you know that in the -- well, let me ask the back up

7    question.  Were there discussions between Pet Life and

8    Dad's during the wind down of Mapleleaf, specifically,

9    with respect to determining where the Mapleleaf

10   customers were going to go?

11        A.    Yeah.  That -- those type of discussions

12   started before August and were really initiated

13   outside of the realm of, is Pet Life going to sell

14   assets.  Pet Life became pretty discouraged with the

15   Mapleleaf arrangement not long after it started,

16   because we admitted we didn't have the personnel and

17   accounting and so forth to handle the Mapleleaf

18   operation, didn't have the warehouse.  Dad's said, Oh,

19   we have all of it.  We'll volunteer.  We just heard

20   how they were trying to help us -- help Pet Life.  We

21   soon found out that who has the cash is king.  All of

22   the money would go up there and we couldn't get our

23   money for Pet Life, we couldn't get bills paid, they

24   were offsetting credits quote/unquote screw ups of Pet

25   Life.  We have didn't like the arrangement, after a

43

1  short period of time, because we felt like Dad's was

2  taking advantage of Pet Life through the Mapleleaf

3  arrangement and through their ability to hold the

4  checkbook, so to speak.

5      Q.    Okay.

6      A.    So we had already started talking to them

7  about, Gee, this isn't fair.  We can't get any

8  response.  You know, Where's all of this help you said

9  you had?

10              So those discussions had already

11  started and were overriding a lot of other issues with

12  Dad's and Pet Life.  You had the salespeople saying,

13  you know, White Cap wasn't doing their job, we ought

14  to take them over.  Just a lot of issues.  When

15  something is not going right, you know, the finger

16  starts being pointed and then all of a sudden a

17  different finger gets pointed and things fall apart.

18      Q.    Okay.  I believe you had indicated, though,

19  that at -- around the time of the Settlement

20  Agreement, the August 1st Settlement Agreement, that

21  Pet Life -- had it been Pet Life's sole decision,

22  would have wanted to proceed and continued proceeding

23  with Mapleleaf with some changes; is that right?

24      A.    With changes in amendments, yes.

25      Q.    Okay.  All right.  With respect to the